Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel For Lead Plaintiffs*
*Ali Alavi and the A Legacy Foundation*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Genius Brands International, Inc. Securities Litigation | Case No. CV 20-7457 DSF (RAO) |
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | **DEMAND FOR JURY TRIAL** |
| | Judge:  Hon. Dale S. Fischer<br>Location: Courtroom 7D |
| | Trial Date: None Set<br>Date Action Filed: August 18, 2020 |

# **TABLE OF CONTENTS**

NATURE OF THE ACTION AND OVERVIEW ..................................................... 1

JURISDICTION AND VENUE ............................................................................... 4

PARTIES .................................................................................................................. 5

SUBSTANTIVE ALLEGATIONS .......................................................................... 7

    Background ........................................................................................................... 7

    The Truth Began to be Revealed ...................................................................... 11

    Materially False and Misleading ..................................................................... 13

    Statements Issued During the Class Period ..................................................... 13

    Disclosures Following the Class Period .......................................................... 23

CLASS ACTION ALLEGATIONS ....................................................................... 25

UNDISCLOSED ADVERSE FACTS .................................................................... 26

LOSS CAUSATION .............................................................................................. 27

APPLICABILITY OF PRESUMPTION OF RELIANCE .................................... 29

(FRAUD-ON-THE-MARKET DOCTRINE) ........................................................ 29

NO SAFE HARBOR ............................................................................................. 31

FIRST CLAIM ....................................................................................................... 31

SECOND CLAIM .................................................................................................. 34

PRAYER FOR RELIEF ........................................................................................ 35

JURY TRIAL DEMANDED ................................................................................. 35

1        Lead Plaintiffs Ali Alavi and A Legacy Foundation ("Plaintiffs"),
2  individually and on behalf of all others similarly situated, by and through their
3  attorneys, allege the following upon information and belief, except as to those
4  allegations concerning Plaintiffs, which are alleged upon personal knowledge.
5  Plaintiffs' information and belief is based upon, among other things, their counsel's
6  investigation, which includes, without limitation: (a) the review and analysis of
7  regulatory filings made by Genius Brands International, Inc. ("Genius" or the
8  "Company") with the United States Securities and Exchange Commission ("SEC");
9  (b) the review and analysis of press releases and media reports issued and
10  disseminated by Genius; (c) interviews of former employees of the Company; and
11  (d) the review of other publicly available information concerning Genius.

## NATURE OF THE ACTION AND OVERVIEW

13    1.    This is a securities fraud class action brought pursuant to the Securities
14  Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated
15  thereunder. This action is brought on behalf of all persons and entities other than
16  Defendants (defined below) who purchased or otherwise acquired Genius securities
17  from March 11, 2020 through July 5, 2020, inclusive (the "Class Period"), and who
18  were damaged thereby.

19    2.    Genius is a media company focused on cartoons for children. Some of
20  the Company's more well-known shows include Rainbow Rangers, Llama Llama,
21  and Stan Lee's SuperHero Kindergarten. Genius securities trade on the NASDAQ
22  stock exchange under the ticker symbol "GNUS."

23    3.    Defendants heavily marketed Genius stock to retail investors through
24  several misleading tactics to entice investment. For example, Genius repeatedly
25  compared itself to Netflix, calling itself the "Netflix for Kids, but free." Netflix is,
26  of course, is one of the most successful growth stocks of the last decade, growing
27  from under $10 per share in 2010 to over $530 per share today. Likening Genius to
28  Netflix created an unwarranted "fear of missing out" feeling among investors.

Genius also touted its purported association with celebrities like Arnold Schwarzenegger and Stan Lee to create interest in the Company.

4.     As a final tactic aimed at retail investors, but unbeknownst to any Genius investor, Genius engaged a third-party stock promotion company called PennyStocks.com ("PennyStocks") to begin issuing favorable reports about the Company.

5.     PennyStocks warns on its website that if one of its campaigns has the effect of boosting an issuer's stock price, "***then subsequent investors will pay inflated prices for any securities of the Profiled Issuers*** that they purchase." PennyStocks clarifies that "[t]his will likely result in the Profiled Issuers having trading losses." Genius, however, made no similar disclosure.

6.     Throughout the Class Period, Defendants made false and/or misleading statements and omissions regarding: (1) the Company's undisclosed use of a third-party stock promoter intended to drive up the price of the shares; (2) Nickelodeon's purported broadcast expansion of Genius's Rainbow Rangers cartoon; (3) subscription fees for the Kartoon Channel!; and (4) the Company's growth potential and overall prospects, including its purported resilience to the economic impact from COVID-19.  While the share price of Genius stock was artificially inflated due to these misstatements, Genius registered for sale tens of millions of shares in direct offerings, allowing certain longtime investors to profit at the expense of Plaintiffs and the Class.

7.     On June 5, 2020, Hindenburg Research published a report entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" (the "Hindenburg Research Report").  This report questioned the valuation of Genius and revealed the truth regarding Defendants' representations. Specifically, the Hindenburg Research Report showed that Rainbow Rangers was airing nine times per week rather than the 26-airings that Defendants represented. Additionally, the Hindenburg Research Report demonstrated that the shows were

not airing in favorable time slots.  Instead, the shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

8.     In addition to the Hindenburg Report, on June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations.  In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock.  The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks's campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

9.     Defendants also misrepresented Genius's multimedia properties and the Kartoon Channel!  When Genius announced the slate of content, investors began to realize that the Kartoon Channel! was not going to be the new "Netflix for Kids," but rather was just another app in a crowded space.  Indeed, on June 16, 2020, Genius stock declined by approximately 14% when the Company announced the programming lineup for the app and investors digested the information from the *Seeking Alpha* report.

10.     While the price of Genius shares was still artificially inflated, moreover, Genius once again filed securities registration documentation with the SEC.  Specifically, on June 11, 2020 – just prior to the official launch of the Kartoon Channel! – Genius registered 60 million shares for sale by a group of "selling shareholders."  These selling shareholders were the same long-standing investors who purchased shares in the direct offerings described above and were able to "cash out" their investment in the Company's securities at inflated prices. The share price listed in the prospectus was $4.51 per share.

11.     On July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020.  This vague announcement significantly boosted the Company's stock price, as the price rose from $2.31 on July 1, 2020 to $3.55 on July 2, 2020.

12.     Defendants' announcement on July 6, 2020, however, was another exaggerated press release whereby Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time at Marvel Entertainment.  Indeed, Defendant Andy Heyward, Genius's founder, stated that "[t]he potential value in this single asset, is greater than any IP anywhere in Hollywood."

13.     Investors then began to digest the truth related to Defendants' misrepresentations.  Following the July 6, 2020 press release, the price of Genius stock dropped significantly from a close of $3.55 on the previous trading day to a closing price of $2.66.

14.     Moreover, following the launch of the Kartoon Channel! app and Defendants' misrepresentations, the price of Genius shares has plummeted.  Indeed, the Company has lost nearly 80% of its value.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.  In addition, the Company's principal executive offices are located in this District.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## **PARTIES**

20.    As set forth in the previously filed certifications (Dkt. No. 35-2), which are incorporated herein by reference, Lead Plaintiffs Ali Alavi and A Legacy Foundation purchased Genius shares at artificially inflated prices during the Class Period and were damaged thereby.

21.    Defendant Genius is a multimedia company based in Beverly Hills, California.  The Company's common stock is traded on NASDAQ under the ticker symbol "GNUS."

22.    Defendant Andy Heyward ("Heyward") is the founder and was the Chief Executive Officer ("CEO") of Genius at all relevant times.

23.    Defendant Robert Denton ("Denton") served as Chief Financial Officer ("CFO") of Genius at all relevant times.

24.    Defendants Heyward and Denton are collectively referred to herein as the "Individual Defendants."

25.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of

directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26. The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

27. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

28. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common

stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS
### Background

30.   Genius is a multimedia company that licenses entertainment content for children.

31.   Genius's shares trade on the NASDAQ and are thus subject to the listing requirements thereon. In 2019, Genius's stock struggled to maintain its status as a NASDAQ listed security because NASDAQ listing rules require an issuer's securities to maintain a minimum bid price of $1.00 per share and in July 2019, Genius's shares fell below that level.

32.   The Company's shares remained below $1.00 from July 23, 2019 through the end of the year. Accordingly, on September 4, 2019, Genius received a notification letter from the NASDAQ informing the Company that it had 180 calendar days, or until March 2, 2020, to regain compliance.

33.   The September 4, 2019 NASDAQ letter further stated that for Genius to regain such compliance, its shares must sustain a minimum bid price of $1.00 per share for 10 consecutive days.

34.   Around this time and unbeknownst to shareholders, Genius began to work with a third-party stock promoter, PennyStocks, to begin issuing favorable reports about the Company.  According to its website, PennyStocks only publishes favorable information because it is "compensated to only publish favorable information."  It also states that not all information is sent to investors at the same time, and that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, ***then subsequent investors will pay inflated prices for any securities of the Profiled Issuers*** that they purchase."  The website also explained that "[t]his will likely result in the Profiled Issuers having trading losses."[1]

35.   In addition to publishing only favorable reports about a company as PennyStocks concedes, apparently PennyStocks will even publish content provided to it ***directly by the issuer***, without ever attributing it as coming from the issuer.

36.   For instance, Confidential Witness 1 ("CW1") was employed as an Associate Manager with Genius between February 2019 through November 2019.  CW1 reported to SVP of Global Consumer Products, Llyod Mintz, and later to VP of Franchise Marketing & Communications, Jamie Sikorski.  According to CW1, while employed at Genius, CW1 was directed by EVP of Business Development & General Manager of Kartoon Channel!, Jon Ollwerther, to proofread an article about Genius that would subsequently appear on PennyStocks.  Ollwerther told CW1 that it was important to boost the stock price of Genius to keep it registered on the NASDAQ.  Ollwerther, moreover, reported directly to Heyward, and CW1 stated that all major decisions went to Heyward for final approval.

---

[1]      Available here: https://pennystocks.com/disclaimer/

37.     While trading in Genius shares began to increase during the second half of 2019, its trading volume did not parabolically explode until the following year. For example, the average daily volume of Genius shares during the first half of 2019 was just 46,414 shares.[2] By contrast, the average daily volume increased to 252, 900 shares during the second half of 2019, but were still well below the following year, when in 2020 average daily volume rocketed to 27.6 million shares, representing over an 18-fold (or 18,135%) increase compared to the full year 2019.

38.     Average daily volume during the Class Period was even higher -- around 40.4 million shares on average.

39.     As for the NASDAQ listing requirements, at no point between July 23, 2019 and the end of that year did Genius shares ever trade above $1.00 per share for even a day, let alone the 10 days required by applicable listing rules. Even so, on March 5, 2020, Genius disclosed in a Form 8-K filed with the SEC hat it received notification from the NASDAQ two days earlier wherein the Company had been granted a 180-day extension to regain compliance. That extension gave Genius until August 31, 2020 to regain compliance.

40.     Six days after receiving that extension, beginning on March 11, 2020, Genius conducted several direct offerings of shares to certain "long standing investors," whereby millions of shares were sold at prices below the publicly traded market price.   For example, the Company sold convertible notes that included warrants for up to 65.6 million shares of the Company's securities.   The warrants came with an exercise price of just $0.26 per Genius share.   Defendant Heyward participated in this deal, investing $1,000,000 of his own money.

---

[2]     The first half is measured as all trading days between January 2, 2019 and June 28, 2019.   The second half comprises all trading days between July 1, 2019 through December 31, 2019.

41.     The same day, Genius filed a Form 8-K related to the Company's entry into a Material Definitive Agreement, wherein Defendant Heyward, among others, purchased Senior Secured Convertible Notes.  That transaction included a Securities Purchase Agreement, which stated that the Company had not directly or indirectly manipulated the shares of the Company, nor paid any person compensation for the solicitation of purchases of the Company's shares.

42.     Eight days after the Securities Purchase Agreement was filed, Bernard Cahill, a California attorney and member of the Company's Board of Directors resigned "due to personal reasons" on March 19, 2020.  Mr. Cahill was also a member of the Company's audit committee.

43.     Then, five days later, on March 24, 2020, the Company sold four million shares in a direct offering for proceeds of approximately $1 million.  The Company sold the shares to long-standing investors at $0.25 per share although the then-current market price was $0.31 per share.

44.     On May 7, 2020, Genius conducted a direct offering of eight million shares for proceeds approximating $2.8 million.  The Company also sold the shares to long-standing investors at $0.35 per share even though the then-current market price was $0.48.

45.     On May 11, 2020, Genius conducted another direct offering of 12 million shares for total proceeds of $5.4 million.  Similarly, the Company sold the shares to long-time investors for $0.45 per share even though the shares traded for $0.83 cents.

46.     On May 19, 2020, Genius sold 7.5 million shares to long-time shareholders at $1.20 per share, even though the then-current market price was $1.50 per share.

47.     Ahead of, and alongside these offerings, Genius conducted a nonstop campaign to boost the price of the Company's shares.  Defendants' public statements in this regard touted the Company's intellectual properties and the launch

of its new "free" educational multimedia platform, the "Kartoon Channel!" app. Defendants' statements highlighted connections to celebrities like Arnold Schwarzenegger, Warren Buffet, and Stan Lee. These statements also favorably compared Genius to household media names like Netflix, Disney, and Marvel.

48.     The volume of press releases issued by Genius after the equity offerings and compliance extension from NASDAQ in March increased markedly from the prior year. For instance, in the nine months after the March 9, 2020 offering (in which Heyward participated), Genius issued 59 press releases, or 55% more than it issued during all 2019.[3]

49.     As Defendants' fraudulent conduct began to have its desired effect, the Company's shares rose, reflecting the accompanying artificial inflation. The Company thus learned on May 28, 2020 that it had regained its compliance with NASDAQ's listing requirements.

50.     The following day, on May 29, 2020, Genius sold another 20 million shares in a direct offering to long-time shareholders.

51.     On June 11, 2020 – just prior to the official launch of the Kartoon Channel! – Genius registered 60 million shares for sale by a group of "selling shareholders." These selling shareholders were the same long-standing investors who purchased shares in the direct offerings described above who were now able to "cash out" their investment in Genius at inflated prices. The share price listed in the prospectus was $4.51 per share.

### The Truth Began to be Revealed

52.     On June 4, 2020, Citron Research ("Citron") questioned the valuation of the Company. Specifically, among other things, Citron posted several critical comments on social media, including a posting that read "$GNUS to $1...fast  The

---

[3]     To be clear, this figure does not include any press releases issued by PennyStocks.

lowest form of retail investor. Consider: LTM $GNUS rev $5 mil mkt cap $800 mil compare to leader WildBrain (teletubbies) LTM revenue of $332 million mkt cap $175 mil Not to mention massive dilution at $GNUS. Stock Promotion."

53.     Additionally, on June 5, 2020, Hindenburg published the Hindenburg Research Report. This report also questioned the valuation of Genius and examined Defendants' misrepresentations.

54.     With respect to Genius' Rainbow Rangers intellectual property, the Hindenburg Research Report showed that Rainbow Rangers was actually airing nine times per week, rather than the 26-airings figure noted in Genius' press release. Moreover, the episodes were not airing in favorable time slots and were, instead, being broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

55.     Upon the release of the Hindenburg Research Report, the price of Genius common stock fell $0.92, or over 13% on heavy volume, to close at $5.94 per share on June 5, 2020, damaging investors.

56.     In addition to the Hindenburg Report, on June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations. In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock. The report went on to analyze various press releases issued by PennyStocks, concluding that once PennyStocks's campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

57.     Additionally, when Genius announced the slate of content for the Kartoon Channel!, investors began to realize that the Kartoon Channel! was not going to be the new "Netflix for Kids," but rather just another app in a crowded space. Indeed, on June 16, 2020, Genius stock declined by approximately 14% to close at $3.85 per share on heavy volume as the Company announced the

programming lineup for the app and the market digested the news from the prior evening's *Seeking Alpha* report.

58.     On July 6, 2020, Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time at Marvel Entertainment.   Defendant Heyward represented that "[t]he potential value in this single asset, is greater than any IP anywhere in Hollywood." With these statements, investors began to digest the truth related to Defendants' misrepresentations.   Following the July 6, 2020 press release, the price of Genius' stock dropped significantly and on heavy volume from a close of $3.55 on the previous trading day to a closing price of $2.66 per share on July 6, 2020.

## Materially False and Misleading
## Statements Issued During the Class Period

59.     On March 11, 2020, Genius filed a Form 8-K with the SEC related to the Company's entry into a Material Definitive Agreement, wherein Defendant Heyward, among others, purchased Senior Secured Convertible Notes. The Senior Secured Convertible Notes contained warrants convertible into the Company's common stock, at a price of $0.26 per share.  Attached to the March 11, 2020 Form 8-K was Exhibit 10.1, the Securities Purchase Agreement between the Company and the Purchasers of the Convertible Notes, including Defendant Heyward.   The Securities Purchase Agreement stated the following:

> (gg)     Regulation M Compliance.  The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, ***or, paid any compensation for soliciting purchases of, any of the Shares,*** or (iii) paid or agreed to pay to ***any Person any compensation for soliciting another to purchase any other securities of the Company***, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Shares.

---

60. The statements referenced in ¶59 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because, at the time the statement was made, the Company had engaged the services of stock promotion site, PennyStocks, to publish and disseminate favorable information about Genius's shares beginning in late 2019, and that the Company in fact paid PennyStocks 43,077 shares of Genius common stock on January 8, 2020 plus an additional 49,610 shares of Common Stock on June 22, 2020. According to PennyStocks, "during the [promotion] Campaign, the trading volume and price of the securities of each Profile Issuer will likely increase significantly [and] [w]hen the Campaign ends, the volume and price of the Profiled Issuer will likely decrease significantly." Thus, payment for such services constitutes, at best, "compensation for soliciting purchases of, any" Genius shares and/or "pay[ing] any Person any compensation for soliciting another to purchase any other securities of the Company." At worst, it constitutes an "action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company."

61. On March 17, 2020, Genius issued a press release entitled "Nickelodeon Expands Daily Broadcast of Genius Brands International's Hit Preschool Series, Rainbow Rangers." The press release stated in part:

> "Genius Brands" announces today that Nickelodeon, a Viacom Inc. company (Nasdaq: VIA, VIAB), has ***again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week.*** Nick Jr. now airs Rainbow Rangers Monday – Friday, four airings per day, and six airings on the weekends.

62. The statements referenced in ¶61 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired nine times per week, not 26.

AMENDED CLASS ACTION COMPLAINT
14

63.     Three days later, on March 20, 2020, the Genius issued a shareholder letter, wherein it stated:

> "***In light of the COVID-19 coronavirus, will Genius Brands be affected like other businesses?***"[4]

> ***The answer is simple. No***. The business of animated cartoons has proven over and over again, that its appeal is timeless. Like the Walt Disney Company, and as Bob Iger said at the Disney shareholder meeting last Wednesday, "What we create has never been more important or necessary." ***Animated entertainment has shown to be extremely insulated*** to factors that other asset classes can fall prey to: the price of oil, the price of gold, Brexit, impeachment, wars, elections, recessions, and today, even the COVID-19 coronavirus.

> We are a tiny company, but our model is similar to the Walt Disney Company.  However, unlike some entertainment conglomerates, we don't have cruise lines or theme parks, or live Broadway shows to be shut down.  We make cartoons, and we sell licensed products from those cartoons. Kids watch cartoons through all weather and events. If baseball practice or soccer games or Girl Scout meetings are canceled, and even if school is closed down, kids will still watch cartoons, maybe even more cartoons. Our stories are uplifting, they all have positive messages and enriched content, from which kids learn, thus making our cartoons parent friendly as well.

> In fact, we have witnessed ***an increase in viewership, which equates to more revenue, to more recognition*** and appeal of the characters. ***That ultimately equates to product sales at retail, and that is how our business makes money***.

64.     The statements referenced's in ¶63 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading.  Despite stating that the Company was "extremely insulated" from COVID-19, in its March 20, 2020 shareholder letter signed by CEO Heyward, less than two months later in the Company's 1Q 2020 Form 10-Q for the period ended

---

[4] (original emphasis)

March 31, 2020, dated May 18, 2020, (the certification of which was also signed by Heyward) the Company specifically noted that "[t]he [COVID-19] outbreak . . . *could have a significant adverse impact on our business, which could be material*." The 10-Q further stated that the "*Company's management cannot at this point estimate the impact of the outbreak on its business* and no provision for this outbreak are reflected in the accompanying financial statements." Accordingly, because Defendants admitted that Company management was unable to estimate the impact of the outbreak on its business, Defendant Heyward lacked any reasonable basis for asserting any such possible impact on Genius, let alone the *positive* impact (*i.e.*, "equates to more revenue") that he suggested in his March 20, 2020 shareholder letter.  For the same reasons, his March 20, 2020 statement that "the Company's business was "insulated" from COVID 19, was likewise false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading

65.   On May 13, 2020, Genius issued a press release which attached another "Shareholder Letter" from Defendant Heyward. The letter stated in part:

> Kartoon Channel! is what we like to call a "Netflix for kids," except it is free. There is no subscription fee. It is fully ad-supported. It is a pure cartoon play, with no "natural predators," and what one of our board members described as an "economic vaccine for COVID-19."

> *            *            *

> Kartoon Channel! is an "on-demand" channel which means like Netflix, we offer a menu of offerings and the viewer then determines which program he or she chooses to watch. Having said the above, when Kartoon Channel! goes live on June 15, it will be available in over 100 million U.S. television households, and over 200 million mobile devices. All free to the viewer. All ad-supported (with the exception of a small tranche of platforms, where the viewer can elect an SVOD option with no commercials). If you have Amazon Prime, you can see it. If you have Apple TV, you can see it. If you have Comcast, Cox, or DISH and Sling TV, you can see it. I cannot recall any children's channel ever starting with such complete distribution, on Day 1, and let alone, at a time when the demand could not possibly be higher. Those

of us with young kids (as I do) have seen this more clearly than anyone. Kids are staying home and viewing the same shows over and over, but hungry for something different. Parents are searching for new content, often looking for ways to enrich their kids from home with something fresh and original.

66. The statements referenced in ¶65 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (i) the Kartoon Channel! was subject to subscription fees through Amazon Prime; and (ii) the Kartoon Channel! had little viability for future growth for Genius.

67. On June 8, 2020, Genius responded to the criticism raised by the Hindenburg Research Report and the Citron postings. Specifically, the Company stated the following:

**Genius Brands International Responds to Misleading Short Seller Criticisms**

BEVERLY HILLS, Calif. – (BUSINESS WIRE) – Genius Brands International, Inc. "Genius Brands" (NASDAQ:GNUS) today released the following statement from CEO and Chairman Andy Heyward, in response to recent short seller criticisms published online and on certain social media platforms:

"Genius Brands has carefully reviewed the report and social media comments published by two short seller funds last week. These materials contain numerous misleading statements, omissions of key facts, and red herrings. More importantly, the short sellers themselves demonstrate a fundamental misunderstanding of the unique potential of Genius Brands and our position of strength given the current dynamics of our industry.

It is also important to keep in mind how these short sellers make money and what they are trying to do. Make no mistake, their intention – and indeed *how they make their money* – is to manipulate the stock price of companies like ours in order to profit at the expense of other shareholders. Their interests are directly opposed to shareholders' interests. In contrast, as one of the largest investors in the Company

myself, my interests are fully aligned with those of my fellow shareholders – and will remain so.

With that in mind, I submit the following:

**We are well positioned to create substantial value** – With Kartoon Channel! launching on June 15 and to be available in more than 100 million U.S. TV households and 200 million mobile devices, we are positioned to be one of the preeminent ad-supported kids' digital networks.  The service referred to as a 'Netflix for kids' is made even stronger by the distinct fact that it is a free service.  There are no subscriptions fees, it is ad-supported.  Further, we do not anticipate being impacted by COVID-19.  The business of cartoons has historically had an appeal that is timeless, and is a rare asset class which has historically been resistant to typical market forces (e.g., the price of gold, oil, interest rates, elections, etc.).  While the rest of Hollywood is grinding to a stop during the COVID-19 crisis, we're creating new products for an audience that is growing now out of the new technologies and streaming services.  This is especially true at a time when there are more kids at home and in front of their devices during the pandemic.  We believe we will see robust and accelerated revenue growth coming forth in this arena for the foreseeable future.

**Our balance sheet is strong** – We have $9.75 million of debt; in excess of $45 million of cash, significant receivables from a diverse array of companies across our industry with strong credit profiles, and low overhead.  Today, Genius Brands has enough cash on our balance sheet to meet our existing obligations and execute on our business plan for at least 60 months, *and still fund continuing new production and content acquisitions each year*.  Conveniently, last week when one of the short sellers stated we weren't at the same revenue point as one of our Canadian-based competitors, he neglected to mention that the other company has *more than 60 times* ($600 million) as much debt as Genius Brands.  We think identifying this omission is important to understanding the whole story.  Finally, to clear up market confusion that we believe has been generated as a result of one short seller's report, the shelf registration on form S-3 filed on June 4th was related to our capital raise in March 2020.  We registered the resale of shares underlying the warrants we issued in March, and the S-3 filing does not in any way represent a new capital raise, nor is it related to recent changes in our stock price.

**The short sellers' criticisms of our Programs highlight their own industry ignorance** – *Llama Llama is an industry-recognized tremendous asset that we have on great terms, which are mutually beneficial with the IP's author/book publisher and ourselves. We are also confident in the appeal of the soon to be launched Stan Lee's Superhero Kindergarten, one of the last creations of Stan Lee, creator of Spider-Man, X-Men, Iron Man, Incredible Hulk, Thor, Fantastic Four, Black Panther, and the Avengers, among others. Similarly, we are happy with the outlook for Rainbow Rangers.  The fact is that the show's airings on Nick Jr. have been scaled back while we are currently producing new episodes, which is a standard industry practice known as "resting."  We expect the airings to ramp back up in August when the new episodes are completed and this will be timed with the launch of toys from Mattel hitting the shelves of Walmart in August.  We are confident Nick Jr.'s interests are aligned with ours – after all, they have a stake in the consumer products merchandising royalties related to this asset.*

**The track record of our leadership team speaks volumes** – Our senior management comes largely from the Walt Disney Company, DreamWorks Animation, and Hasbro Toys, and has been responsible for many of the biggest and most profitable hits in children's television history, as well as toy and consumer product programs generating Billions of dollars of program sales and royalty income.   The management team and board have had creative, licensing, production, broadcasting, and sales roles in some of the biggest animated hits in children's history, including *Lion King, Toy Story, Strawberry Shortcake, Care Bears, Power Rangers, My Little Pony, Spider-Man, Batman, X-Men, Transformers, Muppet Babies, Fraggle Rock, Real Ghostbusters, and Inspector Gadget.*  Collectively, w*e have more than 150 years of experience in children's media*, and have helped generate literally tens of billions of dollars of content and consumer products sales.

Further, last Friday, we announced the addition of two of our industry's most accomplished executives overseeing the new channel: Margaret Loesch as Executive Chairman of *Kartoon Channel!* (former President of Marvel Entertainment, FOX Kids, and Henson Television), and David Neuman as Chief Content Officer of *Kartoon Channel!* (former President of Walt Disney Television). Margaret was founding CEO of

FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars. None of us claim to be experts at 'short selling'. But we also think it's a stretch for short sellers to claim to know more about this industry than those of us who have been industry leaders and spent decades making money for investors while building some of the sector's most successful brands and companies.

**Genius Brands is a long-term growth story** – We have a number of hit brands and shows today – but we are even more excited about what is coming, and the synergies with the newly announced *Kartoon Channel!*.  We have over 450 licensed products contracted (with advances and guarantees) to come into the marketplace in the coming months. Our pipeline of new animated products, soon to be announced, is robust and pre-sold with significant brand equity.  Our partners, licensees, and retail customers include Alibaba, Amazon, Mattel, Netflix, Target and Walmart, among others.  *RainbowRangers* toys from Mattel, based on our hit series on Nick Jr., will hit Walmart stores in August beginning with a multipack of *Rainbow Rangers* figures. Over 350 other licensed consumer product SKUs are due as well, including publishing, room décor, bedding, footwear, apparel, health and beauty, bicycles, toothpaste, touring shows, among others, some of which are now already on Amazon.com, Walmart.com, and Target.com.

Above all else, we are focused on *long-term value*.  After working with Warren Buffett for 25 years and producing the children's animated series with Warren to teach financial literacy (*Warren Buffett's Secret Millionaires Club*), I've learned to focus on the importance of the basics: asset creation and value-building for our shareholders.

On a personal note, *I have not sold a single share, and in fact, have materially increased my holdings in the Company in the last two years*. We take the views of all our investors seriously, and we and our board are committed to maintaining the highest standards of corporate governance and transparency."

The Company is not suggesting that any particular trading price for the Company's securities is appropriate, whether in the short- or long-term. However, we would like to seek to clarify certain facts as it relates to the short seller information that has been put into the marketplace.

> Finally, the Company reserves the right to take appropriate legal action against Hindenburg Research and Citron Research, as we will always do what we can to protect our shareholders' interests. (emphasis added)

68.     The statements referenced in ¶67 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading.   Indeed, Defendants either admitted or failed to dispute – and therefore impliedly admitted – that: (1) Rainbow Rangers had not been renewed for a new season on *Nick Jr.*; (2) Rainbow Rangers aired only nine times per week at 3:49 a.m. EST during weekdays and Saturdays and twice on Sunday mornings between 6:00 a.m. and 7:00 a.m., not 26 times; (3) Genius had not disclosed the economic terms of the deal with Llama Llama, nor had the Company identified whether or not it owns the intellectual property for Llama Llama rather than merely licensing it; (4) a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits; and (5) the Company was posting Stan Lee's Superhero Kindergarten as content on Amazon as self-marketing for the show, which was a far less desirable accomplishment than Defendants represented.

69.     On June 15, 2020, Genius issued a press release titled "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International."   Within the press release, the Company also stated that former Governor Schwarzenegger "elected to receive warrants to purchase shares of the Company's common stock as an advance against his profit participation in the show."

70.     The statements referenced in ¶69 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because the Company's description of the transaction involving Governor Schwarzenegger, particularly its headline, incorrectly suggested to a reasonable investor that the Company may have been ***receiving*** capital from

Governor Schwarzenegger, when in reality it was the Company that was *paying* Governor Schwarzenegger $3.2 million in the form of non-cash compensation. While the Company did disclose that Governor Schwarzenegger received his Genius warrants in connection with his participation in the production and distribution of a television series, by framing his involvement as "an investor" rather than as a Company hire ("incurring a non-employee compensation expense" as it was later described in the Company's 2Q 2020 Form-10Q), Genius suggested to investors that Governor Schwarzenegger was a potential *source of funds*, rather than an expense on the income statement, or a *use of funds*.

71.    On July 2, 2020, Genius announced that it would host a conference call to discuss a "Key Business Development."  Four days later, on July 6, 2020, Genius indeed issued a press release detailing the "key" update and hosted a conference call to discuss the same.

72.    In the July 6, 2020 press release, CEO Heyward stated the following:

*I have no doubt* that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN, his BLACK FURY, and VIRUS. (original emphasis).

\*     \*     \*

When we looked at the depth of these creations that sit in this library, the magnitude and value of this asset slowly began to sink in. *There simply is no greater treasure chest of Intellectual Property anywhere*.

73.    During the July 6, 2020, conference call discussing the Stan Lee update, Heyward made the following statement:

Now let me speak to something our investors will be interested in, the financial impact on Genius Brands. *The financial impact of an asset like Stan Lee Universe cannot be overstated*. We have seen what properties created by Stan Lee did for The Walt Disney Company in revenues and earnings. Not just in the billions of dollars of movie box office, but in the even greater downstream revenue across the entire

business, be it television, digital, consumer products, games and theme parks. We've studied the Disney Playbook and they have done a brilliant job at bringing Stan's creativity through the food chain.

Having observed and learned, we believe that we can take the next surge of Stan Lee properties 2.0 to the market in no lesser way and create a massive value for our shareholders. Just like LeBron James brought his talents to Miami and then to Cleveland and where he also won a NBA championship and now to Los Angeles, we're confident that Stan Lee Universe will once again demonstrate the creative gift of this man and the power of his brand as it now comes to Genius.

\*     \*     \*

For the Genius Brands shareholders, we look forward to smartly and efficiently monetizing Stan Lee Universe across all platforms. I have no doubt that we will attract the most talented producers, directors and marketers in the world, as we unlock this one of a kind treasury and bring forth the next wave of Stan Lee creations for the world to experience and enjoy.

74.    The statements referenced in ¶¶71-73 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) Defendant Heyward implied that Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the box office, even though Genius had been attempting to launch a show with Stan Lee as early as 2011 and had no meaningful commercial success since that time, let alone the "billions of dollars" of success that Heyward suggested; and (2) because Mr. Lee passed away in November 2018, yet Heyward failed to disclose how Mr. Lee's passing would impact Genius's purported ability to replicate Disney's success.  Moreover, Genius provided no cautionary language discussing the risks related to marketing Stan Lee branded content in light of his passing.

**Disclosures Following the Class Period**

75.    On August 14, 2020, the Company issued its Form 10-Q for the period ended June 30, 2020 (the "2Q 2020 10-Q") wherein it disclosed that it issued 49,610

shares of its Common Stock, then valued at $3.85 per share, to a provider of investor relations services.  The Company also disclosed that its General and Administrative expense for the three-month period ending June 30, 2020 increased by 52% compared to the same period a year earlier.  Genius attributed the increase to salaries, stock-based compensation, legal fees and "*investor relations*" expense.  A reasonable inference can be drawn that the 49,610 shares issued by the Company to a "provider of investor relations services" went to PennyStocks as compensation for its favorable stock promotion campaign that it undertook on behalf of the Company and as initially suggested by the June 15, 2020 *Seeking Alpha* Report.

76.     In the same 2Q 2020 10-Q, the Company also detailed a May 25, 2020 issuance of warrants that presumably went to Governor Schwarzenegger for his work on Stan Lee's Superhero Kindergarten as initially discussed in a June 15, 2020 press release.  The 10-Q provides additional information not previously disclosed by the June 15, 2020 press release:

> The Company issued to an individual and his management company 2,284,172 warrants to purchase shares of Common Stock at $1.39 per share for his involvement with the production and distribution of a television series being developed by the Company. The warrants have a 10-year term and are fully vested upon issuance.

> The warrants become immediately exercisable in whole upon the earlier of May 21, 2021 or the first date the series is exhibited on television or is otherwise available for viewing through a streaming service or otherwise on the internet. The Company anticipates the warrants will become exercisable by December 31, 2020. The warrants were valued at $3,174,806 using the Black-Scholes option pricing model. The warrants were issued as an advance payment against participation amounts that will become due to the individual upon the performance of the series. The warrants are being accounted as non-employee compensation expense which has been recorded as prepaid participation expense over the expected exercise period. As of June 30, 2020, $519,514 was recorded as prepaid participation expense. The valuation inputs for the warrants included expected volatility of 253.01%, and annual risk-free interest rate of 0.7%.

AMENDED CLASS ACTION COMPLAINT

24

77.     The inference from the disclosure above is that it describes the relationship with Governor Schwarzenegger because the Company did not publicly disclose any other transaction in which it would be issuing warrants in connection with the production of a TV series during Q2 2020.   However, unlike the press release, nowhere in the 10-Q is it suggested that Governor Schwarzenegger would become a "significant investor" in Genius.   Rather, the 10-Q makes clear that the warrants the Company paid to Governor Schwarzenegger are a form of non-cash compensation and are accordingly booked as an expense.

78.     Under Generally Accepted Accounting Principles ("GAAP"), a bona fide contribution of capital from an investor would not be booked as a prepaid expense on a company's balance sheet.

## CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Genius securities between March 11, 2020 through July 5, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

80.     The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Genius's securities actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.   Millions of Genius' securities were traded publicly during the Class Period on the NASDAQ.   Record owners and other members of the Class may

be identified from records maintained by Genius or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

81.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

82.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

83.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Genius; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

84.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

85.   The market for Genius's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading

statements, and/or failures to disclose, and/or market manipulation, Genius's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Genius's securities relying upon the integrity of the market price of the Company's securities and market information relating to Genius, and have been damaged thereby.

86.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Genius's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Genius's business, operations, and prospects as alleged herein.

## LOSS CAUSATION

87.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities.  Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein.  As Defendants' prior misrepresentations, market manipulation, and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly.

88.    Specifically, on June 5, 2020, Hindenburg Research published the Hindenburg Research Report which questioned the valuation of Genius and revealed the truth regarding Defendants' representations.   Among other things, the Hindenburg Research Report showed that Rainbow Rangers was airing nine times per week rather than the 26-airings that Defendants represented. Additionally, the Hindenburg Research Report demonstrated that the shows were not airing in favorable time slots.  Instead, the shows were broadcast daily at 3:49 a.m. and twice

on Sunday mornings at 6:00 a.m. and 6:30 a.m. On this news, Genius shares fell $0.92, or 13%, to close at $5.94 per share on June 5, 2020, on unusually heavy volume.

89.    In addition to the Hindenburg Report, on June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations.  In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock. The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks's campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

90.    Defendants also misrepresented Genius's multimedia properties and the Kartoon Channel!  When Genius announced the slate of content, investors began to realize that the Kartoon Channel! was not going to be the new Netflix for Kids, but rather was just another app in a crowded space.  Indeed, on June 16, 2020, Genius stock declined by approximately 14%.

91.    Furthermore, on July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020.  This vague announcement significantly boosted the Company's stock price, as the price rose from $2.31 on July 1, 2020 to $3.55 on July 2, 2020.  Defendants' announcement on July 6, 2020, however, was another exaggerated press release whereby Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time at Marvel Entertainment. Following the July 6, 2020 press release, Genius shares fell $0.89, or 25%, to close at 2.66 per share on July 6, 2020.

92.    Defendants' false and misleading statements and/or omissions and/or market manipulation had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

93.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects.  As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly, causing real economic loss to investors who purchased the Company's securities during the Class Period.

94.    The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in the Company's securities negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

95.    The economic losses (damages) suffered by Plaintiffs and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

96.    The market for Genius's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Genius's securities traded at artificially inflated prices during the Class Period.  On June 3, 2020, the Company's share price closed at a Class Period high of $7.93 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Genius's securities and market information relating to Genius and have been damaged thereby.

97.     During the Class Period, the artificial inflation of Genius's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Genius's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Genius and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

98.     At all relevant times, the market for Genius's securities was an efficient market for the following reasons, among others:

(a)     Genius shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Genius filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Genius regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Genius was followed by securities analysts who wrote reports and/or issued public statements about the Company, and these reports and statements were publicly available and entered the public marketplace.

---

AMENDED CLASS ACTION COMPLAINT

99.   As a result of the foregoing, the market for Genius's securities promptly digested current information regarding Genius from all publicly available sources and reflected such information in Genius's share price. Under these circumstances, all purchasers of Genius's securities during the Class Period suffered similar injury through their purchase of Genius's securities at artificially inflated prices and a presumption of reliance applies.

### NO SAFE HARBOR

100.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.  Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

### FIRST CLAIM
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

101.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

102.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Genius's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

103.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genius's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

104.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Genius's financial well-being and prospects, as specified herein.

105.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Genius's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Genius and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

106.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate recklessness. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Genius's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

107.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Genius's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Genius's securities during the Class Period at artificially high prices and were damaged thereby.

108.   At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Genius was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have

purchased or otherwise acquired their Genius securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

109. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

110. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

111. Plaintiffs repeat and re-alleges each and every allegation contained above as if fully set forth herein.

112. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

113. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore

had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

114. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

115. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

1    DATED:  February 1, 2021

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys For Lead Plaintiffs*
*Ali Alavi and the A Legacy Foundation*

**<u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On February 1, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 1, 2021, at Los Angeles, California.


*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II