**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re Genius Brands International, Inc. Securities Litigation | CV 20-7457 DSF (RAOx)<br><br>Order GRANTING Defendants' Motion to Dismiss (Dkt. 74) |

This case arises out of an alleged scheme by Defendant Genius Brands International, Inc. (Genius or the Company), Andy Heyward and Robert Denton to artificially inflate Genius's stock price. Defendants move to dismiss the First Amended Complaint (FAC). Dkt. 74 (Mot.). Plaintiffs oppose. Dkt. 75 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion to dismiss is GRANTED.[1]

[1] Local Rule 7-3 requires parties to meet and confer and "discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution" at least seven days before filing a motion. If the parties are unable to reach a resolution, "counsel for the moving party shall include in the notice of motion a statement to the following effect: 'This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on (date).'" Defendants' motion does not contain that language and does not mention any conference. In the future, the parties must *thoroughly discuss any issues in good faith*. Failure to follow this rule in the future will likely result in sanctions, and the Court may decline to hear the motion.

# I. BACKGROUND

## A. Genius's NASDAQ Compliance

Genius is a media company based in Beverly Hills that licenses entertainment content for children, including the Kartoon Channel! Dkt. 68 (FAC) ¶¶ 2, 9, 21, 30. Heyward was the founder and chief executive officer of Genius, and Denton was the chief financial officer. Id. ¶¶ 22-23. Plaintiffs purchased shares of Genius stock and claim Defendants "heavily marketed Genius stock to retail investors through several misleading tactics to entice investment." Id. ¶¶ 3.

In July 2019, Genius's stock fell below $1.00 per share, which jeopardized its status as a NASDAQ listed security. Id. ¶ 31. The Company's shares remained below $1.00 from July 23, 2019 through the end of the year. Id. ¶ 32. On September 4, 2019, Genius received a letter from the NASDAQ informing the Company that it had 180 days, until March 2, 2020, to maintain the minimum bid price of $1.00 per share for 10 consecutive days to regain compliance. Id. ¶¶ 32, 33.

Around this time, Genius began work with a third-party stock promoter, PennyStocks, to issue favorable reports about the Company. Id. ¶ 34. According to its website, PennyStocks publishes only favorable information because it is "compensated to only publish favorable information." Id. It also states that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, **then subsequent investors will pay inflated prices for any securities of the Profiled Issuers** that they purchase." Id. The website also explains that "[t]his will likely result in the Profiled Issuers having trading losses." Id.

Plaintiffs claim PennyStocks will publish content provided to it directly by the issuer without attributing it to the issuer. Id. ¶ 35. A confidential witness (CW1), who used to work as an associate manager at Genius between February 2019 and November 2019, stated that Jon Ollwerther, the Executive Vice President of Business Development & General Manager of Kartoon Channel!, asked CW1 to proofread an

article about Genius that would subsequently appear on PennyStocks. Id. ¶ 36. Ollwerther told CW1 that it was important to boost the stock price of Genius to keep it registered on the NASDAQ. Id. Ollwerther reported directly to Heyward, and CW1 stated all major decisions went to Heyward for final approval. Id.

On March 5, 2020, Genius obtained another 180-day extension to regain compliance. Id. ¶ 39. On March 11, 2020, "Genius conducted several direct offerings of shares to certain 'long standing investors,' whereby millions of shares were sold at prices below the publicly traded market price." Id. ¶ 40. "For example, the Company sold convertible notes that included warrants for up to 65.6 million shares of the Company's securities." Id. Heyward invested $1,000,000 of his own money in the deal. Id. The same day, Genius filed a Form 8-K related to the Company's sale agreement. Id. ¶¶ 40-41. That agreement included a Securities Purchase Agreement (SPA), "which stated that the Company had not directly or indirectly manipulated the shares of the Company, nor paid any person compensation for the solicitation of purchases of the Company's shares." Id. ¶ 41.

Eight days later, on March 19, 2020, Bernard Cahill, a California attorney and member of the Company's board of directors and audit committee resigned "due to personal reasons." Id. ¶ 42.

Plaintiffs claim that from March to May 2020, alongside the direct offerings to long-time shareholders, "Genius conducted a nonstop campaign to boost the price of the Company's shares." Id. ¶ 47. Plaintiffs also assert Genius issued many more press releases than in the previous year. Id. ¶ 48. "For instance, in the nine months after the March 9, 2020 offering (in which Heyward participated), Genius issued 59 press releases, or 55% more than it issued during all 2019." Id.

Genius's share price then rose, and it regained compliance with the NASDAQ's listing requirements on May 28, 2020. Id. ¶ 49. The next day, on May 29, 2020, Genius sold an additional 20 million shares in a direct offering to long-time shareholders. Id. ¶ 50. On June 11, 2020, just prior to the official launch of the Kartoon Channel!, Genius registered 60 million shares for sale by a group of shareholders, "the

same long-standing investors who purchased shares in the direct offerings described above who were now able to 'cash out' their investment in Genius at inflated prices." Id. ¶ 51.

### B. Hindenburg and Seeking Alpha Reports

On June 5, 2020, Hindenburg Research, an alleged short-seller, published a report entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" (Hindenburg Report). Id. ¶¶ 7, 53. The Hindenburg Report questioned the valuation of Genius and showed that Rainbow Rangers was airing nine times per week, as opposed to the 26 airings Defendant previously represented. Id. ¶¶ 7, 53, 54. The Report further demonstrated that the shows were not airing in favorable time slots. Id. On the release of the Hindenburg Report, the price of Genius's common stock fell $0.92, or over 13% on heavy volume, to close at $5.94 per share on June 5, 2020. Id. ¶ 55.

On June 15, 2020, after the market closed, Seeking Alpha published a report about Genius in which it "posited that Genius likely engaged PennyStocks to pump Genius's stock" and analyzed various press releases issued by PennyStocks. Id. ¶¶ 8, 56. The Seeking Alpha Report concluded that once PennyStocks' "campaign" ended, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years." Id. ¶ 56.

"Additionally, when Genius announced the slate of content for the Kartoon Channel!, investors began to realize that the Kartoon Channel! was not going to be the new 'Netflix for Kids,' but rather just another app in a crowded space." Id. ¶ 57. On June 16, 2020, Genius Stock declined by approximately 14% to close at $3.85 per share on heavy volume "as the Company announced the programming lineup for the app and the market digested the news from the prior evening's Seeking Alpha report." Id.

On July 6, 2020, Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that

Stan Lee created after his time at Marvel Entertainment. Id. ¶ 57. Heyward represented "[t]he potential value in this single asset, is greater than any IP anywhere in Hollywood." Id. "With these statements, investors began to digest the truth related to Defendants' misrepresentations." Id. Following the July 6, 2020 press release, the price of Genius's stock dropped, on heavy volume, from a close of $3.55 on the previous trading day to a closing price of $2.66 per share on July 6, 2020. Id.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). However, a court is "not bound to accept as true a legal conclusion couched as a factual allegation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557). A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . and factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2)). As a general rule, leave to amend a complaint that has been dismissed should be freely granted. Fed. R. Civ. P. 15(a).

**B. Rule 9(b)**

Under Federal Rule of Civil Procedure 9(b), fraud claims must be pleaded with particularity. Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). "[A] plaintiff must set forth *more* than the neutral facts necessary to identify the transaction." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994). A plaintiff must include "an account of the time, place, and specific content of the false representations" at issue. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (quotation marks omitted). Fraud allegations must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (citing Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001) (punctuation omitted)).

Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 605 (9th Cir. 2014). The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012). In order to allege falsity properly, "a securities fraud complaint must . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." Id. (quotation marks and alteration omitted). In addition, in order to "adequately plead scienter under the PSLRA, the complaint must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. (quotation marks omitted).

# III. DISCUSSION

## A. Request for Judicial Notice (RJN)

In connection with their motion, Defendants request judicial notice of 26 documents, as well as an appendix of 7 additional authorities, making the entirety of their motion and supporting documents 479 pages. See dkt. 74-2 (RJN). Defendants request judicial notice of one additional document in their Reply. Dkt. 78-3. Plaintiffs argue Defendants' motion should be denied for abusing the judicial notice process and the doctrine of incorporation by reference. Dkt. 76. Plaintiffs also request judicial notice of two documents. Dkt. 77.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018) (citing Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir. 2001)). When "matters outside the pleading are presented to and not excluded by the court," the 12(b)(6) motion converts into a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). Both parties must then have the opportunity "to present all the material that is pertinent to the motion." Id.

"There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." Khoja, 899 F.3d at 998. A document is incorporated by reference "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." Id. at 1002 (quoting United States v. Ritchie, 342 F.3d 903, 907 (9th Cir. 2003)). "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." Id. (quoting Coto Settlement v. Eisenberg, 593 F.3d 1031, 1038 (9th Cir. 2010)).

Additionally, Rule 201 permits courts to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known," or

"can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(1)-(2). A court may therefore "take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." Khoja, 899 F.3d at 999 (quoting Lee, 250 F.3d at 689 (quotation marks and citation omitted)). "But a court cannot take judicial notice of disputed facts contained in such public records." Id.

The Court declines to deny the motion solely on the ground of the requests for judicial notice because "in assessing securities fraud claims, 'courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" Id. at 998 (quoting Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007)). But the Court notes the Ninth Circuit's guidance that there is a "concerning pattern in securities cases like this one: exploiting these procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage." Id. The Court will consider only documents properly incorporated by reference or subject to judicial notice.

**1. Defendants' RJN Exhibit 5: March 11, 2020 Current Report on Form 8-K**

Defendants request judicial notice of the Current Report on Form 8-K, filed by Genius with the Securities and Exchange Commission (SEC) on March 11, 2020, including Exhibit 10.1 to the Form 8-K, which is the SPA for the Genius March 11, 2020 Senior Secured Convertible Notes Offering, referred to in the FAC at ¶¶ 41, 59. RJN at 2 ¶ 5, dkt. 74-8 (March 11 SPA). Although Plaintiffs mistakenly referred to the language from the March 22, 2020 SPA, the FAC attributes language to the purported March 11, 2020 SPA and it forms a basis of Plaintiffs' claims. The Court takes judicial notice of the relevant language in the March 11, 2020 SPA.

**2. Defendants' RJN Exhibit 7: March 23, 2020 Current Report on Form 8-K**

Defendants request judicial notice of the Current Report on Form 8-K, filed by Genius with the SEC on March 23, 2020, including Exhibit 99.1 to the Form 8-K, which is the Letter to Shareholders from Andy Heyward, dated March 20, 2020 referred in the FAC at ¶¶ 63, 64. RJN at 2 ¶ 7; dkt. 74-10 (March 20 Statement). The FAC quotes language from the March 20 Statement to the shareholders and it forms a basis of Plaintiffs' claims. The Court takes judicial notice of the relevant language in the March 20 Statement.

**3. Defendants' RJN Exhibit 8: May 13, 2020 Current Report on Form 8-K**

Defendants request judicial notice of the Current Report on Form 8-K, filed by Genius with the SEC on May 13, 2020, including Exhibit 99.1 to the Form 8-K, which is the Letter to Shareholders from Andy Heyward, dated May 13, 2020, referenced in the FAC at ¶ 65. RJN at 2 ¶ 8; dkt. 74-11 (May 13 Statement). The FAC quotes language from the May 13 Statement and it forms a basis of Plaintiffs' claims. The Court takes judicial notice of the relevant language in the May 13 Statement.

**4. Defendants' RJN Exhibit 10: June 15, 2020 Current Report on Form 8-K**

Defendants request judicial notice of the Current Report on Form 8-K, filed by Genius with the SEC on June 15, 2020, including Exhibits 99.1 and 99.2 to the Form 8-K, which are the Letter to Shareholders from Andy Heyward, dated June 15, 2020, referred to in the FAC at ¶¶ 69, 76. RJN at 2 ¶ 8; dkt. 74-13 (June 15 Statement). The FAC quotes language from the June 15, 2020 Statement to the shareholders and it forms a basis of Plaintiffs' claims. The Court takes judicial notice of the relevant language in the June 15 Statement.

The Court did not rely on any other documents. The remaining requests for judicial notice are therefore DENIED as moot.

**B. Rule 10b-5(b): Untrue Statement or Omission of Material Fact**

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5, implementing Section 10(b), states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

**1. False Statement or Omission**

To establish a claim under Section 10(b) and SEC Rule 10b-5, a Plaintiffs must allege with specificity: "(1) a misrepresentation or omission (2) of material fact (3) made with scienter (4) on which the plaintiff justifiably relied (5) that proximately causes the alleged loss." Binder v. Gillespie, 184 F.3d 1059, 1063 (9th Cir. 1999). Under the heightened pleading standard of the PSLRA, "complaints alleging misrepresentations or omissions under 10b-5 must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint

shall state with particularity all facts on which that belief is formed.'" Glazer Cap. Mgmt., LP v. Magistri, 549 F.3d 736, 741 (9th Cir. 2008).

To establish falsity, a plaintiff "must demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." In re Convergent Technologies Sec. Lit., 948 F.2d 507, 512 (9th Cir. 1991). "Whether its allegations concern an omission or a misstatement, a plaintiff must allege materiality." Khoja, 899 F.3d at 1009. "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." Id. (quoting Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005)) (alteration in original).

a. March 11 Statement

Plaintiffs assert Genius's representation in its SPA (between Genius and purchasers of convertible notes, including Heyward) attached to the March 11, 2020 Form 8-K was false because Genius paid PennyStocks to disseminate favorable information about Genius. FAC ¶¶ 59-60. The relevant language from the March 11, 2020 SPA states:

> The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

March 11 SPA at 94.[2] Plaintiffs claim this statement was false or misleading because at the time the statement was made, Genius had engaged PennyStocks to disseminate favorable information about Genius's shares and PennyStocks warned during a promotional campaign, that "the trading volume and price of the securities of each Profile Issuer will likely increase significantly [and] [w]hen the Campaign ends, the volume and price of the Profiled Issuer will likely decrease significantly." FAC ¶ 60 (alterations in original). Plaintiffs assert, therefore, that "payment for such services constitutes, at best, 'compensation for soliciting purchases, of any' Genius shares and/or 'pay[ing] any Person any compensation for soliciting another to purchase any other securities of the Company.' At worst, it constitutes an 'action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company.'" Id. (alteration in original).

Defendants claim Plaintiffs "do not allege facts showing that Genius's private Notes offering was a transaction covered by Reg M in the first place" because the Notes offering was not a public offering, the Notes could not be resold, and the FAC includes no allegations that the offering was a distribution. Mot. at 13-14. Plaintiffs respond that they never alleged the March 11, 2020 statement was false for violating Reg M, but rather because "Defendants' conduct constitutes either '*an action designed to cause or to result in the stabilization or manipulation*' of Genius stock or '*compensation for soliciting*

---

[2] Defendants first claim Plaintiffs' argument fails because the FAC misquotes the SPA and the actual section of the SPA is entitled "Acknowledgement Regarding Buyer's Purchase of Securities," not "Regulation M Compliance." Mot. at 12-13. Plaintiffs respond they mistakenly quoted similar language from the March 23, 2020 8-K, not the March 11, 2020 8-K, but both agreements represent the same substantive fact: "that Genius did not manipulate or pay anyone to stabilize its share price." Opp'n at 5 n.7, see also id. at 22. The Court agrees the language from both agreements is nearly identical and using language from one or the other does not change the analysis.

*purchases*.'" Opp'n at 23 (quoting FAC ¶ 60). The Court agrees and disregards this argument.

Plaintiffs assert they adequately allege the statement was false because Defendants represented that they had not taken any action to stabilize or manipulate the Company's shares. Opp'n at 21. Defendants reply the allegations are insufficient because "Courts have rejected efforts to extend Galena and CytRx," on which Plaintiffs rely, "to sustain stock-manipulation claims based solely on engaging a stock-promotion or investor relations firm." Reply at 3-4.

In In re Galena Biopharma, Inc. Securities Litigation, 117 F. Supp. 3d 1145 (D. Or. 2015) and In re CytRx Corp. Sec. Litig., No. 14-1956-GHK (PJWx), 2015 WL 5031232, at *8 (C.D. Cal. July 13, 2015), the district courts found plaintiffs had adequately stated claims under Section 10(b) and Rule 10b-5. In both cases, the companies stated they had not taken any action to stabilize or manipulate the stock price when executive officers edited, approved, and controlled the content of "misleading" articles before publication as part of a paid promotional campaign. In re Galena, 117 F. Supp. 3d at 1180; In re CytRx, 2015 WL 5031232 at *8.

The March 11 Statement does not support Plaintiffs' claims. Plaintiffs do not identify anything Genius did to stabilize or manipulate its stocks. Plaintiffs allege CW1, who was employed as an associate manager with Genius between February 2019 through November 2019, stated that Ollwerther asked CW1 to proofread an article about Genius that would subsequently appear on PennyStocks. FAC ¶ 36. Ollwerther told CW1 that it was important to boost the stock price of Genius to keep it registered on the NASDAQ. Id.

But unlike in In re Galena and In re CvtRx, there are no allegations that anything in the PennyStocks article was misleading. Other circuit and district courts have uniformly rejected the premise that lawfully engaging a promotional firm, without any misleading information in any of the articles, is "manipulation" of a stock price in violation of securities laws. See, e.g., In re Galectin Therapeutics, Inc. Sec. Litig., 843 F.3d 1257, 1273 (11th Cir. 2016) ("The defendants'

lawfully engaging third parties to 'promote' the Galectin stock through publications of boastful but truthful articles is not stock price 'manipulation' as a matter of law. . . . As the district court correctly held, the defendants' lawful engagement of promotional firms to publicize Galectin and encourage investment in its shares was legal and did not constitute impermissible actions to manipulate the price of its shares."); Stephens v. Uranium Energy Corp., No. CV H-15-1862, 2016 WL 3855860, at *23 (S.D. Tex. July 15, 2016) (dismissing a case and distinguishing cases where the court found the parties stated a claim because in those cases, "the advertisements themselves were allegedly false or misleading").

The March 11 Statement does not support Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

b. March 17 Statement

Plaintiffs assert that the March 17 Statement that Nickelodeon had increased the airing of Rainbow Rogers to 26 showings a week was false because the Hindenburg Report stated Rainbow Rogers aired only 9 times per week. FAC ¶¶ 61-62. Defendants contend this argument fails because the Hindenburg Report was issued on June 2020, and therefore does not support that the statement made on March 17 was false. Mot. at 15. Plaintiffs reply the Hindenburg Report is sufficient to establish falsity and Defendants had a duty to disclose material facts that are necessary to make disclosed statements not misleading. Opp'n at 24.

The Court agrees the Hindenburg Report does not support that the statement that Nickelodeon had increased the airing of Rainbow Rogers to 26 showings a week was false or misleading when made. It is certainly possible that Rainbow Rogers was airing 26 times per week on March 17, but it was then reduced to nine showings per week in the subsequent several months. The March 17 Statement represents that Genius "has again increased the broadcast of the Company's hit original preschool series" to 26 airings a week, FAC ¶ 61, but makes no representation that it will continue airing on the same schedule. This is insufficient to support that the statement was false when made. See

Ronconi v. Larkin, 253 F.3d 423, 431 (9th Cir. 2001) ("Plaintiffs, however, merely assert that the statement was false at the time it was made. They do not specify facts or evidence that show why the statement was false at the time it was made nor that defendants knew or with deliberate recklessness disregarded that it was false.").

Moreover, Genius did not have a duty to update any potential change in the airing schedule. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988). "Section 10(b) of the Exchange Act and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." In re Galectin Therapeutics, 843 F.3d at 1274. Nevertheless, Rule 10b-5(b) does "prohibit[ ] not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1305 (11th Cir. 2011) (quoting 17 C.F.R. § 240.10b-5(b)); see also Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011) (quoting same).

"By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'" FindWhat, 658 F.3d at 1305 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 16 (1st Cir. 1990) (en banc)). "[E]ven absent a duty to speak, a party who discloses material facts in connection with securities transactions assumes a duty to speak fully and truthfully on those subjects." Id. (alteration in original) (quoting In re K-tel Intern., Inc. Sec. Litig., 300 F.3d 881, 898 (8th Cir. 2002)). "[A] defendant may not deal in half-truths." Id. (quoting First Va. Bankshares v. Benson, 559 F.2d 1307, 1314 (5th Cir. 1977)).

But there is no duty to correct "[s]tatements regarding past events [that] contain no implicit prediction that those events or conditions will continue in the future." See In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1078 (N.D. Cal. 2001); see also Wenger v. Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal.

1998) ("Disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future"); In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1410 (9th Cir.) ("technical obsolescence of computer equipment in a field marked by rapid technological advances is information within the public domain"), cert. denied, 520 U.S. 1103 (1997). This is not the type of statement that Defendants had a duty to update if it changed. See In re Galectin Therapeutics, 843 F.3d at 1275 ("Given that Galectin's 10-K and 10-Q reports did no more than accurately report the number of shares sold, the price per share, and the net proceeds, we cannot say that Galectin, by reporting those figures, created a duty for itself to disclose that it had engaged and paid third parties to promote its stock.").

The March 17 Statement does not support Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

c. March 20 Statement

Plaintiffs argue that a March 20 Statement that notes that "[a]nimated entertainment has shown to be extremely insulated to factors that other asset classes can fall prey to," and that Genius had "witnessed an increase in viewership, which equates to more revenue," was false because Genius stated that Covid-19 "could have a significant adverse impact on our business, which could be material" in a May 18, 2020 SEC filing for the same period. Opp'n at 26. Defendants assert there is nothing inconsistent about the March 20 Statement and the May 18 risk disclosure statement. Mot. at 16-17.

The Court agrees. That Genius stated in May that it *could* be significantly impacted by Covid-19 establishes nothing about the truth or falsity of statements made almost two months earlier that animated cartoons' appeal is timeless and that cartoons have been shown to be insulated from factors such as the price of gold or Brexit. March 20 Statement at 161. The impact Covid-19 would have over the ensuing months could not have been predicted in March 2020. Plaintiffs do not state any facts to suggest Defendants had knowledge the rest of the world did not. Further, Plaintiffs do not allege Genius did not

experience an increase in viewership at that time, regardless of what would happen in the future because of Covid-19.

Plaintiffs further argue that Defendants' June 8, 2020 shareholder letter (June 8 Statement), sent after the May 18 risk disclosure statement was filed, again represented the positive impact the pandemic was purportedly going to have on Genius's revenue. Opp'n at 27. They also contend that "while a portion of the statement is perhaps forward-looking ('will Genius Brands be affected like other businesses'), it did not come with adequately cautionary language as shown by the Company's later 10-Q disclosures that were not included in the March 20 shareholder letter." Id.

The Court agrees the June 8 Statement could potentially support a claim because it was incompatible with the May 18 risk disclosure statement. The June 8 Statement affirmatively says, "we do not anticipate being impacted by COVID-19." FAC ¶ 67. But the May 18 risk disclosure statement says Covid-19 "could have a significant adverse impact on our business, which could be material." Opp'n at 26. These statements are at odds and arguably could support a claim if Defendants' cautionary language was insufficient.[3] But the Court also agrees with Defendants that the FAC makes no allegations relating to the impact of Covid-19 in the June 8 Statement and focuses only on other alleged misrepresentations. The FAC does not satisfy the requirements of Rule 9(b) for the June 8 Statement.

The March 20 Statement does not support Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

d. May 13 Statement

(1) Falsity of "All free to the viewer"

Defendants first argue the May 13 Statement that Kartoon Channel! was free was not false because it disclosed there was a fee-based subscription option on certain platforms by identifying a "SVOD

---

[33] Because the finds March 20 Statement does not support Plaintiffs' claims, it need not reach Defendants' safe harbor argument.

option." Mot. at 19. The May 13 Statement announced: "Having said the above, *when Kartoon Channel!* goes live on June 15, it will be available in over 100 million U.S. television households, and over 200 million mobile devices. All free to the viewer. All ad-supported. (with the exception of a small tranche of platforms, where the viewer can elect an SVOD option with no commercials)." May 13 Statement at 171.

Plaintiffs argue that "[t]here is *no* indication that SVOD means, to a reasonable investor, that the program is not free." Opp'n at 27. Regardless of whether a reasonable investor would know the meaning of SVOD, the Statement makes clear that there is an "exception" to the "all free" representation, at least for "a small tranche of platforms." No reasonable investor would take this portion of the Statement to indicate the channel is always free.

(2) Falsity of "Netflix for kids"

Defendants next contend the May 13 Statement referring to Kartoon Channel! as a "Netflix for kids, except it is free," was not false because (1) the May 13 Statement explains "Kartoon Channel! is an 'on-demand' channel which means like Netflix, we offer a menu of offerings and the viewer then determines which program he or she chooses to watch," and (2) the phrase "except it is free" is accurate. Mot. at 18-19.

The comparison to Netflix is so "'exaggerated' or 'vague' that no reasonable investor would rely on it when considering the total mix of available information." In re Splash Tech. Holdings, Inc. Sec. Litig., 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001) (quoting Hoxworth v. Blinder, Robinson & Co., Inc., 903 F.2d 186, 200 (3d Cir. 1990)). This statement is "hyperbole, and did not convey a false or misleading impression of the future on which a reasonable investor would rely." Id. at 1077. The representation that it is free is actionable for the reasons stated above.

The May 13 Statement does not support Plaintiffs' claims under Section 10(b) and SEC Rule 10b-5.

e. June 8 Statement

Defendants assert Plaintiffs' claim that Genius "either admitted or failed to dispute" criticisms raised in a report and tweets by short sellers Hindenburg and Citron fail because (1) the assertion does not allege anything in the June 8 statement was false or misleading, and (2) Defendants had no legal duty to respond to everything in the Hindenburg Report, and were not liable for a third-party statement. Mot. at 20-21.

Plaintiffs respond that Defendants either admitted or failed to dispute that

> (1) Rainbow Rangers had not been renewed for a new season on Nick Jr.; (2) Rainbow Rangers aired only nine times per week at 3:49 a.m. EST during weekdays and Saturdays and twice on Sunday mornings between 6:00 a.m. and 7:00 a.m., not 26 times; (3) Genius had not disclosed the economic terms of the deal with Llama Llama, nor had the Company identified whether it owned the intellectual property for Llama Llama rather than merely licensing it; (4) a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits; and (5) the Company was posting Stan Lee's Superhero Kindergarten as content on Amazon as self-marketing for the show, a far less desirable accomplishment than Defendants represented.

Opp'n at 28-29.

Plaintiffs have not identified any past statements *made by Defendants* that the June 8 Statement revealed to be false or that required additional statements to render them not misleading. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Basic, 485 U.S. at 239 n.17. Absent some level of control over the statements in the Hindenburg Report and Citron postings, Defendants did not have a duty to correct any statements made in those publications. Raab v. Gen. Physics Corp., 4 F.3d 286, 288 (4th Cir.

1993) ("The securities laws require General Physics to speak truthfully to investors; they do not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to General Physics.").

Plaintiffs respond that they are not alleging Defendants bore responsibility for a third-party statement, "but that their response to the Hindenburg Report and Citron postings demonstrates that Defendants' own previous representations were knowingly false and misleading." Opp'n at 29. But Plaintiffs do not identify what "Defendants' own previous representations" are or point to any past statement that would need additional information to correct.

The June 8 Statement does not support Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

f. June 15 Statement

Plaintiffs assert Defendants' June 15 Statement titled "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" was misleading because it suggested Defendants were receiving capital from Schwarzenegger. FAC ¶¶ 69-70. Defendants contend Plaintiffs' argument fails because the plain language of the June 15 Statement makes clear that Schwarzenegger was permitted to purchase Genius stock at a specific price by a specific date (warrants) as compensation for his role as actor and producer on a show called Superhero Kindergarten. Mot. at 22-23.

Given that Defendants stated Schwarzenegger "elected to receive warrants to purchase shares of the Company's common stock as an advance against his profit participation in the show" and stated, "Any further payouts will likely be in the form of cash payments," June 15 Statement at 183, the Court agrees it is unlikely an individual would interpret the June 15 Statement to indicate Schwarzenegger was providing capital. But the headline of the Statement says, "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" right above "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role

Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten." Id. The Court cannot say a reasonable investor would not take this to mean that Schwarzenegger was *both* investing capital Genius *and* receiving stock as compensation for his acting. That is a fact-specific inquiry inappropriate to resolve on a motion to dismiss.

The June 15 Statement supports Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

g. July 6 Statement

Defendants first contend Plaintiffs' arguments about the July 6 Statement fail because the statement comes after the end of Plaintiffs' alleged class period. Mot. at 23. Plaintiffs respond, "[w]hile statements made before or after the class period are not themselves actionable, they may be relevant in that they shed light on the 'truth or falsity of Class Period statements.'" Opp'n at 30 (quoting Shenwick v. Twitter, Inc., 282 F. Supp. 3d 1115, 1134 (N.D. Cal. 2017)).

Plaintiffs state the July 6 Statement "is another example where Defendants intended to drive artificial demand by priming the market with promises of a 'Key Business Development,'" but when the development came, "offered only farfetched comparisons to household names, such as Walt Disney, Stan Lee, and LeBron James – teeming with passing references to 'billions of dollars' and 'create[ing] [sic] massive value' for shareholders – but announced no substantive progress on the Stan Lee project, and had not done so since 2011." Id. Therefore, Plaintiffs assert, "the July 6th statement: (1) shows more indicia of Defendants' intent to mislead shareholders with unrealistic comparisons; (2) contradicts an earlier press release because the 'key update' was no update at all; and (3) fails to disclose that the Company's key asset may not even belong to it." Id.

The Court agrees this statement is outside the class period and therefore cannot support a claim for a false statement. In re Clearly Canadian Sec. Litig., 875 F. Supp. 1410, 1420 (N.D. Cal. 1995) ("As the class period defines the time during which defendants' fraud was

allegedly alive in the market, statements made or insider trading allegedly occurring before or after the purported class period are irrelevant to plaintiffs' fraud claims."). Plaintiffs do not identify any past statement that the July 6 Statement demonstrated was false. Plaintiffs' argument about a "key development" is not stated with specificity, as the FAC does not identify any statement in the "key business development" conversation that the July 6 Statement revealed was false. Plaintiffs do not allege there were statements about Stan Lee made in the July 2 phone call that the July 6 Statement revealed to be false. This argument therefore fails.

The July 6 Statement does not support Plaintiffs' Section 10(b) and SEC Rule 10b-5 claims.

**2. Loss Causation**

Defendants argue Plaintiffs do not adequately plead loss causation. Mot. at 25. Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) (quotation marks omitted). The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 346 (2005). The complaint must plausibly allege that Defendants' share price fell "after the truth became known"; alleging "purchase price inflation alone [is not] sufficient." Id. at 347.

The only statement that potentially support Plaintiffs' claims is the June 15 Statement about Schwarzenegger. Plaintiffs do not tie the June 15 Statement to an inflation of Defendants' stock and point to no moment where the truth about these statements was revealed, after which time the stock's price declined. See Dura, 544 U.S. at 347; In re Immersion Corp. Sec. Litig., No. C 09-4073 MMC, 2011 WL 6303389, at *10 (N.D. Cal. Dec. 16, 2011), aff'd sub nom. Loos v. Immersion Corp.,

762 F.3d 880 (9th Cir. 2014), as amended (Sept. 11, 2014). Plaintiffs therefore fail to plausibly allege loss causation for those statements.

Plaintiffs' claims under Section 10(b) and SEC Rule 10b-5 are DISMISSED.

## C. Rule 10b-5(a) and (c): Market Manipulation

Plaintiffs assert that "[i]f Defendants seek dismissal of Plaintiffs' 10b5-(a)-(c) claim along with their 10b-5(b) claim on reply, the Court should reject such an untimely ploy because 'Defendants did not challenge the scheme liability claim in their opening brief, and for this reason alone the Court could deny their motion to dismiss this claim.'" Opp'n at 11 (quoting In re Aqua Metals, Inc. Sec. Litig., No. 17-CV-07142-HSG, 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019) (denying motion to dismiss 10b-5(a)-(c) claim)).[4] Plaintiffs further assert "Defendants were unquestionably on notice of Plaintiffs' 10b-5(a)-(c) conduct-based claim: the AC refers to 'conduct' 21 times (passim); 'scheme' eight times; 'course of conduct' six times; and 'manipulation' five times." Opp'n at 12.

The Court agrees the allegations in Plaintiffs' FAC put Defendants on notice of a claim under subsections (a) or (c) as well as (b). Although the FAC does not list subsection (a) or (c) as a basis for relief, the FAC states,

> During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Genius's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

[4] The district court did not base its denial on defendants' failure to address the claim.

FAC ¶ 102.

It further asserts Defendants "(i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genius's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5." Id. ¶ 103. This was sufficient to put Defendants on notice. See In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1177 (D. Or. 2015) (finding plaintiffs adequately put defendants on notice when they alleged defendants "carried out a plan, scheme and course of conduct" to deceive the investing public, "employed devices, schemes and artifices to defraud," "engaged in acts, practices, and a course of conduct" to defraud and "engaged in transactions, practices and a course of business that operated as a fraud and deceit," although they mistakenly titled the section as just violations of Section 10(b) and Rule 10b-5(b)). In the interest of fairness and because Plaintiffs' FAC is not a model of clear pleading, the Court declines, however, to find Defendants waived any arguments as to the 10(b)-5(a) and (c) claims.

Defendants assert Plaintiffs fail to state a claim under subsection (a) or (c) because they have not alleged any deceptive or manipulative act except that Defendants issued a large number of press releases and purportedly engaged PennyStocks, and "[n]either assertion alleges "conduct designed to deceive or defraud investors." Dkt. 98 (Reply) at 16.

To allege a violation of Rule 10b-5(a) and (c), 17 C.F.R. § 240.10b-5(a) and (c), a plaintiff must allege the same elements as a Rule 10b-5(b) claim, except that plaintiff's scheme liability claim cannot be based solely on false or misleading statements, but must instead involve deceptive conduct "beyond those misrepresentations or omissions." WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011), abrogated on other grounds by Lorenzo v.

Sec. & Exch. Comm'n, 139 S. Ct. 1094 (2019). To plead a scheme liability claim, a plaintiff must allege: "(1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged deceptive or manipulative act; (5) economic loss; and (6) loss causation." Rabkin v. Lion Biotechnologies, Inc., No. 17-cv-02086-SI, 2018 WL 905862, at *16 (N.D. Cal. Feb. 15, 2018); see also New York City Employees' Ret. Sys. v. Berry, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009). Scheme liability allegations are subject to Rule 9(b)'s heightened pleading standards. In re Bank of Am. Corp., No. 09-MD-02014 JSW, 2011 WL 740902, at *6 (N.D. Cal. Feb. 24, 2011) (citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 498 F.3d 87, 102 (2d Cir. 2007)).

As noted above, Plaintiffs did not establish the elements of their Rule 10b-5(b) claim. They therefore did not adequately plead a violation of Rule 10b-5(a) and (c). Plaintiffs' claims under Rule 10b-5(a) and (c) are DISMISSED.

**D. Allegations Against Denton**

Defendants argue that Plaintiffs make no individualized allegations against Denton and impermissibly rely on group pleading. Mot. at 33-34. "Although the Ninth Circuit has yet to squarely address the issue, the majority of district courts within the Circuit to confront the group pleading doctrine . . . have decided that the doctrine did not survive." Petrie v. Elec. Game Card Inc., No. SACV 10-00252 DOC, 2011 WL 165402, at *3 (C.D. Cal. Jan. 12, 2011).

Plaintiffs respond that the prohibition on group pleading does not apply to scheme-based liability under Sections 10b-5(a)(c). Opp'n at 19-20. Plaintiffs further claim they have shown scienter by alleging CW1 was told by Ollwerther "'how important' it was for Genius to get its share price above $1.00 to keep its listing on the NASDAQ" and "scienter can be shown for a CFO where, as here, the company undertook 'a pervasive scheme affecting the (in part) heart of the company's core operation, namely that the strength of [Defendants']

stock was critical to the company's success.'" Id. at 20 (quoting FAC ¶ 36 and Rabkin, 2018 WL 905862, at *12-13) (alteration in original).

The FAC includes no allegations about Denton other than asserting he is a party and a CFO. FAC ¶¶ 23-24. CW1's statements do not support any claim against Denton, as Ollwerter reported to Heyward, not Denton. Id. ¶ 36. Moreover, as noted above, the Court found the statements regarding the relationship with PennyStocks were not false or misleading. The Court is skeptical that the June 15 Statement about Schwarzenegger, which is the only statement the Court has found could support Plaintiffs' claims, could support scienter under the core operations doctrine as that statement is very narrow and not connected to the company's core operations. See Rabkin, 2018 WL 905862, at *12. Should Plaintiffs choose to amend and name Denton, they must include more particularized allegations as to Denton that support an inference of scienter.

## IV. CONCLUSION

Defendants' motion to dismiss is GRANTED. An amended complaint must be filed no later than September 27, 2021. Failure to file by that date will waive the right to do so. The Court does not grant leave to add new defendants or new claims. Leave to add new defendants or new claims must be sought by a properly noticed motion.

IT IS SO ORDERED.

Date: August 30, 2021

Dale S. Fischer
United States District Judge