Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel For Lead Plaintiffs*
*Ali Alavi and the A Legacy Foundation*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re Genius Brands International, Inc. Securities Litigation | Case No. CV 20-7457 DSF (RAO) <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **<u>DEMAND FOR JURY TRIAL</u>** <br><br> Judge: Hon. Dale S. Fischer <br> Location: Courtroom 7D <br><br> Trial Date: None Set <br> Date Action Filed: August 18, 2020 |

# **TABLE OF CONTENTS**

NATURE OF THE ACTION AND OVERVIEW ........................................................ 1

JURISDICTION AND VENUE ................................................................................ 10

PARTIES ................................................................................................................... 10

SUBSTANTIVE ALLEGATIONS .......................................................................... 13

    The Truth Is More Fully Revealed ...................................................................... 40

    Materially False and Misleading ......................................................................... 50

    Statements Issued During the Class Period ......................................................... 50

CLASS ACTION ALLEGATIONS ......................................................................... 67

UNDISCLOSED ADVERSE FACTS ...................................................................... 69

ADDITIONAL SCIENTER ALLEGATIONS ......................................................... 69

LOSS CAUSATION ................................................................................................ 72

APPLICABILITY OF PRESUMPTION OF RELIANCE ....................................... 77

(FRAUD-ON-THE-MARKET DOCTRINE) .......................................................... 77

NO SAFE HARBOR ............................................................................................... 78

FIRST CLAIM ......................................................................................................... 79

SECOND CLAIM .................................................................................................... 82

THIRD CLAIM ........................................................................................................ 83

PRAYER FOR RELIEF .......................................................................................... 84

JURY TRIAL DEMANDED .................................................................................... 84

Lead Plaintiffs Ali Alavi and A Legacy Foundation ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) the review and analysis of regulatory filings made by Genius Brands International, Inc. ("Genius" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) the review and analysis of press releases and media reports issued and disseminated by Genius; (c) interviews of former employees of the Company; and (d) the review of other publicly available information concerning Genius.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a securities fraud class action brought pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder. This action is brought on behalf of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired Genius securities from March 11, 2020 through March 30, 2021, inclusive (the "Class Period"), and who were damaged thereby.

2.     Genius is a media company focused on cartoons for children. Some of the Company's more well-known shows include Rainbow Rangers, Llama Llama, and Stan Lee's SuperHero Kindergarten. Genius securities trade on the NASDAQ stock exchange under the ticker symbol "GNUS."

3.     This case, in addition to involving false statements, also involves a scheme known as a "pump-and-dump." Pump-and-dumps take on different varieties, but the general idea is the same and involves a few steps: (1) an inside investor or group of investors secures a promoter to spread the message; (2) that group (including the promoter) secures shares before they become inflated; (3) the group issues headline-grabbing press releases – many of which are untrue; and (4) as the price and

volume of the security rise, liquidity is created in the stock. This resulting liquidity gives the inside group a chance to sell and cash out. This process can be repeated with the same security until it is revealed.

4. Pump-and-dumps can happen with any security, although it usually happens with a low market cap, or illiquid security that can be more easily manipulated. And the ideal target is a retail investor—whose ranks swelled during the pandemic.

5. The SEC has issued guidance regarding pump-and-dump schemes. For instance, in 2016, the SEC stated the following:

> Fraudsters may promote a stock in seemingly independent and unbiased sources including:
>
> - **Social Media:** Fraudsters may use social media to promote a stock anonymously or while pretending to be someone else. Read Updated Investor Alert: Social Media and Investing -- Stock Rumors.
>
> - **Investment Newsletters:** In some cases, an investment newsletter may promote a particular stock because the newsletter publisher has been paid to do so. Read Investor Alert: Investment Newsletters Used as Tools for Fraud.
>
> - **Online Advertisements:** Fraudsters may purchase pop-up ads or banner ads that are targeted to a particular group based on demographics or interests. Ads may be fraudulent even if they appear on legitimate websites, including on the online financial pages of news organizations
>
> * * *
>
> - Increase in stock price or trading volume linked to promotional activity.
>
> - Press releases or promotional activity announcing events that ultimately do not happen
>
> - Company issues a lot of shares without a corresponding increase in the company's assets.

* * *

- Aggressive stock promotion.  Exercise extreme caution if there appears to be greater promotion of the company's stock than of the company's products or services.[1]

6.     Many of the above conditions are present here and unfolded over the course of the Class Period.

7.     Defendants heavily marketed Genius stock to retail investors through social media. For example, the Company's Chief Executive Officer ("CEO"), Andy Heyward ("Heyward"), interacted directly with investors on his Instagram page and monitored other social media, including on the Company's Twitter page.

8.     Defendants also relied heavily on shareholder letters (akin to "investment newsletters" described above)—issuing eight such letters over a five-month timeframe.[2]

9.     Defendants also used what appeared to be fraudulent advertising tactics, including deceptive pop-up ads that subsequently sparked separate litigation. *See* ¶¶232-37, *infra*.

10.     As discussed below, Genius shares experienced a surge in trading volume in response to a stock promoter. *See* ¶¶ 67-71, *infra*.

11.     The Company also issued press releases promising events that never happened—like sharing a report that speculated that it was "only a matter of time" before Genius would be sold to Netflix or Disney.  This third-party report was posted on Genius's corporate Twitter page and it was ***the only*** analyst report posted on Genius's corporate Twitter page during the Class Period.

---

[1] Available at: https://www.sec.gov/oiea/investor-alerts bulletins/ia_promotions.html

[2] Including on: March 20, 2020; April 20, 2020; May 13, 2020; June 5, 2020; June 15, 2020; July 6, 2020; July 15, 2020; and August 13, 2020.

12.     The Company also issued "a lot of shares without a corresponding increase in the company's assets." Specifically, at the beginning of 2020,[3] Genius had $29.4 million in total assets (less than four hundred thousand of which was cash) and 9.45 million total shares outstanding. By the end of the year, Genius reported $134.2 million in total assets – nearly 75% of it comprised of cash raised by selling the Company's stock—and 258.4 million shares outstanding. In other words, from 2019 to 2020, Genius's assets increased 356%, while shares outstanding surged 2,633%, meaning shares outstanding grew about seven times more than assets did. And, when excluding the growth in assets contributed from stock sales (*i.e.*, the increased cash balance), Genius's assets increased *just 16%*, compared to a *2,633%* increase in shares outstanding.[4] As of a proxy statement filed on August 24, 2021, Genius reported 300,791,335 total shares outstanding – an increase of 291.3 million shares, or 3,083% from December 31, 2019.

13.     As a final tactic aimed at retail investors, but unbeknownst to any Genius investor, Genius engaged a third-party stock promotion company called PennyStocks.com ("PennyStocks") to begin issuing favorable reports about the Company that were apparently timed such that PennyStocks' reports would amplify Defendants' misleading statements throughout the marketplace.

14.     PennyStocks warns on its website that if one of its campaigns has the effect of boosting an issuer's stock price, "then subsequent investors will pay inflated prices for any securities of the Profiled Issuers that they purchase." PennyStocks

---

[3] As of the period ending December 31, 2019.

[4] The purpose of excluding cash from the total assets in the comparison is to demonstrate how little Genius's assets increased from organic (*i.e.* productive) use, as opposed to having increased assets just by selling shares in exchange for cash from outside investors. On Genius's statement of cash flows for the period ending December 31, 2020, it shows a cash inflow of $109.4 million from financing activities, meaning that absent such financing activities, Genius would have had a negative cash balance of around $9 million by the end of 2020.

clarifies that "[t]his will likely result in the Profiled Issuers having trading losses." Genius, however, made no similar disclosure.

15.    Defendants' scheme and false statements caused Genius's share price to swell. Then, to capitalize on the artificial inflation, Genius made numerous stock sales, which flooded the corporate coffers and, in the process, allowed Heyward to cash out through related-party deals with Genius that the Company can now easily finance. Such related-party deals include, among others, $380,989 that Heyward was paid for "security costs" for his residence. All told, the many corporate stock sales enabled Heyward to cash out over $1.25 million from Genius in cash compensation as part of his total compensation (*i.e.*, cash and stock) of $17.4 million in 2020—an increase of over $17.0 million, or 4,138%, from the $411,500 he earned in total compensation in 2019. By comparison, at the time of Heyward's March 2020 purchase into Genius (at the beginning of Defendants' scheme), Genius's entire market cap stood at just $6.1 million.[5]

16.    Throughout the Class Period, Defendants made false and/or misleading statements and omissions regarding: (1) the Company's undisclosed use of a third-party stock promoter intended to drive up the price of the shares and the impact such promoter would have on the volatility of Genius shares; (2) Nickelodeon's purported broadcast expansion of Genius's Rainbow Rangers cartoon series; (3) a third-party analyst report that predicted a sale of Genius to Disney or Netflix; (4) the circumstances surrounding a purported investment by Arnold Schwarzenegger in Genius; (5) the Company's purported resilience to the economic impact from COVID-19; and (6) the viability and prospects of the Company's intellectual property in light

---

[5] Market cap equals share price times shares outstanding. On March 11, 2020, Genius closed at $0.24.  On March 9, 2020, Genius had 25,549,152 shares outstanding. Thus, $0.24 x 25,549,152 = $6,131,796.

of its disputed status (a fact known by the Company but concealed throughout much of the Class Period).

17.    While the share price of Genius stock was artificially inflated due to these misstatements, Genius registered for sale hundreds of millions of shares in direct offerings, allowing certain longtime investors to profit at the expense of Plaintiffs and the Class and enabling Heyward to reap millions in undisclosed related-party transactions that lacked audit committee oversight.

18.    On June 4, 2020, famed short-seller Citron research—known for exposing public market frauds—issued a report that partially revealed the previously undisclosed risk that Genius was working with a stock promoter.

19.    On this news, Genius shares fell by $1.07 per share on heavy volume, to $6.86 per share, thereby damaging investors.

20.    The next day, Hindenburg Research published a report entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" (the "Hindenburg Report"). This report questioned the valuation of Genius and revealed the truth regarding Defendants' representations. Specifically, the Hindenburg Report showed that Rainbow Rangers was airing nine times per week in June 2020 rather than the 26-airings that Defendants represented. At the time Defendants represented Rainbow Rangers aired 26 times per week, it was airing just 12 to 14 times per week.[6] Additionally, the Hindenburg Report revealed that the shows were not airing in favorable time slots. Instead, the shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

_____

[6] For instance, during the seven-day period from March 16, 2020 through March 22, 2020 (inclusive) Rainbow Rangers aired 12 times on Nick Jr. *See* Ex. A. From March 17, 2020 through March 23, 2020 (inclusive), Rainbow Rangers aired just 13 times on Nick Jr. *Id*. And from March 18, 2020  through March 24, 2020 (inclusive), Rainbow Rangers aired just 14 times. *Id*.

21.     This revelation caused Genius shares to plunge. On June 5, shares fell by $0.92, or 14.4%, to close at $5.94 per share on heavy volume. The following trading day, Monday June 8, shares continued to decline, falling $0.79 per share, or 14.3% to $5.15 per share, and continued to fall by $1.18, or 26.0%, to $3.97 per share on June 9, 2020, thereby damaging investors.

22.     On top of the Hindenburg Report, on June 15, 2020, after the market closed, *Seeking Alpha* published its own critical report about Genius, containing new revelations. In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock. The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks's campaign was over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

23.     Indeed, on June 16, 2020, Genius stock declined by $0.89 per share, or approximately 14%, to $3.85 on heavy volume as investors digested the revelation from the *Seeking Alpha* report, including that Genius's shares had been artificially inflated by a previously undisclosed stock promoter, and thereby damaging investors.

24.     While the price of Genius shares was still artificially inflated, moreover, Genius once again filed securities registration documentation with the SEC. Specifically, on June 11, 2020 – just before the official launch of the Kartoon Channel! – Genius registered 60 million shares for sale by a group of "selling shareholders." These selling shareholders were the same long-standing investors who purchased shares in the direct offerings described above and were able to "cash out" their investment in the Company's securities at inflated prices. The share price listed in the prospectus was $4.51 per share.

25.     On July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020. This vague announcement significantly boosted the Company's stock price, from $2.31 on July 1, 2020 to $3.55 on July 2, 2020, as investors in the market received the press release

as a signal that the Company would be announcing a sale to Netflix or Disney. This inference was not as disconnected as it may have appeared at first blush. Indeed, just a couple of weeks earlier, Genius had published an analyst report that speculated such a transaction was "just a matter of time." After the report was published, Heyward made several misleading and suggestive statements, such as in the June 5, 2020 shareholder letter that again compared Genius to Netflix and touted a purported Company advisor as having grown a business that was eventually sold to Disney.

26.     Even so, Defendants' announcement on July 6, 2020 had nothing to do with such a sale of Genius, however, but was instead another exaggerated press release in which Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee purportedly created after his time at Marvel Entertainment. In the July 6, 2020 release, Heyward, Genius's founder, stated that "[t]he potential value in this single asset, is greater than any IP anywhere in Hollywood."[7]

27.     As investors reacted to the realization that the Company had no intention to announce a sale or other material transaction on July 6, 2020, the price of Genius stock dropped significantly — from a close of $3.55 on the previous trading day to a closing price of $2.66 on heavy volume, thereby damaging investors.

28.     On August 14, 2020, Genius filed its 10-Q for the quarterly period ending June 30, 2020. In it, the Company revealed that Arnold Schwarzenegger was not going to be both investing in Genius and receiving warrants for the Stan Lee Kindergarten series as misleadingly portrayed on June 15, 2020.

29.     The following trading day, Genius shares fell $0.05 per share, or 3.2%, to $1.55 on August 17, 2020, thereby damaging investors.

_____

[7] The next day, the Company received a letter from a law firm that disputed Genius's property rights in the Stan Lee IP and claimed that such rights had already been acquired by a company that the law firm represents. Even so, Genius made no public disclosure of this letter until March 31, 2021, when it released its Form 10-K.

30.     On October 26, 2020, Genius announced that Shaquille O'Neal would be producing a series called "Shaq's Garage" and "Through the partnership, O'Neal is also becoming a shareholder in Genius Brands", thus partially revealing that Shaquille O'Neal would likewise not be both investing capital into Genius and receiving stock as compensation for his acting, as had been teased by a statement that Heyward made on his Instagram following the June 15, 2020 announcement about a purported investment by Arnold Schwarzenegger.

31.     The following trading day, Genius stock fell by $0.11 or 7.36% to $1.44 per share, thereby damaging investors.

32.     On November 16, 2020, after the market close, Genius released its quarterly form 10-Q for the period ending September 30, 2020. In it, the Company disclosed that it was beginning to be impacted by the COVID-19 pandemic and further revealed that Shaquille O'Neal would not be both investing capital into Genius and receiving stock as compensation for his acting—as Heyward misleadingly implied in his June 27, 2020 message on Instagram.[8]

33.     In response to the above news, Genius shares fell $0.03, or 2.53%, to $1.17 per share on November 17, 2020 following the release of the November 16, 2020 10-Q, thereby damaging investors.

34.     Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms.  This release revealed that contrary to Heyward's representations on July 6, 2020, the Stan Lee IP was not "the Holy grail" of assets as the risk materialized that Genius could not monetize the Stan Lee IP as represented, likely due in part to its disputed ownership status, which the Company had concealed.

---

[8] The Instagram post by Heyward responded to what appears to be a Genius investor suggesting that the company secured an investment from Shaquille O'Neal, as it did with Governor Schwarzenegger.

35.     On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on over 100 million shares traded, thereby damaging investors.

36.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

37.     The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

39.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District. In addition, the Company's principal executive offices are in this District.

40.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange in this District.

## PARTIES

41.     As set forth in the previously filed certifications (Dkt. No. 35-2), which are incorporated herein by reference, Lead Plaintiffs Ali Alavi and A Legacy Foundation purchased Genius shares at artificially inflated prices during the Class Period and were damaged thereby.

42.     Defendant Genius is a multimedia company based in Beverly Hills, California. The Company's common stock is traded on NASDAQ under the ticker symbol "GNUS."

43.     Defendant Heyward  is the founder and was the CEO of Genius at all relevant times.

44.     Defendant Robert Denton ("Denton") served as Chief Financial Officer ("CFO") of Genius at all relevant times.

45.     Defendants Heyward and Denton are collectively referred to herein as the "Individual Defendants."

46.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects.  Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company.  Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

47.     The Individual Defendants are liable as direct participants in the wrongs alleged herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

48.    The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

49.    The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

50.    The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  This scheme: (1) deceived the investing public about the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

**Genius Was A Fledgling Media Company That Needed To Boost Its Share Price Or Face Imminent Delisting**

51.     Genius is a multimedia company that licenses entertainment content for children.

52.     Genius's shares trade on the NASDAQ and are thus subject to the listing requirements thereon. In 2019, Genius's stock struggled to maintain its status as a NASDAQ listed security because NASDAQ listing rules require an issuer's securities to maintain a minimum bid price of $1.00 per share.

53.     In July 2019, Genius's shares fell below that level. The Company's shares remained below $1.00 from July 23, 2019 through the end of the year. Accordingly, on September 4, 2019, Genius received a notification letter from the NASDAQ informing the Company that it had 180 calendar days, or until March 2, 2020, to regain compliance.

54.     The September 4, 2019 NASDAQ letter further stated that for Genius to regain such compliance, its shares must sustain a minimum bid price of $1.00 per share for 10 consecutive days.

At no point between July 23, 2019 and the end of that year did Genius shares ever trade above $1.00 per share for even a day, let alone the 10 days required by applicable listing rules.

**The Pandemic Contributes To A Vulnerable Pool Of Capital**

55.     In early 2020, the COVID-19 pandemic began to take hold and forced many people to work from home. It also prompted an unprecedented amount of fiscal and monetary stimulus, including several support payments being paid directly to individuals. For instance, some people received direct payments of $1,200, which was

---

subsequently followed by $600 and $1,400 payments.[9] Eventually, a lot of this money made its way into the domestic equity markets: one survey of 430 investors (an adequate sample size to generate inferential statistics) found that roughly 50% of investors between 25 and 34 years old planned to spend *half* of their pandemic stimulus on stocks.[10]

56.     With many working from home—just as they were receiving unprecedent amounts of government stimulus—many people, especially younger generations, turned to buying stocks for the first time. Apex Clearing, a financial services provider that facilitates trades for brokerage firms, reported that one million new accounts opened in 2020 had an average age of *just 19 years old* and this burgeoning pool of unsophisticated capital "skyrocketed" and flooded the public markets.[11]

57.     As the New York Times reported in a March 21, 2021 story:

The speculative appetite of small investors like Mr. Sanchez may seem at odds with an economy still reeling from a pandemic that has killed more than half a million Americans, decimated jobs and snuffed out businesses and livelihoods. But one of the biggest tools deployed by the U.S. government to cushion the economic blow — stimulus payments — is also driving a huge surge in investing by small traders.

Analysts at Deutsche Bank recently estimated that as much as $170 billion from the latest round of stimulus payments could flow into the stock market. They conducted a survey of retail traders in which respondents said they planned to put roughly 40 percent of any payment they received — or $2 of every $5 — into the stock market. Traders

---

[9]     https://www.pgpf.org/blog/2021/03/what-to-know-about-all-three-rounds-of-coronavirus-stimulus-checks

[10]     https://www.cnbc.com/2021/03/08/how-the-young-plan-to-spend-stimulus-checks-deutsche-bank.html

[11]     https://www.reuters.com/article/us-retail-trading-numbers/factbox-the-u-s-retail-trading-frenzy-in-numbers-idUSKBN29Y2PW

between the ages of 25 and 34 said they expected to put half of their stimulus check into stocks.

"That could lead to a bit more mania, speculation in the market," said Patrick Fruzzetti, managing director and partner at Hightower Advisors, an investment firm. The "stimmies," he said — using a popular online term for stimulus checks — will go into people's trading accounts, and "they will trade."

For a decade before the pandemic, small investors accounted for roughly a tenth of trading activity in the stock market. But in the last year, they have become responsible for close to a quarter, according to Goldman Sachs analysts.[12]

58.    Retail investors are more susceptible to fraud. Indeed, a December 2020 report by the Board of the International Organization of Securities Commissions ("the IOSC report") found:

What is clear as the pandemic continues to unfold is that there are challenges for retail investors in navigating volatile markets amidst rapidly changing information (or misinformation), and possibly limited resources or accessibility to suitable financial advice, particularly where excessive risk taking or hardship issues are involved.

\*       \*       \*

During the COVID-19 pandemic, IOSCO members have increasingly been concerned about fraudulent schemes related to COVID-19, which have appeared in different forms and mainly targeted retail investors.[13]

59.    It was against this backdrop that Defendants engaged in a scheme to artificially inflate Genius stock, including by making false and misleading statements throughout the Class Period. At times, Heyward interacted directly with investors on social media.

---

[12]   Available at:   https://www.nytimes.com/2021/03/21/business/stimulus-check-stock-market.html

[13]   https://www.iosco.org/library/pubdocs/pdf/IOSCOPD669.pdf (at pp. 2-3)

SECOND AMENDED CLASS ACTION COMPLAINT

15

60.     Recognizing the need to boost the Company's stock at a time when retail investors were more susceptible to being manipulated, Defendants began a stock-promotion scheme designed to take advantage of the increasing presence of retail investors in the marketplace.

### Step One In A Pump-and-Dump: Secure the Promoter

61.     Defendants' scheme involved both conduct and false statements. Defendants' conduct included: (1) structuring a private transaction that allowed Heyward to make perfectly-timed trades in the Company's securities – on terms unavailable to public market investors; (2) engaging in self-dealing through related-party transactions that lacked audit committee oversight and were not disclosed until well after the scheme ran its course; (3) hiring an undisclosed stock promoter and apparently coordinating disclosures with said promoter; (4) arranging for payments of an undisclosed provider of investor relations that appears to be the promoter; (5) concealing the involvement of the promoter; (6) engaging in selective discussions with investors on social media; (7) repeatedly touting the credentials of a Company advisor in a misleading way to give the appearance that the company might be sold to Netflix or Disney; (8) editing articles of the stock promoter ahead of the articles' release and timing those articles to coincide with favorable Genius news so as to amplify the effect in the market; and (9) adopting and/or ratifying misleading content of third-party analysts to spread misinformation throughout social media and the financial markets.

62.     This conduct was all done to boost the price of Genius shares so that the Company could regain its listing on the NASDAQ and sell into such strength, with the result being largely that retail investors would eventually hold securities that would, and eventually did, plummet in value.

63.     Defendants' scheme was aggressive and well-orchestrated. The volume of press releases issued by Genius after the equity offerings and compliance extension from the NASDAQ in March increased markedly from the prior year. In the nine

months after the March 9, 2020 offering (in which Heyward participated), Genius issued 60 press releases, or 57% more than it issued during all 2019.[14]

64.    Additionally, many of these press releases appear to have been coordinated with PennyStocks. For example, on all the following dates, Genius issued a press release *and* PennyStocks issued a report on Genius: April 20, 2020; May 6, 2020; May 13, 2020; June 3, 2020; June 15, 2020; June 23, 2020; July 2, 2020; July 22, 2020; and July 27, 2020.

65.    None of the above press releases by PennyStocks include any disclosure that Genius reviewed and edited content before its publication, nor did it disclose any compensation that it apparently received from Genius.

66.    This media blitz, which appears to have been coordinated, led to a surge in trading volume and volatility for Genius shares.

67.    Trading volume in Genius shares began to increase during the second half of 2019, following the Company's retention of PennyStocks, though its trading volume did not parabolically explode until the following year.

68.    The average daily volume of Genius's shares during the first half of 2019 was just 46,414 shares.[15] By contrast, the average daily volume increased to 252,900 shares during the second half of 2019, but were still well below the following year, when in 2020 average daily volume rocketed to 27.6 million shares, representing over an 18-fold (or 18,135%) increase compared to the full year 2019.

69.    Average daily volume during the Class Period was even higher -- around 40.4 million shares on average.

---

[14]    To be clear, this figure includes no press releases issued by PennyStocks.

[15]    The first half is measured as all trading days between January 2, 2019 and June 28, 2019.  The second half comprises all trading days between July 1, 2019 through December 31, 2019.

70.   This explosion in volume resulted in large part from PennyStocks' involvement. Such involvement had the added harmful effect of increasing volatility in Genius's shares beyond the level it would have seen absent such promotional activity. For instance, volatility in the Company's shares surged in response – rising by around 60% from the first half of 2020 to the second half of the year, according to data provided by Bloomberg L.P., as shown in the graphic immediately below [16]



71.   This volatility harmed investors and was proximately caused by Genius engaging an undisclosed stock promoter.

72.   According to its website, PennyStocks only publishes favorable information because it is "compensated to only publish favorable information." It also states that not all information is sent to investors at the same time, and that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, *then subsequent investors will pay inflated prices for any securities of the Profiled Issuers* that they purchase." The

---

[16] This measurement is based upon 90-day volatility. According to Bloomberg, it calculates 90-day volatility as "[a] measure of the risk of price moves for a security calculated from the standard deviation of day to day logarithmic historical price changes. The 90-day price volatility equals the annualized standard deviation of the relative price change for the 90 most recent trading days closing price, expressed as a percentage."

website also explained that "[t]his will likely result in the Profiled Issuers having trading losses."[17]

73.    In addition to publishing only favorable reports about a company, as PennyStocks concedes, apparently PennyStocks will even publish content provided to it *directly by the issuer*, without ever attributing it as coming from the issuer.

74.    Defendants worked closely with PennyStocks. For instance, Confidential Witness 1 ("CW1") was employed as an Associate Manager with Genius between February 2019 through November 2019. CW1 reported to SVP of Global Consumer Products, Llyod Mintz, and later to VP of Franchise Marketing & Communications, Jamie Sikorski. According to CW1, while employed at Genius, CW1 was directed by EVP of Business Development & General Manager of Kartoon Channel!, Jon Ollwerther, to proofread an article about Genius that would subsequently appear on PennyStocks.  Ollwerther told CW1 that it was important to boost the stock price of Genius to keep it registered on the NASDAQ.  Ollwerther, moreover, reported directly to Heyward, and CW1 stated that all major decisions went to Heyward for final approval.

75.    Neither Genius nor PennyStocks disclosed the relationship, and PennyStocks misleadingly omitted that it received compensation from Genius and/or Heyward within the disclaimer section of its website. For instance, its disclaimer lists other entities that have paid PennyStocks for its promotional services, but not Genius.

76.    Even so, despite omitting that it received compensation from Genius, between January 22, 2020 and the time of the filing of this pleading, Genius-related promotions appear on PennyStocks under the tab "curated stories" tab on Genius' landing page within PennyStocks—strongly suggesting that such stories are, in fact, paid for given: (1) PennyStocks' admission that it only publishes favorable stories because that is what it is compensated to do; (2) CW1's being instructed by Genius

---

[17]    Available here: https://pennystocks.com/disclaimer/

executives to edit articles on PennyStocks before they were published; and (3) Genius's subsequent disclosures that it paid $356,844[18] in compensation to purported and unnamed investor relations professionals, a significant portion of which was paid in stock.

77.    At Genius's height, the shares Genius likely paid to PennyStocks reached a value just shy of $1.1 million.[19] For Genius, which described itself as a "tiny company," $1.1 million represented more than its *entire revenue* during the year ended 2019 and more than double its revenue for the year ended 2018.

78.    In sum, according to the red flags provided by the federal agency that enforces the U.S. securities laws—Genius's conduct throughout the Class Period bears all the hallmarks of a textbook pump-and-dump scheme. Together with the above scheme, Genius also made various false and misleading statements in furtherance of the scheme.

### Step Two In A Pump-and-Dump: Buy Low
### Heyward Makes Perfectly Timed Purchases

79.    At no point between when Genius received its warning from the NASDAQ and the beginning of the Class Period did Genius's shares trade above $1.00 for 10 straight days. Genius, nevertheless, received an extension from the NASDAQ to comply with its listing requirements. Accordingly, on March 5, 2020, Genius disclosed in a Form 8-K filed with the SEC that it received notification from the NASDAQ two days earlier that it had been granted a 180-day extension to regain compliance. That extension gave Genius until August 31, 2020 to get its shares above $1.00 for 10 straight days.

---

[18] Genius paid 43,077 shares on January 8, 2020 and 49,610 shares on June 22, 2020, totaling 92,687 shares. On June 22, 2020, Genius' stock was $3.85 per share.  92,687 shares x $3.85 per share = $356,844.

[19] Genius shares hit a high of $11.73 on June 4, 2020. $11.73 x 92,687 = $1,087,219.

80.     Six days after receiving its listing extension from the NASDAQ, Heyward and others got in early through a perfectly-timed purchase on March 11, 2020, when Genius conducted several direct offerings of shares to certain "long standing investors," whereby millions of shares were sold to these investors at prices below the publicly traded market price.

81.     On March 11, 2020, the Company sold a tranche of convertible notes ("the Notes") that included warrants[20] for up to 65.6 million shares of the Company's securities. The warrants attached to the Notes came with an exercise price of just $0.26 per Genius share, which was later reduced to just $0.21 per share. Defendant Heyward participated in this deal, investing $1,000,000 of his own money.[21]

82.     The Notes were superior to anything public market investors could obtain. These securities: (1) were safer than stock[22]; (2) carried an original issue discount of 20%; yet (3) provided even more upside than common stock because the notes convert at $0.2568 per share, which was later reduced to $0.21, and with the Notes' original issue discount of 20%, Heyward's $1.0 million investment ultimately converted into 5,952,381 shares of Genius stock ($1,200,000 / $0.21 per share).

83.     Heyward did this at a time when Genius shares only traded roughly 619,229 shares per day[23], meaning that had he tried to purchase nearly six million shares of stock in the open market, it would have taken him ***over nine trading days***

---

[20] A Warrant is essentially an option, in this case a call option, that gives the holder the right but not the obligation to purchase equity in Genius at a given price.

[21] According to the Form 10-K for the year ended December 31, 2020 ("the 2020 10-K"), the March 11, 2020 transaction closed on March 17, 2020, which is the same day that Heyward contributed his capital for the Notes.

[22] The securities Heyward bought were convertible notes, which stand before common stock in a liquidation. *See* the SPA at 1 "The Notes will rank senior to all outstanding and future indebtedness of the Company, and its Subsidiaries (as defined below). . . "

[23] For the period of January 1, 2020 through March 11, 2020.

---

(assuming similar volume levels) and likely driven up the price substantially in the process because his purchases would have represented 100% of the average volume at the time. In other words, there is effectively no way he could have secured that many shares at such a low price in the open market—his participation in the Notes transaction was a key part of the scheme.

84.     The Notes also contained a Lockup Agreement that forbid the holder from selling any shares of Genius common stock for 1-year and 90 days from the date of the transaction.

**Step Three In A Pump-and-Dump: Cover Your Tracks**

**The SPA Contained False and/or Misleading Statements**

85.     The same day Heyward made his purchase of the Notes, Genius filed a Form 8-K related to the Company's entry into a Material Definitive Agreement. Heyward's transaction included a Securities Purchase Agreement ("the SPA"). The SPA stated that the Company had not directly or indirectly manipulated the shares of the Company, nor paid any person compensation for the solicitation of purchases of the Company's shares.

86.     More specifically, it stated:

> The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

87.     The above statement sought to reassure investors that the transaction involving Heyward purportedly was not part of a pump-and-dump scheme and would not artificially manipulate the price of Genius shares.

**Step Four In A Pump-and-Dump: Start Pumping**

**Defendants misrepresented Rainbow Rangers' airing schedule**

88.     Just six days after Heyward loaded up on his Notes, the Company issued its second false statement, when on March 17, 2020, Genius issued a press release entitled "Nickelodeon Expands Daily Broadcast of Genius Brands International's Hit Preschool Series, Rainbow Rangers."  The press release stated in part:

> Genius Brands announces today that Nickelodeon, a Viacom Inc. company (Nasdaq: VIA, VIAB), has ***again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week.*** Nick Jr. now airs Rainbow Rangers Monday – Friday, four airings per day, and six airings on the weekends.

89.     The purported expansion was material news to investors because, among other reasons, it was the Company's marquee program and Nick Jr. was one of two customers that accounted for 65% of Genius's revenue during the year ended December 31, 2019.[24] But the Company's statement about Rainbow Rangers was untrue. At the time Defendants represented Rainbow Rangers aired 26 times per week on Nick Jr., it was airing just 12 to 14 times per week,[25] though this was unknown to investors until June 8, 2020, when the Hindenburg Report would reveal the discrepancy.  For the week of March 16, 2020, through March 22, 2020, Rainbow Rangers aired between just once or twice per day, either at 3:51 am, as on March 16 through March 18, 2020, or at 4:11 am and 4:35 am, as on March 19, 2020 through

---

[24] The Company's 2019 10-K also stated that "During the year ended December 31, 2019 compared to December 31, 2018, [Licensing & Royalties revenue] increased $414,820, or 92%, ***primarily due to increases*** [sic] ***revenues generated from Rainbow Rangers*** and Llama Llama properties in 2019." Similarly, the Company's Television and Home Entertainment segment, which comprised 82% of Genius's 2019 revenue "increased $4,493,363 or 1,388%, ***primarily due to*** the revenue generated in 2019 from the delivery of the Llama Llama Season 2 to Netflix ***and Rainbow Rangers Season 1 to Nickelodeon*** and Shanghai Senyu Media in China."

[25] *See supra*, note 6; Ex. A.

1   March 22, 2020, respectively. *See* Ex. A showing a web archive of the Nick Jr. airing
2   schedule for 10 consecutive days beginning March 16, 2020.[26]

3          90.    As the false statements noted above entered the market, Genius shares
4   began to rise. For instance, on March 19, 2020, Genius's shares rose by 25.6% on
5   statistically significant volume.

6          91.    On the same day that the Rainbow Rainbows statement was made,
7   Heyward received $483,600 for purported producer fees that the Company
8   purportedly owed him from the prior year, although this would not be disclosed
9   publicly until March 31, 2021, when the Company's 2020 10-K was filed.

10         92.    Two days after Heyward's receipt of the above undisclosed related party
11  payment, (and eight days after the March 11, 2020 Securities Purchase Agreement
12  was filed), Bernard Cahill, a California attorney and member of the Company's Board
13  of Directors, resigned "due to personal reasons" on March 19, 2020.  Mr. Cahill was
14  also a member of the Company's audit committee.

15         **Heyward also made misleading statements about Genius's purported**
16         **immunity to COVID-19.**

17         93.    The day after Board Member Cahill's resignation, in a March 20, 2020
18  shareholder letter, Heyward touted the Company's purported resilience to Covid-19,
19  stating: "In light of the COVID-19 coronavirus, will Genius Brands be affected like
20  other businesses? The answer is simple. No."

21         94.    This misrepresentation would be the first of several misleading
22  statements Heyward would make about the potential impact that COVID-19 had on
23  Genius's business over the course of the Class Period as shown in the table
24  immediately below.

25

26  _____
    [26] As the Hindenburg Report would later reveal, the airing frequency dropped even
27  further between March 17, 2020 and June 5, 2020.  And as of this filing, Rainbow
    Rangers airs just once per day, at 3:51 am – a time when virtually no children are
28  awake.

| Heyward | Company Filing |
|---|---|
| In light of the COVID-19 coronavirus, **will Genius Brands be affected like other businesses?**"<br><br>The answer is simple. **No.**<br><br><br><br><br>March 20, 2020<br>Shareholder letter | The outbreak has potential to have an adverse impact on the entertainment industry and, if repercussions of the outbreak are prolonged, **could have a significant adverse impact on our business**, which could be material. **The Company's management cannot at this point estimate the impact of the outbreak on** it's business and no provision for this outbreak are reflected in the accompanying financial statements.<br><br>March 30, 2020<br>2019 10-K |
| Heyward | Company Filing |
| Kartoon Channel! is what we like to call a "Netflix for kids," except it is free. There is no subscription fee. It is fully ad-supported. It is a pure cartoon play, with no "natural predators," and what one of our board members described as **an "economic vaccine for COVID-19."**<br><br>May 13, 2020<br>Shareholder letter | **The [COVID-19] outbreak . . . could have a significant adverse impact on our business**, which could be material. . . .the "Company's **management cannot at this point estimate the impact of the outbreak** on its business and no provision for this outbreak are reflected in the accompanying financial statements.<br><br>May 18, 2020<br>Q1 2020 10-Q |
| Heyward | Company Filing |
| **Further, we do not anticipate being impacted by COVID-19.** . The business of cartoons has historically had an appeal that is timeless, and is a rare asset class which has historically been resistant to typical market forces (e.g., the price of gold, oil, interest rates, elections, etc.). . . . We believe we **will see robust and accelerated revenue growth coming forth in this arena for the foreseeable future**.<br><br>June 8, 2020<br>Shareholder letter | **The Company's management cannot at this point estimate the impact of COVID-19 on its business** . . . We will continue to actively monitor the situation and may take further actions that alter our business operations . . . **It is not clear what the potential effects** any such alterations or modifications may have on our business, including . . . **on our financial results**.<br><br><br><br>August 14, 2020<br>Q2 2020 10-Q |

95.     On March 24, 2020, the Company sold four million shares in a direct

offering for proceeds of approximately $1 million. The Company sold the shares to

long-standing investors at $0.25 per share although the then-current market price was $0.31 per share.

96.   On March 30, 2020, Genius filed its annual report on Form 10-K with the SEC for the period ending December 31, 2019 ("the 2019 10-K). The 2019 10-K was signed by Heyward and Denton.

97.   In the 2019 10-K, the Company stated that "The Company's management cannot at this point estimate the impact of the outbreak on its business and no provision for this outbreak are reflected in the accompanying financial statements."[27]

98.   The 2019 10-K also stated the following about Genius's Risk Factors related to the Company's common stock:

> **Our stock price may be subject to substantial volatility, and stockholders may lose all or a substantial part of their investment**. Our common stock currently trades on the Nasdaq Capital Market. There is limited public float, and trading volume historically has been low and sporadic. As a result, the market price for our common stock may not necessarily be a reliable indicator of our fair market value. The price at which our common stock trades may fluctuate as a result of a number of factors, including the number of shares available for sale in the market, quarterly variations in our operating results, actual or anticipated announcements of new releases by us or competitors, the gain or loss of significant customers, changes in the estimates of our operating performance, market conditions in our industry and the economy as a whole.

---

[27] The full statement reads as follows:

With respect to the ongoing and evolving coronavirus (COVID-19) outbreak, which was designated as a pandemic by the World Health Organization on March 11, 2020, the outbreak has caused substantial disruption in international and U.S. economies and markets. The outbreak has potential to have an adverse impact on the entertainment industry and, if repercussions of the outbreak are prolonged, could have a significant adverse impact on our business, which could be material. The Company's management cannot at this point estimate the impact of the outbreak on its business and no provision for this outbreak are reflected in the accompanying financial statements.

99.   The risk factors in the 2019 made no mention of what impact an undisclosed stock promoter such as PennyStocks could have on Genius's share price even though PennyStocks admits that not all information is sent to investors at the same time, and that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, ***then subsequent investors will pay inflated prices for any securities of the Profiled Issuers*** that they purchase.

100.   The 2019 10-K also contained a section with the heading "Board of Directors, Executive Officers, Promoters and Control Persons", which is the only mention of the word "promoter" in the 2019 10-K.

### The Company's Purported Relationship With Mattel

101.   On May 5, 2020, Genius issued a press release announcing that its "Master Toy Partner" Mattel, Inc., ("Mattel") would begin selling its Rainbow Rangers toys into Walmart.

102.   On May 6, 2020, Genius issued a Form 8-K, signed by Heyward that contained the press release from the day prior. The press release within the 8-K included a statement from Heyward that read "I have said many times that ***toys are the key category*** of licensed products for a property like Rainbow Rangers, and this new line from Mattel signals a very big step for the brand. The SKU is well priced to the current retail environment and represents tremendous value to the kids who love our show. With the addition of the new toy line, we now have licensed product in the market ranging from $1.50 all the way to $109.99 MSRP in a variety of different product categories."[28]

---

[28] Just two days earlier, Mattel issued its own 8-K that stated "Mattel committed to a planned 4% reduction in its non-manufacturing workforce. The timing of this action was accelerated due to the impact of COVID-19. Mattel expects to incur severance and restructuring charges of approximately $13 million, consisting solely of cash (footnote continued)

103.   On May 6, 2020 Genius shares rose 42% on heavy volume.

**Step Five in A Pump-and-Dump: Start Quietly Dumping**

**The Company Cashes In As Shares Rise**

104.   The next day, Genius capitalized on its newfound price appreciation when on May 7, 2020, Genius conducted a direct offering of eight million shares for proceeds approximating $2.8 million. The Company also sold the shares to long-standing investors at $0.35 per share even though the then-current market price was $0.48.

105.   The May 7, 2020 offering also contained a Securities Purchase Agreement that represented:

> Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Shares.

106.   On May 11, 2020, Genius conducted another direct offering of 12 million shares for total proceeds of $5.4 million.  Similarly, the Company sold the shares to long-time investors for $0.45 per share even though the shares traded for $0.83 cents.

107.   Two days later, Heyward penned a May 13, 2020 shareholder letter, where he compared Kartoon Channel! to an "economic vaccine" for COVID-19.

---

expenditures for employee termination and severance costs, starting in the second quarter of 2020 through the end of 2020. As a result of the reduction in force actions initiated in 2020, Mattel expects to realize approximately $40 million of run-rate cost savings exiting 2020." On the same day, Mattel withdrew its 2020 earnings guidance "***due to the high level of uncertainty around the impact of COVID-19***".

108.   On May 18, 2020, Genius issued its quarterly report for the period ending March 31, 2020 ("the Q1 2020 10-Q) with the SEC.  In it, Genius stated that "There have been no material changes to the Risk Factors set forth in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019."

109.   On May 19, 2020, Genius sold 7.5 million shares to long-time shareholders at $1.20 per share, even though the then-current market price was $1.50 per share.

110.   As Defendants' fraudulent conduct began to have its desired effect, the Company's shares continued to rise, reflecting in part the accompanying artificial inflation warned of by PennyStocks, but undisclosed by Genius. The Company thus learned on May 28, 2020 that it had regained its compliance with NASDAQ's listing requirements. In response, over 130 million shares of Genius stock traded.

111.   The next day, on May 29, 2020, Genius sold another 20 million shares in a direct offering to long-time shareholders.

112.   On June 11, 2020 – just before the official launch of the Kartoon Channel! – Genius registered 60 million shares for sale by a group of "selling shareholders." These selling shareholders were the same long-standing investors who purchased shares in the direct offerings described above who were now able to "cash out" their investment in Genius at inflated prices. The share price listed in the prospectus was $4.51 per share.

On October 28, 2020, the Company conducted another offering and also entered into a Purchase Agreement with investors wherein the Company agreed to issue and sell, 37,400,000 shares of Genius stock along with warrants to purchase up to 37,400,000 shares of common stock, at an offering price of $1.55 per share of Common Stock and a warrant to purchase one share of Common Stock for gross proceeds of approximately $57.9 million before deducting offering expenses in a registered direct offering.

**Step Six in A Pump-and-Dump: Keep Pumping**

**The Company Adopts And/Or Ratifies a Third-party's Statement Regarding a Rumored Buyout of Genius By Netflix or Disney**

113.   On June 3, 2020, an article by *Insider Financial* was published with the headline "*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*" This article caused Genius shares to surge by 42.8%, to $4.02 per share on over 185 million shares – triggering stock pauses (temporary halts due to volatility) throughout the day.

114.   Given the various stock halts, and Heyward's frequent interaction with potential investors, it is highly likely that he was aware of the cause for such volatility and was thus aware of the *Insider Financial* report that prompted it.

115.   Heyward seized on the opportunity to give investors indicia that a sale of Genius to Netflix or Disney was in the works. For example, while Heyward made misleading comparisons between Genius and both Netflix and Disney throughout the Class Period, after the June 3, 2020 *Insider Financial* article came out, these comparisons struck a different tone – one more overt and deceptive and ultimately included tweeting an *Insider Financial* article that again speculated on the sale.

116.   For instance, beginning just two days after the *Insider Financial* Report, Heyward touted the background of a Genius Board Member and "appointee" who worked for Fox Kids Networks, including a statement that sought to link the sale of Fox Kids Networks *to Disney for $5.3 billion*—insinuating that the "appointee" effected the sale. On its face, this statement may seem innocent enough, but not when considering the context and the retail investor base Genius had. Moreover, Heyward omitted that Disney bought Fox Kids Networks roughly three years after the Company's "appointee" left Fox Kids Networks and that the appointee was really no more than an advisor to Genius, presumably, an informal one. Finally, Heyward would then repeat the above statement (or a substantially similar variation) five

times[29] in various Company communications that fell between the June 3, 2020 *Insider Financial* article that began the speculation of a sale, and June 22, 2020, when Genius would publish a second *Insider Financial* article to its corporate Twitter page that likewise speculated about such a sale.

117.   The "appointee" is Margaret Loesch ("Loesch"), who was, and had been, a Genius Board of Directors member since March 2015. On her LinkedIn page, Loesch claims to be an advisor to Genius. *See* Ex. B.

118.   Even so, on June 5 (just two days after the *Insider Financial* report) Genius issued a press release announcing the "appointment" of Loesch as "as Executive Chairman of the New Kartoon Channel!" According to the Press Release, Loesch was "the founding president and CEO of Fox Kids Networks Worldwide, growing the channels across all metrics, where it was eventually *sold to the Walt Disney Company for $5.5 billion.*"

119.   The June 5 press release did not state that Loesch left Fox News roughly three years before it was sold to Disney for $5.2 billion.[30] It also did not state that Loesch's role with Genius is that of an "advisor", as her LinkedIn page states.

120.   The same day, Genius also issued another shareholder letter. The June 5, 2020 shareholder letter similarly stated:

> I am proud to share that this morning we announced the engagement of the most successful programming executive in the history of children's television, Margaret Loesch, as Executive Chairman of Kartoon Channel!

---

[29] The repetitions included: (1) the June 5, 2020 press release; (2) the June 5, 2020 Shareholder Letter; (3) the June 8, 2020 press release responding to short seller criticism; (4) the June 12, 2020, press release announcing Kartoon! Channel; and (5) the June 18, 2020 blog posted to Genius's website.

[30] Loesch's LinkedIn page states that she left Fox Kids Worldwide in October 1998. According to public information, Disney acquired Fox Kids Worldwide for $5.2 billion in October 2001.

Loesch was the founding president and CEO of Fox Kids Networks Worldwide, growing the channels across all metrics, ***where it was eventually sold to the Walt Disney Company for $5.5 billion***.

121.  Three days later, Heyward again entangled Genius with market rumors of a sale to Disney or Netflix by again reiterating that "Margaret [Loesch] was founding CEO of FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars" in a June 8, 2020 response to a short seller report.

122.  Again, on June 12, Heyward stated "Margaret founded and built Fox Kids Network, a product that was eventually sold to the Walt Disney Company for $5.5 billion" in a press release announcing the launch of the Kartoon! Channel.  The same day, Twitter user @chrishon8 responded to Genius' corporate twitter page, asking "Will there be a Disney BO?"[31]

123.  Similarly, on June 13, 2020, user @BeKindToAll_xo, responded to Genius's twitter page saying "Future Today merger / buyout?"

124.  Five days later, on June 18, 2020 in a signed blog posted to Genius' website, Heyward again stated:

All of this under the leadership of Margaret Loesch, the most successful programmer in children's television history, herself, the former President of Marvel Entertainment, and Founder and CEO of FOX Kids, who, after putting on blockbuster children's content like Power Rangers and X-Men, which ***was sold in 3 years time to the Walt Disney Company for $5.5 Billion dollars.*** And for good measure, add David Neuman, former President of Walt Disney Television, our Chief Content Officer, of Kartoon Channel!

125.  And because the above information is both misleading as to Loesch's role and irrelevant to most of the press releases that it appeared in, the cogent and compelling inference is that Defendants purposefully sought to entangle Genius with

---

[31] "BO" presumably stands for "buy-out".

the speculation throughout the market. This fact is further evidenced by Defendants' subsequent adoption and/or post-publication ratification of a June 21, 2020 *Insider Financial* article that again affirmatively speculated that Genius could be sold to Netflix or Disney.

126.   On June 22, 2020 Genius published the June 21, 2020 *Insider Financial* report on the Genius Twitter page. In Genius' June 22, 2020 republication, the Company also pulled specific quotations from the article and repeated them in the post on the Company's Twitter account -- establishing that it had been reviewed by Genius executives. In so doing, Genius impliedly represented the accuracy of the *Insider Financial* analysis—including the conclusion that Genius would be sold to Disney or Netflix— and this was done on the Company's Twitter page:



127.  Genius also sought to draw additional attention to the article by including hashtags and dollar signs[32] adjacent to the Company's ticker—thus clearly entangling Genius with the views of the article itself, ratifying its content, and even going one step further and seeking to draw attention to it by tagging it with hashtags and dollar signs.

128.  Like the June 3, 2020 report, the June 21, 2020 report also discussed a potential sale of Genius to either Netflix or Disney, saying "it's just a matter of time"

129.  The June 21, 2020 report also stated:

NETFLIX OR DISNEY?
Before Citron and Hindenburg attacked the company, our subscribers got in before the big move to $11 as we at Insider Financial speculated that Disney or Netflix would buy Genius Brands. As we said earlier this month:

Consider the shows in development and the depth of characters in the Genius Brands International portfolio. Disney bought Marvel for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. We believe ***it's only a matter of time before either Disney or Netflix buys Genius Brands International***.

130.  By posting this article to the Company's website, Genius endorsed, adopted, and/or ratified the statement. And by quoting a portion of it, Defendants established that they in fact read the article and were aware of its misleading content.

131.  This was the ***only third-party analyst report that Genius republished on its Twitter account during the Class Period***. In other words, it was not as if Genius published analyst reports routinely: in over a year, the only report it elected to publish on its Twitter account was one that speculated on a sale of Genius to Disney.

---

[32] Users on Twitter use a dollar sign in front of a ticker to denote that it refers to a stock. So if one wanted to search for discussions of Genius stock on Twitter, he or she could enter $GNUS into the search function, and all posts tagged as such would show up. Hashtags work the same way, but are not limited to discussion of an equity security.

132.   Genius made no attempt to dispute the statement that "it's only a matter of time before either Disney or Netflix buys Genius Brands."[33]

133.   Rather, just days later, on July 2, 2020, Heyward announced that he would be hosting a conference call on July 6, 2020, to discuss a "key business development update."

134.   In response, investors became even more confident that the July 6 "key update" would be the announcement of a sale to Netflix or Disney, as Defendants had been teasing for weeks. For instance, on Twitter, users who appear to be either investors or prospective Genius investors responded to the Genius announcement with statements such as:

@ekemaSteven: "Disney buyout!?!?"[34]

@stungmedia: "or a buyout"?[35] and

@watercoolerview: "@GNUSBrands Great to see a #GeniusBrands @netflix or @disneyplus partnership or buyout. Great for the product to move into the streaming big league. Big news on Monday!"[36]

135.   Around the same time Defendants were making and ratifying misleading statements about a possible sale of the Company to Netflix or Disney, they also made misleading statements related to the Company's relationship with Arnold Schwarzenegger.

---

[33] Because the *Insider Financial* speculation about a sale to Disney inflated Genius' shares just a few weeks earlier, the Company's subsequent ratification of the statement served to maintain some of that inflation but did not cause the stock to increase meaningfully on June 22, 2020.

[34] On July 2, 2020 at 6:25 am PT.

[35] On July 2, 2020 at 7:43 am PT.

[36] On July 3, 2020 at 4:10 am PT.

136.   For instance, on  June 15, 2020, Genius made a series of announcements, including on social media, relating to a purported "investment" by Arnold Schwarzenegger.

137.   The headline read "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" right above the statement "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten", giving investors the misleading impression that Schwarzenegger was both investing capital into Genius and receiving stock as compensation for his acting.

138.   One social media post that the Company adopted included a story by *tvkidsdaily* that misleadingly stated, "Arnold Schwarzenegger Invests in Genius Brands", with nothing more in the headline. Genius also retweeted this on the Company's Twitter page.



139.   The Company also made the following posts to its own social media accounts, again using hashtags and dollar signs to further attract the attention of investors and prospective investors:





140.   In response, Genius shares surged 8% to $4.52 on June 15, 2020.

141.   Twelve days later, Heyward had the following dialogue on Heyward's Instagram page, which uses the handle "@realgadgetandy" on June 27, 2020:



142.   The above statement suggested that, on top of Schwarzenegger purportedly "investing" in Genius, an imminent investment from Shaquille O'Neil was also in the works, thus giving investors the misleading impression that Shaquille

O'Neil would, like Arnold Schwarzenegger, both invest capital into Genius and receive stock as compensation for his acting.

### **The Truth Is Partially Revealed**

143.   On June 4, 2020, Citron Research ("Citron"), a well-known analyst that has exposed prior corporate frauds, including in Valeant,[37] questioned the valuation of the Company and suggested the use of an undisclosed promoter.  Specifically, among other things, Citron posted several critical comments on social media, including a posting that read "$GNUS to $1...fast  The lowest form of retail investor. Consider:  LTM $GNUS rev $5 mil mkt cap $800 mil compare to leader WildBrain (teletubbies) LTM revenue of $332 million mkt cap $175 mil Not to mention massive dilution at $GNUS.  ***Stock Promotion***."

144.   The Citron tweet revelation that Genius may be using an undisclosed stock promoter caused Genius shares to fall by $1.07 per share, or 14.5% to $6.86 per share on heavy volume.

145.   Additionally, on Friday June 5, 2020, Hindenburg published the Hindenburg Report.  This report also questioned the valuation of Genius and examined Defendants' misrepresentations.

146.   With respect to Genius' Rainbow Rangers intellectual property, the Hindenburg Report showed that Rainbow Rangers was actually airing nine times per week, rather than the 26-airings figure noted in Genius's press release. Moreover, the episodes were not airing in favorable time slots and were, instead, being broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

147.   Upon the release of the Hindenburg Report, the price of Genius common stock fell $0.92, or over 13% on heavy volume, to close at $5.94 per share on June 5, 2020, damaging investors.

---

[37]   https://www.forbes.com/sites/antoinegara/2015/10/21/valeant-plunges-30-after-short-seller-citron-research-makes-fraud-allegation/?sh=24195a0d64ae

148.   The Hindenburg Report spotlighted Defendants' misrepresentations about, among others, the Rainbow Rangers airing schedule and as a result, removing some prior artificial price inflation that came with them.

149.   And the Company's response to the Hindenburg Report, which came the next trading day, also revealed additional truths to the market.

150.   On Monday June 8, 2020, the Company issued a response to the Hindenburg Report (*see* ¶202, *infra*) that contained both admissions and false denials. As to the former, Defendants either admitted or failed to dispute – and therefore impliedly admitted – that: (1) Rainbow Rangers had not been renewed for a new season on *Nick Jr.*; (2) Rainbow Rangers aired between 12 to 14 times per week at the time the statement was made and only nine times per week at 3:49 a.m. EST during weekdays and Saturdays and twice on Sunday mornings between 6:00 a.m. and 7:00 a.m. by June, not 26 times and (3) a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits. And as for the latter, Heyward doubled down on certain earlier misrepresentations, such as those related to the Company's resilience to Covid-19, and he also reiterated the purported relationship between Loesch and her role in the sale of Fox Kids to Disney, among others.

151.   The combination of (a) continued selling pressure from the revelations from the Hindenburg Report with (b), the Company's additional implied admissions, kept Genius shares pressured for the following two trading days: on June 8, 2020, Genius shares fell by $0.79 per share, or 14.3%, to $5.15 per share on heavy volume; and on June 9, 2020, Genius shares fell by $1.18, or 26.0%, to close at $3.97 on heavy volume.

## **The Truth Is More Fully Revealed**

152.   On June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations. In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock. The report then

analyzed various press releases issued by PennyStocks, and concluded that once PennyStocks's campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years" revealing both the undisclosed relationship between PennyStocks and Genius and thus, that such relationship would have the effect of making Genius shares more volatile than disclosed in the Company's 2019 10-K risk factors.

153. Indeed, on June 16, 2020, Genius stock declined by approximately $0.89 per share, or 14% to close at $3.85 per share on heavy volume as investors digested the revelation from the *Seeking Alpha* report, including that Genius's shares had been artificially inflated by a previously undisclosed stock promoter.

154. The selling continued the next day and on June 17, 2020, Genius shares fell by $0.75 per share, or 21.7% on heavy volume to close at $3.10 per share.

155. Finally, on July 6, 2020, Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time at Marvel Entertainment. There was no discussion of a sale to Disney or Netflix, as had been misleadingly intimated by Genius's republication and ratification of the June 21, 2020 *Insider Financial* report.

156. Following the July 6, 2020 press release, the price of Genius's stock plunged and on heavy volume from a close of $3.55 on the previous trading day to a closing price of $2.66 per share on July 6, 2020 as investors came to realize that the purported "key business development" update had nothing to do with a sale to Disney or Netflix, as Heyward and Defendants had led them to believe.

157. In response to the July 6, 2020 news, twitter user @_jules replied to the Genius corporate twitter page saying, "announce Disney merger." Twitter user @ffanstasypro1 also replied to the Genius corporate page after the announcement saying, "did any one [sic] here [sic] about the Disney news yet? Is it true".

158. Brian Murphy (@BrianMu63331595) also replied to the Genius corporate page, on July 6, 2020 in response to the Genius press release: "Gnus once

again pumps it's [sic] stock only to let shareholders take the hit, way to make your investors non believers left bleeding from the eyes!"

159.   While there was no transaction between Disney and Genius, the July 6, 2020 press release did contain false and/or misleading statements such as Heyward's statement that, "there simply is no greater treasure chest of Intellectual Property anywhere" and "This is the Holy Grail. Stan Lee Universe is a once in a lifetime asset drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time."

160.   Genius also represented that the Stan Lee Universe would be "Jointly owned" between Genius and Pow! Entertainment. Heyward also stated "Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount." The July 6 press release also stated, "The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated Stan Lee Universe program block."

161.   The next day, Genius received a letter from a law firm ("the July 7 Letter") alleging that the rights Genius Brands had licensed from POW!, LLC, through its the Stan Lee Universe, LLC joint venture, had already been sold to another company, represented by that law firm." The law firm also stated that the Company was "interfering with their contractual rights." The July 7 Letter exposed a material risk that Genius would not be able to monetize the Stan Lee IP consistent with the ways represented in the July 6, 2020 press release, but the Company concealed the July 7 Letter, and the accompanying undisclosed risk, until March 31, 2021.

162.   On August 14, 2020, the Company issued its Form 10-Q for the period ended June 30, 2020 (the "2Q 2020 10-Q"), wherein it disclosed that it issued 49,610 shares of its Common Stock, then valued at $3.85 per share, to a provider of investor relations services.  The Company also disclosed that its General and Administrative expense for the three-month period ending June 30, 2020 increased 52% compared to

the same period a year earlier.  Genius attributed the increase to salaries, stock-based compensation, legal fees and "*investor relations*" expense.  A reasonable inference can be drawn that the 49,610 shares issued by the Company to a "provider of investor relations services" went to PennyStocks as compensation for its favorable stock promotion campaign that it undertook on behalf of the Company and as first suggested by the June 15, 2020 *Seeking Alpha* Report.

163.   In the same 2Q 2020 10-Q, the Company also detailed a May 25, 2020 issuance of warrants that presumably went to Governor Schwarzenegger for his work on Stan Lee's Superhero Kindergarten as initially discussed in a June 15, 2020 press release.  The 10-Q provided additional information not previously disclosed by the June 15, 2020 press release:

> The Company issued to an individual and his management company 2,284,172 warrants to purchase shares of Common Stock at $1.39 per share for his involvement with the production and distribution of a television series being developed by the Company. The warrants have a 10-year term and are fully vested upon issuance.

> The warrants become immediately exercisable in whole upon the earlier of May 21, 2021 or the first date the series is exhibited on television or is otherwise available for viewing through a streaming service or otherwise on the internet. The Company anticipates the warrants will become exercisable by December 31, 2020. The warrants were valued at $3,174,806 using the Black-Scholes option pricing model. The warrants were issued as an advance payment against participation amounts that will become due to the individual upon the performance of the series. The warrants are being accounted as non-employee compensation expense which has been recorded as prepaid participation expense over the expected exercise period. As of June 30, 2020, $519,514 was recorded as prepaid participation expense. The valuation inputs for the warrants included expected volatility of 253.01%, and annual risk-free interest rate of 0.7%.

164.   The inference from the disclosure above is that it describes the relationship with Governor Schwarzenegger because the Company did not publicly disclose any other transaction in which it would be issuing warrants in connection

with the production of a TV series during Q2 2020. However, unlike the press release, nowhere in the 10-Q is it suggested that Governor Schwarzenegger would become a "significant investor" in Genius and receive warrants as compensation for his acting services. Rather, the 10-Q makes clear that the warrants the Company paid to Governor Schwarzenegger are a form of non-cash compensation and are accordingly booked as an expense, and thus revealing that Governor Schwarzenegger would not be both investing capital into Genius and receiving stock as compensation for his acting.

165. The following trading day, Genius shares fell $0.05 per share, or 3.2%, to $1.55 on August 17, 2020, thereby damaging investors.

166. On October 26, 2020, Genius announced that Shaquille O'Neal would be producing a series called "Shaq's Garage" and "Through the partnership, O'Neal is also becoming a shareholder in Genius Brands", thus partially revealing that Shaquille O'Neal would not be both investing capital into Genius and receiving stock as compensation for his acting.

167. The following trading day, Genius stock fell by $0.11, or 7.36%, to $1.44 per share, thereby damaging investors.

168. On November 16, 2020, after the market close, Genius released its quarterly form 10-Q for the period ending September 30, 2020. In it, the Company disclosed that it was in fact susceptible to the COVID-19 pandemic:

> In terms of our consumer products business, ***we are starting to see some negative impact from COVID-19*** as consumer activity decelerates in the U.S. and across the world. Global supply chain issues had a negative impact on the timing of certain toy releases. ***The toy manufacturing business has experienced slowdowns related to global supply chain issues*** caused by the COVID -19 outbreak. Equally important, the retail toy business has suffered a slowdown and closures effecting toy sales. New to market brands are impacted more severely by a slowdown in physical retail sales. Other consumer products licensees' business is driven, by toy sales, so a there is a negative downstream effect

across the industry. If the COVID-19 outbreak is prolonged, we will see a negative impact on our revenues.

169.   The above revealed the falsity of Heyward's prior statements related to Genius's purported resilience to COVID-19 and also represented the materialization of a previously undisclosed risk that COVID-19 could pose to the Company's previously announced deal with Mattel.

170.   The November 16, 2020 10-Q also stated "On October 15, 2020, the Company issued to an individual and his management company $500,000 in cash, 1,000,000 shares of the Company's common stock at $1.44 per share and 1,000,000 warrants to purchase shares of Common Stock at $1.39 per share for his involvement with the production and distribution of a television series being developed by the Company", which presumably relates the October 26, 2020 press release related to Shaq's garage, thus further revealing that Shaquille O'Neal would not be, be both investing capital into Genius and receiving stock as compensation for his acting as Heyward misleadingly implied in his June 27, 2020 message on Instagram by comparing Shaquille O'Neal to Governor Schwarzenegger.

171.   In response to the above news, Genius shares fell $0.03, or 2.53%, to $1.17 per share, on November 17, 2020, following the release of the November 16, 2020 10-Q.

172.   Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms, and impliedly admitted that Genius did not control the same breadth of IP that it represented in the July 6, 2020 press release and Shareholder letter[38], and thereby

---

[38] Compare the July 6, 2020 shareholder letter, stating "Stan Lee Universe, will assume worldwide rights, in perpetuity, to the name, physical likeness, physical signature, *live and animated motion picture*, television, online, digital, *publishing*, *theme park, comic book*, merchandising and licensing rights to Stan Lee and *his IP creations past\*, present, and going forward*" (original emphasis omitted, current emphasis added) *with* the March 30, 2021 press release, stating "'Stan Lee Universe', (footnote continued)

1  materializing a previously known but undisclosed risk that the content could not be
2  monetized in the ways suggested by the July 6, 2020 press release.

3      173.   On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on
4  over 100 million shares traded, thereby damaging investors.

5              **Post Class Period Disclosures**

6      174.   On March 31, 2021, Genius filed its 10-K for the period ending
7  December 31, 2020.  In it, the Company said that Genius is "starting to see some
8  ***negative impact from COVID-19*** as consumer activity decelerates in the U.S. and
9  across the world. Global supply chain issues had a negative impact on the timing of
10 certain toy releases." At pp. 22.   The Company continued, "[i]f the COVID-19
11 outbreak is prolonged, we will ***see a negative impact on our revenues***." The 2020 10-
12 K also stated, "[t]he [COVID-19] outbreak . . .  could have a significant adverse
13 impact on our business, which could be material" and the "Company's management
14 cannot at this point estimate the impact of the outbreak on its business."

15     175.   Moreover, the 2020 10-K also stated that on July 7, 2020 the Company
16 learned from a law firm that "the rights Genius Brands had purportedly licensed" for
17 its "Stan Lee Universe, LLC joint venture had already been sold to another company"
18 and that Genius was "interfering with their contractual rights."  The Company learned
19 of this law firm letter one day after releasing its July 6, 2020 press release that had
20 promised that "[t]he potential value in this single asset [the Stan Lee JV], is greater
21 than any IP anywhere in Hollywood," but made no disclosure of it until the 2020 10-
22 K on March 31, 2021.

23

24

25  _____

26  its recently announced joint venture with POW! Entertainment, LLC, controls the
    Stan Lee name, the animated and live Stan Lee likeness, the Stan Lee signature, as
27  well as the broad Stan Lee brand/Stan Lee Presents, and a variety of Stan Lee
28  properties created post Marvel."

176. This disputed legal status of the IP makes it harder for Genius to monetize its purported Stan Lee asset, and thereby creates a known risk associated therewith.

177. On May 18, 2021, the Company issued its Form 10-Q for the period ending March 31, 2021. In it, the Company disclosed that on April 7, 2021, the Company finalized a Mutual Termination Agreement with Mattel, Inc., with regard to its Rainbow Rangers property.

**Defendants profit greatly form the above scheme through Related Party Transactions Made Possible By The Company's Stock Issuances**

178. The series of secondary offerings conducted by Genius flooded Genius' coffers and allowed Heyward to realize substantial personal gain as a result, though the full extent that Heyward and Denton profited was not fully disclosed until the 2020 10-K.

179. The 2020 10-K revealed several lucrative and previously undisclosed related party transactions between the Company and Heyward—such as the $389,989 spent for "security at Mr. Heyward's residence" (at pp. 39, 47). The 2020 10-K also revealed that Heyward was paid the following in cash compensation during 2020: (1) a base salary of $311,717; (2) a bonus of $73,528; (3) purported producer fees of $161,200 for 13 half-hours of delivered content for *Rainbow Rangers* (series 1); (4) $322,400 for 26 half-hours of *Rainbow Rangers Season 2* airings — making a combined total of $483,600 for purported "executive producing fees" that Heyward received from the Company during 2020; (5) $11,370 in interest on Senior Convertible Notes Heyward held; and (6) $3,000 for board fees Heyward received. At pp. 39-40, 46.[39]

---

[39] These amounts are on top of another $322,400 in separate purported producer fees that Heyward was still "owed" as of December 31, 2020.

180.   In total, the 2020 10-K reports that Heyward received $1,252,834 in cash compensation during 2020—$873,589 of which stemmed from purported executive producing fees and purported "security costs" at his residence. The 2020 10-K also revealed that on December 7, 2020, Heyward's salary was increased to $430,000 from $300,000, even though Heyward had entered into a five-year employment agreement on November 16, 2018 that called for an annual salary of $300,000.

181.   A significant portion of Heyward's 2020 compensation was paid *the same day* he made his "investment" in the Notes. On March 17, 2020, the day the March 11, 2020 Note Transaction closed (and thus the day Heyward contributed his $1,000,000 investment), Genius paid Heyward approximately $483,600 for purported earned but then unpaid executive producer fees.[40] And as noted above, by the end of 2020, Heyward received a total of $1,252,834 in cash compensation—meaning that he managed to cash out his *entire* March 11, 2020 "investment" plus another $252,834 while still retaining his entire ownership stake. In other words, Heyward effectively de-risked his entire March 11, 2020 purchase of the Notes, *and* received a 25%+ return, *and* kept his entire initial equity stake received through warrants attached to the Notes.

---

[40] According to the 2020 10-K:

> Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode for which he provides services as an executive producer. The first identified series under this employment agreement is Rainbow Rangers. As of March 31, 2019, twenty-six half hours had been delivered and, accordingly, Mr. Heyward was owed $322,400. The second series identified was Rainbow Rangers Season 2. Thirteen half hours of Rainbow Rangers Season 2 were delivered in the fourth quarter of 2019 and, accordingly, Mr. Heyward was owed $161,200. ***Mr. Heyward was paid the total amount due to him of $483,600 for his producer services on March 17, 2020***.

182.   On top of the cash payments Heyward received, the 2020 10-K also established that Heyward was awarded a combined 15,000,000 shares of restricted stock units and another 5,000,000 stock options, helping him maintain his ownership stake without being diluted like common shareholders were.

183.   All told, Heyward's compensation went from $411,500 in 2019, *to $17.4 million in 2020: an increase of over $17.0 million, or 4,138%.*

184.   All the above related party transactions appear to have **been made without Audit Committee oversight** because the 2020 10-K notes that the above transactions were made **before** the adoption of the Audit Committee charter, and "Pursuant to the written charter of our Audit Committee, the Audit Committee is responsible for reviewing and approving all transactions both in which (i) we are a participant and (ii) any parties related to us, including our executive officers, our directors, beneficial owners of more than 5% of our securities, immediate family members of the foregoing persons and any other persons whom our Board of Directors determines may be considered related parties under Item 404 of Regulation S-K, has or will have a direct or indirect material interest.". At a minimum, such transactions were made without the benefit of audit committee member Cahill's oversight following his resignation.

185.   The 2020 10-K also showed that Denton increased his total compensation by more than eightfold: from $262,439 in 2019, to $2,163,908 in 2020. In addition, on December 7, 2020, the Company granted 950,000 stock options to Denton with a strike price of $1.39 and a term of 10 years. 380,000 of the options vested on the grant date with the remaining options vesting 190,000 each of the next three years. On December 7, 2020, the Company also granted 475,000 Restricted Stock Units to Denton.

186.   The substantial personal gains Defendants realized would not have been possible absent the stock sales made throughout the Class Period– and those sales

would not have been possible without the surge in price and volume that Defendants' manipulative scheme generated.

**Materially False and Misleading
Statements Issued During the Class Period**

187.   On March 11, 2020, Genius filed a Form 8-K with the SEC related to the Company's entry into a Material Definitive Agreement, wherein Defendant Heyward, among others, purchased Senior Secured Convertible Notes. The Senior Secured Convertible Notes contained warrants convertible into the Company's common stock, at a price of $0.26 per share.  Attached to the March 11, 2020 Form 8-K was Exhibit 10.1, the Securities Purchase Agreement between the Company and the Purchasers of the Convertible Notes, including Defendant Heyward. The Securities Purchase Agreement stated the following:

> (q) Manipulation of Prices. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, ***or paid any compensation for soliciting purchases of, any of the Securities***, or (iii) other than the Agent, paid or agreed ***to pay to any person any compensation for soliciting another to purchase any other securities of the Company***.

188.   The statements referenced in ¶187 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because, at the time the statement was made, the Company had engaged the services of stock promotion site, PennyStocks, to publish and disseminate favorable information about Genius's shares beginning in late 2019, and that the Company in fact paid PennyStocks 43,077 shares of Genius common stock on January 8, 2020 plus an additional 49,610 shares of Common Stock on June 22, 2020. According to PennyStocks, "during the [promotion] Campaign, the trading volume and price of the securities of each Profile Issuer will likely increase significantly [and]

[w]hen the Campaign ends, the volume and price of the Profiled Issuer will likely decrease significantly." PennyStocks published misleading articles including by omitting that it received compensation from Genius; and omitting that it permits Genius to review, edit, and approve articles before PennyStocks disseminates them. Moreover, PennyStocks also states that it contacts certain clients before it publicly disseminates its articles, which constitutes solicitation of investments. Thus, payment for such services constitutes, at best, "compensation for soliciting purchases of, any" Genius shares and/or "pay[ing] any Person any compensation for soliciting another to purchase any other securities of the Company." At worst, it constitutes an "action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company."

189. On March 17, 2020, Genius issued a press release entitled "Nickelodeon Expands Daily Broadcast of Genius Brands International's Hit Preschool Series, Rainbow Rangers." The press release stated in part:

> "Genius Brands" announces today that Nickelodeon, a Viacom Inc. company (Nasdaq: VIA, VIAB), has **again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week.** Nick Jr. now airs Rainbow Rangers Monday – Friday, four airings per day, and six airings on the weekends.

190. The statements referenced in ¶189 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because at the time the statement was made, Rainbow Rangers did not air 26 times per week. *See* Ex. A; note 6, *supra*. Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired between 12 to 14 times per week at the time the statement was made, not 26. During the week of March 17, 2020 through March 23, 2020 (i.e., the week the statement was made), Rainbow Rangers aired between just one or two times per day, at either 3:51 am or 4:11 and 4:35 am, respectively.

191.   The same day Genius issued its March 20, 2020 shareholder letter, it also hosted a conference call. During that conference call, Heyward reiterated his statement that Rainbow Rangers airs 26 times on Nick Jr:

> On Tuesday, I also announced that Rainbow Rangers is now up to 26 broadcast per week on Nick Jr. We intend to share a significant number of releases regarding Rainbow Rangers in the coming days, but I do want to say in brief that it's now being broadcast in the entire western hemisphere.

192.   The March 20, 2020 shareholder letter also stated, "Cartoons endure. We announced Tuesday that Rainbow Rangers is now up to 26 broadcasts a week on Nick Jr.!!!"

193.   The statements referenced in ¶¶191-92 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because at the time the statement was made, Rainbow Rangers did not air 26 times per week.  *See* Ex. A note 6, *supra*.  Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired between 12 to 14 times per week at the time the statement was made, not 26. During the week of March 17, 2020 through March 23, 2020 (*i.e.*, the week the statement was made), Rainbow Rangers aired between just one or  two times per day, at either 3:51 am or 4:11 and 4:35 am, respectively.

194.   On March 30, 2020, Genius issued the 2019 10-K.

195.   The 2019 10-K stated the following about its Risk Factors related to the Company's common stock:

**Our stock price may be subject to substantial volatility, and stockholders may lose all or a substantial part of their investment**.
Our common stock currently trades on the Nasdaq Capital Market. There is limited public float, and trading volume historically has been low and sporadic. As a result, the market price for our common stock may not necessarily be a reliable indicator of our fair market value. The price at which our common stock trades may fluctuate as a result of a number of factors, including the number of shares available for sale in the market, quarterly variations in our operating results, actual or anticipated announcements of new releases by us or

competitors, the gain or loss of significant customers, changes in the estimates of our operating performance, market conditions in our industry and the economy as a whole.

196.   The 2019 10-K also contained a section under Item 10 with a heading entitled "Board of Directors, Executive Officers, Promoters and Control Persons", which is the only mention of the word "promoter" in the 2019 10-K.

197.   The statements referenced in ¶¶195-96 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) they failed to disclose the existence and use of a stock promoter which was misleading given that the 10-K has a heading titled "Board of Directors, Executive Officers, Promoters and Control Persons", leading a reasonable investor to believe that if a promoter was being used, it would have been disclosed within that section of the 10-K, otherwise use of the word "promoter" would be superfluous; and (2) they failed to disclose that Genius was paying PennyStocks to publish articles with the aim of boosting the market price of Genius's common stock and that such undisclosed promotional activity could – and indeed did – have an impact on the volatility of Genius' stock, a fact Defendants knew or should have known because the warning on PennyStocks website cautions that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors *subsequent investors will pay inflated prices for any securities of the Profiled Issuers* that they purchase" and that "[t]his will likely result in the Profiled Issuers having trading losses." Genius, however, made no similar disclosure and thus failed to disclose the material risk that PennyStocks' promotional campaign could have on Genius shares.

198.   On May 13, 2020, Genius issued a press release which attached another "Shareholder Letter" from Defendant Heyward. The letter stated in part:

Kartoon Channel! is what we like to call a "Netflix for kids," except it is free. There is no subscription fee. It is fully ad-supported. It is a pure cartoon play,

with no "natural predators," and what one of our board members described as an "***economic vaccine for COVID-19***."

199.   The statements referenced in ¶198 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (a) Heyward continued to give a misleading impression that Genius was insulated from the effects of Covid-19 (referring to Kartoon Channel! 'an economic vaccine') when just five days later the Company admitted that "could have a significant adverse impact on our business, which could be material" and (b) Genius's statement that "we do not anticipate being impacted by COVID-19" conflicts with the Company's risk disclosure statement on May 18 that says "The [COVID-19] outbreak . . . could have a significant adverse impact on our business, which could be material. " *See* ¶94, *supra*.

200.   On May 18, 2020, Genius issued its quarterly report for the period ending March 31, 2020 ("the Q1 2020 10-Q) with the SEC.  In it, Genius stated that "There have been no material changes to the Risk Factors set forth in our Annual Report on Form 10-K for the fiscal year ended December 31, 2019."

201.   The statements referenced in ¶200 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because they failed to disclose that Genius was paying PennyStocks to publish articles with the aim of boosting the market price of Genius's common stock and that such undisclosed promotional activity could – and indeed did – have an impact on the volatility of Genius's stock.

202.   On June 8, 2020, Genius responded to the criticism raised by the Hindenburg Report and the Citron postings.  Specifically, the Company stated the following:

**Genius Brands International Responds to Misleading Short Seller Criticisms**

BEVERLY HILLS, Calif. – (BUSINESS WIRE) – Genius Brands International, Inc. "Genius Brands" (NASDAQ:GNUS) today released the following statement from CEO and Chairman Andy Heyward, in response to recent short seller criticisms published online and on certain social media platforms:

"Genius Brands has carefully reviewed the report and social media comments published by two short seller funds last week. These materials contain numerous misleading statements, omissions of key facts, and red herrings. More importantly, the short sellers themselves demonstrate a fundamental misunderstanding of the unique potential of Genius Brands and our position of strength given the current dynamics of our industry.

It is also important to keep in mind how these short sellers make money and what they are trying to do. Make no mistake, their intention – and indeed *how they make their money* – is to manipulate the stock price of companies like ours in order to profit at the expense of other shareholders. Their interests are directly opposed to shareholders' interests. In contrast, as one of the largest investors in the Company ***myself, my interests are fully aligned with those of my fellow shareholders – and will remain so***.

With that in mind, I submit the following:

**We are well positioned to create substantial value** – With Kartoon Channel! Launching on June 15 and to be available in more than 100 million U.S. TV households and 200 million mobile devices, we are positioned to be one of the preeminent ad-supported kids' digital networks. The service referred to as a 'Netflix for kids' is made even stronger by the distinct fact that it is a free service. There are no subscriptions fees, it is ad-supported. ***Further, we do not anticipate being impacted by COVID-19.*** The business of cartoons has historically had an appeal that is timeless, and is a rare asset class which has historically been resistant to typical market forces (e.g., the price of gold, oil, interest rates, elections, etc.). While the rest of Hollywood is grinding to a stop during the COVID-19 crisis, we're creating new products for an audience that is growing now out of the new technologies and streaming services. This is especially true at a time when there are

more kids at home and in front of their devices during the pandemic. ***We believe we will see robust and accelerated revenue growth coming forth in this arena for the foreseeable future.***

**Our balance sheet is strong** – We have $9.75 million of debt; in excess of $45 million of cash, significant receivables from a diverse array of companies across our industry with strong credit profiles, and low overhead. Today, Genius Brands has enough cash on our balance sheet to meet our existing obligations and execute on our business plan for at least 60 months, *and still fund continuing new production and content acquisitions each year*. Conveniently, last week when one of the short sellers stated we weren't at the same revenue point as one of our Canadian-based competitors, he neglected to mention that the other company has *more than 60 times* ($600 million) as much debt as Genius Brands. We think identifying this omission is important to understanding the whole story. Finally, to clear up market confusion that we believe has been generated as a result of one short seller's report, the shelf registration on form S-3 filed on June 4th was related to our capital raise in March 2020. We registered the resale of shares underlying the warrants we issued in March, and the S-3 filing does not in any way represent a new capital raise, nor is it related to recent changes in our stock price.

The short sellers' criticisms of our Programs highlight their own industry ignorance – Llama Llama is an industry-recognized tremendous asset that we have on great terms, which are mutually beneficial with the IP's author/book publisher and ourselves. We are also confident in the appeal of the soon to be launched Stan Lee's Superhero Kindergarten, one of the last creations of Stan Lee, creator of Spider-Man, X-Men, Iron Man, Incredible Hulk, Thor, Fantastic Four, Black Panther, and the Avengers, among others. Similarly, we are happy with the outlook for Rainbow Rangers. The fact is that the show's airings on Nick Jr. have been scaled back while we are currently producing new episodes, which is a standard industry practice known as "resting." We expect the airings to ramp back up in August when the new episodes are completed and this will be timed ***with the launch of toys from Mattel hitting the shelves of Walmart in August***. We are confident Nick Jr.'s interests are aligned with ours – after all, they have a stake in the consumer products merchandising royalties related to this asset.

**The track record of our leadership team speaks volumes** – Our senior management comes largely from the Walt Disney Company, DreamWorks Animation, and Hasbro Toys, and has been responsible for many of the biggest and most profitable hits in children's television history, as well as toy and consumer product programs generating Billions of dollars of program sales and royalty income.  The management team and board have had creative, licensing, production, broadcasting, and sales roles in some of the biggest animated hits in children's history, including *Lion King, Toy Story, Strawberry Shortcake, Care Bears, Power Rangers, My Little Pony, Spider-Man, Batman, X-Men, Transformers, Muppet Babies, Fraggle Rock, Real Ghostbusters, and Inspector Gadget*.  Collectively, w*e have more than 150 years of experience in children's media*, and have helped generate literally tens of billions of dollars of content and consumer products sales.

Further, last Friday, we announced the addition of two of our industry's most accomplished executives overseeing the new channel: Margaret Loesch as Executive Chairman of *Kartoon Channel!* (former President of Marvel Entertainment, FOX Kids, and Henson Television), and David Neuman as Chief Content Officer of *Kartoon Channel!* (former President of Walt Disney Television). ***Margaret was founding CEO of FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars***. None of us claim to be experts at 'short selling'. But we also think it's a stretch for short sellers to claim to know more about this industry than those of us who have been industry leaders and spent decades making money for investors while building some of the sector's most successful brands and companies.

**Genius Brands is a long-term growth story** – We have a number of hit brands and shows today – but we are even more excited about what is coming, and the synergies with the newly announced *Kartoon Channel!*. We have over 450 licensed products contracted (with advances and guarantees) to come into the marketplace in the coming months. Our pipeline of new animated products, soon to be announced, is robust and pre-sold with significant brand equity.  Our partners, licensees, and retail customers include Alibaba, Amazon, Mattel, Netflix, Target and Walmart, among others. ***Rainbow Rangers toys from Mattel, based on our hit series on Nick Jr., will hit Walmart stores in August beginning with a multipack of Rainbow Rangers figures***.  Over 350 other licensed

consumer product SKUs are due as well, including publishing, room décor, bedding, footwear, apparel, health and beauty, bicycles, toothpaste, touring shows, among others, some of which are now already on Amazon.com, Walmart.com, and Target.com.

Above all else, we are focused on *long-term value*.  After working with Warren Buffett for 25 years and producing the children's animated series with Warren to teach financial literacy (*Warren Buffett's Secret Millionaires Club*), I've learned to focus on the importance of the basics: asset creation and value-building for our shareholders.

On a personal note, ***I have not sold a single share, and in fact, have materially increased my holdings in the Company in the last two years.*** We take the views of all our investors seriously, and ***we and our board are committed to maintaining the highest standards of corporate governance and transparency***."

The Company is not suggesting that any particular trading price for the Company's securities is appropriate, whether in the short- or long-term. However, we would like to seek to clarify certain facts as it relates to the short seller information that has been put into the marketplace.

Finally, the Company reserves the right to take appropriate legal action against Hindenburg Research and Citron Research, as we will always do what we can to protect our shareholders' interests. (emphasis added)

203.   The statements referenced in ¶202 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because:

**(1) Genius's statements about Loesch**

Genius failed to disclose Loesch left Fox Kids three years before its sale to Disney, and thus gave investors a misleading impression that she was the executive who executed such a transaction. Additionally, Genius failed to disclose that Loesch was operating in a mere advisory role and not an operational one. Genius's statement regarding Loesch was also misleading in light of the third-party analyst report that

suggested a sale of Genius to Disney – a fact Defendants would have known because the report led to Genius's stock being halted.

### (2) Heyward's statements about COVID-19

Genius failed to disclose the known risk that COVID-19 could have on its launch of its toys with Mattel. Genius's statement that "we do not anticipate being impacted by COVID-19" conflicts with the Company's risk disclosure statement on May 18 that says "The [COVID-19] outbreak . . . could have a significant adverse impact on our business, which could be material. " *See* ¶94, *supra*.

### (3) Heyward's statements about his ownership and corporate governance

Heyward's statement that he "had not sold a share" was misleading because: (a) under the terms the SPA he could not sell any shares, a decision he made when the Company's stock was just $0.26 per share, and by saying that he had not sold while omitting that he could not sell is misleading because it suggests that he did not sell because he had some view of Genius's stock price's value, when in fact, absent the agreement in the SPA it is possible that Heyward would have sold; (b) Heyward's statement that he had not sold and those related to corporate governance were materially misleading because Heyward omitted that the Company paid him $483,600 the same exact day he "invested" $1,000,000, meaning he really only invested half as much as it appeared to investors; and (c) Heyward's statement that his "interests are fully aligned with those of [his] fellow shareholders – and will remain so" was misleading because he failed to disclose that he profited from material nondisclosed related party transactions that ran directly *counter* to the interests of his shareholders, such as the $389,989 the Company spent for "security at Mr. Heyward's residence" and the $483,600 Heyward received for purported "executive producing fees" during 2020 that were not disclosed until March 31, 2021. For similar reasons, Heyward's statement that "we and our board are committed to maintaining the highest standards of corporate governance and transparency" is likewise misleading because at the time this statement was made and the time of his related-party transactions, the Company's

audit charter – which is the Company's controlling document for reviewing and approving related party transactions – had not even been adopted.

204. On June 15, 2020, Genius issued a press release titled "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International." The above headline appeared right above the statement "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten."

205. The statements referenced in ¶204 above were also false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because the Company's description of the transaction involving Governor Schwarzenegger, particularly its headline, incorrectly suggested to a reasonable investor that Schwarzenegger was both investing capital into Genius and receiving stock as compensation for his acting.

206. Also on June 15, 2020, the Company adopted a misleading headline of a third-party (tvkidsdaily), that read "Arnold Schwarzenegger Invests in Genius Brands" with no further context in the headline. The Company made this adoption and/or ratification by retweeting the tvkidsdaily headline on Genius' corporate Twitter page.

207. The statement referenced in ¶206 above was false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because the Company's ratification of the tvkidsdaily story involving Governor Schwarzenegger, particularly its headline, incorrectly suggested to a reasonable investor that Schwarzenegger was investing capital into Genius, but the tvkidsdaily gave no indication that such "investment" was not a contribution of capital, but rather the receipt of equity in exchange for acting services.

208.   On June 3, 2020, an article by *Insider Financial* was published with the headline "*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*"

209.   On June 22, 2020 Genius published the June 21, 2020 *Insider Financial* report on the Genius Twitter page. In Genius' June 22, 2020 republication, the Company also pulled specific quotations from the article, including one that stated that "This is a CEO who is going to fight for his shareholders" and repeated them in the post on the Company's Twitter account.

210.   Within the June 21, 2020 report it states:

NETFLIX OR DISNEY?
Before Citron and Hindenburg attacked the company, our subscribers got in before the big move to $11 as we at Insider Financial speculated that Disney or Netflix would buy Genius Brands. As we said earlier this month:

Consider the shows in development and the depth of characters in the Genius Brands International portfolio. Disney bought Marvel for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. We believe ***it's only a matter of time before either Disney or Netflix buys Genius Brands International***.

211.   The statements referenced in ¶¶208-210 above were also false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because by posting the June 21, 2020 *Insider Financial* article to the Company's website, Genius endorsed, adopted, and/or ratified the statement and Genius made no effort to dispute any of its contents, including the statement that "it's only a matter of time before either Disney or Netflix buys Genius Brands." Rather, for a matter of weeks after the June 3, 2020 *Insider Financial* article, Heyward misleadingly touted the credentials of a purported company "appointee" that had purportedly led a company that eventually sold itself to Disney.

212.   On June 27, an Instagram user messaged Heyward "if you can convince Shaq to be an investor like Arnold that would be huge, given the fact that Shaq has a

history of smart investments [thumbs up emoji]." Heyward, using his Instagram account, @realgadgetandy, responded: "Keep watching [followed by three fireworks emojis] I can't discuss non-disclosed material events *until* they happen . . ."

213.   The statement referenced in ¶212 above was false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because Heyward implied that Shaquille O'Neil would be investing in Genius, and/or that Heyward was giving the above Instagram user the impression that he was learning about a "non-disclosed material event" before the public was.

214.   On July 2, 2020, Genius announced that it would host a conference call to discuss a "Key Business Development."

215.   The statement referenced in ¶214 above was, under the circumstances, purposefully misleading when made and/or omitted to state material facts necessary to make the statements not misleading because given the context of the days preceding this announcement – including Defendants' adoption and/or ratification of the June 23, 2020 republication of the *Insider Financial* analyst report that speculated that it was only a matter of time before Genius would sell itself to Netflix or Disney— investors were led to believe, and did in fact believe, that an announcement related to Disney or Netflix was forthcoming, when it was not.

216.   On July 6, 2020, Genius indeed issued a press release detailing the "key" update and hosted a conference call to discuss the same. In the July 6, 2020 press release, CEO Heyward stated the following:

> ***This is the Holy Grail***. Stan Lee Universe is a once in a lifetime asset drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time
>
> Jointly owned and subject to due diligence and documentation, the deal will leave Genius Brands as the managing and controlling partner of the ***Stan Lee Universe*** joint venture.
>
> Stan Lee was the creator of the most successful characters ever made, including Spiderman, Iron Man, Black Panther, The Incredible Hulk, X

Men,     Thor,     Captain     America, Ms.     Marvel, Silver Surfer, Antman, Nick Fury, Guardians of the Galaxy, and of course the #1 movie box-office franchise of all time, The Avengers.  For decades, Stan was the editor and creative force behind Marvel Comics**, which was sold to the Walt Disney Company for $4.4 billion** and has since proved to be worth many multiples of that amount.

In addition to the #1 movie box office hit, Avengers Endgame, Stan Lee created two of the Walt Disney Company's top three blockbusters, and five of the top 12 grossing movies of all time.

"It's almost impossible to conceive that one mind created all this wealth," said Heyward. "The spinoffs alone defy the imagination. From animated television, to toys, apparel, video games, and every conceivable licensed product imaginable, Stan Lee characters populate the screens and retail shelves worldwide. There is no creator who has influenced pop culture and created more successful entertainment. Not even Walt Disney. Over and over, again and again, he created characters and stories that resonated in the hearts and minds of all peoples of all ages around the world, with billions and billions and billions of dollars of motion picture box-office, television, and consumer product licensing."

Stan Lee Universe will be built from the repository of all of the characters and IP created by Stan Lee, post-Marvel Entertainment*, not otherwise elsewhere.  It is drawn from over 100 original Stan Lee creations, from which it will develop and license approximately seven properties per year.

"Having worked with Stan and been a close friend for almost 30 years, nothing could make me prouder than for Genius Brands to become the guardian of both his brand and body of work," commented Heyward. "I have no doubt that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN,  his BLACK FURY, and VIRUS."

\*     \*     \*

> ***I have no doubt*** that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN,  his BLACK FURY, and VIRUS. (original emphasis).
>
> \*     \*     \*
>
> When we looked at the depth of these creations that sit in this library, the magnitude and value of this asset slowly began to sink in. ***There simply is no greater treasure chest of Intellectual Property anywhere***.[41]

217.   The July 6, 2020 press release also represented that the Stan Lee Universe would be "Jointly owned."  Heyward also stated, "Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount." The July 6 press release also stated "The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated Stan Lee Universe program block."

218.   During the July 6, 2020, conference call discussing the Stan Lee update, Heyward made the following statement:

> Now let me speak to something our investors will be interested in, the financial impact on Genius Brands. ***The financial impact of an asset like Stan Lee Universe cannot be overstated***. We have seen what properties created by Stan Lee did for The Walt Disney Company in revenues and earnings. Not just in the billions of dollars of movie box office, but in the even greater downstream revenue across the entire business, be it television, digital, consumer products, games and theme parks. We've studied the Disney Playbook and they have done a brilliant job at bringing Stan's creativity through the food chain.
>
> Having observed and learned, we believe that we can take the next surge of Stan Lee properties 2.0 to the market in no lesser way and create a massive value for our shareholders. Just like LeBron James brought his talents to Miami and then to Cleveland and where he also won a NBA championship and now to Los Angeles, we're confident that Stan Lee

---

[41] Original emphasis omitted, emphasis here added.

Universe will once again demonstrate the creative gift of this man and the power of his brand as it now comes to Genius.

\*       \*       \*

For the Genius Brands shareholders, we look forward to smartly and efficiently monetizing Stan Lee Universe across all platforms. I have no doubt that we will attract the most talented producers, directors and marketers in the world, as we unlock this one of a kind treasury and bring forth the next wave of Stan Lee creations for the world to experience and enjoy.

219.   Finally, Heyward also penned a shareholder letter on July 6, 2020 wherein he stated:

Dear Friends and Shareholders:

This morning we announced a groundbreaking joint venture between Genius Brands International (NASDAQ:GNUS) and Stan Lee's POW! Entertainment to create STAN LEE UNIVERSE.

STAN LEE UNIVERSE, will assume worldwide rights, in perpetuity, to  the name, physical  likeness, physical  signature, live and animated motionpicture, television, online, digital, publishing, themepark, comic book, merchandising and licensing rights to Stan Lee and his IP creations past\*, present, and going forward. (emphasis omitted)

220.   The statements referenced in ¶¶216-219 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because Heyward implied that Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the box office in connection with the Stan Lee IP, even though Genius did not (a) disclose the known risk that its IP rights related to the Stan Lee project may be in dispute;[42] (b) correct

---

[42] A fact Heyward knew or was reckless in not knowing given (a) lengthy litigation history involving Stan Lee's IP, including by his own daughter; and (b) his 30-year long friendship with Mr. Lee.

the misleading impression given by the above in light of the letter that it received from a law firm the following day that challenged the Company's ownership in the Stan Lee IP given the Company's prior statement that such IP would be "jointly owned"; or (c) that the scope of the IP owned by Genius was not as broad as represented in the July 6, 2020 shareholder letter.

221. On October 28, 2020, Genius entered into another Securities Purchase Agreement ("the October 28 SPA") with certain investors pursuant to which the Company agreed to issue and sell, an aggregate of 37,400,000 shares (the "Shares") of common stock, and warrants for gross proceeds of approximately $57.9 million before deducting the placement agent fees and offering expenses.

222. The October 28, 2020 SPA also included the following provision under Representations and Warranties of the Company (¶ 3.1):

> (a) <u>Subsidiaries</u>. All of the direct and indirect subsidiaries of the Company are set forth on the SEC Reports, other than newly formed subsidiary Stan Lee Universe, LLC, which has no assets or operations. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.

> * * *

> (p) <u>Intellectual Property</u>. The Company and the Subsidiaries ***have, or have rights to use***, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and ***other intellectual property rights*** and similar rights necessary or required for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could have a Material Adverse Effect (collectively, the "<u>Intellectual Property Rights</u>"). None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or

terminate or be abandoned, within two (2) years from the date of this Agreement. ***Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports***, ***a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person***, except as could not have or reasonably be expected to not have a Material Adverse Effect. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

223.  The statements referenced in ¶222 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because on July 7, 2020, Genius received a letter from a law firm "alleging that rights Genius Brands had licensed from POW!, LLC, through its the Stan Lee Universe, LLC joint venture, had already been sold to another company, represented by that law firm" and that Genius was "interfering with their contractual rights"—which represents a clear written notice of a claim to Genius's IP (or that of a subsidiary) and/or a claim that Genius is violating the IP rights of any person, thus rendering the Company's statements above in the October 28, 2020 SPA, false and/or misleading.

## **CLASS ACTION ALLEGATIONS**

224.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Genius securities between March 11, 2020 through July 5, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

225.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Genius's securities actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Genius' securities were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by Genius or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

226.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

227.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

228.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Genius; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

229.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

230.   The market for Genius's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, and/or market manipulation, Genius's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Genius's securities relying upon the integrity of the market price of the Company's securities and market information relating to Genius, and have been damaged thereby.

231.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Genius's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Genius's business, operations, and prospects as alleged herein.

## ADDITIONAL SCIENTER ALLEGATIONS

232.   Beyond the misrepresentations alleged above, Genius is also currently embroiled in litigation that alleges – with persuasive evidence – that Genius is also making false statements in its advertising in a manner that itself borders on fraud. *See A Parent Media Co. Inc. v. Genius Brands International, Incl*, No. 2-21-cv-04897, C.D. Cal. filed June 16, 2021 ("the Parent Media action").

---

233.   That Parent Media action alleges, *inter alia*, that "Once consumers click on Defendant's bogus ad, they are taken to Defendant's website, kartoonchannel.com" even though the ad that they click on states, "Kidoodle TV – Free To Watch & Kid Safe." *See id*, at Dkt. 1 ¶ 34.

234.   In other words, Defendants use similar misleading tactics in their advertising as they are in their securities promotion: misdirection, and false and misleading statements, evidencing a pattern and practice of conduct. As plaintiff in the Parent Media Action describes:

> This infringing headline is particularly egregious in that it makes an explicitly false statement of fact that Kidoodle TV is supposedly a "new show on Kartoon Channel." ***This statement is blatantly false***, confusing, and confounding. Further, when this false advertisement was clicked, the searcher was taken to Defendant's website, kartoonchannel.com.

235.   It provides evidentiary support:



236.   To be clear, what is alleged in the Parent Media Action appears to be supported with credible evidence and is brazen: Genius represents that a competitor's program belongs to Genius.

237.   Such deception could arguably even sustain its own (post Class Period) claim for a securities violation given that Genius fails to disclose the above advertising scheme in its filings with the SEC.

238.   During Heyward's June 8, 2020 statement that responded to the Hindenburg Report Heyward stated:

> Similarly, we are happy with the outlook for Rainbow Rangers.  The fact is that **the show's airings on Nick Jr. have been scaled back** while we are currently producing new episodes, which is a standard industry practice known as "resting."  We expect the airings to ramp back up in August when the new episodes are completed and this will be timed with the launch of toys from Mattel hitting the shelves of Walmart in August.

239.   Heyward's statement above supports scienter because Rainbow Rangers had not been scaled back *after* the Company's March 17, 2020, statement announcing the purported increased airing of Rainbow Rangers to 26 times per week on Nick Jr, but had been airing as little as just once per day, including on March 16, 2020; March 17, 2020; and March 18, 2020. In other words, Heyward's March 17, 2020 statement was false when made, but when brought to light by an analyst that drew attention to the discrepancy in June 2020, Heyward implied that the show had been "scaled back" *after* the March 17, 2020 announcement when that was not the case. Rather, even during the March 17, 2020 announcement, Heyward's statement was false when made, but rather than correcting it, he offered a misleading explanation – that the airings changed after the fact.

240.   Additionally, Heyward made selective disclosures on his personal Instagram page to investors such as in July 2020 wherein Heyward reportedly stated, "why would we stop at $10????!!!" in reference to Genius' stock price. This interaction evinces: (1) Heyward's knowledge of Genius' retail investor base; (2) a

purposeful intent to boost Genius stock; and (3) that Heyward was not just monitoring social media, but also responding to it personally. It also evinces scienter to the extent that the post is no longer available.[43]



## LOSS CAUSATION

241. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations, market manipulation, and fraudulent conduct were disclosed and

---

[43] The July 2020 screenshot was discovered by counsel for Plaintiffs on Reddit and was posted by a Reddit user. The Reddit user represented that it was originally posted in July 2020, but, after a diligent search, counsel for Plaintiffs were unable to locate the reply by Heyward on Heyward's personal Instagram page.

SECOND AMENDED CLASS ACTION COMPLAINT

72

became apparent to the market, the price of the Company's securities declined significantly.

242. On June 4, 2020, famed short-seller Citron research—known for exposing public market frauds—issued a report that partially revealed the previously undisclosed risk that Genius was working with a stock promoter.

243. On this news, Genius shares fell by $1.07 per share on heavy volume, to $6.86 per share, thereby damaging investors.

244. On June 5, 2020, Hindenburg Research published the Hindenburg Report which questioned the valuation of Genius and revealed the truth regarding Defendants' representations. Among other things, the Hindenburg Report showed that Rainbow Rangers was airing nine times per week rather than the 26-airings that Defendants represented. Additionally, the Hindenburg Report demonstrated that the shows were not airing in favorable time slots.  Instead, the shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m. On this news, Genius shares fell $0.92, or 13%, to close at $5.94 per share on June 5, 2020, on unusually heavy volume.

245. The combination of (a) continued selling pressure from the revelations from the Hindenburg Report with (b), the Company's additional implied admissions, kept Genius shares pressured for the following two trading days: on June 8, 2020, Genius shares fell by $0.79 per share, or 14.3%, to $5.15 per share on heavy volume; and on June 9, 2020, Genius shares fell by $1.18, or 26.0%, to close at $3.97 on heavy volume, thereby damaging investors.

246. In addition to the Hindenburg Report, on June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations.  In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock.  The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks' campaign is over, Genius's "trading

volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

247. On this news, on June 16, 2020, Genius stock declined by approximately $0.89 per share, or 14% to close at $3.85 per share on heavy volume as investors digested the revelation from the *Seeking Alpha* report, including that Genius' shares had been artificially inflated by a previously undisclosed stock promoter.

248. The selling continued the next day and on June 17, 2020, Genius shares fell by $0.75 per share, or 21.7% on heavy volume to close at $3.10 per share

249. Furthermore, on July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020. This vague announcement significantly boosted the Company's stock price, as the price rose from $2.31 on July 1, 2020 to $3.55 on July 2, 2020. Defendants' announcement on July 6, 2020, however, was another exaggerated press release whereby Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time at Marvel Entertainment but had no announcement about a sale to Disney or Netflix as had been intimated and misleadingly implied through the Company's ratification of a third-party analyst reported that speculated on such an outcome. As investors reacted to the realization that the Company had no intention to announce a sale on July 6, 2020, the price of Genius stock dropped significantly — from a close of $3.55 on the previous trading day to a closing price of $2.66 on heavy volume, thereby damaging investors.

250. On August 14, 2020, Genius its 10-Q for the quarterly period ending June 30, 2020. In it, the Company revealed disclosures sufficient to reveal that Arnold Schwarzenegger, was not going to be both investing in Genius and receiving warrants for the Stan Lee Kindergarten series as misleadingly portrayed on June 15, 2020.

251. The following trading day, Genius shares fell $0.05 per share, or 3.2%, to $1.55 on August 17, 2020, thereby damaging investors.

252.   On October 26, 2020, Genius announced that Shaquille O'Neal would be producing a series called "Shaq's Garage" and "Through the partnership, O'Neal is also becoming a shareholder in Genius Brands", thus partially revealing that Shaquille O'Neal would not be, be both investing capital into Genius and receiving stock as compensation for his acting.

253.   The following trading day, Genius stock fell by $0.11 or 7.36% to $1.44 per share, thereby damaging investors.

254.   On November 16, 2020, after the market close, Genius released its quarterly form 10-Q for the period ending September 30, 2020. In it, the Company disclosed that it was beginning to be impacted by the COVID-19 pandemic:

> In terms of our consumer products business, ***we are starting to see some negative impact from COVID-19*** as consumer activity decelerates in the U.S. and across the world. Global supply chain issues had a negative impact on the timing of certain toy releases**.** ***The toy manufacturing business has experienced slowdowns related to global supply chain issues*** caused by the COVID -19 outbreak. Equally important, the retail toy business has suffered a slowdown and closures effecting toy sales. New to market brands are impacted more severely by a slowdown in physical retail sales. Other consumer products licensees' business is driven, by toy sales, so a there is a negative downstream effect across the industry. If the COVID-19 outbreak is prolonged, we will see a negative impact on our revenues.

255.   The above revealed the falsity of Heyward's prior statements related to Genius's purported resilience to COVID-19, and also represented the materialization of a previously undisclosed risk that COVID-19 could pose to the Company's previously announced deal with Mattel.

256.   The November 16, 2020 10-Q also stated "On October 15, 2020, the Company issued to an individual and his management company $500,000 in cash, 1,000,000 shares of the Company's common stock at $1.44 per share and 1,000,000 warrants to purchase shares of Common Stock at $1.39 per share for his involvement

with the production and distribution of a television series being developed by the Company", which presumably relates the October 26, 2020 press release related to Shaq's garage, thus further revealing that Shaquille O'Neal would not be both investing capital into Genius and receiving stock as compensation for his acting as Heyward misleadingly implied in his June 27, 2020 message on Instagram by comparing Shaquille O'Neal to Governor Schwarzenegger.

257. In response to the above news, Genius shares fell $0.03, or 2.53%, to $1.17 per share on November 17, 2020 following the release of the November 16, 2020 10-Q, thereby damaging investors.

258. Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms, and also listed a narrower set of IP that it owns than was disclosed in the July 6, 2020 shareholder letter, revealing that contrary to Heyward's representations on July 6, 2020, Genius could not monetize the Stan Lee IP as previously represented.

259. On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on over 100 million shares traded, thereby damaging investors.

260. Defendants' false and misleading statements and/or omissions and/or market manipulation had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

261. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly, causing real economic loss to investors who purchased the Company's securities during the Class Period.

262. The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's securities negate any inference

that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

263.   The economic losses (damages) suffered by Plaintiffs and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

264.   The market for Genius's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Genius's securities traded at artificially inflated prices during the Class Period.  On June 3, 2020, the Company's share price closed at a Class Period high of $7.93 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Genius's securities and market information relating to Genius and have been damaged thereby.

265.   During the Class Period, the artificial inflation of Genius's securities was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Genius's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Genius and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities.  Defendants' materially false and/or misleading statements

during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

266.   At all relevant times, the market for Genius's securities was an efficient market for the following reasons, among others:

(a)   Genius shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Genius filed periodic public reports with the SEC and/or the NASDAQ;

(c)   Genius regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)   Genius was followed by securities analysts who wrote reports and/or issued public statements about the Company, and these reports and statements were publicly available and entered the public marketplace.

267.   As a result of the foregoing, the market for Genius's securities promptly digested current information regarding Genius from all publicly available sources and reflected such information in Genius's share price. Under these circumstances, all purchasers of Genius's securities during the Class Period suffered similar injury through their purchase of Genius's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

268.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein.   Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection

under the safe harbor provision.  Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

269.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

270.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Genius's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

271.   Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genius's securities in violation of Section 10(b) of the Exchange Act and SEC Rule

10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

272.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Genius's financial well-being and prospects, as specified herein.

273.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Genius's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Genius and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

274.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate recklessness.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Genius's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

275.  As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Genius's securities was artificially inflated during the Class Period.   In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Genius's securities during the Class Period at artificially high prices and were damaged thereby.

276.  At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Genius was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Genius securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

277.  By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

278.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **SECOND CLAIM**

### **For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants**

279.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

280.   This Count is brought solely and exclusively under the provisions of Rule 10b- 5(a) and (c). Accordingly, Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

281.   During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of the Company's securities; and (iii) cause Plaintiffs and other Class members to purchase the Company's securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, and as alleged more fully herein, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b- 5(a) and (c) promulgated thereunder.

282.   Plaintiffs and the Class reasonably relied upon the integrity of the market in which the Company's securities traded. During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased the Company's securities, or if they had, would not have done so at the artificially inflated prices they paid.

---

283.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

284.   By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of the Company's securities during the Class Period.

### THIRD CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

285.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

286.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

287.   The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein.  The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory

1 involvement in the day-to-day operations of the Company and had the power to
2 control or influence the particular transactions giving rise to the securities violations.

3     288. The Individual Defendants all had ultimate authority over the
4 Company's statements, including controlling the content of such statements and
5 whether and how to communicate such statements to the public.

6     289. By reason of such conduct, the Individual Defendants are liable pursuant
7 to Section 20(a) of the Exchange Act.

8 **PRAYER FOR RELIEF**

9     WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

10     (a)    Determining that this action is a proper class action under Rule 23 of the
11 Federal Rules of Civil Procedure;

12     (b)    Awarding compensatory damages in favor of Plaintiff and the other
13 Class members against all defendants, jointly and severally, for all damages sustained
14 as a result of Defendants' wrongdoing, in an amount to be proven at trial, including
15 interest thereon;

16     (c)    Awarding Plaintiffs and the Class their reasonable costs and expenses
17 incurred in this action, including counsel fees and expert fees; and

18     (d)    Such other and further relief as the Court may deem just and proper.

19 **JURY TRIAL DEMANDED**

20     Plaintiffs hereby demand a trial by jury.

21
22
23
24
25
26
27
28

1   DATED:  September 27, 2021          **GLANCY PRONGAY & MURRAY LLP**

2
                                       By:  *s/ Ex Kano S. Sams II*
3                                      Robert V. Prongay
                                       Ex Kano S. Sams II
4                                      Raymond D. Sulentic
                                       1925 Century Park East, Suite 2100
5                                      Los Angeles, California 90067
                                       Telephone: (310) 201-9150
6                                      Facsimile: (310) 201-9160
                                       Email: info@glancylaw.com
7

8                                      *Attorneys For Lead Plaintiffs*
                                       *Ali Alavi and the A Legacy Foundation*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.   On September 27, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.   Executed on September 27, 2021, at Los Angeles, California.


_s/ Ex Kano S. Sams II_
Ex Kano S. Sams II