**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re Genius Brands International, Inc. Securities Litigation | No. 2:20-cv-07457-DSF-RAO<br><br>Order GRANTING in part and DENYING in part Defendants' Renewed Motion to Dismiss Second Amended Complaint (Dkt. 115) and DENYING Plaintiffs' Motion for Leave to File Sur-reply (Dkt. 119) |

Defendants Genius Brands International, Inc., Andy Heyward, and Robert Denton move to dismiss Plaintiffs' second amended complaint (SAC) for failure to state a claim. Dkt. 115 (Mot.). Lead Plaintiffs Ali Alavi and A Legacy Foundation oppose. Dkt. 116 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED in part and DENIED in part.[1]

[1] Plaintiffs move for leave to file a sur-reply. Dkts. 119-121. Defendants oppose. Dkt. 122. The Court finds no valid reason for additional briefing. Defendants' arguments on reply regarding the Court's authority to consider the issue of falsity with respect to the Disney/Netflix Claim is a direct response to arguments raised in Plaintiffs' opposition papers. Compare Opp'n at 3, 15 and Dkt. 117 (Reply) at 6-7. This is characteristic of a reply brief. Plaintiffs' arguments suggesting mischaracterizations in Defendants' briefing and responding to Defendants' statement that Plaintiffs have lacked candor also do not merit a sur-reply. And Plaintiffs' page count argument, dkt. 120 at 3, is frivolous. Plaintiffs' motion for leave to file a sur-reply is DENIED.

## I. Background

Genius Brands International, Inc. (Genius or the Company) is a children's media company known for cartoons such as Rainbow Rangers, Llama Llama, and Stan Lee's SuperHero Kindergarten. Dkt. 82 (SAC) ¶ 2. Genius's securities trade on the NASDAQ exchange. Id. ¶ 52. In 2019, Genius began struggling to maintain its securities at the minimum bid price of $1.00 per share required by NASDAQ listing rules. Id. Beginning on July 23, 2019, and through the end of the year, Genius's shares remained below the $1.00 threshold. Id. ¶¶ 53-54. On September 4, 2019, Genius received a letter from NASDAQ notifying the Company that it needed to come into compliance with NASDAQ's listing rules within 180 days (or by March 2, 2020). Id. ¶ 53. To regain compliance, Genius's shares were required to maintain the $1.00 per share minimum bid price for ten consecutive days. Id. ¶ 54. Genius later received a 180-day extension from NASDAQ, which gave Genius until August 31, 2020 to come into compliance. Id. ¶ 79.[2]

Plaintiffs allege that Genius employed a variety of tactics "to boost the price of Genius shares so that the Company could regain its listing on the NASDAQ . . . ." Id. ¶ 62. They also allege Genius retained a stock promoter, PennyStocks.com (PennyStocks), to publish favorable articles about Genius in exchange for over 90,000 shares of Genius common stock. Id. ¶ 76. On March 17, Genius issued a press release stating that Nickelodeon "has again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week." Id. ¶ 88. On May 7, Genius conducted a direct offering of shares that was subject to a Securities Purchase Agreement (SPA). Id. ¶ 104. The May 7 SPA, which did not disclose Genius's relationship with PennyStocks, represented that the Company had complied with U.S. Securities and Exchange Commission (SEC) Regulation M:

[2] Except where otherwise indicated, the events the Court discusses took place in 2020.

> The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Shares.

Id. ¶ 105.

In addition to the May 7 direct offering, Genius conducted direct offerings on March 11 and 24 and May 11, 19, and 29, each time selling millions of shares to "long standing investors" on conditions superior to anything public market investors could obtain. Id. ¶¶ 80-83, 95, 106, 109, 111. On June 11, Genius registered 60 million shares for sale by a group of shareholders—the same shareholders who had previously purchased shares in direct offerings under favorable conditions. Id. ¶ 112. Those shareholders were then "able to 'cash out' their investment in Genius at [the] inflated price[ ]" of $4.51 per share. Id.

On June 3, Insider Financial published an article that speculated about a possible acquisition of Genius by Disney or Netflix and the Company's shares rose by 42.8%. Id. ¶ 113. Another Insider Financial article, published on June 21, stated: "We believe it's only a matter of time before either Disney or Netflix buys Genius Brands International." Id. ¶ 129. The following day, Genius shared the June 21 article on the Company's Twitter account in a post that included hashtags and dollar signs adjacent to its stock ticker symbol, as well as a quote from the article stating that Genius's Chief Executive Officer Andy Heyward "is a CEO who is going to fight for his shareholders[.]" Id. ¶¶ 126-27. That tweet marked the only time Genius republished a third-party analyst report on its Twitter account during the class period. Id. ¶ 131.

On July 2, Heyward announced that Genius would reveal a "key business development update" on July 6, triggering some online speculation that the July 6 update would concern an acquisition of Genius by Disney or Netflix. Id. ¶¶ 133-34. But Genius did not announce a sale to Disney or Netflix on July 6. Id. ¶ 155. Instead, the Company announced that it would be entering a "joint venture with POW! Entertainment regarding the intellectual property that Stan Lee created after his time with Marvel Entertainment[,]" including over 100 original properties (the Stan Lee Universe). Id. ¶¶ 155, 159. After that announcement, the price of Genius stock fell to a closing price of $2.66 per share, down from a closing price of $3.55 on the previous trading day. Id. ¶ 156.

On July 7, Genius received a letter from a law firm claiming that the Stan Lee Universe had already been sold to a company represented by that law firm and alleging that Genius was interfering with the contractual rights of one of the law firm's clients. Id. ¶ 161. Genius did not publicly disclose the letter, or any other risks regarding the Company's rights to the Stan Lee Universe, until March 30, 2021, when Genius issued a press release that "impliedly admitted that [it] did not control the same breadth of [intellectual property] that it" had represented in the July 6 announcement. Id. ¶¶ 161, 172. Genius's shares then experienced a 22.6% drop. Id. ¶ 173.

Genius shareholders filed this putative class action alleging that Genius; its founder and CEO, Andy Heyward; and its former Chief Financial Officer, Robert Denton violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and implementing Rule 10b-5(a)-(c) by fraudulently: (1) concealing Genius's relationship with PennyStocks (PennyStocks Claim); (2) exaggerating the number of times Nickelodeon Jr. aired Genius's show Rainbow Rangers in a week (Rainbow Rangers Claim); (3) misrepresenting that Disney or Netflix would acquire Genius (Disney/Netflix Claim); and (4) overstating its rights to the Stan Lee Universe (Stan Lee Claim). Plaintiffs also assert individual claims against Heyward and Denton under § 20(a) of the Exchange Act.

On April 5, 2024, the Ninth Circuit affirmed in part and reversed in part this Court's order dismissing the SAC (Dkt. 100) and remanded for further proceedings. In re Genius Brands Int'l, Inc. Sec. Litig., 97 F.4th 1171, 1190 (9th Cir. 2024). Having concluded as to the Rule 10b-5(b) claims that Plaintiffs adequately allege falsity for the PennyStocks Claim and loss causation for the Rainbow Rangers, Disney/Netflix, and Stan Lee Claims, the circuit instructed the Court to determine on remand whether Plaintiffs sufficiently allege the remaining elements of those claims and whether Plaintiffs' allegations regarding the PennyStocks, Rainbow Rangers, Disney/Netflix, and Stan Lee Claims are sufficient to state a claim for scheme liability under SEC Rule 10b-5(a) and (c) or controlling individual liability under § 20(a) of the Exchange Act. Id.

## II. Legal Standard

### A. Rule 12(b)(6)

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). Allegations contradicted by matters properly subject to judicial notice or by exhibit need not be accepted as true, Produce Pay, Inc. v. Izguerra Produce, Inc., 39 F.4th 1158, 1161 (9th Cir. 2022); and the court is "not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557).

A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]' —'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Dismissal under Rule 12(b)(6) is proper when the complaint . . . fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

## B. Heightened Pleading Standards

Allegations of fraud are excepted from the "notice pleading" standard of Rule 8(a)(2). Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 513 (2002). Under Federal Rule of Civil Procedure 9(b), fraud claims must be pleaded with particularity. Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). Fraud claims under Rule 9(b) must still meet Iqbal's plausibility standard. Cafasso, 637 F.3d at 1055. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded by statute on other grounds). A plaintiff must include "an account of the time, place, and specific content of the false representations" at issue. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (cleaned up). Fraud allegations must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just

deny that they have done anything wrong." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).

Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc., 774 F.3d 598, 605 (9th Cir. 2014). The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012). To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc. (Glazer II), 63 F.4th 747, 765 (9th Cir. 2023) (quoting 15 U.S.C. § 78u-4(b)(1)). In addition, to adequately plead scienter under the PSLRA, "the complaint must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" Id. at 766 (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Under the "strong inference" standard, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). The standard is then met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

## III. Discussion

### A. SEC Rule 10b-5(b): Untrue Statement or Omission of Material Fact

The use of "manipulative or deceptive" practices "in connection with the purchase or sale of any security" is prohibited by § 10(b) of the Exchange Act. 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements

§ 10(b), prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Glazer II, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim under § 10(b) and Rule 10b-5, a complaint must allege: "(1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Id. (cleaned up).

The only issues before the Court with respect to Plaintiffs' Rule 10b-5(b) claim are materiality, loss causation, and scienter as to the PennyStocks Claim; scienter as to the Rainbow Rangers Claim; materiality and scienter as to the Disney/Netflix Claim; and materiality, falsity, and scienter as to the Stan Lee Claim.[3]

**1. PennyStocks Claim**

As the circuit explained, "[t]he thrust of the PennyStocks Claim is that Genius misled investors when it represented in its May 7 SPA that it had not hired anyone to solicit its securities, when, in reality, it had compensated PennyStocks to publish favorable articles about Genius." Genius, 97 F.4th at 1181.[4] The circuit concluded that,

[3] The circuit found Plaintiffs "plausibly allege that, for their Rule 10b-5(b) Claims, Genius's representations regarding PennyStocks in its May 7 SPA were misleading, and Genius's statements regarding Rainbow Rangers, Disney/Netflix, and Stan Lee caused the shareholders' losses." Genius, 97 F.4th at 1190. The circuit remanded for the Court to determine whether the remaining elements of those claims are sufficiently alleged. Id.

[4] As the parties have noted, the Court's order dismissing the SAC addressed the March 11 SPA, as did the parties' briefing on appeal. However, because the circuit considered the May 7 SPA and did not discuss the March 11 SPA, the Court takes the same approach here. The Court concludes that the fact that the statements were made roughly two months apart does not change

whether the PennyStocks Claim is construed "as statement- or omission-based, a 'reasonable investor' would have been misled by Genius's May 7 SPA." Id. at 1183. The circuit specifically ordered the Court to "consider whether the shareholders adequately alleged materiality with respect to the PennyStocks Claim[,]" id. at 1183 n.6, and also to "determine whether the shareholders alleged facts sufficient to show the remaining elements of the PennyStocks" Claim, id. at 1190.

Defendants contend Plaintiffs fail to adequately allege materiality, loss causation, and scienter as to the PennyStocks claim.

a. Materiality

Defendants argue that the May 7 statement is immaterial because the PennyStocks website features a prominent disclaimer that discloses PennyStocks is a paid advertiser that publishes only information favorable to those who pay it and informs investors that they should not rely on any information PennyStocks publishes. Mot. at 14-15. According to Defendants, because they are "described by their publisher as inaccurate and unreliable[,]" the PennyStocks articles are "immaterial to a reasonable investor." Id. at 15-16. "But the PennyStocks Claim does not concern the veracity of the PennyStocks articles or the sources of PennyStocks' funding. Rather, the dispositive question is whether Genius, by representing that it did not hire anyone to solicit its securities, made a [materially] misleading statement." Genius, 97 F.4th at 1181 n.5.

A "misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." Khoja v. Orexigen Therapeutics, Inc. (Khoja I), 899 F.3d 988, 1009 (9th Cir. 2018) (quoting Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005)). The materiality determination "requires delicate assessments of the inferences a

---

the analysis and the language in the May 7 SPA is not meaningfully different from the language in the March 11 SPA.

reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." Fecht v. Price Co., 70 F.3d 1078, 1080 (9th Cir. 1995) (cleaned up) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450 (1976)). "Therefore, only if . . . the materiality of the statement is so obvious that reasonable minds could not differ are these issues appropriately resolved as a matter of law." Id. at 1081 (cleaned up) (reversing dismissal for failure to adequately plead material falsity because, in that case, materiality could not be decided as a matter of law).

At issue is the materiality of Genius's representation that it "had not hired anyone to promote its securities, through articles or otherwise." Genius, 97 F.4th at 1182. Even if a reasonable investor would not be personally influenced by the content of the PennyStocks articles, there is still a "substantial likelihood" that a reasonable investor would consider the potential impact of the promotional campaign on the market value of Genius's securities to be "important in his or her decision making." No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 934 (9th Cir. 2003) (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988)).

The materiality of Genius's representation that it had not hired anyone to promote its securities is not so obvious that reasonable minds could not differ on the issue. See Fecht, 70 F.3d at 1080. Plaintiffs have adequately alleged materiality as to the PennyStocks Claim.

b. Loss Causation

Defendants argue that Plaintiffs fail to allege loss causation as to the PennyStocks Claim because they have not alleged "a corrective disclosure that revealed the supposed misstatement." Mot. at 16.[5]

---

[5] Plaintiffs contend that because "Defendants did not challenge loss causation as to the PennyStocks statements in their briefing on appeal" the issue is waived. Opp'n at 19. But *neither* party briefed the issue on appeal because the PennyStocks Claim was dismissed for failure to allege falsity, so loss

To allege loss causation, a plaintiff must plead that the truth of the alleged fraud became known. Genius, 97 F.4th at 1184. "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 790 (9th Cir. 2020). At the pleading stage, a plaintiff advancing a theory of loss causation relying on corrective disclosures must "allege with particularity facts 'plausibly suggesting'" that two showings can be made: "(1) a corrective disclosure revealed, in whole or in part, the truth concealed by the defendant's misstatements; and (2) disclosure of the truth caused the company's stock price to decline and the inflation attributable to the misstatements to dissipate." Id. at 791.

Plaintiffs advance a loss causation theory that relies on critical reports published by Citron Research, an activist short seller, and Seeking Alpha, a financial analysis group. Opp'n at 5. On June 4, Citron "posted several critical comments on social media," including a tweet that compared Genius's revenue and market capitalization to that of another company and claimed that there was "massive dilution at $GNUS." SAC ¶ 143.[6] The tweet concluded with a simple phrase: "Stock Promotion." Id. Genius's shares fell 14.5% that day. Id. ¶ 144. On June 15, Seeking Alpha published a report "posit[ing] that Genius likely engaged PennyStocks to pump Genius's stock." Id. ¶ 246. The Seeking Alpha report concluded that Genius may be engaging in "possible stock promotion" after a public search of "the symbol page for GNUS . . . reveal[ed] that PennyStocks ha[d] written about [Genius]

---

causation as to that claim was not at issue. See Genius, 97 F.4th at 1180. Plaintiffs' waiver argument is meritless.

[6] Twitter users can indicate that a tweet refers to a particular stock by placing a dollar sign in front of the ticker symbol for that stock. SAC ¶ 127 n.32. "Genius securities trade on the NASDAQ stock exchange under the ticker symbol 'GNUS.'" Id. ¶ 2. A person who "wanted to search for discussions of Genius stock on Twitter . . . could enter $GNUS into the search function, and all posts tagged as such would show up." Id. ¶ 127 n.32.

several times since May 6." Dkt. 115-11 (Seeking Alpha Report) at 11.[7] The report explained that "[g]oing by the disclosures in the Privacy Policy section of [the PennyStocks] website, it's reasonable to assume that either Genius Brands or a third party might be promoting the stock to retail investors." Id. The disclosures on which Seeking Alpha based this assumption include that "PennyStocks only publishes favorable information because it is 'compensated to only publish favorable information.'" SAC ¶ 72. Genius's stock dropped in the two days following the release of the Seeking Alpha report, falling 14% on the first day and 21.7% on the second. Id. ¶ 247.

Defendants argue that Plaintiffs have not alleged a corrective disclosure because the Citron tweet said "nothing about PennyStocks (or any other stock promoter)" and the Seeking Alpha report "merely cite[d] information available to anyone—that PennyStocks published a piece on its public website about Genius—and speculate[d] about stock promotion paid for by someone." Mot. at 16-17.

Although a corrective disclosure "must by definition reveal new information to the market that has not yet been incorporated into the price" of the stock, the Ninth Circuit has "endorse[d] a flexible approach to evaluating corrective disclosures." BofI Holding, 977 F.3d at 794-95. "A disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure." Id. at 795. Ultimately, the question is whether, based on the SAC's particularized allegations, the Court can "plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price[.]" Id. "The fact that the underlying data was publicly available is certainly one factor to consider" in answering that question. Id. Other relevant "factors

---

[7] The Court grants Defendants' unopposed request for judicial notice of the Seeking Alpha report dated June 15, 2020. Dkt. 115-2 (RJN) at 3. The report may properly be incorporated by reference because the SAC extensively refers to the report, see SAC ¶¶ 22-23, 152-53, 162, 246-47, and Plaintiffs' theory of loss causation for the PennyStocks' claim necessarily depends on the report, see Opp'n at 19-20.

include the complexity of the data and its relationship to the alleged misstatements," as well as the level of effort required to locate and analyze it. Id. The Court "must assess these and other factors on a case-by-case basis." Id.

Here, the alleged misstatement is Genius's representation "that it had not hired anyone to solicit its securities, when, in reality, it had compensated PennyStocks to publish favorable articles about Genius." Genius, 97 F.4th at 1181. The publicly available information underlying the Citron and Seeking Alpha reports was that PennyStocks published articles about Genius on its website and disclosed on that same website that it "only publishes favorable information because it is 'compensated to only publish favorable information.'" SAC ¶ 72. This publicly available information is not at all complex, and it directly touches on the alleged misstatement. Further, the "level of effort required to locate and analyze" this information is minimal—the paid promotional articles are on the same website as the disclosure that reveals the promotional nature of those articles, and the analysis requires only a simple inference. See id. ¶ 76 (alleging that "Genius-related promotions appear on PennyStocks under the 'curated stories' tab on Genius' landing page within PennyStocks—strongly suggesting that such stories are, in fact, paid for given . . . PennyStocks' admission that it only publishes favorable stories because that is what it is compensated to do"); see also Seeking Alpha Report at 11 (asserting that, based on PennyStocks' disclosures and the fact that PennyStocks had published articles about Genius, "it's reasonable to assume that either Genius Brands or a third party might be promoting the stock to retail investors").

Plaintiffs' attempt to rely on the circuit's analysis of loss causation as to the Rainbow Rangers Claim fails. See Opp'n at 19-20. Considering a report by short seller Hindenburg Research that revealed Nickelodeon Jr. was airing Rainbow Rangers less frequently than Genius had previously claimed, the circuit explained that "[a]lthough the Hindenburg Report was premised on" the broadcast schedule featured on Nickelodeon Jr's website, "that information had 'little to no probative value in its native state.'" Genius, 97 F.4th at

1186 (quoting Pub. Emps. Ret. Sys. v. Amedisys, Inc., 769 F.3d 313, 318–23 (5th Cir. 2014)). Because "the information contained in the Nickelodeon Jr. broadcast schedule was not in a 'readily digestible' form on the Nickelodeon Jr. website and did not become digestible until the Hindenburg Report synthesized it for the marketplace[,]" Plaintiffs plausibly alleged the Hindenburg Report was a corrective disclosure and had adequately pleaded loss causation. Id. at 1187 (quoting BofI Holding, 977 F.3d at 795). Not so here, where the publicly available information underlying the alleged corrective disclosures was easily accessible and readily digestible in its native state, allowing the market to "understand it and react accordingly" without the help of the Citron or Seeking Alpha reports. See id. at 1186 (explaining that "securities issuers should not escape liability for misrepresentations merely because they can show that corrective information was publicly available on some webpage tucked in a deep corner of the internet or buried in some unwieldy spreadsheet" because "[s]uch information is so hidden that the market cannot access or understand it and react accordingly"); see also In re Herbalife, Ltd. Sec. Litig., No. 14-cv-02850-DSF-JCGX, 2015 WL 1245191, at *3 (C.D. Cal. Mar. 16, 2015) (concluding that analyst report based on publicly available information was not a corrective disclosure because the complaint "provide[d] no basis to conclude that [the report's] conclusions required expert analysis or that the underlying information was not available to the public").

Plaintiffs also contend that the fact that Genius's "stock drop[ped] after the Citron and Seeking Alpha reports show[s] the revealed facts had not been previously reflected in Genius's share price." Opp'n at 20. Although the timing of the decline in price is certainly relevant to the loss causation analysis, the Court finds it is not sufficient standing alone where, as here, the alleged corrective disclosure was based entirely on publicly available information that was easily accessible and required no special analysis. The Citron and Seeking Alpha reports both included information and analysis unrelated to any alleged misrepresentations that could explain the negative market reaction. See SAC ¶ 143 (alleging that, in addition to

its suggestion of "Stock Promotion," the Citron tweet also commented on Genius's market capitalization and revenue); Seeking Alpha Report at 3 (questioning "hype" surrounding Genius's anticipated launch of streaming platform for children by noting that "the world is quickly moving away from ad-based services to subscription models" and Genius "will be competing with the likes of popular brand names" like Disney+ and highlighting that Genius "has not been able to deliver any meaningful growth in the last half a decade, whereas its costs have risen dramatically in comparison to revenue").

At the pleadings stage, "Plaintiffs' burden is to plausibly allege that 'the decline in [Genius's] stock price was proximately caused by a revelation of fraudulent activity,' rather than other factors." Grigsby v. BofI Holding, Inc., 979 F.3d 1198, 1206 (9th Cir. 2020) (quoting Loos v. Immersion Corp., 762 F.3d 880, 887 (9th Cir. 2014)). The Court concludes that Plaintiffs have failed to satisfy that burden as to the PennyStocks claim.

c. Scienter

The exacting pleading requirements of the "PSLRA require[ ] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n.12 (1976)). "'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1053, 1059 (9th Cir. 2014)). "[D]eliberate recklessness is 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" Id. (second alteration in original) (quoting Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 705 (9th Cir. 2016)). Ultimately, "[r]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." Id.

The PSLRA provides that, in a securities fraud action, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA's "strong inference" standard requires the Court to "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 324. A securities fraud complaint will survive then "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

In the Ninth Circuit, a court "conducts a dual inquiry" to determine whether the strong inference standard is satisfied:

> First, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a holistic review to determine whether the allegations combine to give rise to a strong inference of scienter.

Glazer II, 63 F.4th at 766 (cleaned up).

Defendants argue that Plaintiffs have failed to allege any facts supporting a strong inference that Defendants intentionally set out to deceive investors about Genius's relationship with PennyStocks "through a rather obscure representation buried in a lengthy and technical private-transaction SPA." Mot. at 23-24. The Court agrees; the SAC falls short of satisfying the strong inference standard.

First, Plaintiffs contend that "Genius is a tiny company that had less than $1.1 million in revenue in 2019, but spent up to $356,844 on an undisclosed 'investor relations provider,' ([SAC] ¶¶ 76-77), which shows scienter." Opp'n at 20. Relatedly, Plaintiffs claim that "Genius omitted who received, at its peak, compensation worth over a million dollars for 'investor relations' work." Id. at 20-21 (citing SAC ¶ 77).

Plaintiffs base this argument on their allegation that Genius disclosed that it compensated "unnamed investor relations professionals" with Genius securities in the amount of "43,077 shares on January 8, 2020 and 49,610 shares on June 22, 2020, totaling 92,687 shares." SAC ¶ 76 n.18. To reach the monetary values Plaintiffs argue, they calculated the value of 92,687 Genius shares on June 22 ($356,844) and June 4 ($1,087,219). Id. ¶¶ 76 n.18, 77 n.19. Even if it is reasonable to infer that some portion of those shares were paid to PennyStocks, Plaintiffs fail to point to any allegations supporting their inference that *all* 92,687 shares went to PennyStocks. The Court also finds misleading Plaintiffs' argument that Genius paid "compensation worth over a million dollars for 'investor relations' work." The value of 92,687 shares may have been over one million dollars on June 4, but according to Plaintiffs' allegations, only half that many shares (49,610) had been paid at that point in time. See SAC ¶ 76 n.18. And by the time the other half was paid – 18 days later – the value of Genius shares had dropped sharply. Id. Plaintiffs also fail to explain why the dollar value of the shares in June 2020 should be compared to Genius's 2019 revenue to establish scienter for a statement made on May 7, 2020.[8] And in the absence of any facts regarding the context of the alleged disclosure, there is no basis for inferring a coverup simply because Genius did not specifically name the "investor relations professionals" that had received shares.

Next, Plaintiffs argue that two facts demonstrate "a desire to remain on the NASDAQ" that supports scienter for Heyward and Denton: (1) a statement by Jon Ollwerther[9] to a confidential witness (CW1) that "underscored 'how important' it was for Genius . . . to remain NASDAQ-listed"; and (2) a statement by Heyward on February 10, 2023. Opp'n at 21. Plaintiffs offer no facts connecting the Ollwerther statement to Genius's representations in the May 7 SPA,

---

[8] Plaintiffs' allegations regarding the March 11 SPA do not clarify this point.

[9] Plaintiffs allege that Ollwerther was EVP of Business Development & General Manager of Kartoon Channel! and reported directly to Heyward. SAC ¶ 74.

and that statement must have been made at least six months before the May 7 SPA,[10] because CW1 was no longer employed at Genius after November 2019. SAC ¶ 74. Heyward's statement in February 2023 is outside the pleadings, and irrelevant to establishing scienter nearly three years prior.

Finally, Plaintiffs argue that the allegations that Ollwerther directed CW1 to proofread an article that would "later appear on PennyStocks" and that CW1 said that "all major decisions went to Heyward for approval . . . further support[ ] an inference of Heyward's awareness." Opp'n at 21-22. That Ollwerther reported directly to Heyward, SAC ¶ 74, is not enough to suggest that Heyward was aware of or involved in any proofreading of PennyStocks articles, and it is unclear why having an employee proofread a single article would be a "major decision" requiring CEO approval.

Even viewing the allegations holistically, Plaintiffs have, at most, alleged "a motive to commit fraud and opportunity to do so[,]" and that alone is not sufficient to establish the strong inference of scienter required by the PSLRA. City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 619 (9th Cir. 2017). Plaintiffs fail to allege that any particular individual, whether Heyward, Denton, or some other corporate officer, was involved with drafting, reviewing, or approving the May 7 SPA and was also involved with or knowledgeable of the PennyStocks relationship.

A plaintiff in a securities fraud action typically must "plead scienter with respect to those individuals who actually made the false statements . . . ." Glazer Cap. Mgmt., LP v. Magistri (Glazer I), 549 F.3d 736, 745 (9th Cir. 2008). Although the Ninth Circuit has "not foreclose[d] the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate[,]" the circuit has generally framed "the doctrine of collective scienter . . . [as] an

---

[10] Neither does the SAC contain any allegations connecting Ollwerther's alleged statement to CW1 with the March 11 SPA. The difference of two months' time would not merit a different result.

exception to individualized scienter pleading[ ]" requirements. Id. at 744-45. In declining to categorically reject the concept of collective scienter, the circuit has explained that, "in certain circumstances, some form of collective scienter pleading might be appropriate[,]" such as where "a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." Id.

This is not such a case. Here, the alleged misstatement was a single sentence in the nine page "representations and warranties" section of the May 7 SPA. This cannot reasonably be considered a public statement of high importance. And although the circuit concluded that a *reasonably diligent investor* would have been misled, the fact that the question of falsity could only be answered by a fulsome analysis of the meaning of "solicitation" suggests that the relevant statement was not "dramatically false." See Genius, 97 F.4th at 1181-83. These facts do not merit an exception to individualized scienter pleading requirements. See Glazer I, 549 F.3d at 745 (holding that "the PSLRA require[d] [the plaintiff] to plead scienter with respect to those individuals who actually made the" alleged misstatements, which all appeared in the "representations and warranties" section of a sixty-page merger agreement).

Plaintiffs have failed to adequately allege scienter as to the PennyStocks claim.[11]

### 2. Rainbow Rangers Claim

The circuit held that Plaintiffs' allegations "that Genius's statement about the frequency of the Rainbow Rangers showings increased the price of Genius stock" and that Genius's shares fell after

[11] The Court denies Plaintiffs' request for judicial notice of two documents filed in unrelated litigation pending in the Southern District of New York, Augenbaum v. Anson Invs. Master Fund LP, No. 2:22-cv-00249. See Dkt. 116-1 (RJN); Dkt. 116-4 (Augenbaum Emails); Dkt. 116-9 (Augenbaum Privilege log). The Court further addresses this issue below, in its discussion of Plaintiffs' request for leave to amend.

"the Hindenburg Report 'revealed the discrepancy'" are sufficient "to demonstrate loss causation at the pleading stage." Genius, 97 F.4th at 1186. Having concluded that Plaintiffs adequately alleged that "Genius's statements regarding Rainbow Rangers . . . caused the shareholders' losses[,]" the circuit remanded for the Court to "determine whether the shareholders alleged facts sufficient to show the remaining elements of the" Rainbow Rangers Claim. Id. at 1190. The parties address scienter only.

a. Scienter

The Rainbow Rangers Claim is based on a press release Genius issued on March 17 that announced Nickelodeon Jr. had "again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week." SAC ¶ 189. That claim was repeated by Heyward on a March 20 conference call and in a shareholder letter. Id. ¶¶ 191-92. In reality, "Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired between 12 to 14 times per week at the time the statement was made, not 26." Id. ¶ 190. During the week the statements were made, "Rainbow Rangers aired between just one or two times per day, at either 3:51 am or 4:11 and 4:35 am, respectively." Id. The discrepancy was revealed on June 5, when Hindenburg Research published a report showing Rainbow Rangers was airing only nine times per week, and in unfavorable time slots. See id. ¶ 244 ("[T]he shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m."). In his June 8 statement responding to the Hindenburg Report, Heyward asserted that the Rainbow Rangers airings on Nickelodeon Jr. had been "scaled back" while Genius produced new episodes, in line with "standard industry practice." Id. ¶ 238.

To plead scienter adequately in a federal securities fraud action, the plaintiff must "state with particularity facts giving rise to a strong inference," 15 U.S.C. § 78u-4(b)(2)(A), that the defendant acted with "the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting NVIDIA, 768 F.3d at 1053, 1059). In determining whether the

strong inference standard is satisfied, a court must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, 551 U.S. at 324. A complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

Defendants advance the nonculpable explanation that the inaccuracy of the Rainbow Rangers announcement was "a simple error of providing outdated information regarding the program's viewing schedule." Mot. at 23. In response, Plaintiffs highlight eight allegations that they contend support a strong inference of scienter—both individually and holistically. See Opp'n at 10-15. The Court need not determine whether any of those allegations, standing alone, would be sufficient to satisfy the strong inference standard because, viewing the allegations holistically, "the inference of scienter [is] cogent and at least as compelling as" the opposing inference—that Heyward mistakenly relied on outdated information. Tellabs, 551 U.S. at 324.

There is a significant discrepancy between Rainbow Rangers' limited airtime and the expanded viewing schedule announced by Heyward. At the time of the claimed "expansion," the show was being aired on Nickelodeon Jr. half as frequently as what had been announced—only one or two times per day—and only in highly unfavorable time slots—either at 3:51 am or 4:11 and 4:35 am. See SAC ¶ 190. Plaintiffs allege that Nickelodeon Jr. "was one of two customers that accounted for 65% of" Genius's 2019 revenue, id. ¶ 89, and that Rainbow Rangers was the Company's "marquee program," which, along with Llama Llama, had been "primarily responsible for a 92% increase" in Genius's licensing and royalties revenue during 2019, Opp'n at 4 (quoting SAC ¶ 89 n.24).

Reporting false information "can be probative of scienter if 'the information is readily apparent to the defendant corporation's senior management.'" In re Mullen Auto. Sec. Litig., No. 22-cv-3026-DMG-AGRX, 2023 WL 8125447, at *8 (C.D. Cal. Sept. 28, 2023) (quoting Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1001 (9th Cir.

2009)). "The falsity must be patently obvious: the facts must be so prominent that it would be *absurd* to suggest top management was unaware of them." Id.

Here, the paucity of airtime would seem to be "information that [was] readily apparent to [Genius's] senior management." Id. (finding strong inference of scienter where "it would be absurd for [defendant], the CEO, founder, and public face of a small [electric vehicle] company," not to know of the breakdown of an important partnership). Plaintiffs have adequately alleged that—because Rainbow Rangers was a "core feature" of Genius's business—"it would be absurd" to suggest that Heyward, Genius's founder and CEO, "simply restated false claims about" an expansion of the show's broadcast schedule on a major network that was also a key customer. See id. at *9 ("[W]here a core feature of Defendants' business was the claimed creation of its own groundbreaking battery technology, it would be absurd to suggest that Michery, Defendants' founder and CEO, simply restated false claims about Defendants' battery technology without scienter."). Considering how important Rainbow Rangers and Nickelodeon Jr. were to Genius's business model, it seems unlikely that Heyward was both unaware that Rainbow Rangers was airing only once or twice a day, and also believed it was now expanding to 26 times per week.

It is also notable that Heyward responded to the Hindenburg Report, which showed that Rainbow Rangers was airing only nine times per week on Nickelodeon Jr., by claiming that the show's airings had been temporarily "scaled back." See SAC ¶ 283. Considering Nickelodeon Jr. had been airing Rainbow Rangers infrequently and only in the early hours of the morning since at least mid-March, Heyward's attempt to attribute the show's June schedule to a recent scaling back further supports the inference of scienter.

Accepting the allegations as true, and taking them collectively, the "inference of scienter [is] cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314. The Court finds that, at a minimum, Plaintiffs' allegations are sufficient to support a strong inference that the Rainbow Rangers

statements were made with "deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting NVIDIA, 768 F.3d at 1053, 1059).

### 3. Disney/Netflix Claim

"The gravamen of [the Disney/Netflix] [C]laim is that Genius misled investors on June 22 when it retweeted a June 21 [Insider Financial] article—the second of two [Insider Financial] articles that month speculating that Disney or Netflix would acquire Genius." Genius, 97 F.4th at 1187. "Considering the enormous price increase" caused by the first Insider Financial article, the circuit found it "plausible that Genius's June 22 retweet maintained its stock price at a higher level 'than it would have been' absent the retweet." Id. at 1188 (quoting BofI Holding, 977 F.3d at 789). And the shareholders allege that when Genius "said nothing about a Disney or Netflix buyout" on July 6, instead announcing that the Company would jointly own the Stan Lee Universe, that "announcement caused investors to realize that Genius had misrepresented its prospects of being acquired by Disney or Netflix because the purported 'key business development' update on July 6 had nothing to do with a sale to Disney or Netflix." Id. (cleaned up). The circuit found these allegations "sufficient to plead loss causation" and remanded for the Court to determine "whether the shareholders alleged facts sufficient to show the remaining elements of the" Disney/Netflix Claim. Id. at 1190.

#### a. Falsity

Defendants argue that Plaintiffs fail to plead falsity because the full context of Genius's June 22 re-tweet of the June 21 Insider Financial article shows that the tweet "had nothing to do with any merger speculation" and instead referred only to the article's positive statements about Heyward's response to negative information short sellers had published about Genius. Mot. at 11-12. But the circuit held that Plaintiffs plausibly alleged that the June 21 Insider Financial "article's assertions are attributable to Genius." Genius, 97 F.4th at 1188 n.7. And the circuit's loss causation analysis with respect to the

Disney/Netflix Claim makes clear that its attribution holding included the article's statements regarding a possible buyout by Disney or Netflix. Id. at 1188-89 (concluding that "the shareholders plausibly allege 'that the market understood' the Stan Lee announcement on July 6 'to be a revelation' that Genius's June 22 retweet of the second [Insider Financial] article was false or misleading" because "fail[ing] to mention the Disney or Netflix buyout signaled that no such buyout would take place"). Defendants' falsity argument is foreclosed by the rule of mandate because it would directly contradict the circuit's decision on the issue of attribution. See United States v. Perez, 475 F.3d 1110, 1113 (9th Cir. 2007).

b. Materiality

The only argument Defendants offer on the issue of materiality is a one sentence footnote. Mot. at 12 n.12. It is not the role of the Court to make parties' arguments for them, see Indep. Towers of Wash. v. Wash., 350 F.3d 925, 929 (9th Cir. 2003), and "[a]rguments raised only in footnotes . . . are generally deemed waived and need not be considered[,]" Khoja v. Orexigen Therapeutics, Inc. (Khoja II), 498 F. Supp. 3d 1296, 1309 n.4 (S.D. Cal. 2020). The Court declines to analyze materiality as to the Disney/Netflix Claim. For the purpose of this motion only, the Court finds Plaintiffs have sufficiently pleaded materiality.

c. Scienter

The basis for the Disney/Netflix Claim is that Genius's June 22 retweet of a June 21 Insider Financial article was misleading because the article contained "speculat[ion] that Disney or Netflix would acquire Genius." Genius, 97 F.4th at 1187.

As the Court previously noted, in a securities fraud action, scienter "means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting NVIDIA, 768 F.3d at 1053, 1059). Deliberate recklessness "is a higher standard than mere recklessness . . . ." Id. The standard requires a showing of "an *extreme* departure from the

standards of ordinary care which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it." Id. (cleaned up). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Tellabs, 551 U.S. at 324. In other words, "an inference of fraudulent intent" that is "plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct" is not enough. Id. at 314.

Plaintiffs argue that the tweet's use of "hashtags and dollar signs" indicates an intent "to draw investors' attention to the false statements." Opp'n at 17 (citing SAC ¶ 127). Plaintiffs also emphasize that the June 21 article was "the only analyst report that appeared on Genius' Twitter page during the class period." Id. (citing SAC ¶ 131). Finally, Plaintiffs contend that, even if Defendants did not intend to mislead investors by retweeting the June 21 article, "at a minimum, [Genius] was deliberately reckless for failing to even read [the article] before doing so." Id. Although it may be reasonable to infer that Heyward[12] was aware of the article's buyout speculation from the fact that the tweet quoted the article and that Heyward wanted the tweet to draw investor attention to the article from the use of the tags "$GNUS #GNUS #GeniusBrands #NASDAQ $nasdaq #kartoonchannel[,]" SAC ¶ 126, the Court must consider the strength of that inference in light of other, nonculpable explanations, Tellabs, 551 U.S. at 324.

Defendants argue that the SAC "does not allege facts that support a strong inference that the tweet was intended to stir false merger speculation . . . ." Mot. at 24. Emphasizing that the tweet itself "quote[d] from an entirely different and separate part of the June 21 article . . . [and] made no reference to any merger speculation," Defendants contend the only compelling inference "is that Genius

---

[12] In their briefing, Plaintiffs and Defendants both characterized the June 22 retweet, which was posted on Genius's corporate Twitter account, as being "Heyward's statement." See Mot. at 2; Opp'n at 16.

retweeted the June 21 article because of its positive statements about Mr. Heyward." Id.

Considering the facts alleged, the inference that Defendants either intended the June 22 retweet to misrepresent Genius's prospects of being acquired by Disney or Netflix or were deliberately reckless to an obvious danger that investors would be so misled is "less cogent and compelling" than the opposing nonculpable inference, which is that Defendants intended to draw investor attention to the June 21 article because the article provided a counter-narrative to the critical reports Citron and Hindenburg had published about Genius. See Dkt. 115-12 (June 21 Article).[13] The nonculpable inference is stronger because (1) the general tenor of the article is debunking short seller criticism, as reflected in the article's title: "Genius Brands Stock: Why the Shorts are Wrong"; (2) the article devotes only one paragraph to merger speculation; and (3) the paragraph on merger speculation is placed at the end of the article and two sections after the language quoted in the tweet. See id. The Court also agrees that if the intent had been "to create the impression that Genius would be acquired," that would have been better served by retweeting the June 3 Insider Financial article, which focused entirely on merger speculation, rather than "the June 21 article, which devoted almost nothing to that topic." Reply at 7 n.9.

Plaintiffs fail to adequately allege scienter as to the Disney/Netflix Claim.

### 4. Stan Lee Claim

The basis of the Stan Lee Claim is that Genius misrepresented its rights to the Stan Lee Universe because it overstated the scope of its rights and failed to disclose the risk that its rights may be in dispute.

---

[13] The Court grants Defendants' unopposed request for judicial notice of the Insider Financial article dated June 21, 2020. RJN at 3. The article may properly be incorporated by reference because the SAC extensively refers to the article, see SAC ¶¶ 116, 125-26, 128-29, 132, 155, 209-11, 215, and the article forms the basis of the Disney/Netflix Claim.

SAC ¶ 220. The alleged misstatements include: (1) a July 6 press release claiming: "Jointly owned and subject to due diligence and documentation, the deal [with POW! Entertainment] will leave Genius Brands as the managing and controlling partner of the ***Stan Lee Universe*** joint venture"; (2) a July 6 shareholder letter claiming that the Stan Lee Universe would "assume worldwide rights, in perpetuity, to the name, physical likeness, physical signature, live and animated motion picture, television, online, digital, publishing, theme park, comic book, merchandising and licensing rights to Stan Lee and his IP creations past*, present, and going forward"; and (3) an October 28 SPA representing that it had not received "a clear written notice of a claim to Genius's [intellectual property] (or that of a subsidiary) and/or a claim that Genius is violating the [intellectual property] rights of any person . . . ." Id. ¶¶ 216, 219, 223.

a. Falsity

Plaintiffs allege Defendants' representations regarding Genius's rights to the Stan Lee Universe intellectual property were false or misleading because Genius received a letter from a law firm on July 7, which claimed the Stan Lee Universe had already been sold to a company represented by that law firm and alleged that Genius was interfering with the contractual rights of the firm's client. Id. ¶ 161. Plaintiffs also allege Genius "impliedly admitted that [it] did not control the same breadth of [intellectual property] that it [previously] represented[,]" id. ¶ 161, when on March 30, 2021, it issued a press release describing its Stan Lee Universe "portfolio much differently, and far more narrowly[,]" Opp'n at 7 (citing SAC ¶ 172 n.38). Specifically, the scope of the intellectual property announced in July 2020 included 11 unique attributes, while the March 2021 press release included only "five attributes, notably omitting theme park and comic book rights, among others." Opp'n at 7 (citing SAC ¶ 172 n.38). Finally, Plaintiffs argue that "[b]y determining that the truth became known, on March 30, 2021, the [circuit] implicitly held that the Stan Lee IP statements were untrue." Opp'n at 22 (citing Genius, 97 F.4th at 1188). According to Plaintiffs then, the Court cannot find against

them on falsity because doing so would "implicitly contradict the mandate." Id.

Although Plaintiffs may be overstating the circuit's holding, the Court agrees that it cannot find for Defendants on the issue of falsity without directly contradicting reasoning that was essential to the holding on loss causation for the Stan Lee Claim.

Defendants argue that their representations regarding Genius's rights to the Stan Lee Universe intellectual property were not false because "Genius used and still uses the Stan Lee" intellectual property, and because Plaintiffs allege no facts suggesting that the author of the July 7 law firm letter (or his client) ever asserted or threatened a valid claim against Genius. Mot. at 12-13. Defendants also argue that the July 7 letter "cannot retroactively render the July 6 Statement false when made." Id. at 12. In contrast, the circuit explained that "Genius received a letter from a law firm on July 7 indicating that POW! had already licensed the rights to the Stan Lee Universe[,]" and that, "because Genius did not publicly disclose the letter or the information it reflected . . ., the truth of Genius's rights to the Stan Lee Universe—or lack thereof—did not become known until Genius disclaimed its rights over eight months later" in the March 30, 2021 press release. Genius, 97 F.4th at 1189-90. That reasoning was central to the circuit's holding that loss causation was adequately alleged as to the Stan Lee Claim and cannot be reconciled with Defendants' falsity arguments.[14]

b. Materiality

Defendants do not dispute materiality as to the Stan Lee Claim. See Mot. at 12-14 (contesting only falsity); Reply at 4 (same).

---

[14] The Court will not consider the parties' arguments concerning the PSLRA's safe harbor for forward-looking statements at this time because, as the Court explains below, the Stan Lee Claim is dismissed with leave to amend based on Plaintiffs' failure to adequately allege scienter.

c. Scienter

Plaintiffs argue that scienter is established because "it would be absurd if Heyward were unaware of litigation involving Stan Lee's" intellectual property given Heyward's representation that he "worked with Stan and [had] been a close friend for almost 30 years." Opp'n at 24. In particular, Plaintiffs highlight litigation between Stan Lee's daughter, JC Lee, and POW! Entertainment, arguing that "[i]t is common sense that someone with a 'close' 30-year friendship, like Heyward and Stan Lee, would know that his 'close' friend's daughter was suing POW! Entertainment over the very [intellectual property] Genius was purporting to acquire." Id.

As an initial matter, any inference that Heyward must have known of the JC Lee litigation because of his close friendship with Stan Lee is negated by the fact that JC Lee initiated the suit against POW after her father's death. See Lee v. POW! Ent., Inc., 468 F. Supp. 3d 1220, 1226 (C.D. Cal. 2020), aff'd in part, rev'd in part sub nom. Lee v. Pow Ent., Inc., No. 20-55928, 2021 WL 5768462 (9th Cir. Dec. 6, 2021) (explaining that "[w]hen Stan Lee died in November 2018, JC Lee, as his only heir and trustee of his estate" filed suit). Moreover, that action was resolved in POW! Entertainment's favor before Genius made the July 6 announcement when, on June 25, the court dismissed all of JC Lee's claims with prejudice after concluding that they were barred by res judicata. Id. at 1230. The court explained that "the fate of all intellectual property rights" claimed by JC Lee "rested on the enforceability of the assignment clause" in a 1998 Agreement and that at least three "[c]laims premised on the 1998 Agreement have been dismissed with prejudice." Id. at 1128-29. Essentially, the JC Lee litigation was resolved in POW! Entertainment's favor precisely because prior litigation had already resolved the issues in POW's favor.

The Court questions whether this litigation history, considered in light of Heyward's asserted close friendship with Stan Lee, can support even a plausible inference of scienter. But even if it could, the inference of scienter is surely less compelling than the opposing inference—that Heyward was aware of a series of earlier judgments in

POW's favor that only bolstered his confidence in the joint venture. The PSLRA requires a plaintiff to plead facts that give rise to an "inference of scienter [that is] cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Plaintiffs' allegations here fall short.[15]

### B. Rule 10b-5(a) and (c): Scheme Liability

Subsection (a) of Rule 10b-5 "makes it unlawful to "employ any device, scheme, or artifice to defraud" and "subsection (c) makes it unlawful to 'engage in any act, practice, or course of business' that 'operates . . . as a fraud or deceit.'" Lorenzo v. Sec. & Exch. Comm'n, 587 U.S. 71, 77 (2019) (alteration in original) (quoting 17 C.F.R. § 240.10b-5). The Ninth Circuit has explained that the argument that "Rule 10b-5(a) and (c) claims cannot overlap with Rule 10b-5(b) statement liability claims is foreclosed by Lorenzo, which rejected the petitioner's argument that Rule 10b-5(a) and (c) 'concern "scheme liability claims" and are violated only when conduct other than misstatements is involved.'" In re Alphabet, Inc. Sec. Litig., 1 F.4th 687, 709 (9th Cir. 2021) (quoting Lorenzo, 587 U.S. at 79-80).

For Plaintiffs' Rule 10b-5(a) and (c) claims, the only argument Defendants advance in favor of dismissal is that Plaintiffs have failed to plead a legally viable claim under subsection (b) of Rule 10b-5, and in particular have insufficiently alleged scienter. Mot. at 26. This argument fails as to the Rainbow Rangers Claim because, as explained above, Plaintiffs have adequately alleged that claim under Rule 10b-5(b), including the element of scienter. The same is not true for the

---

[15] The parties also raise arguments regarding Genius's representations in an October 28 SPA. Defendants do not dispute that Plaintiffs' appeal included that statement, but they argue the statement is "not part of the case on remand" because it was not discussed in the circuit's opinion. See Reply at 5-6. The Court disagrees with Defendants and clarifies that the October 28 SPA remains within the scope of the Stan Lee Claim and, should Plaintiffs elect to file a third amended complaint, they may include allegations reasonably related to that statement.

PennyStocks, Disney/Netflix, and Stan Lee Claims, which each fail to adequately allege scienter.

Plaintiffs' Rule 10b-5(a) and (c) claim is adequately alleged for the Rainbow Rangers statements. Plaintiffs' allegations regarding the PennyStocks, Disney/Netflix, and Stan Lee statements fail to state a claim under Rule 10b-5(a) and (c).

### C. Section 20(a): Controlling Individuals' Liability

"Section 20(a) of the Exchange Act imposes liability on certain 'controlling' individuals for violations of Section 10(b) and its underlying regulations." Glazer II, 63 F.4th at 765 (citing 15 U.S.C. § 78t(a)). Because controlling individuals' liability is "derivative and 'therefore require[s] an independent violation of the Exchange Act,'" a plaintiff's failure to adequately plead a § 10(b) claim will be fatal to any § 20(a) claims. See In re Facebook, Inc. Sec. Litig., 87 F.4th 934, 947 (9th Cir. 2023), cert. granted in part sub nom. Facebook, Inc. v. Amalgamated Bank, 144 S. Ct. 2629 (2024), and cert. dismissed as improvidently granted sub nom. Facebook, Inc. v. Amalgamated Bank, No. 23-980, 2024 WL 4861195 (U.S. Nov. 22, 2024) (citing Johnson v. Aljian, 490 F.3d 778, 781 (9th Cir. 2007)).

Plaintiffs have adequately pleaded a claim under § 20(a) for the Rainbow Rangers statements. Plaintiffs' allegations regarding the PennyStocks, Disney/Netflix, and Stan Lee statements fail to state a claim under § 20(a).

### D. Allegations Against Denton

Defendants argue that Plaintiffs make no individualized allegations against Denton, noting that the Court previously "warned Plaintiffs that they 'must include more particularized allegations as to Denton that support an inference of scienter.'" Mot. at 26 (quoting Dkt. 81 (FAC Ord.) at 26)). Plaintiffs argue that scienter can be inferred from Denton's role and responsibilities as CFO because they allege a "pervasive scheme" that affected factors critical to Genius's success, such as the strength of its stock and ability to remain NASDAQ-listed.

Opp'n at 27. Plaintiffs also point to allegations that Denton "increased his cash compensation eightfold" as supporting scienter. Id.

In its order dismissing Plaintiffs' first amended complaint, the Court noted that the only allegations about Denton were those asserting that he is a party and a CFO. FAC Ord. at 26. Although Plaintiffs added a few individualized allegations about Denton to the SAC, they still missed the mark. There are only three paragraphs in the substantive portions of the SAC that even mention Denton, and, within that, there are only two individualized allegations against him: that Denton (1) was signatory on Genius's 2019 10-k (SAC ¶ 96); and (2) profited greatly from Genius's stock issuances, as demonstrated by an eightfold increase in his total compensation between 2019 and 2020 (SAC ¶¶ 178, 185). The SAC fails to allege facts sufficient to satisfy the strong inference standard as to Denton.

## E. Leave to Amend

After the Ninth Circuit's remand, Plaintiffs did not have an opportunity to amend their complaint before this motion was filed. As discussed below, the Court will grant Plaintiffs limited leave to amend to cure the deficiencies identified in this Order.

In their opposition, Plaintiffs contend that, in the time since the SAC was filed, "many facts have emerged that further support [their] claims, particularly on scienter[.]" Opp'n at 9. The Court is not convinced of the relevance of most of these facts and many of the events that Plaintiffs highlight occurred outside the class period, which extends from March 11, 2020 through March 30, 2021. See SAC ¶ 1.

Plaintiffs' first "newly emerged fact" is that "Genius stipulated to liability for false advertising made between April 19, 2021 and June 17, 2021, an alleged aspect of Defendants' scheme[.]" Opp'n at 9 (citing Dkt. 116-8; SAC ¶¶ 232-236). Here, Plaintiffs refer to an unrelated trademark infringement and false advertising suit brought against Genius by one of its competitors (the Parent Media Action). See Dkt. 116-8. The SAC does not allege that the false advertising at issue in the Parent Media Action was an "aspect of [Genius's] scheme," but

rather that it showed that Genius "uses similar misleading tactics in their advertising as they [do] in their securities promotion . . . ." SAC ¶ 234. The Court does not find the Parent Media Action to be at all relevant to Plaintiffs' remaining claims.

Plaintiffs next allege that Heyward "stated in a February 10, 2023 press release that it was 'of the utmost importance' to keep the Company's listing on NASDAQ[.]" Opp'n at 9. As the Court already explained, that statement is entirely irrelevant to establishing scienter for the alleged misstatements, which were made nearly three years earlier. Heyward's 2022 and 2023 compensation, and Plaintiffs' allegation that Denton was replaced as CFO in September 2023, and that Genius replaced its auditor one month later and then again in January 2024, see id., are irrelevant for the same reason.

Finally, Plaintiffs point to two documents filed by Genius in unrelated litigation pending in the Southern District of New York, Augenbaum v. Anson Invs. Master Fund LP, No. 2:22-cv-00249.

The first Augenbaum document is a privilege log "show[ing] Denton cc'd on emails discussing the SPA[.]" Opp'n at 9 (citing Dkt. 116-9 (Augenbaum Privilege Log)). Even assuming the Augenbaum privilege log could plausibly support an inference of scienter as to Denton, Plaintiffs' allegations against Denton would still not be sufficient to satisfy the strong inference standard. The Court will grant one final opportunity to allege a claim against Denton, if Plaintiffs can do so consistent with the requirement of Rule 11 of the Federal Rules of Civil Procedure.

The second Augenbaum document is an exhibit "show[ing] that Heyward stated in an August 2019 email that Genius's 'need [for cash] is immediate' and 'IF WE RUN OUT OF CASH, I WILL BE THE ONE WRITING A CHECK TO KEEP THE LIGHTS ON (and I don't want to do that!).'" Opp'n at 9-10 (citing Dkt. 116-4 (Augenbaum Emails)). Although Plaintiffs may be overstating the extent to which the Augenbaum emails support an inference of scienter, the Court does not agree with Defendants' contention that the emails are "wholly

unremarkable" or "completely irrelevant[,]" see Reply at 13, to the claims against Genius and Heyward.

## IV. Conclusion

Defendants' Renewed Motion to Dismiss the SAC is DENIED as to the Rainbow Rangers Rule 10b-5(b), Rule 10b-5(a) and (c), and § 20(a) Claims against Defendants Genius Brands International, Inc. and Andy Heyward only. The Motion is GRANTED in part as follows: the PennyStocks, Disney/Netflix, and Stan Lee Rule 10b-5(b), Rule 10b-5(a) and (c), and § 20(a) Claims against Defendants Genius Brands International, Inc. and Andy Heyward are dismissed with leave to amend. The claims against Defendant Robert Denton are dismissed with leave to amend.

Plaintiffs may file a Third Amended Complaint (TAC) no later than March 3, 2025. The TAC must be complete in itself without reference to the SAC. The TAC may not add new defendants or claims.[16] If Plaintiffs seek to add new defendants or claims, they must file a noticed motion for leave to amend. Plaintiffs must submit a redlined version of any amended complaint to the chambers email. If Plaintiffs fail to file a timely TAC, Defendants' response to the SAC will be due March 24, 2025.

IT IS SO ORDERED.

Date: February 4, 2025

Dale S. Fischer
United States District Judge

[16] Plaintiffs acknowledge that only four statements remained in this action after the Ninth Circuit's decision—the PennyStocks, Rainbow Rangers, Disney/Netflix, and Stan Lee Claims. See Opp'n at 3 ("Following the Court's dismissal [of the SAC], the Ninth Circuit . . . revived four out of the five statements that Plaintiffs appealed."); Genius, 97 F.4th at 1190. Plaintiffs are granted leave to amend only as to the claims discussed in this Order and may not attempt to revive previously abandoned claims in the TAC.