Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel For Lead Plaintiffs*
*Ali Alavi and the A Legacy Foundation*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

In re Genius Brands International, Inc. Securities Litigation

Case No. 2:20-cv-07457 DSF (RAO)

**THIRD AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**

Judge: Hon. Dale S. Fischer
Location: Courtroom 7D

Trial Date: None Set
Date Action Filed: August 18, 2020

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION AND OVERVIEW ........................................ 1

II. JURISDICTION AND VENUE ........................................ 5

III. PARTIES AND RELEVANT NONPARTIES ........................................ 6

IV. SUBSTANTIVE ALLEGATIONS ........................................ 8

A. To Avoid Imminent Delisting From the NASDAQ, Genius Hires An Undisclosed Stock Promoter and Begins a Series of Equity Offerings ........................................ 8

B. Defendants Secure Stock Promoter To Solicit Investors ........................................ 10

C. Heyward Makes Perfectly Timed Purchases ........................................ 12

D. Defendants Introduce Artificial Inflation to Genius Shares through a Series Of False Statements And Deceitful Conduct ........................................ 14

1. Defendants Make False Statements in Two Securities Purchase Agreements ("SPAs") and Proceed to Aggressively Raise Capital ........................................ 14

2. Defendants Make False Statements about Rainbow Rangers Airing Schedule ........................................ 15

3. Defendants Capitalize On Genius' Artificial Price Inflation Through a Series of Offerings ........................................ 17

4. Defendants Make False or Misleading Statements About a Potential Sale to Netflix or Disney And/or Adopt and Ratify a Third-party's Statements About a Rumored Buyout of Genius by Netflix or Disney ........................................ 19

E. The Truth Is Partially Revealed ........................................ 25

F. The Truth Is More Fully Revealed ........................................ 27

G. Post Class Period Disclosures ........................................ 30

H. Defendants profit greatly form the above scheme through Related Party Transactions Made Possible By The Company's Stock Issuances ....... 34

V. MATERIALLY FALSE AND MISLEADING STATEMENTS ............... 36

A. March 11 and May 7 SPA Solicitation Statements ............... 36

B. Rainbow Rangers Statements ............... 38

C. *Insider Financial* Statements ............... 39

D. July 6 and October 28, 2020 Stan Lee IP Statements ............... 40

VI. ADDITIONAL SCIENTER ALLEGATIONS ............... 46

A. Additional Scienter Allegations For Defendants' *Insider Financial* Statements ............... 46

B. Additional Scienter Allegations Regarding Defendants' Rainbow Rangers Statements ............... 58

C. Additional Scienter Allegations re Stan Lee ............... 62

D. Additional Scienter Allegations That Apply to Defendants' Solicitation/PennyStocks Statements ............... 70

E. Additional Scienter Allegations That Apply to All Statements ............... 70

VII. LOSS CAUSATION ............... 76

VIII. CLASS ACTION ALLEGATIONS ............... 81

IX. UNDISCLOSED ADVERSE FACTS ............... 82

X. APPLICABILITY OF PRESUMPTION OF RELIANCE ............... 83

XI. NO SAFE HARBOR ............... 84

XII. FIRST CLAIM ............... 86

XIII. SECOND CLAIM ............... 88

XIV. THIRD CLAIM ............... 90

XV. PRAYER FOR RELIEF ............... 91

XVI. JURY TRIAL DEMANDED ............... 91

Lead Plaintiffs Ali Alavi and A Legacy Foundation ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) the review and analysis of regulatory filings made by Genius Brands International, Inc. ("Genius" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) the review and analysis of press releases, Tweets, and other media reports, including social media issued and disseminated by Genius; (c) interviews of former employees of the Company; and (d) the review of other publicly available information concerning Genius, including filings made in litigation and/or analysts.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a securities fraud class action brought pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder. This action is brought on behalf of all persons and entities other than Defendants (defined below) who purchased or otherwise acquired Genius securities from March 11, 2020 through March 30, 2021, inclusive (the "Class Period"), and who were damaged thereby.

2. Genius is a media company focused on cartoons for children. During the Class Period, Genius securities traded on the NASDAQ stock exchange under the ticker symbol "GNUS." The Company has since changed its name to Kartoon Studios Inc., and its securities currently trade on the American Stock Exchange under the ticker "TOON." For consistency with prior pleadings, the Company is referred to as Genius throughout this Third Amended Complaint, rather than by its current name, Kartoon Studios.

3. Defendants' scheme and false statements caused Genius's share price to swell. Then, to capitalize on the artificial inflation before the truth was fully revealed,

Genius made numerous stock sales, which flooded the corporate coffers with cash and, in the process, allowed Chief Executive Officer ("CEO") Andy Heyward ("Heyward") to cash out through related-party deals with Genius that the Company was then able to finance. Such related-party deals include, among others, $380,989 that Heyward was paid for "security costs" for his residence. All told, the many corporate stock sales enabled Heyward to cash out over $1.25 million from Genius in cash compensation as part of his total compensation (*i.e.*, cash and stock) of $17.4 million in 2020—an increase of over $17.0 million, or 4,138%, from the $411,500 he earned in total compensation in 2019. Since that time, he has earned multiples more in cash compensation, which again would not have been possible had the Company not sold stock at artificially inflated prices. By comparison, at the time of Heyward's March 2020 purchase into Genius (at the beginning of Defendants' scheme), Genius's entire market cap stood at just $6.1 million.[1]

4. Throughout the Class Period, Defendants made many false and/or misleading statements and half truths. Pursuant to the Court's February 4, 2025 Order Granting in part and Denying in part Defendants' Renewed Motion to Dismiss Second Amended Complaint ("the Order"), this pleading is limited to four sets of actionable false or misleading statements: (1) the Company's false statements about soliciting an undisclosed third-party stock promoter ("the PennyStocks claim"); (2) Nickelodeon's purported broadcast expansion of Genius's Rainbow Rangers cartoon series ("the Rainbow Rangers claim"); (3) Defendants' adoption of a third-party analyst report that predicted a sale of Genius to Disney or Netflix ("the Insider Financial claim"); and (4) the viability, scope, and prospects of the Company's intellectual property in the Stan Lee Universe in light of its disputed status by an entity called Proxima

[1] Market cap equals share price times shares outstanding. On March 11, 2020, Genius closed at $0.24. On March 9, 2020, Genius had 25,549,152 shares outstanding. Thus, $0.24 x 25,549,152 = $6,131,796.

Studios fka Stan Lee Studios ("Proxima") ("the Stan Lee claim"). To the extent that other false or misleading statements made by Defendants are referenced, they are cited for context, to allege a pattern-and-practice, or to support other elements of Plaintiffs' claims, *e.g.*, scienter.

5. The truth of Defendants' false and misleading statements was revealed over a series of partial corrective disclosures beginning on June 4, 2020, when famed short-seller Citron Research—known for exposing public market frauds—issued a report that partially revealed the previously undisclosed risk that Genius was working with a stock promoter. On this news, Genius shares fell by $1.07 per share, or 13.5%, on heavy volume, to close at $6.86 per share, thereby damaging investors.

6. The next day, on June 5, 2020, Hindenburg Research published a report entitled "A Bagholder's Guide to Why We Think Genius Brands Will Be a $1.50 Stock Within a Month" ("Hindenburg Report"). The Hindenburg Report showed that Rainbow Rangers was airing nine times per week in June 2020 rather than the 26-airings that Defendants represented. At the time Defendants represented Rainbow Rangers aired 26 times per week, it was airing just 12 to 14 times per week.[2] Additionally, the Hindenburg Report revealed that the shows were not airing in favorable time slots. Instead, the shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

7. This revelation caused Genius shares to plunge. On June 5, shares fell by $0.92, or 13.4%, to close at $5.94 per share on heavy volume. The following trading day, Monday June 8, shares continued to decline, falling $0.79 per share, or 14.3% to

[2] For instance, during the seven-day period from March 16, 2020 through March 22, 2020 (inclusive) Rainbow Rangers aired 12 times on Nick Jr. *See* Ex. A. From March 17, 2020 through March 23, 2020 (inclusive), Rainbow Rangers aired just 13 times on Nick Jr. *Id*. And from March 18, 2020 through March 24, 2020 (inclusive), Rainbow Rangers aired just 14 times. *Id*.

$5.15 per share, and continued to fall by $1.18, or 26.0%, to $3.97 per share on June 9, 2020, thereby damaging investors.

8. On June 15, 2020, after the market closed, *Seeking Alpha* published its own report about Genius, containing new revelations. In it, the report posited that someone likely engaged PennyStocks to pump Genius's stock. The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks's campaign was over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

9. In response to the revelation of an undisclosed stock promoter as cited in the *Seeking Alpha* report, on June 16, 2020, Genius stock declined by $0.67 per share, or approximately 14.8%, to $3.85 per share on heavy volume. The selling continued the next day and on June 17, 2020, Genius shares fell by $0.75 per share, or 21.7% on heavy volume to close at $3.10 per share, also on heavy volume.

10. On July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020. This announcement significantly boosted the Company's stock price, from $2.31 on July 1, 2020 to $3.55 on July 2, 2020, as investors in the market received the press release as a signal that the Company would be announcing a sale to Netflix or Disney. Indeed, just a couple of weeks earlier, Genius had published an analyst report that speculated such a transaction was "just a matter of time." After the report was published, Heyward made several misleading and suggestive statements, such as in the June 5, 2020 shareholder letter that again compared Genius to Netflix and touted a board member as having grown a business that was eventually sold to Disney.

11. Yet Defendants' announcement on July 6, 2020 had nothing to do with such a sale of Genius, however, but was instead another exaggerated press release in which Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee purportedly created after his time at

Marvel Entertainment. In the July 6, 2020 release, Heyward, Genius's founder, stated that "[t]he potential value in this single asset, is greater than any IP anywhere in Hollywood" and misrepresented the scope of what Genius was actually acquiring.[3]

12. As investors reacted to the realization that the Company had no intention to announce a sale on July 6, 2020, the price of Genius stock dropped significantly — from a close of $3.55 on the previous trading day to a closing price of $2.66, a decline of $0.89 per share, or 25.1%, on heavy volume, thereby damaging investors.

13. Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms and instead listed a set of IP that was much more narrow than previously represented. This release revealed that contrary to Heyward's representations on July 6, 2020, the Stan Lee IP was not "the Holy grail" of assets as the risk materialized that Genius could not monetize the Stan Lee IP as represented, likely due in part to its disputed ownership status, which the Company had concealed.

14. On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on over 100 million shares traded, thereby damaging investors.

15. As a result of Defendants' wrongful acts, misrepresentations and/or half-truths, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

[3] The next day, the Company received a letter from a law firm that disputed Genius's property rights in the Stan Lee IP and claimed that such rights had already been acquired by a company that the law firm represents. Even so, Genius made no public disclosure of this letter until March 31, 2021, when it released its Form 10-K.

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District. In addition, the Company's principal executive offices are in this District.

19. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange in this District.

## III. PARTIES AND RELEVANT NONPARTIES

20. As set forth in the previously filed certifications (ECF 91-1), which are incorporated herein by reference, Lead Plaintiffs Ali Alavi and A Legacy Foundation purchased Genius shares at artificially inflated prices during the Class Period and were damaged thereby.

21. Defendant Genius is a multimedia company based in Beverly Hills, California.

22. Defendant Heyward is the founder and was the CEO of Genius at all relevant times.

23. Nonparty Robert Denton ("Denton") served as Chief Financial Officer ("CFO") of Genius at all relevant times during the Class Period.

24. During the Class Period, Heyward, as founder, CEO, and large shareholder, was privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, Heyward and Denton had access to material adverse non-public information concerning the Company. Because of their positions within the Company, Heyward and Denton had access to

non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, Heyward and Denton knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25. Heyward is liable as a direct participant in the wrongs alleged herein. In addition, Heyward, by reason of his status as a senior executive officer and/or large shareholder and director, was a "controlling person" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of his position of control, Heyward was able to, and did, directly or indirectly, control the conduct of the Company's business.

26. Heyward and Denton, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. Heyward and Denton were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Heyward and Denton had the opportunity to commit the fraudulent acts alleged herein.

27. Heyward and Denton, as senior executive officers and/or directors – and Heyward as a controlling person of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business,

products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. Heyward's misrepresentations and half-truths during the Class Period violated these specific requirements and obligations.

28. Heyward is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public about the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiffs and members of the Class to purchase the Company's common stock at artificially inflated prices.

## IV. SUBSTANTIVE ALLEGATIONS

### A. To Avoid Imminent Delisting From the NASDAQ, Genius Hires An Undisclosed Stock Promoter and Begins a Series of Equity Offerings

29. Genius is a multimedia company that licenses entertainment content for children. During the Class Period, its shares traded on the NASDAQ and were thus subject to the listing requirements thereon. NASDAQ listing rules require an issuer's securities to maintain a minimum bid price of $1.00 per share.

30. In mid-2019, Genius needed cash to fund its business, so it engaged The Special Equities Group ("SEG"), a division of Chardan Capital Markets LLC from 2008 through May 21, 2019, a division of Bradley Woods & Co Ltd. from May 2019 until March 22, 2021, and a division of broker-dealer, Dawson James Securities since leaving Bradley Woods. From 2013 through June 2020, SEG raised over $85 million in capital for Genius. SEG claims to have expertise in increasing investor awareness.

31. On August 31, 2019, Heyward sent an email to Jonathan Schechter at SEG (Ccing Denton and Jon Ollwerther) stating that "we need cash to pay our bills." Heyward also wrote that he was going to be on the road a month later "to raise money." Heyward further stated that "Our need is immediate." Shecter was a curious choice for Heyward to contact. According to deposition testimony given in the *Augenbaum* litigation[4] that was quoted in public filings, Schecter admitted that SEG will take whatever actions are necessary, including misstating facts to make a sale.

32. Earlier the same day on August 31, 2019, Heyward also wrote that "Nobody is more focused on getting money in than me, BECAUSE IF WE RUN OUT OF CASH, I WILL BE THE ONE WRITING A CHECK TO KEEP THE LIGHTS ON.(and I don't want to do that!)…" (sic, emphasis in original).

33. For Defendants, time was of the essence because beginning in July 2019, Genius's shares had been trading below the $1.00 per share required to keep the Company's NASDAQ listing. Accordingly, on September 4, 2019, Genius received a notification letter from the NASDAQ informing the Company that it had 180 calendar days, or until March 2, 2020, to regain compliance.

34. Ten days later, on September 14, 2019, a member of Anson Investments ("Anson"), emailed Heyward and other Genius executives saying that the then ongoing efforts to raise capital "cannot have anything that will cause issues with NASDAQ." Thus, it was to Heyward, of the utmost importance for Genius to keep its NASDAQ listing leading into the Class Period and during it.

35. To keep Genius' NASDAQ listing, Genius shares had to sustain a minimum bid price of $1.00 per share for 10 consecutive days. At no point between July 23, 2019 and the end of that year did Genius shares ever trade above $1.00 per share for even a day, let alone the 10 days required by applicable listing rules.

---

[4] "Augenbaum" refers to *Augenbaum v. Anson Invs. Master Fund LP*, No. 22-cv-249 (AS) (S.D.N.Y.).

36. In connection with their efforts to raise capital for Genius, on November 8, 2019, Joe Reda at SEG wrote an email to several people including Heyward and Ollwerther suggesting an all-hands call. Reda said the first topic on the list for the call was that "the Company is running out of time and money."

**B. Defendants Secure Stock Promoter To Solicit Investors**

37. To boost the price of Genius shares so that the Company could regain its listing on the NASDAQ, Defendants engaged an undisclosed stock promoter called PennyStocks.com ("PennyStocks").

38. According to its website, which is not widely known to investors, PennyStocks only publishes favorable information because it is "compensated to only publish favorable information." It also states that not all information is sent to investors at the same time, and that "[i]f the trading volume and price of a Profile Issuer's securities increases after the Information is provided to an earlier group of investors, ***then subsequent investors will pay inflated prices for any securities of the Profiled Issuers*** that they purchase." The website also explained that "[t]his will likely result in the Profiled Issuers having trading losses."[5]

39. In addition to publishing only favorable reports about a company, as PennyStocks concedes, apparently PennyStocks will even publish content provided to it ***directly by the issuer***, without ever attributing it as coming from the issuer.

40. Confidential Witness 1 ("CW1") was employed as an Associate Manager with Genius between February 2019 through November 2019. CW1 reported to SVP of Global Consumer Products, Llyod Mintz, and later to VP of Franchise Marketing & Communications, Jamie Sikorski. According to CW1, while employed at Genius, CW1 was directed by EVP of Business Development & General Manager of Kartoon Channel!, Jon Ollwerther, to proofread an article about Genius that would subsequently appear on PennyStocks. Ollwerther told CW1 that it was important to

[5] Available here: https://pennystocks.com/disclaimer/

boost the stock price of Genius to keep it registered on the NASDAQ. Ollwerther, moreover, reported directly to Heyward, and CW1 stated that all major decisions went to Heyward for final approval.

41. Neither Genius nor PennyStocks disclosed the relationship, and PennyStocks misleadingly omitted that it received compensation from Genius and/or Heyward within the disclaimer section of its website. For instance, its disclaimer lists other entities that have paid PennyStocks for its promotional services, but not Genius.

42. Even so, despite omitting that it received compensation from Genius, between January 22, 2020 and the time of the filing of this pleading, Genius-related promotions appear on PennyStocks under the tab "curated stories" tab on Genius' landing page within PennyStocks—strongly suggesting that such stories are, in fact, paid for given: (1) PennyStocks' admission that it only publishes favorable stories because that is what it is compensated to do; (2) CW1's being instructed by Genius executives to edit articles on PennyStocks before they were published; and (3) Genius's subsequent disclosures that it paid $356,844[6] in compensation to purported and unnamed investor relations professionals, a significant portion of which was paid in stock.

43. For Genius, which described itself as a "tiny company," the $356,844 in compensation represented around 41% of Genius' ***entire revenue*** during the year ended 2019 and around 79% of the Company's full year 2018 revenue.

44. Defendants issued many press releases that appear to have been coordinated with PennyStocks. For example, while Genius-related stories began to appear on PennyStocks beginning January 22, 2020, on all the following dates, Genius issued a press release *and* PennyStocks issued a report on Genius: April 20, 2020;

[6] Genius paid 43,077 shares on January 8, 2020 and 49,610 shares on June 22, 2020, totaling 92,687 shares. On June 22, 2020, Genius' stock was $3.85 per share. 92,687 shares x $3.85 per share = $356,844.

May 6, 2020; May 13, 2020; June 3, 2020; June 15, 2020; June 23, 2020; July 2, 2020; July 22, 2020; and July 27, 2020.

45. None of the above press releases by PennyStocks include any disclosure that Genius reviewed and edited content before its publication, nor did it disclose any compensation that it apparently received from Genius. Nor would investors have any idea that PennyStocks existed or promoted Genius because there are hundreds of websites that promote small and micro cap issuers such as Genius, each with their own disclaimers (or in some cases without disclaimers). Investors have no way to know where to look for whether a security is being promoted because there is no centralized database that lists all ongoing stock promotions or even all stock promotion websites.

**C. Heyward Makes Perfectly Timed Purchases**

46. At no point between when Genius received its initial warning from the NASDAQ and the beginning of the Class Period did Genius's shares trade above $1.00 for 10 straight days. Genius, nevertheless, received an extension from the NASDAQ to comply with its listing requirements. Accordingly, on March 5, 2020, Genius disclosed in a Form 8-K filed with the SEC that it received notification from the NASDAQ two days earlier that it had been granted an extension to regain compliance, thus giving it another 180 days to get its share price above $1.00 for 10 straight days. That extension gave Genius until August 30, 2020.

47. On March 11, 2020, the Company sold a tranche of convertible notes ("the Notes") that included warrants[7] for up to 65.6 million shares of the Company's securities. The warrants attached to the Notes came with an exercise price of just $0.26 per Genius share, which was later reduced to just $0.21 per share. Defendant

[7] A Warrant is essentially an option, in this case a call option, that gives the holder the right but not the obligation to purchase equity in Genius at a predetermined price. That predetermined price is referred to as the "exercise price" or "strike price."

Heyward participated in this deal, investing $1,000,000 of his own money on March 17 when the deal closed.[8]

48. As placement agent for the March 11, 2020 transaction, SEG received warrants to purchase roughly 6.5 million shares of Genius stock at $0.26 per share.

49. The other investors who participated with Heyward in the March 11, 2020 transaction would subsequently participate in future transactions with Genius. These "Long-standing Investors" included persons from Anson, Brio Capital Master Fund, Iroquois Master, and M3A, among others. Heyward kept in regular contact with SEG about these Long-standing Investors during 2019 and throughout the Class Period according to evidence referred to or filed in *Augenbaum*.

50. The Notes were superior to anything public market investors could obtain. These securities: (1) were safer than stock[9]; (2) carried an original issue discount of 20%; yet (3) provided even more upside than common stock because the notes convert at $0.2568 per share, which was later reduced to $0.21, and with the Notes' original issue discount of 20%, Heyward's $1.0 million investment ultimately converted into 5,952,381 shares of Genius stock ($1,200,000 / $0.21 per share).

51. Heyward did this at a time when Genius shares only traded roughly 619,229 shares per day[10], meaning that had he tried to purchase nearly six million shares of stock in the open market, it would have taken him over nine trading days (assuming similar volume levels) and likely driven up the price substantially in the process because his purchases would have represented 100% of the average volume

---

[8] According to the Form 10-K for the year ended December 31, 2020 ("the 2020 10-K"), the March 11, 2020 transaction closed on March 17, 2020, which is the same day that Heyward contributed his capital for the Notes.

[9] The securities Heyward bought were convertible notes, which stand before common stock in a liquidation. *See* the SPA at 1 "The Notes will rank senior to all outstanding and future indebtedness of the Company, and its Subsidiaries (as defined below). . . "

[10] For the period of January 1, 2020 through March 11, 2020.

at the time. In other words, there is effectively no way he could have secured that many shares at such a low price in the open market—his participation in the Notes transaction was a material part of the scheme. The Notes also contained a Lockup Agreement that forbid the holder from selling any shares of Genius common stock for 1-year and 90 days from the date of the transaction.

### D. Defendants Introduce Artificial Inflation to Genius Shares through a Series Of False Statements And Deceitful Conduct

#### 1. Defendants Make False Statements in Two Securities Purchase Agreements ("SPAs") and Proceed to Aggressively Raise Capital

52. On March 11, 2020, Genius filed a Form 8-K related to the Company's entry into a Material Definitive Agreement related to the March 11 Notes transaction. The Notes transaction included a Securities Purchase Agreement ("the SPA"), which was signed both by the Company and by Heyward in his individual capacity as an investor. The SPA stated that the Company had not paid any person compensation for the solicitation of purchases of the Company's shares.

53. More specifically, it stated:

> The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) other than the Agent, paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

54. The Agent was defined as SEG. Thus, the above statement was misleading because by paying PennyStocks to write and disseminate favorable articles, the Company had paid someone (other than the Agent) to solicit another to purchase its securities.

### 2. Defendants Make False Statements about Rainbow Rangers Airing Schedule

55. The transaction dated March 11 closed on March 17, 2020. The same day, on March 17, 2020, two things occurred. ***First***, at the same time Heyward funded his $1.0 million investment in the Notes, the Company almost simultaneously paid Heyward $483,600, purportedly for previously owed producer fees, although this payment to Heyward would not be disclosed publicly until March 31, 2021, when the Company's 2020 10-K was filed.

56. ***Second***, the Company issued its second false statement in the Class Period, when on March 17, 2020, Genius issued a press release entitled, "Nickelodeon Expands Daily Broadcast of Genius Brands International's Hit Preschool Series, Rainbow Rangers." The press release stated in part:

> Genius Brands announces today that Nickelodeon, a Viacom Inc. company (Nasdaq: VIA, VIAB), has ***again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week.*** Nick Jr. now airs Rainbow Rangers Monday – Friday, four airings per day, and six airings on the weekends.

57. The purported expansion was material news to investors because, among other reasons, it was the Company's marquee program and Nick Jr. was one of two customers that accounted for 65% of Genius's revenue during the year ended December 31, 2019.[11] But the Company's statement about Rainbow Rangers was untrue. At the time that Defendants represented Rainbow Rangers aired 26 times per

[11] The Company's 2019 10-K also stated that "During the year ended December 31, 2019 compared to December 31, 2018, [Licensing & Royalties revenue] increased $414,820, or 92%, ***primarily due to increases*** [sic] ***revenues generated from Rainbow Rangers*** and Llama Llama properties in 2019." Similarly, the Company's Television and Home Entertainment segment, which comprised 82% of Genius's 2019 revenue "increased $4,493,363 or 1,388%, ***primarily due to*** the revenue generated in 2019 from the delivery of the Llama Llama Season 2 to Netflix ***and Rainbow Rangers Season 1 to Nickelodeon*** and Shanghai Senyu Media in China."

week on Nick Jr., it was airing just 12 to 14 times per week,[12] though this was unknown to investors until June 8, 2020, when the Hindenburg Report would reveal the discrepancy. For the week of March 16, 2020, through March 22, 2020, Rainbow Rangers aired between just once or twice per day, either at 3:51 am, as on March 16 through March 18, 2020, or at 4:11 am and 4:35 am, as on March 19, 2020 through March 22, 2020, respectively. *See* Ex. A showing a web archive of the Nick Jr. airing schedule for 10 consecutive days beginning March 16, 2020.[13]

58. As alleged more specifically in §V.B. below, the same Rainbow Rangers statement was repeated shortly thereafter.

59. Also on March 17, 2020, Heyward texted with Schechter. Schecter recommended to Heyward that the Company issue press releases "in up days and once the market stabilizes" but not issue press releases when the futures were down. Schecter also criticized Heyward for issuing two press releases on March 17 (one was the Rainbow Rangers press release; the other was a press release announcing the close of the Notes transaction). In response to Schecter's criticism, according to documents filed in *Augenbaum*, Heyward responded, "[we]e have litrally (sic) 20 stories backed up!" and "I wish you guys knew what I knew, i can't tell you now because I can't . . . But trust me somethings (sic) huge are coming forth. Huge Just keep watching the news!!!".

60. As the false Rainbow Rangers statements noted above entered the market, Genius shares began to rise. For instance, on March 17, Genius shares rose 15%, from $0.20 to $0.23 per share. On March 19, 2020, Genius's shares continued to rise in response to the Rainbow Rangers news, rising by an additional 25.6% on statistically significant volume to close at $0.32 per share on March 19, 2020.

---

[12] *See* Ex. A.

[13] As the Hindenburg Report would later reveal, the airing frequency dropped even further between March 17, 2020 and June 5, 2020.

61. On March 19, 2020, just two days after the first Rainbow Rangers statement, Bernard Cahill, a California attorney and member of the Company's Board of Directors, resigned "due to personal reasons" effective March 19, 2020. Mr. Cahill was also a member of the Company's audit committee.

**3. Defendants Capitalize On Genius' Artificial Price Inflation Through a Series of Offerings**

62. Following the artificial price inflation injected into the market by Defendants' false statements, Genius executed a series of additional capital raise transactions. For instance, on March 20, 2020, Genius stock closed at $0.31 per share. On March 22, 2020, Genius sold 4.0 million shares of common stock at $.2568 per share, for proceeds of around $1.0 million.

63. On May 6, 2020, Genius announced that it was rebranding two of its kids cartoon channels, *Kid Genius Cartoon Channel* and *Baby Genius TV*, under one new network brand, *Kartoon Channel!*. That day, Genius stock closed at $0.48 per share.

64. The next day, on May 7, 2020, Genius continued to capitalize on the artificial price inflation that followed Defendants' false Rainbow Rangers' statements, when on May 7, 2020, Genius conducted a direct offering of eight million shares for proceeds approximating $2.8 million. The Company also sold the shares to Long-standing investors at $0.35 per share even though the then-current market price was $0.48.

65. The May 7, 2020 offering also contained a Securities Purchase Agreement that represented:

> Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Shares.

66. The statement above was false for the same reason the March 11 SPA was: by paying PennyStocks to write and disseminate favorable articles, the Company had paid someone to solicit the purchase of Genius' securities.

67. On May 11, 2020, Genius conducted another direct offering of 12 million shares for total proceeds of $5.4 million. Similarly, the Company sold the shares to Long-standing investors for $0.45 per share even though the shares traded for $0.81 cents.

68. On May 14, 2020, Genius stock closed at $1.63 per share.

69. On May 19, 2020, Genius sold 7.5 million shares to Long-standing Investors at $1.20 per share, even though the then-current market price was $1.50 per share for gross proceeds of $9.0 million.

70. As Defendants' fraudulent conduct began to have its desired effect, the Company's shares continued to rise, reflecting, in part, the price appreciation from Defendants Rainbow Rangers statements. On May 27, 2020, Genius stocked closed at $1.83 per share. The Company thus learned on May 28, 2020 that it had regained its compliance with NASDAQ's listing requirements. In response, over 130 million shares of Genius stock traded.

71. The next day, on May 29, 2020, Genius sold another 20 million shares in a direct offering to long-time shareholders at a price of $1.50 per share, for gross proceeds of approximately $30.0 million.

72. A privilege log produced in *Augenbaum* establishes that Shecter was included on communications between Hayward, Denton, and counsel regarding, among other things, legal advice regarding a Genius securities offering and press release between May 28, 2020 and December 14, 2020.

73. On June 11, 2020, Genius registered 60 million shares for sale by a group of "selling shareholders." These selling shareholders were the same Long-standing Investors who purchased shares in the direct offerings described above who were now

able to "cash out" their investment in Genius at inflated prices. The share price listed in the prospectus was $4.51 per share.

74. On October 28, 2020, the Company conducted another offering and also entered into a Purchase Agreement with investors wherein the Company agreed to issue and sell, 37,400,000 shares of Genius stock along with warrants to purchase up to 37,400,000 shares of common stock, at an offering price of $1.55 per share of Common Stock and a warrant to purchase one share of Common Stock for gross proceeds of approximately $57.9 million before deducting offering expenses in a registered direct offering.

75. Finally, on January 28, 2021, Defendants negotiated with certain investors to exercise 39.7 million shares worth of Genius stock that those investors obtained via warrants. The net result was that Genius raised another $61.6 million in cash (39.7 million warrants were exercised at a price of $1.55 per share).

**4. Defendants Make False or Misleading Statements About a Potential Sale to Netflix or Disney And/or Adopt and Ratify a Third-party's Statements About a Rumored Buyout of Genius by Netflix or Disney**

76. On June 3, 2020, an article by *Insider Financial* was published with the headline "*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*" This article caused Genius shares to surge by 42.8%, to $4.02 per share on over 185 million shares traded – triggering stock pauses (temporary halts due to volatility) throughout the day.

77. Given the various stock halts, and Heyward's frequent interaction with potential investors, it is highly likely that he was aware of the cause of such volatility and was thus aware of the *Insider Financial* report that prompted it.

78. While the article headline included "Will Netflix or Disney Buy Genius Brands International" within it, the article was ***not*** solely focused entirely on merger speculation. It also highlighted: (1) that the Company had recently regained NASDAQ compliance; (2) that short sellers had previously "worked on their short

and distort campaigns" against Genius; and (3) included nearly one page of analysis related to Rainbow Rangers, among other positive facts about Genius. The article concluded with the statement that "We believe it's only a matter of time before either Disney or Netflix buys Genius Brands International."

79. The day after the June 3 *Insider Financial* Report came out, on June 4, 2020 Defendants issued a press release that touted the background of a Genius Board Member and "appointee" who once worked for Fox Kids Network, including a statement that sought to link the sale of Fox Kids Networks *to Disney for $5.3 billion*—insinuating that the "appointee" effected the sale. Defendants would then repeat the above statement (or a substantially similar variation) six times[14] in various Company communications that fell between the June 3, 2020 *Insider Financial* article that began the speculation of a sale, and June 22, 2020, when Genius would publish a second *Insider Financial* article to its corporate Twitter page that likewise speculated about such a sale.

80. The "appointee" is Margaret Loesch ("Loesch"), who was, and had been, a Genius Board of Directors member since March 2015. Prior to its May 6, 2020 rebranding—from Kid Genius Cartoon Channel and Baby Genius TV, to Kartoon Channel!—Loesch had already been in charge of Kid Genius Cartoon Channel (since December 16, 2019). So the June 4 press release announcing her purported appointment was not even really a new appointment, it was just the same appointment of a business that had just been renamed.

81. Even so, on June 4 (the day after the *Insider Financial* report) Genius issued a press release announcing the "appointment" of Loesch as "as Executive

[14] The repetitions included: (1) the June 5, 2020 press release; (2) the June 5, 2020 Shareholder Letter; (3) the June 8, 2020 press release responding to short seller criticism; (4) the June 12, 2020, press release announcing Kartoon! Channel; and (5) the June 15, 2020 press release announcing the purported official launch of the Kartoon Channel!; and (6) the June 18, 2020 blog posted to Genius's website.

Chairman of the New Kartoon Channel!" According to the Press Release, Loesch was "the founding president and CEO of Fox Kids Networks Worldwide, growing the channels across all metrics, where it was eventually *sold to the Walt Disney Company for $5.5 billion.*"

82. The June 4 press release did not state that Loesch left Fox Kids roughly three years before it was sold to Disney for $5.2 billion.[15]

83. The next day, Genius issued another shareholder letter. The June 5, 2020 shareholder letter similarly stated:

> I am proud to share that this morning we announced the engagement of the most successful programming executive in the history of children's television, Margaret Loesch, as Executive Chairman of Kartoon Channel!
>
> Loesch was the founding president and CEO of Fox Kids Networks Worldwide, growing the channels across all metrics, ***where it was eventually sold to the Walt Disney Company for $5.5 billion***.

84. Three days later, on June 8, 2020, Heyward again entangled Genius with market rumors of a sale to Disney or Netflix by again reiterating that "Margaret [Loesch] was founding CEO of FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars" in a June 8, 2020 response to a short seller report.

85. Again, on June 12, Heyward stated "Margaret founded and built Fox Kids Network, a product that was eventually sold to the Walt Disney Company for $5.5 billion" in a press release announcing the launch of the Kartoon! Channel. The

---

[15] Loesch's LinkedIn page states that she left Fox Kids Worldwide in October 1998. According to public information, Disney acquired Fox Kids Worldwide for $5.2 billion in October 2001.

same day, Twitter user @chrishon8 responded to Genius' corporate Twitter page, asking "Will there be a Disney BO?"[16]

86. Similarly, on June 13, 2020, user @BeKindToAll_xo, responded to Genius's Twitter page saying "Future Today merger / buyout?"

87. Five days later, on June 18, 2020 in a signed blog posted to Genius' website, Heyward again stated:

> All of this under the leadership of Margaret Loesch, the most successful programmer in children's television history, herself, the former President of Marvel Entertainment, and Founder and CEO of FOX Kids, who, after putting on blockbuster children's content like Power Rangers and X-Men, which ***was sold in 3 years time to the Walt Disney Company for $5.5 Billion dollars.*** And for good measure, add David Neuman, former President of Walt Disney Television, our Chief Content Officer, of Kartoon Channel!

88. And because the above information is both misleading as to Loesch's role and irrelevant to most of the press releases that it appeared in, the cogent and compelling inference is that Defendants purposefully sought to entangle Genius with the speculation throughout the market. This fact is further evidenced by Defendants' subsequent adoption and/or post-publication ratification of the June 21, 2020 *Insider Financial* article that again affirmatively speculated that Genius could be sold to Netflix or Disney. *See* § VI.A. *infra* (discussing additional scienter allegations).

89. On June 22, 2020, at 5:55 a.m., before the market opened, Genius published the June 21, 2020 *Insider Financial* report on the Genius Twitter page. In Genius' June 22, 2020 republication, the Company also pulled specific quotations from the article and repeated them in the post on the Company's Twitter account — establishing that it had been reviewed by Genius executives. In so doing, Genius impliedly represented the accuracy of the *Insider Financial* analysis—including the

---

[16] "BO" presumably stands for "buyout".

conclusion that Genius would be sold to Disney or Netflix— and this was done on the Company's Twitter page:




90. Genius also sought to draw additional attention to the article by including hashtags and dollar signs[17] adjacent to the Company's ticker—thus clearly entangling Genius with the views of the article itself, ratifying its content, and even going one step further and seeking to draw attention to it by tagging it with hashtags and dollar signs.

---

[17] Users on Twitter use a dollar sign in front of a ticker to denote that it refers to a stock. So if one wanted to search for discussions of Genius stock on Twitter, he or she could enter $GNUS into the search function, and all posts tagged as such would show up. Hashtags work the same way but are not limited to discussion of an equity security.

91. Like the June 3, 2020 report, the June 21, 2020 report also discussed a potential sale of Genius to either Netflix or Disney, saying "it's just a matter of time"

92. The June 21, 2020 report also stated:

> NETFLIX OR DISNEY?
> Before Citron and Hindenburg attacked the company, our subscribers got in before the big move to $11 as we at Insider Financial speculated that Disney or Netflix would buy Genius Brands. As we said earlier this month:
>
> Consider the shows in development and the depth of characters in the Genius Brands International portfolio. Disney bought Marvel for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. We believe ***it's only a matter of time before either Disney or Netflix buys Genius Brands International***.

93. By posting this article to the Company's website, Genius endorsed, adopted, and/or ratified the statement. And by quoting a portion of it, Defendants established that they in fact read the article and were aware of its misleading content.

94. This was the ***only third-party analyst report that Genius republished on its Twitter account during the Class Period***. In other words, it was not as if Genius published analyst reports routinely: in over a year, the only report it elected to publish on its Twitter account was one that speculated on a sale of Genius to Disney.

95. Genius made no attempt to dispute the statement that "it's only a matter of time before either Disney or Netflix buys Genius Brands."[18]

96. Rather, just days later, on July 2, 2020, Heyward announced that he would be hosting a conference call on July 6, 2020, to discuss a "key business development update."

---

[18] Because the *Insider Financial* speculation about a sale to Disney inflated Genius' shares just a few weeks earlier, the Company's subsequent ratification of the statement served to maintain some of that inflation but did not cause the stock to increase meaningfully on June 22, 2020.

97. In response, investors became even more confident that the July 6 "key update" would be the announcement of a sale to Netflix or Disney, as Defendants had been teasing for weeks. For instance, on Twitter, users who appear to be either investors or prospective Genius investors responded to the Genius announcement with statements such as:

@ekemaSteven: "Disney buyout!?!?"[19]

@stungmedia: "or a buyout"?[20] and

@watercoolerview: "@GNUSBrands Great to see a #GeniusBrands @netflix or @disneyplus partnership or buyout. Great for the product to move into the streaming big league. Big news on Monday!"[21]

**E. The Truth Is Partially Revealed**

98. On June 4, 2020, Citron Research ("Citron"), a well-known analyst that has exposed prior corporate frauds, including in Valeant,[22] questioned the valuation of the Company and suggested the use of an undisclosed promoter. Specifically, among other things, Citron posted several critical comments on social media, including a posting that read "$GNUS to $1...fast The lowest form of retail investor. Consider: LTM $GNUS rev $5 mil mkt cap $800 mil compare to leader WildBrain (teletubbies) LTM revenue of $332 million mkt cap $175 mil Not to mention massive dilution at $GNUS. ***Stock Promotion***."

99. The Citron tweet revelation that Genius may be using an undisclosed stock promoter caused Genius shares to fall by $1.07 per share, or 13.5% to $6.86 per share on heavy volume.

---

[19] On July 2, 2020 at 6:25 am PT.

[20] On July 2, 2020 at 7:43 am PT.

[21] On July 3, 2020 at 4:10 am PT.

[22] https://www.forbes.com/sites/antoinegara/2015/10/21/valeant-plunges-30-after-short-seller-citron-research-makes-fraud-allegation/?sh=24195a0d64ae

100. Additionally, on Friday June 5, 2020, Hindenburg published the Hindenburg Report. This report also questioned the valuation of Genius and examined Defendants' misrepresentations.

101. With respect to Rainbow Rangers, the Hindenburg Report showed that Rainbow Rangers was actually airing nine times per week, rather than the 26-airings figure noted in Genius's press release. Moreover, the episodes were not airing in favorable time slots and were, instead, being broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m.

102. Upon the release of the Hindenburg Report, the price of Genius common stock fell $0.92, or over 13.4% on heavy volume, to close at $5.94 per share on June 5, 2020, damaging investors.

103. The Hindenburg Report spotlighted Defendants' misrepresentations about, among others, the Rainbow Rangers airing schedule and as a result, removing some prior artificial price inflation that came with them.

104. And the Company's response to the Hindenburg Report, which came the next trading day, also revealed additional truths to the market.

105. On Monday June 8, 2020, the Company issued a response to the Hindenburg Report (*see* ¶204, *infra*) that contained both admissions and false denials. As to the former, Defendants either admitted or failed to dispute – and therefore impliedly admitted – that: (1) Rainbow Rangers had not been renewed for a new season on *Nick Jr.*; (2) Rainbow Rangers aired between 12 to 14 times per week at the time the statement was made and only nine times per week at 3:49 a.m. EST during weekdays and Saturdays and twice on Sunday mornings between 6:00 a.m. and 7:00 a.m. by June, not 26 times and (3) a new wave of selling was likely to pummel the Company's stock as its financial backers sought to lock in profits. In that June 8 response, Heyward again reiterated the purported relationship between Loesch and her role in the sale of Fox Kids to Disney.

106. The combination of (a) continued selling pressure from the revelations from the Hindenburg Report with (b), the Company's additional implied admissions, kept Genius shares pressured for the following two trading days: on June 8, 2020, Genius shares fell by $0.79 per share, or 13.3%, to $5.15 per share on heavy volume; and on June 9, 2020, Genius shares fell by $1.18, or 26.0%, to close at $3.97 on heavy volume.

**F. The Truth Is More Fully Revealed**

107. On June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations. In it, the report posited that Genius likely engaged PennyStocks to pump Genius's stock. The report then analyzed various press releases issued by PennyStocks, and concluded that once PennyStocks's campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years" revealing both the undisclosed relationship between PennyStocks and Genius and thus, that such relationship would have the effect of making Genius shares more volatile than was known to the market until the *Seeking Alpha* report.

108. Indeed, on June 16, 2020, Genius stock declined by approximately $0.67 per share, or 14.8% to close at $3.85 per share on heavy volume as investors digested the revelation from the *Seeking Alpha* report, including that Genius's shares had been artificially inflated by a previously undisclosed stock promoter.

109. The selling continued the next day and on June 17, 2020, Genius shares fell by $0.75 per share, or 21.7% on heavy volume to close at $3.10 per share, also on heavy volume.

110. Finally, on July 6, 2020, Genius announced the creation of a joint venture with POW! Entertainment regarding the purported intellectual property that Stan Lee created after his time at Marvel Entertainment. There was no discussion of a sale to Disney or Netflix, as had been misleadingly intimated by Genius's republication and ratification of the June 21, 2020 *Insider Financial* report.

111. Following the July 6, 2020 press release, the price of Genius's stock plunged 25.1% on heavy volume from a close of $3.55 on the previous trading day to a closing price of $2.66 per share on July 6, 2020 as investors came to realize that the purported "key business development" update had nothing to do with a sale to Disney or Netflix, as Heyward and Defendants had led them to believe.

112. In response to the July 6, 2020 news, Twitter user @_jules replied to the Genius corporate Twitter page saying, "announce Disney merger." Twitter user @ffanstasypro1 also replied to the Genius corporate page after the announcement saying, "did any one [sic] here [sic] about the Disney news yet? Is it true".

113. Brian Murphy (@BrianMu63331595) also replied to the Genius corporate page, on July 6, 2020 in response to the Genius press release: "Gnus once again pumps it's [sic] stock only to let shareholders take the hit, way to make your investors non believers left bleeding from the eyes!"

114. While there was no transaction between Disney and Genius, the July 6, 2020 press release did contain false and/or misleading statements such as Heyward's statement that, "there simply is no greater treasure chest of Intellectual Property anywhere" and "This is the Holy Grail. Stan Lee Universe is a once in a lifetime asset drawn from over 100 original, heretofore unexploited properties, created by the most successful creator of intellectual property of our time."

115. Genius also represented that the Stan Lee Universe would be "Jointly owned" between Genius and Pow! Entertainment. Heyward also stated "Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount." The July 6 press release also stated, "The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated Stan Lee Universe program block."

116. The next day, Genius received a letter from a law firm ("the July 7 Letter") alleging that the rights Genius Brands had licensed from POW!, LLC,

through its the Stan Lee Universe, LLC joint venture, had already been sold to another company, called Proxima Studios fka Stan Lee Studios, which was represented by that law firm. The law firm also stated that the Company was "interfering with their contractual rights." The July 7 Letter exposed a material risk that Genius would not be able to monetize the Stan Lee IP consistent with the ways represented in the July 6, 2020 press release, but the Company concealed the July 7 Letter, and the accompanying undisclosed risk, until March 31, 2021.

117. On August 14, 2020, the Company issued its Form 10-Q for the period ended June 30, 2020 ("2Q 2020 10-Q"), wherein it disclosed that it issued 49,610 shares of its Common Stock, then valued at $3.85 per share, to a provider of investor relations services. The Company also disclosed that its General and Administrative expense for the three-month period ending June 30, 2020 increased 52% compared to the same period a year earlier. Genius attributed the increase to salaries, stock-based compensation, legal fees and "*investor relations*" *expense.* A reasonable inference can be drawn that the 49,610 shares issued by the Company to a "provider of investor relations services" went to PennyStocks as compensation for its favorable stock promotion campaign that it undertook on behalf of the Company and as first suggested by the June 15, 2020 *Seeking Alpha* Report.

118. The following trading day, Genius shares fell $0.05 per share, or 3.2%, to $1.55 on August 17, 2020, thereby damaging investors.

119. Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms, and impliedly admitted that Genius did not control the same breadth of IP that it represented in the July 6, 2020 press release and Shareholder letter[23], and thereby

---

[23] Compare the July 6, 2020 shareholder letter, stating "Stan Lee Universe, will assume worldwide rights, in perpetuity, to the name, physical likeness, physical signature, ***live and animated motion picture***, television, online, digital, ***publishing***, ***theme park, comic book***, merchandising and licensing rights to Stan Lee and ***his IP*** (footnote continued)

materializing a previously known but undisclosed risk that the content could not be monetized in the ways suggested by the July 6, 2020 press release.

120. On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on over 100 million shares traded, thereby damaging investors.

**G. Post Class Period Disclosures**

121. On March 31, 2021, Genius filed its 10-K for the period ending December 31, 2020. In it, the Company stated that on July 7, 2020 the Company learned from a law firm that "the rights Genius Brands had purportedly licensed" for its "Stan Lee Universe, LLC joint venture had already been sold to another company" and that Genius was "interfering with their contractual rights." The Company learned of this law firm letter one day after releasing its July 6, 2020 press release that had promised that "[t]he potential value in this single asset [the Stan Lee JV], is greater than any IP anywhere in Hollywood," but made no disclosure of it until the 2020 10-K on March 31, 2021.

122. This disputed legal status of the IP makes it harder for Genius to monetize its purported Stan Lee asset, and thereby creates a known risk associated therewith.

123. On or about November 4, 2021, POW! and Proxima entered a binding settlement agreement resolving all the claims made by Proxima about the disputed Stan Lee IP.

124. On December 13, 2021, Genius replaced Defendant Denton with Zrinka Dekic ("Dekic") as CFO. Dekic had an impressive pedigree, with an undergraduate

---

***creations past*, present, and going forward***" (original emphasis omitted, current emphasis added) *with* the March 30, 2021 press release, stating "'Stan Lee Universe', its recently announced joint venture with POW! Entertainment, LLC, controls the Stan Lee name, the animated and live Stan Lee likeness, the Stan Lee signature, as well as the broad Stan Lee brand/Stan Lee Presents, and a variety of Stan Lee properties created post Marvel."

degree from Amherst College and an MBA in finance from the Wharton School of Business at the University of Pennsylvania. Prior to working at Genius, Dekic also worked at Goldman Sachs in New York, where she was responsible for overseeing $30 billion in assets under management. In the press release announcing her appointment, Dekic expressed enthusiasm, stating, “I am thrilled to be joining the Company at such an exciting time and to be part of the leadership team that will take Genius Brands to the next level.” Dekic signed an employment agreement for a term of two years.

125. On March 4, 2022, before Genius would file its 10-K for the year ended December 21, 2021, Dekic resigned from her position as CFO of Genius “for personal reasons” after less than three months on the job, and well before her 250,000 shares of stock options in Genius would vest (options that she received when she joined the Company). The “personal reasons” she gave for her resignation was the same reason that former Board of Directors member Cahil, who resigned two days after Heyward’s Rainbow Rangers statement, gave.

126. According to her LinkedIn profile, apart from a Board of Directors role she had between 2021 and 2024, Dekic did not begin working full-time until August 2022, or more than five months after her resignation from Genius. In other words, Dekic apparently did not leave Genius to immediately begin working at another position elsewhere. Dekic does not list her short tenure at Genius on her LinkedIn profile under her work experience, although there is a post about her joining the Company that can still be seen on her LinkedIn profile.

127. As Genius’s CFO, Dekic would have been required to attest to the accuracy of Genius’ financials, including attesting that “this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report” and “ I have disclosed . . . Any fraud, whether or not material, that involves management or

other employees who have a significant role in the registrant's internal control over financial reporting" had she remained at Genius. *See* Exhibit 31.2 to Genius' Form 10-K filed on April 6, 2022.

128. But because Dekic resigned before Genius' 10-K was filed, she did not have to make such attestations, which were instead made by Denton – who was reappointed as Genius' CFO when Dekic resigned.

129. A cogent and compelling inference from Dekic's rapid resignation, which came just before the filing of Genius' 10-K — which would have required her to attest to SOX certifications—is that she was uncomfortable signing such SOX attestations and instead elected to resign—even without having another job lined up—rather than attesting to the accuracy of Genius' financials.

130. On April 6, 2022, Genius filed its 10-K for the year ended December 31, 2021 ("the 2021 10-K"). In the 2021 10-K the Company stated that, with respect to its intellectual property (emphasis below added):

> In addition, although we own ***most*** of the music and intellectual property included in our products, there are some titles which the music or other elements are in the public domain and for which it is difficult or even impossible to determine whether anyone has obtained ownership or royalty rights. It is an inherent risk in our industry that people may make such claims with respect to any title already included in our products, whether or not such claims can be substantiated. For example, in July 2020, we received a letter from a law firm alleging that rights that we had licensed from POW!, LLC had already been sold to another company, Proxima. This matter was settled by POW! in November 2021, but the settlement negotiations were costly and required diversion of ***management attention***.

131. The 2021 10-K also stated that (emphasis below added):

> On September 30, 2021, the Company entered into a Loan Agreement and Promissory Note with POW! in the amount of $1,250,000, accruing simple interest at the annualized rate of 9%. The entire principal sum was required to be remitted to POW!'s client trust account of POW!'s legal counsel within 5 days of the effective date. The principal, plus interest must be repaid by no later than November 1, 2022. Within the

> Loan Agreement, it is stated that the ***proceeds of $1,000,000 are required to be used by POW! to settle the arbitration against Stan Lee Studios (aka Proxima Studios)*** and $250,000 shall be used to solely pay for the payment of legal costs and fees. The principal amount was transferred to POW! on October 12, 2021 and on or about November 4, 2021, POW and Proxima entered into a binding settlement agreement resolving all the claims made by Proxima. The loan has accrued interest of $26,221 as of December 31, 2021 and is recorded as a Note Receivable from Related Party on the Company's consolidated balance sheet.

132. Finally, on April 13, 2023, the Company filed its 10-K for the year ended December 31, 2022 ("the 2022 10-K"). In the 2022 10-K, the Company stated that (emphasis below added):

> On November 1, 2022, POW failed to repay the Loan as set forth in the applicable loan agreement. GBI then provided POW with a notice of default and thirty days to cure. As of December 31, 2022, the Company has not received payment on the Loan. As the Library secures repayment, ***the Company initiated a public sale during February 2023 of the Stan Lee Library owned by POW***. The Library consists of over 250 titles, most of which were created by Stan Lee during his employment with POW from 2001 to 2018. The Library includes treatments, synopses and screenplays, as well as derivative rights in certain novels, comic books and other publications. The public auction is being conducted by auctioneer Ocean Tomo, a division of J.S. Held. The auction will be held on April 21, 2023 and Ocean Tomo will be accepting initial bids on the Library until April 7, 2023. The Company will be participating in the auction as a credit bidder.

133. Denton signed SOX certifications appended to both the 2021 and 2022 10-Ks.

134. On September 23, 2023, Denton was again replaced as CFO.

135. One month after Denton was replaced as CFO, on October 23, 2023, the Company replaced its then auditor, Baker Tilly US LLP, and replaced it with Mazars.

136. On January 24, 2024, the Company dismissed its nearly brand-new auditor and replaced Mazars with WithumSmith+Brown, PC.

### H. Defendants profit greatly form the above scheme through Related Party Transactions Made Possible By The Company's Stock Issuances

137. The series of secondary offerings conducted by Genius flooded Genius' coffers and allowed Heyward and Denton to reap substantial sums of compensation.

138. The 2020 10-K revealed several lucrative and previously undisclosed related party transactions between the Company and Heyward—such as the $389,989 spent for "security at Mr. Heyward's residence" (at pp. 39, 47). The 2020 10-K also revealed that Heyward was paid the following in cash compensation during 2020: (1) a base salary of $311,717; (2) a bonus of $73,528; (3) purported producer fees of $161,200 for 13 half-hours of delivered content for *Rainbow Rangers* (series 1); (4) $322,400 for 26 half-hours of *Rainbow Rangers Season 2* airings — making a combined total of $483,600 for purported "executive producing fees" that Heyward received from the Company during 2020; (5) $11,370 in interest on Senior Convertible Notes Heyward held; and (6) $3,000 for board fees Heyward received.[24]

139. In total, the 2020 10-K reports that Heyward received $1,252,834 in cash compensation during 2020—$873,589 of which stemmed from purported executive producing fees and purported "security costs" at his residence. The 2020 10-K also revealed that on December 7, 2020, Heyward's salary was increased to $430,000 from $300,000, even though Heyward had entered into a five-year employment agreement on November 16, 2018 that called for an annual salary of $300,000.

140. A significant portion of Heyward's 2020 compensation was paid ***the same day*** he made his "investment" in the Notes. On March 17, 2020, the day the March 11, 2020 Note Transaction closed (and thus the day Heyward contributed his $1,000,000 investment), Genius paid Heyward approximately $483,600 for purported

[24] These amounts are on top of another $322,400 in separate purported producer fees that Heyward was still "owed" as of December 31, 2020.

earned but then unpaid executive producer fees.[25] And as noted above, by the end of 2020, Heyward received a total of $1,252,834 in cash compensation—meaning that he managed to cash out his ***entire*** March 11, 2020 "investment" plus another $252,834 while still retaining his entire ownership stake. In other words, Heyward effectively de-risked his entire March 11, 2020 purchase of the Notes, *and* received a 25%+ return, *and* kept his entire initial equity stake received through warrants attached to the Notes.

141. On top of the cash payments Heyward received, the 2020 10-K also established that Heyward was awarded a combined 15,000,000 shares of restricted stock units and another 5,000,000 stock options, helping him maintain his ownership stake without being diluted like common shareholders were.

142. All told, Heyward's compensation went from $411,500 in 2019, to $17.4 million in 2020: an increase of over $17.0 million, or 4,138%.

143. All the above related party transactions appear to have been made without Audit Committee oversight because the 2020 10-K notes that the above transactions were made before the adoption of the Audit Committee charter, and "Pursuant to the written charter of our Audit Committee, the Audit Committee is responsible for reviewing and approving all transactions both in which (i) we are a

---

[25] According to the 2020 10-K:

> Mr. Heyward is entitled to an Executive Producer fee of $12,400 per half hour episode for each episode for which he provides services as an executive producer. The first identified series under this employment agreement is Rainbow Rangers. As of March 31, 2019, twenty-six half hours had been delivered and, accordingly, Mr. Heyward was owed $322,400. The second series identified was Rainbow Rangers Season 2. Thirteen half hours of Rainbow Rangers Season 2 were delivered in the fourth quarter of 2019 and, accordingly, Mr. Heyward was owed $161,200. Mr. Heyward was paid the total amount due to him of $483,600 for his producer services ***on March 17, 2020***.

participant and (ii) any parties related to us, including our executive officers, our directors, beneficial owners of more than 5% of our securities, immediate family members of the foregoing persons and any other persons whom our Board of Directors determines may be considered related parties under Item 404 of Regulation S-K, has or will have a direct or indirect material interest.”. At a minimum, such transactions were made without the benefit of audit committee member Cahill’s oversight following his resignation.

144. The 2020 10-K also showed that Denton increased his total compensation by more than eightfold: from $262,439 in 2019, to $2,163,908 in 2020. In addition, on December 7, 2020, the Company granted 950,000 stock options to Denton with a strike price of $1.39 and a term of 10 years. 380,000 of the options vested on the grant date with the remaining options vesting 190,000 each of the next three years. On December 7, 2020, the Company also granted 475,000 Restricted Stock Units to Denton.

145. The substantial personal gains Defendants realized would not have been possible absent the stock sales made throughout the Class Period–and those sales would not have been possible without the surge in price and volume that Defendants’ scheme generated.

## V. MATERIALLY FALSE AND MISLEADING STATEMENTS

Four sets of statements are alleged to be false and/or misleading.

### A. March 11 and May 7 SPA Solicitation Statements

146. On March 11, 2020, Genius filed a Form 8-K with the SEC related to the Company’s entry into a Material Definitive Agreement, wherein Defendant Heyward, among others, purchased Senior Secured Convertible Notes. The Senior Secured Convertible Notes contained warrants convertible into the Company’s common stock, at a price of $0.26 per share. Attached to the March 11, 2020 Form 8-K was Exhibit 10.1, the Securities Purchase Agreement between the Company and the Purchasers of

the Convertible Notes, including Defendant Heyward. The Securities Purchase Agreement stated the following:

> (q) Manipulation of Prices. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken or may take, directly or indirectly, any action designed to cause or to result, or that would reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) other than the Agent (as defined in Section 3(ee)), sold, bid for, purchased, ***or paid any compensation for soliciting purchases of, any of the Securities***, or (iii) other than the Agent, paid or agreed ***to pay to any person any compensation for soliciting another to purchase any other securities of the Company***.

147. The statements referenced in ¶146 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because, at the time the statement was made, the Company had engaged the services of stock promotion site, PennyStocks, to publish and disseminate favorable information about Genius's shares. Thus, payment for such services constitutes "compensation for soliciting purchases of, any" Genius shares and/or "pay[ing] any Person any compensation for soliciting another to purchase any other securities of the Company."

148. On May 7, 2020, Genius conducted another direct offering. Like the March 11, 2020 SPA, the May 7, 2020 SPA also contained a Securities Purchase Agreement that represented:

> Regulation M Compliance. The Company has not, and to its knowledge no one acting on its behalf has, (i) taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Shares, (ii) sold, bid for, purchased, or, paid any compensation for soliciting purchases of, any of the Shares, or (iii) paid or agreed to pay to any Person any compensation for soliciting another to purchase any other securities of the Company, other than, in the case of clauses (ii) and (iii), compensation paid to the Company's placement agent in connection with the placement of the Shares.

149. The statement above was false for the same reason the March 11 SPA was false.

**B. Rainbow Rangers Statements**

150. On March 17, 2020, Genius issued a press release entitled "Nickelodeon Expands Daily Broadcast of Genius Brands International's Hit Preschool Series, Rainbow Rangers." The press release stated in part:

> "Genius Brands" announces today that Nickelodeon, a Viacom Inc. company (Nasdaq: VIA, VIAB), has ***again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week.*** Nick Jr. now airs Rainbow Rangers Monday – Friday, four airings per day, and six airings on the weekends.

151. The statements referenced in ¶150 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because at the time the statement was made, Rainbow Rangers did not air 26 times per week. *See* Ex. A. Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired between 12 to 14 times per week at the time the statement was made, not 26. During the week of March 17, 2020 through March 23, 2020 (*i.e.*, the week the statement was made), Rainbow Rangers aired between just one or two times per day, at either 3:51 am or 4:11 and 4:35 am, respectively.

152. The same day Genius issued its March 20, 2020 shareholder letter, it also hosted a conference call. During that conference call, Heyward reiterated his statement that Rainbow Rangers airs 26 times on Nick Jr:

> On Tuesday, I also announced that Rainbow Rangers is now up to 26 broadcast per week on Nick Jr. We intend to share a significant number of releases regarding Rainbow Rangers in the coming days, but I do want to say in brief that it's now being broadcast in the entire western hemisphere.

153. The March 20, 2020 shareholder letter also stated, "Cartoons endure. We announced Tuesday that Rainbow Rangers is now up to 26 broadcasts a week on Nick Jr.!!!"

154. The statements referenced in ¶¶152-153 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because at the time the statement was made, Rainbow Rangers did not air 26 times per week. *See* Ex. A. Nickelodeon's purported Rainbow Rangers expansion was temporary and/or overstated and only aired between 12 to 14 times per week at the time the statement was made, not 26. During the week of March 17, 2020 through March 23, 2020 (*i.e.*, the week the statement was made), Rainbow Rangers aired between just one or two times per day, at either 3:51 am or 4:11 and 4:35 am, respectively.

**C. *Insider Financial* Statements**

155. On June 3, 2020, an article by *Insider Financial* was published with the headline "*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*"

156. On June 22, 2020 Genius published the June 21, 2020 *Insider Financial* report on the Genius Twitter page. In Genius' June 22, 2020 republication, the Company also pulled specific quotations from the article, including one that stated that "This is a CEO who is going to fight for his shareholders" and repeated them in the post on the Company's Twitter account.

157. Within the June 21, 2020 report it states:

> NETFLIX OR DISNEY?
> Before Citron and Hindenburg attacked the company, our subscribers got in before the big move to $11 as we at Insider Financial speculated that Disney or Netflix would buy Genius Brands. As we said earlier this month:
>
> Consider the shows in development and the depth of characters in the Genius Brands International portfolio. Disney bought Marvel

> for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. We believe ***it's only a matter of time before either Disney or Netflix buys Genius Brands International***.

158. The statements referenced in ¶¶155-157 above were also false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because by posting the June 21, 2020 *Insider Financial* article to the Company's website, Genius endorsed, adopted, and/or ratified the statement and Genius made no effort to dispute any of its contents, including the statement that "it's only a matter of time before either Disney or Netflix buys Genius Brands." Rather, for a matter of weeks after the June 3, 2020 *Insider Financial* article, Heyward misleadingly touted the credentials of a purported company "appointee" that had purportedly led a company that eventually sold itself to Disney.

159. On July 2, 2020, Genius announced that it would host a conference call to discuss a "Key Business Development."

160. The statement referenced immediately above was, under the circumstances, purposefully misleading when made and/or omitted to state material facts necessary to make the statements not misleading because given the context of the days preceding this announcement – including Defendants' adoption and/or ratification of the June 23, 2020 republication of the *Insider Financial* analyst report that speculated that it was only a matter of time before Genius would sell itself to Netflix or Disney—investors were led to believe, and did in fact believe, that an announcement related to Disney or Netflix was forthcoming, when it was not.

**D. July 6 and October 28, 2020 Stan Lee IP Statements**

161. On July 6, 2020, Genius indeed issued a press release detailing the "key" update and hosted a conference call to discuss the same. In the July 6, 2020 press release, CEO Heyward stated the following:

> This is the Holy Grail. Stan Lee Universe is a once in a lifetime asset ***drawn from over 100 original, heretofore unexploited properties***, created by the most successful creator of intellectual property of our time

Jointly owned and subject to due diligence and documentation, the deal ***will leave Genius Brands as the managing and controlling partner of the Stan Lee Universe*** joint venture.

Stan Lee was the creator of the most successful characters ever made, including Spiderman, Iron Man, Black Panther, The Incredible Hulk, X Men, Thor, Captain America, Ms. Marvel, Silver Surfer, Antman, Nick Fury, Guardians of the Galaxy, and of course the #1 movie box-office franchise of all time, The Avengers. For decades, Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount.

In addition to the #1 movie box office hit, Avengers Endgame, Stan Lee created two of the Walt Disney Company's top three blockbusters, and five of the top 12 grossing movies of all time.

"It's almost impossible to conceive that one mind created all this wealth," said Heyward. "The spinoffs alone defy the imagination. From animated television, to toys, apparel, video games, and every conceivable licensed product imaginable, Stan Lee characters populate the screens and retail shelves worldwide. There is no creator who has influenced pop culture and created more successful entertainment. Not even Walt Disney. Over and over, again and again, he created characters and stories that resonated in the hearts and minds of all peoples of all ages around the world, with billions and billions and billions of dollars of motion picture box-office, television, and consumer product licensing."

Stan Lee Universe will be built from the repository ***of all of the characters and IP created by Stan Lee, post-Marvel Entertainment*, not otherwise elsewhere***. ***It is drawn from over 100 original Stan Lee creations, from which it will develop and license approximately seven properties per year***.

"Having worked with Stan and been a close friend for almost 30 years, nothing could make me prouder than for Genius Brands to become the guardian of both his brand and body of work," commented Heyward. "I have no doubt that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big

> as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN, his BLACK FURY, and VIRUS."
>
> * * *
>
> I have no doubt that the greatest characters, the greatest stories, and the greatest hits from the mind of Stan Lee have yet to be told. As big as Spider Man, Black Panther, X Men, and the Avengers are today, tomorrow it will be Stan Lee's TOMORROW MEN, his STRINGBEAN, his BLACK FURY, and VIRUS. (original emphasis).
>
> * * *
>
> When we looked at the depth of these creations that sit in this library, the magnitude and value of this asset slowly began to sink in. ***There simply is no greater treasure chest of Intellectual Property anywhere***.[26]

162. The July 6, 2020 press release also represented that the Stan Lee Universe would be "Jointly owned." Heyward also stated, "Stan was the editor and creative force behind Marvel Comics, which was sold to the Walt Disney Company for $4.4 billion and has since proved to be worth many multiples of that amount." The July 6 press release also stated "The spinoff opportunities for Kartoon Channel! alone are mindboggling, including a dedicated Stan Lee Universe program block."

163. During the July 6, 2020, conference call discussing the Stan Lee update, Heyward made the following statement:

> Now let me speak to something our investors will be interested in, the financial impact on Genius Brands. ***The financial impact of an asset like Stan Lee Universe cannot be overstated***. We have seen what properties created by Stan Lee did for The Walt Disney Company in revenues and earnings. Not just in the billions of dollars of movie box office, but in the even greater downstream revenue across the entire business, be it television, digital, consumer products, games and theme parks. We've studied the Disney Playbook and they have done a brilliant job at bringing Stan's creativity through the food chain.

[26] Original emphasis omitted, emphasis here added.

> Having observed and learned, we believe that we can take the next surge of Stan Lee properties 2.0 to the market in no lesser way and create a massive value for our shareholders. Just like LeBron James brought his talents to Miami and then to Cleveland and where he also won a NBA championship and now to Los Angeles, we're confident that Stan Lee Universe will once again demonstrate the creative gift of this man and the power of his brand as it now comes to Genius.
>
> * * *
>
> For the Genius Brands shareholders, we look forward to smartly and efficiently monetizing Stan Lee Universe across all platforms. I have no doubt that we will attract the most talented producers, directors and marketers in the world, as we unlock this one of a kind treasury and bring forth the next wave of Stan Lee creations for the world to experience and enjoy.

164. Finally, Heyward also penned a shareholder letter on July 6, 2020 wherein he stated:

> Dear Friends and Shareholders:
>
> This morning we announced a groundbreaking joint venture between Genius Brands International (NASDAQ:GNUS) and Stan Lee's POW! Entertainment to create STAN LEE UNIVERSE.
>
> STAN LEE UNIVERSE, will assume worldwide rights, in perpetuity, to the name, physical likeness, physical signature, live and animated motionpicture, television, online, digital, publishing, themepark, comic book, merchandising and licensing rights to Stan Lee and his IP creations past*, present, and going forward. (emphasis omitted)

165. The statements referenced in ¶¶162-164 above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because Heyward implied that Genius had the potential to, like the Walt Disney Company, earn billions of dollars in revenue from the box office in connection with the Stan Lee IP, even though Genius did not (a) disclose the known

risk that its IP rights related to the Stan Lee project may be in dispute;[27] (b) correct the misleading impression given by the above in light of the letter that it received from a law firm the following day that challenged the Company's ownership in the Stan Lee IP given the Company's prior statement that such IP would be "jointly owned"; or (c) that the scope of the IP owned by Genius was not as broad as represented in the July 6, 2020 shareholder letter.

166. On October 28, 2020, Genius entered into another Securities Purchase Agreement ("the October 28 SPA") with certain investors pursuant to which the Company agreed to issue and sell, an aggregate of 37,400,000 shares of common stock, and warrants for gross proceeds of approximately $57.9 million before deducting the placement agent fees and offering expenses.

167. The October 28, 2020 SPA also included the following provision under Representations and Warranties of the Company (¶ 3.1):

> (a) Subsidiaries. All of the direct and indirect subsidiaries of the Company are set forth on the SEC Reports, other than newly formed subsidiary Stan Lee Universe, LLC, which has no assets or operations. The Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary free and clear of any Liens, and all of the issued and outstanding shares of capital stock of each Subsidiary are validly issued and are fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.
>
> * * *
>
> (p) Intellectual Property. The Company and the Subsidiaries ***have, or have rights to use***, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and ***other intellectual property rights*** and similar rights necessary or required for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could have a Material Adverse Effect

[27] This is a fact Heyward knew or was deliberately reckless in not knowing given his 30-year long friendship with Mr. Lee, which would give him a deep familiarity with exactly what IP rights Genius was actually acquiring.

> (collectively, the "Intellectual Property Rights"). None of, and neither the Company nor any Subsidiary has received a notice (written or otherwise) that any of, the Intellectual Property Rights has expired, terminated or been abandoned, or is expected to expire or terminate or be abandoned, within two (2) years from the date of this Agreement. ***Neither the Company nor any Subsidiary has received, since the date of the latest audited financial statements included within the SEC Reports, a written notice of a claim or otherwise has any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person***, except as could not have or reasonably be expected to not have a Material Adverse Effect. To the knowledge of the Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights. The Company and its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of all of their intellectual properties, except where failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

168. The statements referenced immediately above were false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because on July 7, 2020, Genius received a letter from a law firm "alleging that rights Genius Brands had licensed from POW!, LLC, through its the Stan Lee Universe, LLC joint venture, had already been sold to another company, represented by that law firm" and that Genius was "interfering with their contractual rights"—which represents a clear written notice of a claim to Genius's IP (or that of a subsidiary) and/or a claim that Genius is violating the IP rights of any person; thus rendering the Company's statements above in the October 28, 2020 SPA, false and/or misleading.

169. The statements referenced in ¶167 above were also false and or misleading because the Company did have knowledge that the Intellectual property Rights violate or infringe upon the rights of another person following the July 7 Letter.

# VI. ADDITIONAL SCIENTER ALLEGATIONS

## A. Additional Scienter Allegations For Defendants' *Insider Financial* Statements

170. **Fact 1:** Heyward's pattern of discussing merger activity, combined with his pre–Class Period statements about a future "liquidity event" support an inference of scienter regarding the *Insider Financial* statements.

171. Heyward's statements about Genius potentially being for sale changed over time. Initially, during 2016, Heyward downplayed the likelihood of a sale, and even explicitly told investors that Genius was not for sale. But by 2018, he reversed course and explicitly told investors that the ultimate value of Genius would be realized in a "liquidity event." His later statements primed the market for a sale. Heyward's change in messaging is discussed below.

172. In a Form 8-K filed March 30, 2016, Heyward mentioned Disney buying Marvel, but in so doing, he downplayed the likelihood that Genius was for sale at that time:

> In 2001, Marvel stock (MVL) opened the year at $1.43/share, and closed at $3.80/share with a $96 million dollar market cap. In 2009, Marvel was bought by the Walt Disney Company for $4.24 billion dollars. Disney paid $30 dollars/share cash plus .745 Disney shares for each Marvel share. While I am not suggesting we are going to sell Genius Brands for $4 billion dollars, I believe that Genius Brands is on a tear creating some of the most exciting characters coming forth in the kids business, anywhere today, and from any studio.

173. Similarly, one month later, in a June 30, 2016 shareholder letter, Heyward again discussed larger media companies (*e.g.*, Disney) acquiring smaller ones (*i.e.*, smaller ones like Genius): "Over the last years, one by one, these companies which make animated cartoons and have had catalogues and the infrastructure to create kids brands have been gobbled up at increasingly higher values, culminating most recently with DreamWorks recent sale to Comcast/Universal for $3.8 Billion dollars." He then listed 10 more examples of media M&A transactions, three of which

involved companies sold to Disney (*i.e.*, being "gobbled up"). He concluded by saying, "All of them today are gone. ***Sold either to Disney, Warner Brothers, Comcast/Universal, or elsewhere.***" (original emphasis).

174. Despite suggesting that Disney was an active buyer, in 2016, Heyward made sure to clarify to the market that Genius was ***not*** for sale at that time: "The company is not for sale. We are building value, and are excited to see it grow in the coming months", is what he said in a June 30, 2016 shareholder letter

175. But Heyward changed course two years later. Unlike in 2016, by 2018, Heyward expressly stated that Genius' value *will be* unlocked by a liquidity event, which for a public company, means a sale.[28] Specifically, during an April 3, 2018 investor call, an investor asked Heyward about Genius' then languishing stock price, and Heyward noted that ultimately Genius' value would be recognized by "some kind of liquidity event transaction":

> Anthony Marchesi: Hey Andy, your metrics all are great, yet the stock, frankly, trades closer to it's 52-week low than it's 52-week high. Can you just give us your perspective on what is it that you think the market is missing, or what is it that they're not seeing that—obviously you have a lot of enthusiasm, great message. Things seem to be well yet the stock just languishes. I don't know how else to put it, so I'd just like your perspective on what it is that you think is going on, from your CEO position

---

[28] A "liquidity event" is a term of art used by investors that means, in the public company context, a sale to another entity, which allows insiders and large shareholders to liquidate their shares. In the private market context, a liquidity event could mean an IPO, a public listing, or a sale. But an IPO or public listing would not be considered liquidity events to a company that is already public, as Genius was in 2018 because public markets are already considered liquid. *See e.g.*, https://www.investopedia.com/terms/l/liquidity_event.asp; *In re Zohar III, Corp.*, No. 21-2799, 2022 WL 3009744, at *1 (3d Cir. July 29, 2022) ("Under the MSA, PPMG was entitled to a 'Transaction Fee' upon the occurrence of a qualifying 'Liquidity Event,' defined in Section 3(c)(ii)(D) to include the sale of 50% of Oasis's equity, the sale of 80% of its assets, or the merger of Oasis with another entity").

> Andy Heyward: It's a very good question and one that I've obviously given some thought to. I think in the small cap plays it's very hard to get attention and to get the trading volume up to a place where it really is going to matter. We're working on that. We have some things that we are doing that will affect that, but as I've always said, the ultimate value of our company is going to be reflected not in the stock but at some point ***when we do some kind of liquidity event transaction***. That's occurred in my previous two companies and I think that will be the case in Genius at the right point as well. (emphasis added).

176. As shown above, unlike Heyward's 2016 statements, Heyward's 2018 statements—which came in response to Genius' then languishing stock price—expressly indicated to the market that the ultimate value of Genius was going to be reflected by a "liquidity event transaction." And by saying, "that's occurred in my previous two companies", which were in fact sold (according to Heyward), Heyward made clear to the market that his expectation was for Genius also to eventually be sold as well. And at no point thereafter did Heyward ever reverse course again and say Genius would not be sold. In other words, with regards to Genius being sold, the last express statement Heyward had made to the market was his statement about a future "liquidity event transaction."

177. Thereafter, Heyward would continue to point out instances of large media companies (normally Disney) acquiring smaller ones. For instance, in a February 20, 2019 shareholder letter, Heyward again noted that he previously sold two companies, one of which was purportedly to Disney:

> In the world of content creation, those who are patient, ultimately win. It is not insignificant to note that Marvel closed the year 2000 trading at $1.42/share. In that year, the assets of Marvel were Spider-Man, Iron Man, The Incredible Hulk, X-Men, Captain America, Thor, and The Avengers, among others. In 2009, that same Marvel with essentially the same character assets, was sold to the Walt Disney Company for **$4.2 billion**. (original emphasis)

> **Personally, I have sold my last company to Cap Cities/ABC and the Walt Disney Company in the past**. It too, had animated characters, which we then established: Inspector Gadget, and Strawberry Shortcake, and Care Bears, and Dennis the Menace and The Archies and Sabrina the Teenage Witch. I am familiar with the appetite globally for animated content. It is growing, not receding, and I believe stronger than ever, those who show patience, will ultimately win. Often, they win BIG. (emphasis added)

178. Months later, in an October 15, 2019 shareholder letter, Heyward again discussed merger transactions, this time mergers involving toy companies. He, not coincidentally, made this statement about toy companies also being acquired in a shareholder letter in which he told Genius investors that Rainbow Rangers would be featured in *a Mattel Toy product launch* (that launched July 15, 2019):

> Two noteworthy transactions took place this year. The Saban kids catalogue was sold to Hasbro Toys for $500 million dollars. Also sold to Hasbro was the Entertainment One asset for $4.2 billion dollars, led in large part, by its two lead properties, *Peppa Pig* and *PJ Masks*.
>
> Lightning is silent until it strikes, and few people saw these transactions coming.
>
> Much of our senior leadership at Genius Brands comes from The Walt Disney Company and Hasbro Toys, as well as the Spin Master Toy Company, the creators and owners of the billion-dollar mega-hit *Paw Patrol*. I am confident that our management is at the epicenter of this business and is as experienced as anyone in the creating and realizing of value

179. It is atypical for a public company CEO to discuss merger activity as regularly as Heyward did. Moreover, given Genius' tiny market cap at the time that Heyward was making such statements, Heyward was necessarily suggesting that Genius was a merger target, not an acquirer, because the Company was simply not large enough to buy another company before its multiple capital raises made during the Class Period.

180. Accordingly, Heyward's pattern-and-practice described above, along with the context of his statements both support an inference of scienter for Defendants' retweeting of the June 21, 2020 *Insider Financial* statement that speculated about a sale to Disney or Netflix. At a minimum, it was deliberately reckless for Defendants to re-tweet an article speculating about a sale to Disney given Heyward's repeated pattern of discussing merger activity, including a statement where he (a) expressly advised investors of his expectation of a future liquidity event for Genius; and (b) also repeatedly stated that Disney was an active buyer of media companies like Genius.

181. **Fact 2:** the June 2020 Loesch statements support scienter for the *Insider Financial* statements. Three aspects of Defendants' June 2020 Loesch Statements support scienter: (1) that the June 2020 statements were themselves misleading supports scienter; (2) the temporal proximity of the statements – with six iterations timed to immediately follow the first *Insider Financial* report – supports scienter; and (3) the evolution of how Loesch was described—with increased emphasis on the Fox Kids sale to Disney becoming more prominent during the Class Period—also supports scienter. Each of these aspects is discussed in turn below.

182. **(1) The Loesch statements themselves were misleading**. On June 4, 2020, just *one day* after the June 3, 2020 *Insider Financial* article, Defendants issued a press release announcing that Loesch was supposedly "appointed" as Executive Chairman (sic) of Kartoon Channel!. The ***very first sentence*** describing Loesch's background reads: "Loesch was the founding president and CEO of Fox Kids Networks Worldwide, growing the channels across all metrics, where it was eventually sold to the Walt Disney Company for $5.5 billion."

183. Defendants' description of Loesch's experience at Fox Kids was misleading in two ways. ***First***, it was misleading because Loesch had *already been appointed* to run Kid Genius Cartoon Channel—since December 19, 2016 in fact. As alleged above, on May 6, 2020 (*see* ¶63), Kid Genius Cartoon Channel rebranded as

Kartoon Channel! So the June 4, 2020 announcement that Loesch was being appointed to run Kartoon Channel! was not really an appointment at all, it was just a logical function of her running the same platform (since 2016) under a different name. The fact that Loesch had been in a similar role since 2016 was completely omitted from the June 4 Loesch statement. Indeed, even followers of the Company were confused when the official debut of the newly-branded channel launched on June 15.[29] ***Second***, Loesch's experience was misleadingly presented because she left Fox Kids three years before it was sold to Disney. So Loesch had nothing to do with the sale of Fox Kids' sale to Disney. Yet the Fox Kids sale to Disney was the first thing Defendants chose to highlight after announcing her purported appointment on June 4, and they did so the day after the June 3 *Insider Financial* report said Genius might be sold to Disney. They then repeated similar statements six times in close proximity (listed immediately below at ¶184). Those facts invite an inference that Defendants manufactured a reason to highlight the Fox Kids sale to Disney, which makes it far less likely that Defendants were focused on something other than the sale to Disney when they retweeted the June 21 *Insider Financial* article.

184. **(2) The temporal proximity of the June 2020 Loesch statements was designed to fuel additional merger speculation**. The close temporal proximity between the *Insider Financial* report coming out on June 3, which was then followed the next day by the <u>first of six</u> Loesch Statements—all of which came in between the June 3 and June 21 *Insider Financial* reports—further supports scienter. Below is a

[29] For example, one comment in response to the June 15, 2020, *Seeking Alpha* report on Genius stated, "Today was their launch day and I can't find anything. I need to pay $4 / month through Amazon for the channel. Not available on iOS yet... their YouTube channel was only updated with a 30 second preview of shows that have been updated ***out there for years***. I really think someone at GNUS dropped the ball here on their advertised launch date." (emphasis added).

timeline depicting the temporal proximity of the June Loesch Statements with the two *Insider Financial* reports:

- **June 3, 2020**, *Insider Financial* published an article with the headline "*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*" The article continued, "Disney bought Marvel for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. We believe it's only a matter of time before either Disney or Netflix buys Genius Brands International."

- **Genius June 4, 2020 press release**. Fox Kids being sold to Disney for $5.3 billion appears in the first sentence in Loesch' background description.

- **Genius June 5, 2020 shareholder letter**. Another gratuitous mention of Fox Kids being sold to Disney for $5.3 billion appears in Loesch' background description.

- **Genius June 8, 2020 press release responding to short seller reports**. Another mention of mention of Fox Kids being sold to Disney for $5.3 billion appears in Loesch' background description: "Margaret was founding CEO of FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars."

- **Genius June 12, 2020 press release**. Another mention of Fox Kids being sold to Disney for $5.3 billion appears in Loesch' background description: "Margaret founded and built Fox Kids Network, a product that was eventually sold to the Walt Disney Company for $5.5 billion."

- **Genius June 15, 2020 press release** announcing launch of Kartoon Channel!. In discussing the office launch, Heyward stated, "Margaret founded and built *Fox Kids Network*, a product that was eventually sold to the *Walt Disney Company* for $5.5 billion."

- **Genius June 18, 2020 blog posting**. Another mention of Fox Kids being sold to Disney for $5.3 billion appears in Loesch'

> background description: "All of this under the leadership of Margaret Loesch, the most successful programmer in children's television history, herself, the former President of Marvel Entertainment, and Founder and CEO of FOX Kids, who, after putting on blockbuster children's content like Power Rangers and X-Men, which was sold in 3 years time to the Walt Disney Company for $5.5 Billion dollars."

- **June 22, 2020**. Genius published the June 21, 2020 *Insider Financial* report on the Genius Twitter page which again speculated about a sale to Disney or Netflix.

185. That Defendants repeated the Loesch Statements six times in close proximity to the *Insider Financial* reports evinces a purposeful effort to subtly message the market that Genius had the right team in place to also be sold to Disney. It is atypical for a public company CEO to repeat—so often, and seemingly for no reason—that a board member once worked for a company that was sold three years after that board member left.

186. Accordingly, when Defendants retweeted the second *Insider Financial* article, on June 22, 2020, that dissemination was also to draw the market's attention to the portion of the June 21, 2020 *Insider Financial* statement that said it was only matter of time before Genius would be sold to Netflix or Disney.

187. **(3) The evolution of the Loesch Statements**.

188. Defendants' scienter becomes even more apparent by comparing how Loesch was described before the Class Period with how Defendants described her immediately after the first *Insider Financial* report. Suffice it to say, the Fox Kids sale to Disney took on increasingly more prominence just after the June 3, 2020 *Insider Financial* report saying Genius would be sold to Disney.

189. For instance, before June 4, 2020, most descriptions of Loesch typically (with a few exceptions) omitted mention of Fox Kids sale to Disney. And that makes sense because, as discussed above, Loesch left Fox Kids in October 1998. Disney acquired Fox Kids in October 2001—three years after Loesch left. So there is no

particular reason—apart from trying to foster price inflation related to merger expectations—to connect those two unrelated events.

190. **Typical descriptions of Loesch's experience before the June 3, 2020 *Insider Financial* statement made no reference to a Fox Kids/Disney transaction**. Leading up to the June 2020 Insider Financial report, at least seven instances of Loesch's background appear in Genius' filings, none of which mention the Fox Kids/Disney sale.

191. [#1] Loesch joined Genius' board, on March 18, 2015, Genius filed a form 8-K announcing the same. At that time, nothing in Loesch's 2015 background mentions Fox Kids being sold to Disney:

> On March 18, 2015, the Company's Board of Directors appointed Margaret Loesch as a director of the Company. Beginning in 2009 through 2014, Ms. Loesch, 68, served as Chief Executive Officer and President of The Hub Network, a cable channel for children and families, including animated features. The Company has, in the past, provided The Hub Network with certain children's programming. From 2003 through 2009 Ms. Loesch served as Co-Chief Executive Officer of The Hatchery, a family entertainment and consumer product company. From 1998 through 2001 Ms. Loesch served as Chief Executive Officer of the Hallmark Channel, a family related cable channel. From 1990 through 1997 Ms. Loesch served as the Chief Executive Officer of Fox Kids Network, a children's programming block and from 1984 through 1990 served as the Chief Executive Officer of Marvel Productions, a television and film studio subsidiary of Marvel Entertainment Group. Ms. Loesch's 40 years of experience at the helm of major children and family programming and consumer product channels brings a great deal of expertise and experience to the Company. Ms. Loesch obtained her bachelors of science from the University of Southern Mississippi.
>
> Ms. Loesch has no family relationship with any of the executive officers or directors of the Company. There are no arrangements or understandings between Ms. Loesch and any other person

> pursuant to which she was appointed as a director of the Company.

192. [#2] Days later, in a March 26, 2015 conference call, Heyward again described Loesch's experience and again said nothing of any sale of Fox Kids to Disney:

> Some of you may have seen a press release that went out today where I'm particularly proud to share that we just announced the appointment of Margaret Loesch to our Genius Board of Directors. Margaret has been at the top of the kids' entertainment business for 30 years. She ran NBC Kids in the glory days of Smurfs and Alvin and the Chipmunks. She was Head of Production at Hanna-Barbera Studios. She was President of Marvel Animation. She was the founder of the Fox Kids Network where she discovered and launched Power Rangers and X-Men, among other products. She eventually became President of Hallmark Channel and subsequently Founder and CEO of the Hub Network, the joint venture between Hasbro and Discovery. She sits on many Boards, including The Academy of Television Arts and Sciences, Sesame Workshop. Her ties go across the creative community, the advertising community, the broadcast community. She's truly one of the most admired people in the industry and she will join us and become Chair of one of our important committees shortly, which we'll announce.
>
> She's going to make a huge contribution to the growth of the Company and we'll discuss more about that in a moment.
>
> She'll be replacing the seat that's currently held by Jeff Weiss, who will continue to serve as a very valued advisor to the Company, but will no longer sit on the Board, because Jeff doesn't live here. He's cross country and too many complications for him to get to the Board meetings in Los Angeles.

193. [#3] Similarly, in Genius' Form 10-K for the year ended December 31, 2015 ("the 2015 10-K"), Loesch's experience again made no mention of Fox Kids being sold to Disney:

> Margaret Loesch, 69*,* was appointed to the Board of Directors on March 18, 2015. Beginning in 2009 through 2014, Ms. Loesch, served as Chief Executive Officer and President of The Hub Network, a cable channel for children and families, including animated features. The Company has, in the past, provided The Hub Network with certain children's programming. From 2003 through 2009 Ms. Loesch served as Co-Chief Executive Officer of The Hatchery, a family entertainment and consumer product company. From 1998 through 2001 Ms. Loesch served as Chief Executive Officer of the Hallmark Channel, a family related cable channel. From 1990 through 1997 Ms. Loesch served as the Chief Executive Officer of Fox Kids Network, a children's programming block and from 1984 through 1990 served as the Chief Executive Officer of Marvel Productions, a television and film studio subsidiary of Marvel Entertainment Group. Ms. Loesch obtained her bachelors of science from the University of Southern Mississippi. Ms. Loesch was chosen to be a director based on her 40 years of experience at the helm of major children and family programming and consumer product channels.

194. [#4] In Genius' Def 14A Proxy Statement filed June 12, 2017, a section on Loesch's work experience appears. In it, there is no mention of Fox Kids being sold to Disney.

195. [#5] In Genius' 10-K for the year ended December 31, 2018, Loesch's biography again made no mention of Fox Kids being sold to Disney.

196. [#6] In Genius' Form 14A Proxy Statement filed with the SEC on May 8, 2019, Loesch's work experience is again described, but there is no mention in that May 8, 2019 document about Fox Kids being sold to Disney within Loesch's experience summary.

197. [#7] In Genius' Form DEF 14A Proxy Statement, filed <u>April 14, 2020</u>—shortly *before* the first *Insider Financial* was published, a section on qualifications of Genius' executives and Board of Directors members appears. There, Loesch's work experience is again described, but there is <u>no mention</u> of Fox Kids being sold to Disney.

198. **Descriptions of Loesch's experience after the June 3, 2020 *Insider Financial* statement**. *Insider Financial* published its first report speculating on a sale of Genius to Netflix or Disney on June 3, 2020. The very next day, Defendants suddenly and repeatedly emphasized Loesch's background differently. *See* ¶184.

199. **Fact 3**: that Defendants already addressed the June 4 and June 5 2020 short seller reports on June 8 further cuts against any nonfraudulent inference that they retweeted the June 21 *Insider Financial* article to make a point that they had already made. The only two short seller reports here came out June 4 (Citron) and June 5 (Hindenburg).[30] Heyward responded to both of those reports on June 8. Thus, in light of the above allegations, it is not more compelling that Defendants re-tweeted the June 21 *Insider Financial* report to respond to short seller criticism because nothing came out between June 8—when Heyward responded to such short sellers—and June 22, when Defendants retweeted the June 21, 2020 *Insider Financial* report.

200. **Fact 4**: that this was the only analyst report retweeted during the Class Period further supports scienter.

201. **Fact 5**: that Defendants sought to advertise the report using hashtags and dollar signs supports scienter.

202. **Fact 6:** Defendants had motive to keep Genius' stock price high to execute the October 2020 equity transaction further supports scienter.

203. **Fact 7:** the Core Operations Doctrine supports scienter. That the *Insider Financial* report discussed a sale of Genius—which is the most important event that a company will experience—further supports scienter under the core operations doctrine.

---

[30] While the *Seeking Alpha* analysis came out June 15, that analysis was not by a short seller. The author of that report stated that he had no positions in Genius and received no compensation for his analysis on Genius.

### B. Additional Scienter Allegations Regarding Defendants' Rainbow Rangers Statements

204. **Fact 1**: Heyward's response to the revelation of the truth supports scienter. On June 8, 2020, Genius responded to the criticism raised by the Hindenburg Report and the Citron postings. Specifically, the Company stated the following:

> **Genius Brands International Responds to Misleading Short Seller Criticisms**
>
> BEVERLY HILLS, Calif. – (BUSINESS WIRE) – Genius Brands International, Inc. "Genius Brands" (NASDAQ:GNUS) today released the following statement from CEO and Chairman Andy Heyward, in response to recent short seller criticisms published online and on certain social media platforms:
>
> "Genius Brands has carefully reviewed the report and social media comments published by two short seller funds last week. These materials contain numerous misleading statements, omissions of key facts, and red herrings. More importantly, the short sellers themselves demonstrate a fundamental misunderstanding of the unique potential of Genius Brands and our position of strength given the current dynamics of our industry.
>
> It is also important to keep in mind how these short sellers make money and what they are trying to do. Make no mistake, their intention – and indeed *how they make their money* – is to manipulate the stock price of companies like ours in order to profit at the expense of other shareholders. Their interests are directly opposed to shareholders' interests. In contrast, as one of the largest investors in the Company myself, my interests are fully aligned with those of my fellow shareholders – and will remain so.
>
> With that in mind, I submit the following:
>
> **We are well positioned to create substantial value** – With Kartoon Channel! Launching on June 15 and to be available in more than 100 million U.S. TV households and 200 million mobile devices, we are positioned to be one of the preeminent ad-supported kids' digital networks. The service referred to as a 'Netflix for kids' is made even stronger by the distinct fact that it is a free service. There are no subscriptions fees, it is ad-supported. Further, we do not anticipate being

impacted by COVID-19. The business of cartoons has historically had an appeal that is timeless, and is a rare asset class which has historically been resistant to typical market forces (e.g., the price of gold, oil, interest rates, elections, etc.). While the rest of Hollywood is grinding to a stop during the COVID-19 crisis, we're creating new products for an audience that is growing now out of the new technologies and streaming services. This is especially true at a time when there are more kids at home and in front of their devices during the pandemic. We believe we will see robust and accelerated revenue growth coming forth in this arena for the foreseeable future.

**Our balance sheet is strong** – We have $9.75 million of debt; in excess of $45 million of cash, significant receivables from a diverse array of companies across our industry with strong credit profiles, and low overhead. Today, Genius Brands has enough cash on our balance sheet to meet our existing obligations and execute on our business plan for at least 60 months, and still fund continuing new production and content acquisitions each year. Conveniently, last week when one of the short sellers stated we weren't at the same revenue point as one of our Canadian-based competitors, he neglected to mention that the other company has more than 60 times ($600 million) as much debt as Genius Brands. We think identifying this omission is important to understanding the whole story. Finally, to clear up market confusion that we believe has been generated as a result of one short seller's report, the shelf registration on form S-3 filed on June 4th was related to our capital raise in March 2020. We registered the resale of shares underlying the warrants we issued in March, and the S-3 filing does not in any way represent a new capital raise, nor is it related to recent changes in our stock price.

The short sellers' criticisms of our Programs highlight their own industry ignorance – Llama Llama is an industry-recognized tremendous asset that we have on great terms, which are mutually beneficial with the IP's author/book publisher and ourselves. We are also confident in the appeal of the soon to be launched Stan Lee's Superhero Kindergarten, one of the last creations of Stan Lee, creator of Spider-Man, X-Men, Iron Man, Incredible Hulk, Thor, Fantastic Four, Black Panther, and the Avengers, among others. Similarly, we are happy with the outlook for Rainbow Rangers. ***The fact is that the show's airings on Nick Jr. have been scaled back*** while we are currently producing new episodes, which is a ***standard industry practice*** known as "resting." We expect the airings to

ramp back up in August when the new episodes are completed and this will be timed with the launch of toys from Mattel hitting the shelves of Walmart in August. We are confident Nick Jr.'s interests are aligned with ours – after all, they have a stake in the consumer products merchandising royalties related to this asset.

**The track record of our leadership team speaks volumes** – Our senior management comes largely from the Walt Disney Company, DreamWorks Animation, and Hasbro Toys, and has been responsible for many of the biggest and most profitable hits in children's television history, as well as toy and consumer product programs generating Billions of dollars of program sales and royalty income. The management team and board have had creative, licensing, production, broadcasting, and sales roles in some of the biggest animated hits in children's history, including Lion King, Toy Story, Strawberry Shortcake, Care Bears, Power Rangers, My Little Pony, Spider-Man, Batman, X-Men, Transformers, Muppet Babies, Fraggle Rock, Real Ghostbusters, and Inspector Gadget. Collectively, we have more than 150 years of experience in children's media, and have helped generate literally tens of billions of dollars of content and consumer products sales.

Further, last Friday, we announced the addition of two of our industry's most accomplished executives overseeing the new channel: Margaret Loesch as Executive Chairman of Kartoon Channel! (former President of Marvel Entertainment, FOX Kids, and Henson Television), and David Neuman as Chief Content Officer of Kartoon Channel! (former President of Walt Disney Television). Margaret was founding CEO of FOX Kids, and built it from zero to the most successful and profitable kids program service, and what was eventually sold to the Walt Disney Company for $5.5 billion dollars. None of us claim to be experts at 'short selling'. But we also think it's a stretch for short sellers to claim to know more about this industry than those of us who have been industry leaders and spent decades making money for investors while building some of the sector's most successful brands and companies.

**Genius Brands is a long-term growth story** – We have a number of hit brands and shows today – but we are even more excited about what is coming, and the synergies with the newly announced *Kartoon Channel!*. We have over 450 licensed products contracted (with advances and guarantees) to come into the marketplace in the coming months. Our

> pipeline of new animated products, soon to be announced, is robust and pre-sold with significant brand equity. Our partners, licensees, and retail customers include Alibaba, Amazon, Mattel, Netflix, Target and Walmart, among others. Rainbow Rangers toys from Mattel, based on our hit series on Nick Jr., will hit Walmart stores in August beginning with a multipack of Rainbow Rangers figures. Over 350 other licensed consumer product SKUs are due as well, including publishing, room décor, bedding, footwear, apparel, health and beauty, bicycles, toothpaste, touring shows, among others, some of which are now already on Amazon.com, Walmart.com, and Target.com.
>
> Above all else, we are focused on *long-term value*. After working with Warren Buffett for 25 years and producing the children's animated series with Warren to teach financial literacy (*Warren Buffett's Secret Millionaires Club*), I've learned to focus on the importance of the basics: asset creation and value-building for our shareholders.
>
> On a personal note, I have not sold a single share, and in fact, have materially increased my holdings in the Company in the last two years. We take the views of all our investors seriously, and we and our board are committed to maintaining the highest standards of corporate governance and transparency."
>
> The Company is not suggesting that any particular trading price for the Company's securities is appropriate, whether in the short- or long-term. However, we would like to seek to clarify certain facts as it relates to the short seller information that has been put into the marketplace.
>
> Finally, the Company reserves the right to take appropriate legal action against Hindenburg Research and Citron Research, as we will always do what we can to protect our shareholders' interests. (emphasis added)

205. Heyward's response above, specifically the portion that stated that Nick Junior had purportedly been "scaled back" supports scienter because Rainbow Rangers had not been scaled back *after* the Company's March 17, 2020, statement announcing the purported increased airing of Rainbow Rangers to 26 times per week on Nick Jr. Rather, it had been airing as little as just once per day, including on March 16, 2020; March 17, 2020; and March 18, 2020. In other words, Heyward's March

17, 2020 statement was false when made, but when brought to light by an analyst that drew attention to the discrepancy in June 2020, Heyward implied that the show had been "scaled back" *after* the March 17, 2020 announcement when that was not the case. Even during the March 17, 2020 announcement, Heyward's statement was false when made, but rather than correcting it, he offered a misleading explanation – that the airings changed after the fact. His attempt to attribute the show's June schedule to a recent scaling back – particularly in the context of a direct response to inquiries from an analyst – further supports scienter.

206. **Fact 2**: that Heyward made multiple statements about the airing schedule further supports scienter.

207. **Fact 3**: by making detailed factual statements which contradicted information Defendants had readily available, further supports scienter.

208. **Fact 4**: Heyward had indicated that he did not want to write a check to the Company, but he did exactly that, just before making the false Rainbow Rangers statements, which further supports scienter.

209. **Fact 5**: that Defendants were desperately trying to keep the Company's NASDAQ listing establishes motive for the Rainbow Rangers statements, which further supports scienter.

210. **Fact 6**: that California attorney and audit committee member Bernard Cahill resigned just two days after Defendants' March 17 Rainbow Rangers press release further supports scienter.

211. **Fact 7**: that Heyward acquired 5.95 million shares of Genius stock at $0.21 per share, when the then prevailing market price was $0.24 per share, just before Defendants made their false Rainbow Rangers statements further supports scienter.

**C. Additional Scienter Allegations re Stan Lee**

212. **Fact 1:** Defendants' repeated statements made with actual knowledge support scienter. As alleged above, Defendants had actual knowledge of the falsity of

their Stan Lee IP statements, by July 7, 2020, *at the latest*. Still, with that knowledge, Defendants continued to tout the Stan Lee IP, which supports scienter.

213. For example, on July 15, 2020, more than a week after receiving the July 7, 2020 Letter, Defendants issued a press release with the headline "Archie Comics, Genius Brands Partner to Launch Comic Books Based on 'Stan Lee Universe' of Characters" with the byline "*Industry Icon, Originator and Executive Producer of "Batman" Films, Michael E. Uslan, to Lead Development of the 'Stan Lee Universe*.'" (emphasis in original). The July 15 press release continued:

> Following the recently announced 'STAN LEE UNIVERSE,' Genius Brands International "Genius Brands" (NASDAQ:GNUS) has entered into a ground-breaking comic book publishing agreement with Archie Comics (Archie, Betty & Veronica, Sabrina, Josie and the Pussycats, and more), to publish comic books/graphic novels based on the never-before-exploited IP of Stan Lee Universe.
>
> "It is only fitting that the comic book roots of Stan Lee, which began with Marvel, give birth to the next generation of great Stan Lee properties. I have long felt that the greatest Stan Lee characters and stories have yet to be told, and the next Marvel has yet to be built. That is Stan Lee Universe," said Genius Brands CEO and Chairman, Andy Heyward."
>
> ***
>
> Concurrent with the announcement of the Archie Comics publishing deal, Genius Brands is proud to announce that Michael E. Uslan will bring his decades of experience and expertise to advise and ***help mine the great IP in the Stan Lee Universe*** to build ongoing global branded franchises. ***The treasure chest of post-Marvel Stan Lee IP*** will be guided by Uslan, whose input will cover all film and TV development and production under the banner.
>
> ***
>
> Stan Lee Universe, a joint venture between Genius Brands and Stan Lee's POW! Entertainment, managed by Genius, ***owns the worldwide rights***, ***in perpetuity***, to the name, physical likeness, physical signature, live-action and animated motion picture, television, online, digital, publishing, comic book, theme park, and merchandising/licensing rights from the repository of characters and IP created by Stan Lee

> drawn from over one hundred creations (postMarvel Entertainment), including Tomorrow Men, Stringbean, Black Fury, Virus, Superhero Kindergarten, and many more. Genius Brands will develop seven new franchises per year, primarily targeted for families and kids.
>
> The legendary Stan Lee was the Co-Creator of some of the most successful characters of all time, including Spider-Man, Iron Man, Black Panther, The Incredible Hulk, X-MEN, Thor, Silver Surfer, Ant-Man, Nick Fury, and The Avengers. As the editor and a creative force behind Marvel Comics for decades, ***which was sold to the Walt Disney Company for $4.4 billion,*** Stan Lee COCREATED franchises that continue to prove to be worth billions of dollars. (emphasis added)

214. The statement above supports scienter because Defendants made it with actual knowledge of the July 7 Letter by Proxima disputing Genius' ownership of Stan Lee's IP, yet Defendants continued to tout the Stan Lee IP transactions initially disclosed on July 6, 2020. In other words, rather than correcting the misleading impressions given to investors on July 6, 2020, Defendants reiterated them just over a week later. That makes it more likely that the July 6 statements were similarly made with scienter because if Defendants were unaware of the falsity of their statement on July 6, but then became aware of it on July 7 by the Proxima letter, they would have changed the way they described the IP on July 15—unless they intended to mislead all along. And that is what happened here with the July 6 statement.

215. Similarly, also on July 15, 2020, Defendants re-tweeted on Genius' corporate Twitter account a story by *The Hollywood Reporter* about the purported comic book venture which stated, *inter alia*, that: "The comic book publishing agreement follows Genius Brands International striking a joint venture with Stan Lee's POW! Entertainment to acquire never-before-exploited IP from the creator of iconic superhero comic characters like *Spider-Man,* the *X-Men, Thor, Iron Man, Black Panther* and the *Fantastic Four.*" The July 15 Hollywood Reporter article also stated that: "Genius Brands and Stan Lee's POW! Entertainment's partnership will exploit more than 100 original Stan Lee creations to create a 'Stan Lee Universe.' The

Stan Lee IP collection will be built from all characters and IP created by Lee outside of Marvel Entertainment, now owned by The Walt Disney Co. Lee created POW! Entertainment in 2001 to manage his creator rights and licenses as it developed film, TV and video game properties." In other words, rather than acknowledge the dispute over the IP as indicated by the July 7 Letter, Defendants continued to tout the false scope of the IP as falsely represented in the July 6, 2020 press release.

216. Also on July 15, 2020, Heyward issued another shareholder letter. In it, he described the Stan Lee universe as:

> Let me be clear. **In *Stan Lee Universe*, we are building out the *next* MARVEL, based on the creations of the man who built the *original* Marvel… Stan Lee**. We are doing so through the single most widely distributed comic book publisher, **Archie Comics**, and its visionary Publisher, Jon Goldwater, under the creative leadership of the most respected and accomplished authority in comic books today, **Michael Uslan**. (original emphasis)

217. That the above statement continued to tout the Stan Lee IP even ***after*** the July 7 Letter challenging Genius' ownership was yet another statement made with actual knowledge of contrary facts. And that Heyward was no less enthusiastic on July 15—with knowledge of those contrary facts—than he was on July 6, suggests that he was similarly aware of the contested IP on July 6.

218. Again, during a November 16, 2020 special call with investors, Heyward stated that, "We have important things coming forth with this one of-a-kind asset, and I am authorized to share today that we are now working with Marvel Studios on an important Stan Lee initiative, which we will be announcing shortly. Like everything that Stan Lee ever touched, I can assure all our shareholders, it will be significant, and the announcement will be worth the wait."

219. **Fact 2:** Genius admits that its management was focused on the Proxima arbitration related to the Stan Lee IP. On April 6, 2022, the Company filed its 2021 10-K. With respect to the arbitration between POW! and Proxima, the Company stated that the "matter was settled by POW! in November 2021, but the settlement

negotiations were costly and ***required diversion of management attention***." The fact that management was involved in the disputed IP means that Heyward and Denton were aware of the false statements about the IP made within the July 15, 2020 press release ***and*** the October 28, 2020 SPA because both statements were made *after* the Company received the July 7, 2020 letter disputing the Stan Lee IP. By the Company's own admission, the dispute over the IP had management's attention. They cannot claim ignorance to those facts.

220. **Fact 3:** Defendants had motive to keep Genius' stock price high for the October 28, 2020 offering of 37.4 million shares of Genius stock. The October 28, 2020 stock offering, which priced at $1.55 per share, would raise around $61.6 million for Genius, and, in turn, fund millions more in compensation to Heyward and Denton. That motive further supports an inference that Defendants *purposefully* omitted the dispute over the Stan Lee IP within the October 28, 2020 SPA's representations about Genius' intellectual property because the Offering price, or indeed the Offering altogether, would have been directly impacted had the truth been revealed.

221. **Fact 4:** Defendants had additional motive to keep Genius' stock price high to close and fund a merger with ChizComm, which was announced just weeks later. On November 16, 2020, Genius announced that it would be acquiring ChizComm Ltd., a marketing and media agency, as well as ChizComm Beacon Media, a media research planning and buying business. As part of the ChizComm transaction, Genius would pay $8.5 million in cash and issue to the sellers $3.5 million of Genius shares. The transaction also provided for potentially issuing the sellers an additional $8.0 million in Genius shares, subject to ChizComm hitting certain EBITDA targets.

222. The Company issued 1.9 million shares of Genius stock at $1.78 per share on February 1, 2021, and an additional 48,495 shares at $1.81 per share on February 4, 2021 for partial consideration of the ChizComm acquisition. Both share grants were made before the truth of the Stan Lee IP was revealed on March 30, 2021.

223. Thus, Defendants had both motive to keep Genius' stock price high to fund the acquisition with ChizComm, and to avoid any negative reaction that ChizComm management may have had if they had known the truth about the disputed status of the Stan Lee IP.

224. **Fact 5:** Defendants had motive to keep Genius' stock price high to induce certain investors to renegotiate their warrants on January 28, 2021**.** On January 28, 2021, before the market opened, the Company announced that it had entered into letter agreements with certain investors whereby those investors would exercise 39,740,500 warrants on Genius stock at an exercise price of $1.55 per share ("the January 28, 2021 Letter Agreements"). In exchange for exercising at $1.55 per share, those warrant holders received new warrants with a new strike price of $2.37 per share, which could be exercised up to five years from the initial issuance date. By exercising those warrants, the Company received gross proceeds of $61.6 million in cash (39.7 million shares times $1.55 per share exercise price).

225. In a Form 8-K filed with the SEC on January 28, 2021, the Company stated that it intended to use proceeds from the January 28, 2021 Letter Agreements to acquire intellectual property and/or companies in the children's family and entertainment space.

226. To induce such warrant holders to exercise their options, Defendants had strong motive to keep Genius' share price high, because a rational warrant holder would not exercise a warrant if the exercise price of that warrant were above the prevailing market price of the stock.[31] And the Company only receives proceeds if

[31] Because a warrant operates just like a call option, a warrant holder is entitled to share price appreciation above the exercise price. But the investor is not *required* to buy stock (and would not buy stock) at the exercise price if the exercise price was higher than the market price. For example, if a warrant holder could buy Genius stock for $1.55 (the exercise price), when the prevailing market price was $3.06 per share, the warrant holder would save the difference between the market price ($3.06 per share) and the exercise price of ($1.55 per share), which is $1.51 per share savings to (footnote continued)

those warrant holders exercise. On January 27, 2021—the day before the January 28, 2021 Letter Agreements—Genius' stock closed at $3.06 per share. So the Warrant Holders warrants were in the money – both at the initial exercise price of $1.55 per share and at the new exercise price of $2.37 per share. Both of those warrants' exercise prices were below Genius' market price of $3.06 per share on January 27, 2021. In other words, at the time the January 28, 2021 exercise transaction was announced, the renegotiated exercise price was in-the-money ($2.37 per share exercise, compared to $3.06 per share closing price the day before).[32] Had the exercise price not been in-the-money, the warrant holders would not have exercised their warrants—because they would have lost money doing so. Thus, the warrant exercise transaction, which netted Genius $61.6 million in gross proceeds, provides further motive and thus further supports scienter as to the Stan Lee IP statements because even with knowledge of contrary facts, Defendants continued to conceal the truth of their false Stan Lee IP statements all the way through the January 27, 2021 warrant exercise transaction.

227. **Fact 6:** Defendants' concealment of the July 7 Letter, until it was eventually disclosed on March 31, 2021, further supports scienter – particularly in light of the motive allegations above. When the truth of the Stan Lee IP transactions was revealed on March 30, 2021, Genius stock fell by 22.6% to close at $2.07 per share. But before that fall, Defendants used Genius' artificially inflated share price to: (1) raise $57.9 million through the October 28, 2020 equity offering; (2) fund the

---

the warrant holder. But if the market price were *less* than the exercise price, no rational investor would pay $1.55 per share when he or she could just pay, for example, $1.00 per share in the open market. Thus, only if the market price is higher than the exercise price would an investor elect to exercise a warrant.

[32] After the January 28, 2021 Letter Agreements were announced, Genius stock closed at $1.97 per share on January 28, 2021.

ChizComm acquisition on November 16, 2020; and (3) raise an additional $61.6 million in gross proceeds from the January 28, 2021 Letter Agreements.

228. Moreover, the initial complaint in this action was filed August 18, 2020, which was after Defendants received the July 7 Letter, but before they disclosed it. Thus, Defendants had the added motive to conceal the letter to avoid additional liability here. Indeed, because the First Amended Complaint was due February 1, 2021 (ECF 68), but Defendants did not disclose receipt of the July 7 Letter until March 31, 2021, Defendants were initially successful in avoiding disclosure of the July 7 Letter until after Plaintiffs' First Amended Complaint was filed.

229. Defendants' subsequent concealment of the details of the Proxima arbitration further supports scienter. Much like Defendants delayed disclosure of the July 7 Letter for ten months, Defendants also delayed disclosure of the resolution of the Proxima arbitration. On September 30, 2021, the Company entered into a loan agreement with POW! for $1.25 million, of which $1.0 million was used to settle the arbitration with Proxima. The remaining $250,000 of the loan was to be used to cover legal fees in connection with the Proxima arbitration. The Proxima arbitration was settled on or about November 4, 2021. Defendants did not disclose the settlement until they released Genius' 2021 10-K on April 6, 2022 and did not disclose the amount paid in the arbitration until Genius released its 2022 10-K on April 13, 2023.

230. **Fact 7:** the core operations doctrine supports scienter. On July 15, 2020, just eight days after the July 6 misrepresentations about the Stan Lee IP, the Company issued a press release describing the Company's "3 drivers of value", which were Kartoon Channel!; the Stan Lee Universe; and Rainbow Rangers. Thus, not only was the Stan Lee IP a core operation of Genius, it was also, purportedly, one of three primary value generators. Moreover, on November 17, 2020, in a form 8-K filed with

the SEC, the Stan Lee Universe was cited as one of the five pillars of asset creation that "individually and in the aggregate" were "driving long term value for Genius.[33]

**D. Additional Scienter Allegations That Apply to Defendants' Solicitation/PennyStocks Statements**

231. Defendants had motive to boost Genius' share price to keep the Company's NASDAQ listing, which supports scienter.

232. Heyward signed the March 11 SPA in California. Under California law, he is charged with the knowledge of its contents. He also signed the form 10-K issued March 30, 2020, which contained information about share grants given to the undisclosed stock promoter. By signing the 10-K, he is also charged with knowledge of its contents. Thus, Heyward knew both the solicitation representation and the contrary facts in the 10-K by the time that the May 7 2020 SPA was filed.

**E. Additional Scienter Allegations That Apply to All Statements**

233. **Fact 1:** the sheer number of false statements here supports an inference of a pattern-and-practice and that all the false statements were made purposely or with deliberate recklessness.

234. Defendants made at least six false statements during the Class Period. In addition to the four sets of permitted and actionable statements alleged above, Defendants also made more false or misleading statements. And while the additional false statements are not alleged to be independently actionable in this complaint, they do support the existence of scienter for the actionable statements because the

---

[33] For the same reasons, the Stan Lee IP statements were material. They were also material because, among other reasons, the Company's 2020 10-K stated that "protecting and defending against intellectual property claims may have a material adverse effect on our business." Moreover, in the Company's 2021 10-K, it stated under the heading "Legal Proceedings" that "… there were no material pending legal proceedings … *other than* described below." (emphasis added). And then below that heading, appeared a brief description of the Proxima arbitration, thus effectively admitting that it was material.

existence of *so many* false statements during the Class Period does not occur by accident (or negligently).[34]

235. The Court previously found that a June 15 statement about Arnold Schwarzenegger was actionable as a misleading statement, even if it failed to state a claim due to a failure to allege loss causation. *See* ECF 81 ("*Genius I*") at 17. That statement was made on June 15, 2020, when Defendants issued a press release with a headline that read, "Arnold Schwarzenegger Enters Into Agreement to Become Significant Investor in Genius Brands International" right above the statement "Schwarzenegger Will Receive Warrants in Genius Brands Under the Agreement for His Role Starring in and Co-Producing the New Animated Children's Series, Stan Lee's Superhero Kindergarten", giving investors the misleading impression that Schwarzenegger was both investing capital into Genius and receiving stock as compensation for his acting.

236. To dispel any doubt about whether the above June 15, 2020 Schwarzenegger statement was perhaps made innocently, or even negligently, compare it to an October 15, 2019 shareholder letter made before the Class Period in which Heyward stated, "Coinciding with the launch of *Stan Lee's Superhero Kindergarten*, Arnold Schwarzenegger, will not only star and co-produce with Genius Brands and Alibaba Group, but also becomes a significant shareholder in Genius Brands ***through his equity participation in lieu of other compensation***." (emphasis added). In other words, not only was the June 15, 2020 statement announcing Genius' involvement with Schwarzeneggar misleading *and* old news, but also the Class Period headline was purposefully made *more misleading* by removing the emphasized

[34] Again, to be clear, Plaintiffs are not alleging the additional statements discussed in this section are independently actionable. Pursuant to the Court's Order, Plaintiffs only allege that the four sets of statements alleged in §§ V.A – V.D are independently actionable. But the existence of the additional false statements discussed in § VI.E are alleged to support *scienter*.

portion of the pre-Class Period 2019 statement that previously clarified exactly how and why Schwarzenegger was becoming an investor in Genius. Yet the October 2019 statement did not generate a significant share price increase for Genius. So Defendants tried it again in 2020, except they made it more misleading on purpose. Accordingly, Defendants' June 2020 Class Period conduct involving Schwarzenegger makes it more likely that Defendants' four actionable sets of false statements were also made with scienter. It is all part of Heyward's pattern-and-practice to artificially inflate Genius' share price.

237. The Court also ruled that Heyward's June 8 statement about purported COVID resilience could potentially support a claim because it was inconsistent with the Company's May 18 risk disclosure statement. Indeed, the chart below—contrasting Heyward's (false) statements to the Company's (accurate) Risks Disclosures—shows *multiple* material inconsistencies, which further supports a pattern-and-practice of deliberate recklessness on Heyward's part (even if the COVID statements are not themselves independently actionable).

| Heyward | Company Filing |
|---|---|
| In light of the COVID-19 coronavirus, **will Genius Brands be affected like other businesses?**<br><br>The answer is simple. **No.**<br><br>March 20, 2020<br>Shareholder letter | The outbreak has potential to have an adverse impact on the entertainment industry and, if repercussions of the outbreak are prolonged, **could have a significant adverse impact on our business**, which could be material. **The Company's management cannot at this point estimate the impact of the outbreak o**n it's business and no provision for this outbreak are reflected in the accompanying financial statements.<br><br>March 30, 2020<br>2019 10-K |
| Heyward | Company Filing |
| Kartoon Channel! is what we like to call a "Netflix for kids," except it is free. There is no subscription fee. It is fully ad-supported. It is a pure cartoon play, with no | **The [COVID-19] outbreak . . . could have a significant adverse impact on our business**, which could be material. . . .the "Company's **management cannot at this point estimate the** |

| | |
|---|---|
| "natural predators," and what one of our board members described as **an "economic vaccine for COVID-19**."<br><br>May 13, 2020<br>Shareholder letter | **impact of the outbreak** on its business and no provision for this outbreak are reflected in the accompanying financial statements.<br><br>May 18, 2020<br>Q1 2020 10-Q |
| Heyward | Company Filing |
| **Further, we do not anticipate being impacted by COVID-19.** . The business of cartoons has historically had an appeal that is timeless, and is a rare asset class which has historically been resistant to typical market forces (e.g., the price of gold, oil, interest rates, elections, etc.). . . . We believe we **will see robust and accelerated revenue growth coming forth in this arena for the foreseeable future**.<br><br>June 8, 2020<br>Shareholder letter | **The Company's management cannot at this point estimate the impact of COVID-19 on its business** . . . We will continue to actively monitor the situation and may take further actions that alter our business operations . . . **It is not clear what the potential effects** any such alterations or modifications may have on our business, including . . . **on our financial results**.<br><br>August 14, 2020<br>Q2 2020 10-Q |

238. **Fact 2**: that Heyward texted Schecter of SEG on March 17, 2020 (just as he made his first false Rainbow Rangers statement) and said, "[w]e have litrally (sic) 20 stories backed up!" and "I wish you guys knew what I knew, i can't tell you now because I can't . . . But trust me soemthings (sic) huge are coming forth. Huge Just keep watching the news!!!" supports an inference of premeditation. Heyward was saying he had press releases already lined up—which cuts against any non-fraudulent inference that Defendants were releasing news organically as it occurred. Instead, the press releases were pre-written and timed to be released to artificially boost Genius' stock price.

239. Indeed, as highlighted by the re-purposing of the 2019 Schwarzeneggar statement in June 2020 (except made to be more misleading in 2020) and the misleading framing of the June 2020 Loesch appointment as somehow being new (even though it effectively happened years prior) shows that the June 2020 Loesch statements were just a pretext to hint at a Disney acquisition. Viewed holistically, they

cannot be explained as non-culpable, particularly when considering all of Heyward's additional conduct and pattern-and-practice.

240. Discovery in *Augenbaum* also revealed that certain of the Long-standing Investors (*i.e.*, the *Augenbaum* Defendants) referred to Heyward at various times, presumably during the Class Period, as "a schemer" and "a criminal." *See Augenbaum* ECF 263 ¶3.[35] Those are the same Long-standing Investors that repeatedly invested in the Company and presumably had insight into Heyward's state of mind during the Class Period. While crass and perhaps tongue-in-cheek, these Long-standing Investors were not describing Heyward as honest. And they knew him in the context of investing in securities offerings. Accordingly, Heyward's March 17 text to Schecter supports scienter because it supports an inference that Heyward had a manipulative plan or design in mind from the outset.

241. **Fact 3**: that the cash proceeds raised by the Company were used to funnel money to Heyward without meaningful board oversight and in concealed or misleading ways further supports scienter. For example, the 2020 10-K filed in March 2021 reveals that following the Company's various capital raises, Heyward was paid for $380,989 for purported "security costs" at his residence, which is clearly a pretext to make a self-directed transfer payment. Another example is how Heyward was paid $483,600 for purported "executive producing fees" on March 17, 2020 – but he concealed that March 17, 2020 payment until March 31, 2021, even though he issued a press release March 17, 2020 telling investors how he purportedly invested $1.0 million into the Company. That is, he touted his purported investment of $1.0 million, but concealed his receipt of just under half that amount, even though both transactions happened the same day. And that all this happened shortly after Heyward's August

[35] Though some of those same investors apparently tried to downplay their statements at their depositions. *See id.* (where one investor claimed to be "being facetious.").

31, 2019 statement that "Nobody is more focused on getting money in than me", further bolsters the inference.

242. **Fact 4**: the abrupt resignation of former CFO Dekic on March 4, 2022 supports scienter. Given the timing of her resignation (just before Genius 2021 10-K was filed) and the duration of Dekic's employment (just three months), the cogent and compelling inference is that Dekic saw something in Genius's financials and was uncomfortable attesting to the accuracy of them under her Sarbanes-Oxley obligations that all public company CFOs have. Moreover, that after Dekic left, Heyward again installed Denton to sign off on Genius' 2021 financials invites an inference that Denton was Heyward's yes man—willing to sign off on financials when Dekic—who had stronger credentials and more objectivity given she was brand new to the Company—was apparently uncomfortable doing so.

243. **Fact 5:** Defendants had a consistent motivation to keep the Company's NASDAQ listing. Defendants were motivated to keep Genius' NASDAQ listing throughout the Class Period. In a February 10, 2023 press release, Genius announced a 1-for-10 reverse stock split to boost Genius' share price and keep its NASDAQ listing. Heyward stated in that February 10, 2023 press release that "maintaining our listing on Nasdaq is of utmost importance given the anticipated milestones and visibility a Nasdaq listing provides." And while that statement attributing the "utmost importance" fell outside the Class Period, the reasons Heyward viewed having the public listing as beneficial—Company milestones and visibility to investors—applied equally during the Class Period. Indeed, when initially structuring the March 11, SPA, documents revealed in *Augenbaum* establish that complying with NASDAQ was a key consideration at the outset of the Class Period. That Heyward still cared about it nearly three years later, in February 2023, further supports the inference of scienter.

244. **Fact 6:** That on August 19, 2019, Heyward stated that he did not want to "writ[e] a check to keep the lights on", but he reversed course shortly thereafter and his change of mind to invest came *days before* his first of many false statements,

supports an inference that the catalyst that changed his mind to invest into Genius was advanced knowledge of the alleged scheme here. The catalyst could not have been his advanced knowledge about a looming expansion of Rainbow Rangers because that did not happen: Defendants' Rainbow Rangers statements were false. Defendants' Rainbow Rangers statement preceded even more false statements. And on the day of the first Rainbow Rangers statement, Heyward texted SEG that "[w]e have litrally (sic) 20 stories backed up!" What happened shortly after was *a series* of false or misleading statements and the later re-tweeting of a false story about Genius being sold to Disney. And then Heyward cashed out millions. So Heyward's initial reluctance to invest, combined with his change of heart—which immediately preceded a series of false statements—further supports scienter.

245. In sum, the allegations above support a broad inference of scienter that should be considered as part of a holistic analysis of any individual statement.

246. **A lack of insider selling does not cut against scienter given the SPA Lockup Agreement**. To help secure and induce the investors in the March 11 SPA to invest in Genius, the SPA contained a Lockup Agreement. That lockup agreement required Heyward to hold his shares obtained through the March 11 SPA for one year and 90 days (beyond the duration of the Class Period). The March 11 SPA's holding period differed from a standard lock-up agreement, which typically extends for no more than 180 days from the date of the Offering. So a lack of stock sales here does not cut against an inference of scienter because Heyward effectively traded his right to sell Genius shares before the first false statement alleged in the Class Period. He also used the proceeds of the capital raises to pay himself cash compensation multiples higher than what he invested.

## VII. LOSS CAUSATION

247. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's securities. Defendants' conduct, moreover, operated as a

fraud or deceit on Class Period purchasers of the Company's securities by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's securities declined significantly.

248. **PennyStocks partial corrective disclosure**. On June 4, 2020, famed short-seller Citron research—known for exposing public market frauds—issued a report that partially revealed the previously undisclosed risk that Genius was working with a stock promoter.

249. On this news, Genius shares fell by $1.07 per share on heavy volume, to $6.86 per share, thereby damaging investors.

250. **Rainbow Rangers corrective disclosure**. On June 5, 2020, Hindenburg Research published the Hindenburg Report which questioned the valuation of Genius and revealed the truth regarding Defendants' representations. Among other things, the Hindenburg Report showed that Rainbow Rangers was airing nine times per week rather than the 26-airings that Defendants represented. Additionally, the Hindenburg Report demonstrated that the shows were not airing in favorable time slots. Instead, the shows were broadcast daily at 3:49 a.m. and twice on Sunday mornings at 6:00 a.m. and 6:30 a.m. On this news, Genius shares fell $0.92, or 13.4%, to close at $5.94 per share on June 5, 2020, on unusually heavy volume.

251. The combination of (a) continued selling pressure from the revelations from the Hindenburg Report with (b), the Company's additional implied admissions, kept Genius shares pressured for the following two trading days: on June 8, 2020, Genius shares fell by $0.79 per share, or 14.3%, to $5.15 per share on heavy volume; and on June 9, 2020, Genius shares fell by $1.18, or 26.0%, to close at $3.97 on heavy volume, thereby damaging investors.

252. **PennyStocks second partial corrective disclosure**. In addition to the Hindenburg Report, on June 15, 2020, after the market close, *Seeking Alpha* published its own critical report about Genius, containing new revelations. In it, the report

posited that Genius likely engaged PennyStocks to pump Genius's stock. The report also analyzed various press releases issued by PennyStocks, concluding that once PennyStocks' campaign is over, Genius's "trading volume will decline drastically and investors might end up holding a worthless stock that might trade horizontally for years."

253. On *this news* (*i.e.*, the revelations about PennyStocks, and only those revelations), on June 16, 2020, Genius stock declined by approximately $0.67 per share, or 14.8% to close at $3.85 per share on heavy volume as investors digested the revelation from the *Seeking Alpha* report, including that Genius' shares had been artificially inflated by a previously undisclosed stock promoter.

254. The selling continued the next day and on June 17, 2020, when Genius shares fell by $0.75 per share, or 21.7% on heavy volume to close at $3.10 per share.

255. The *Seeking Alpha* report also discussed risks to Genius' business, such as competition with Disney, the risk that people were purportedly "moving away from ad-based services to subscription models" and that Genius had not delivered any meaningful growth in the last half decade, whereas its costs have risen dramatically. But the market did not react to *that* news because the only new material piece of news from the *Seeking Alpha* report was the statements related to Genius' theretofore undisclosed relationship with Penny stocks.

256. For example, in its Genius' 10-K for the year-ended December 31, 2019, which was filed on March 20, 2020, the Company disclosed, under its competition heading, that "We compete against other creators of children's content including Disney, Nickelodeon, PBS Kids, and Sesame Street as well as other small and large creators." So the *Seeking Alpha* analysis of competition revealed nothing new to the market. Moreover, Genius market cap, revenue, and losses had also been previously disclosed in the same 2019 10-K. As had the risk that "Because of the rapid growth of technology, shifting consumer tastes and the popularity and availability of other forms of entertainment, it is impossible to predict the overall effect these factors could

have on potential revenue from, and profitability of, distributing entertainment programming."

257. Indeed, the ***only*** piece of incremental news that the market reacted to following the June 15 *Seeking Alpha* report, was *Seeking Alpha's* analysis that found, buried within a Privacy Policy statement on an obscure website, that "Genius Brands or a third party might be promoting the stock to investors" and that once that promotion is over "the trading volume will decline drastically and investors might be end up holding a worthless stock that might trade horizontally for years." Accordingly, the significant price declines on June 16th and June 17th were solely attributable to the revelations about PennyStocks.

258. ***Insider Financial* (Disney/Netflix) corrective disclosure**. On July 2, 2020, Genius issued a press release touting that a "Key Business Development" would be announced on July 6, 2020. This vague announcement significantly boosted the Company's stock price, as the price rose from $2.31 on July 1, 2020 to $3.55 on July 2, 2020. Defendants' announcement on July 6, 2020, however, was another exaggerated press release whereby Genius announced the creation of a joint venture with POW! Entertainment regarding the intellectual property that Stan Lee purportedly created after his time at Marvel Entertainment but had no announcement about a sale to Disney or Netflix as had been intimated and misleadingly implied through the Company's ratification of a third-party analyst reported that speculated on such an outcome. As investors reacted to the realization that the Company had no intention to announce a sale on July 6, 2020, the price of Genius stock dropped significantly — from a close of $3.55 on the previous trading day to a closing price of $2.66 on heavy volume, thereby damaging investors.

259. **Stan Lee IP corrective disclosure**. Finally, on March 30, 2021, Genius released its purported collaboration with Marvel Studios for the Stan Lee IP, but did not disclose any financial terms, and also listed a narrower set of IP that it owns than was disclosed in the July 6, 2020 shareholder letter, revealing that contrary to

Heyward's representations on July 6, 2020, Genius could not monetize the Stan Lee IP as previously represented.

260. On this news, Genius shares fell $0.53, or 22.6%, to close at $2.07 on over 100 million shares traded, thereby damaging investors.

261. The following day, on March 31, 2021, before the market opened, Genius released its 2020 10-K, which, for the first time, disclosed receipt of the July 7 Letter and confirmed the market's deductions about the scope of the Stan Lee IP made the day prior.

**Applies to all statements**

262. Defendants' false and misleading statements and/or half-truths and/or market manipulation had the intended effect, and caused, the Company's securities to trade at artificially inflated levels throughout the Class Period.

263. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's securities fell significantly, causing real economic loss to investors who purchased the Company's securities during the Class Period.

264. The declines in the price of the Company's securities after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations and half-truths being revealed to investors and the market. The timing and magnitude of the price declines in the Company's securities negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to Defendants' fraudulent conduct.

265. The economic losses (damages) suffered by Plaintiffs and the other Class members were a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's securities and the subsequent significant decline in the

value of the Company's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII. CLASS ACTION ALLEGATIONS

266. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Genius securities between March 11, 2020 through July 5, 2020, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

267. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Genius's securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Genius' securities were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Genius or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

268. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

269. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

270. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Genius; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

271. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. UNDISCLOSED ADVERSE FACTS

272. The market for Genius's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, and/or market manipulation, Genius's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Genius's securities relying upon the integrity of the market price of the Company's securities and market information relating to Genius, and have been damaged thereby.

273. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Genius's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The

statements and half-truths were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Genius's business, operations, and prospects as alleged herein.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

274. The market for Genius's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Genius's securities traded at artificially inflated prices during the Class Period. On June 3, 2020, the Company's share price closed at a Class Period high of $7.93 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Genius's securities and market information relating to Genius and have been damaged thereby.

275. During the Class Period, the artificial inflation of Genius's securities was caused by the material misrepresentations and/or half-truths particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Genius's business, prospects, and operations. These material misstatements and/or half-truths created an unrealistically positive assessment of Genius and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities. Defendants' materially false and/or misleading statements and half-truths during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

276. At all relevant times, the market for Genius's securities was an efficient market for the following reasons, among others:

(a) Genius shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Genius filed periodic public reports with the SEC and/or the NASDAQ;

(c) Genius regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Genius was followed by securities analysts who wrote reports and/or issued public statements about the Company, and these reports and statements were publicly available and entered the public marketplace.

277. As a result of the foregoing, the market for Genius's securities promptly digested current information regarding Genius from all publicly available sources and reflected such information in Genius's share price. Under these circumstances, all purchasers of Genius's securities during the Class Period suffered similar injury through their purchase of Genius's securities at artificially inflated prices and a presumption of reliance applies.

## XI. NO SAFE HARBOR

278. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Where a forward-looking statement is accompanied by a non-forward-looking factual statement that supports

the forward-looking statement, cautionary language must be understood in the light of the non-forward-looking statement. If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language—short of an outright admission of the false or misleading nature of the non-forward-looking statement—would be "sufficiently meaningful" to qualify the statement for the safe harbor.

279. And while the paragraph above applies to all of Defendants' statements, it applies with particular force as to Defendants' Stan Lee IP statements. For example, the July 6, 2020 Stan Lee IP statements identified no factors about the Stan Lee Universe that might cause actual results to differ materially from those in any purportedly forward-looking statements. Indeed, the conference call discussing the July 6 statements (which were also alleged to be false) said only the following with respect to what factors may cause results to differ: "Investors are cautioned that all forward-looking statements involve risks and uncertainties, which may cause actual results to differ from those anticipated by Genius Brands at this time." That language is insufficient on its face because, among other things, it does not indicate that the actual results may differ ***materially*** from any purportedly forward looking statement, which is required for any cautionary language to qualify under the Safe Harbor. *See* 15 USC §78u-5(c)(1)(A)(i).

280. While the July 6, 2020 press release did include the word "materially" (unlike the July 6 conference call), it still failed to identify any factors related to the Stan Lee Universe such that any forward looking statements might be within the statutory Safe Harbor. Though the July 6, 2020 press release did vaguely refer to "various risks and uncertainties including without limitation those set forth in the Company's filings with the Securities and Exchange Commission (the 'SEC'), not limited to Risk Factors relating to its patent business contained therein", it did not specifically cite which SEC filings, nor incorporate by reference any particular risk factor from any particular SEC filing. And, even if the July 6, 2020 press release had

specifically incorporated the risk factors from Genius 2019 10-K (which it did not), the 2019 10-K says nothing about risks related to the Stan Lee Universe.

281. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## XII. FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

282. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

283. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Genius's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

284. Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Genius's securities in violation of Section 10(b) of the Exchange Act and SEC Rule

10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

285. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Genius's financial well-being and prospects, as specified herein.

286. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Genius's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Genius and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

287. Defendants had actual knowledge of the misrepresentations and/or half-truths of material facts set forth herein or acted with deliberate recklessness. Such defendants' material misrepresentations and/or half-truths were done knowingly or recklessly and for the purpose and effect of concealing Genius's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or half-truths alleged, were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

288. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Genius's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Genius's securities during the Class Period at artificially high prices and were damaged thereby.

289. At the time of said misrepresentations and/or half-truths, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Genius was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Genius securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

290. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

291. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## XIII. <u>SECOND CLAIM</u>

### For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

292. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

293. This Count is brought solely and exclusively under the provisions of Rule 10b- 5(a) and (c). Accordingly, Plaintiffs need not allege in this Count nor prove in this case that any of the Defendants made any misrepresentations or half-truths of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

294. During the Class Period, Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of the Company's securities; and (iii) cause Plaintiffs and other Class members to purchase the Company's securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, and as alleged more fully herein, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b- 5(a) and (c) promulgated thereunder.

295. Plaintiffs and the Class reasonably relied upon the integrity of the market in which the Company's securities traded. During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased the Company's securities, or if they had, would not have done so at the artificially inflated prices they paid.

296. As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

297. By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of the Company's securities during the Class Period.

## XIV. THIRD CLAIM
## Violation of Section 20(a) of The Exchange Act
## Against Heyward

298. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

299. Heyward acted as a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, Heyward had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

300. Heyward, moreover, was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. Heyward was provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, Heyward had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

301. Heyward had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

302. By reason of such conduct, Heyward is liable pursuant to Section 20(a) of the Exchange Act.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: March 3, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Raymond D. Sulentic*
Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Attorneys For Lead Plaintiffs*
*Ali Alavi and the A Legacy Foundation*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On March 3, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 3, 2025.

*/s/ Raymond D. Sulentic*
Raymond D. Sulentic