**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re Genius Brands International, Inc. Securities Litigation | No. 2:20-cv-07457-DSF-RAO<br><br>Order GRANTING in part and DENYING in part Defendants' Motion to Dismiss Plaintiffs' Third Amended Complaint (Dkt. 128) |

Defendants Genius Brands International, Inc. and Andy Heyward move to dismiss Plaintiffs' third amended complaint (TAC) for failure to state a claim. Dkt. 128-1 (Mot.). Lead Plaintiffs Ali Alavi and A Legacy Foundation oppose. Dkt. 130 (Opp'n). The Court deems this matter appropriate for decision without oral argument. See Fed. R. Civ. P. 78; Local Rule 7-15. For the reasons stated below, the motion is GRANTED in part and DENIED in part.

## I. Background

Genius Brands International, Inc. (Genius or the Company) is a multimedia company that licenses entertainment content for children, with a primary focus on children's cartoons. Dkt. 125 (TAC) ¶¶ 2, 29. During the class period, Genius's securities traded on the NASDAQ exchange under the ticker symbol "GNUS." Id.[1]

---

[1] The Company has since changed its name to Kartoon Studios Inc., and its securities now trade on the American Stock Exchange under the ticker symbol "TOON." TAC ¶ 2.

In July 2019, Genius's securities began trading below the $1.00 per share minimum bid price required by NASDAQ listing rules. Id. ¶ 33. On September 4, 2019, Genius received a letter from NASDAQ notifying the Company that it needed to come into compliance with NASDAQ's listing rules within 180 days (or by March 2, 2020). Id. To regain compliance and keep its NASDAQ listing, Genius's shares would have to maintain the $1.00 per share minimum for ten consecutive days. Id. ¶ 35. For the rest of 2019, Genius's shares continued to trade below the required minimum price. Id. Genius later received a 180-day extension from NASDAQ that gave it until August 30, 2020 to regain compliance. Id. ¶ 46.[2]

Plaintiffs allege Genius, facing imminent delisting, retained stock promoter PennyStocks.com (PennyStocks) to publish favorable articles about the Company to boost the price of its shares so that it could come back into compliance with NASDAQ rules. Id. ¶¶ 37-38. Plaintiffs allege Genius went on to make a series of materially false or misleading statements about the Company's business prospects and operations, artificially inflating the price of its securities. Id. ¶ 275. First, Genius issued a press release on March 17 announcing that Nickelodeon "again increased the broadcast of the Company's hit original preschool series, Rainbow Rangers, to 26 airings per week." Id. ¶ 56. But the truth was far less favorable—Rainbow Rangers was airing only 12 to 14 times per week. Id. ¶ 57. Then, in the Securities Purchase Agreement (SPA) for a May 7 direct offering of Genius shares, the Company represented that it had not hired anyone to solicit purchases of its securities, failing to disclose its relationship with PennyStocks. Id. ¶¶ 64-65.

Next, a June 22 post on Genius's Twitter account linked to an article published a day earlier by Insider Financial that "speculated that Disney or Netflix would buy Genius" and asserted: "We believe it's only a matter of time before Disney or Netflix buys Genius Brands International." Id. ¶¶ 89-92. Then, on July 2, Heyward, Genius's

[2] Except where otherwise indicated, the events the Court discusses took place in 2020.

founder and CEO, announced that Genius planned to reveal a "key business development update" on July 6, triggering some online speculation that the update would concern an acquisition of the Company by Disney or Netflix. Id. ¶¶ 96-97. But the July 6 update did not ultimately concern an acquisition, and Genius instead announced it would be entering into a "joint venture with POW! Entertainment regarding the purported intellectual property that Stan Lee created after his time with Marvel Entertainment[,]" including more than 100 original properties (the Stan Lee Universe). Id. ¶¶ 110, 114.

The next day, Genius received a letter from a law firm claiming that the Stan Lee Universe had already been sold to a company called Proxima Studios and alleging Genius was interfering with Proxima's contractual rights to that intellectual property. Id. ¶ 116. Genius did not publicly disclose the letter, or any other risks regarding its rights to the Stan Lee Universe, until March 30, 2021, when Genius issued a press release that "impliedly admitted that [it] did not control the same breadth of [intellectual property] that it" had represented in the July 6 announcement. Id. ¶¶ 116, 119.

Genius shareholders filed this putative class action alleging that Genius and Heyward violated § 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and implementing Rule 10b-5(a)-(c) by fraudulently: (1) concealing Genius's relationship with PennyStocks (PennyStocks Claim); (2) exaggerating the number of times per week Nickelodeon Jr. aired Genius's show Rainbow Rangers (Rainbow Rangers Claim); (3) misrepresenting that Disney or Netflix would acquire Genius (Disney/Netflix Claim); and (4) overstating its rights to the Stan Lee Universe (Stan Lee Claim). Plaintiffs also assert individual claims against Heyward under § 20(a) of the Exchange Act.[3]

On appeal from the Court's order granting Defendants' motion to dismiss Plaintiffs' second amended complaint (SAC), the Ninth Circuit

---

[3] Although earlier versions of the complaint included claims against Genius's former Chief Financial Officer Robert Denton, the operative complaint alleges Denton is a "relevant nonparty" and brings no claims against him. TAC ¶ 23.

found that Plaintiffs plausibly alleged that "Genius's representations regarding PennyStocks in its May 7 SPA were misleading, and Genius's statements regarding Rainbow Rangers, Disney/Netflix, and Stan Lee caused [Plaintiffs'] losses." In re Genius Brands Int'l, Inc. Sec. Litig. (Genius II), 97 F.4th 1171, 1190 (9th Cir. 2024). The circuit instructed the Court to determine on remand whether Plaintiffs alleged facts sufficient to show the remaining elements of the PennyStocks, Rainbow Rangers, Disney/Netflix, and Stan Lee Claims. Id.

On February 4, 2025, the Court granted in part and denied in part Defendants' renewed motion to dismiss the SAC, finding Plaintiffs adequately alleged the Rainbow Rangers Claim only, and dismissing the PennyStocks, Disney/Netflix, and Stan Lee Claims with leave to amend. See In re Genius Brands Int'l, Inc. Sec. Litig. (Genius III), 763 F. Supp. 3d 1027, 1054 (C.D. Cal. 2025). After Plaintiffs timely filed a third amended complaint, Defendants again moved to dismiss.

## II. Legal Standard

### A. Rule 12(b)(6)

Rule 12(b)(6) allows an attack on the pleadings for failure to state a claim on which relief can be granted. "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam). Allegations contradicted by matters properly subject to judicial notice or by exhibit need not be accepted as true, Produce Pay, Inc. v. Izguerra Produce, Inc., 39 F.4th 1158, 1161 (9th Cir. 2022); and the court is "not bound to accept as true a legal conclusion couched as a factual allegation," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (alteration in original) (quoting Twombly, 550 U.S. at 557).

A complaint must "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. This means that the complaint must plead "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. There must be "sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively . . . [and] the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

Ruling on a motion to dismiss will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)). "Dismissal under Rule 12(b)(6) is proper when the complaint . . . fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013).

"Normally, when a viable case may be pled, a district court should freely grant leave to amend." Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., 637 F.3d 1047, 1058 (9th Cir. 2011). Leave to amend should be granted even if the plaintiff did not request leave, unless it is clear that the complaint cannot be cured by the allegations of different or additional facts. Doe v. United States, 58 F.3d 494, 497 (9th Cir. 1995). "Leave to amend may also be denied for repeated failure to cure deficiencies by previous amendment." Abagninin v. AMVAC Chem. Corp., 545 F.3d 733, 742 (9th Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

**B. Heightened Pleading Standards**

Allegations of fraud are excepted from the "notice pleading" standard of Rule 8(a)(2). Swierkiewicz v. Sorema, N.A., 534 U.S. 506,

513 (2002). Under Federal Rule of Civil Procedure 9(b), fraud claims must be pleaded with particularity. Kearns v. Ford Motor Co., 567 F.3d 1120, 1126 (9th Cir. 2009). Fraud claims under Rule 9(b) must still meet Iqbal's plausibility standard. Cafasso, 637 F.3d at 1055. "[A] plaintiff must set forth more than the neutral facts necessary to identify the transaction." In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548 (9th Cir. 1994) (superseded by statute on other grounds). A plaintiff must include "an account of the time, place, and specific content of the false representations" at issue. Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007) (cleaned up). Fraud allegations must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003).

Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action." Oregon Pub. Emps. Ret. Fund v. Apollo Grp., Inc., 774 F.3d 598, 605 (9th Cir. 2014). The Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), "imposes additional specific pleading requirements, including requiring plaintiffs to state with particularity both the facts constituting the alleged violation and the facts evidencing scienter." In re Rigel Pharms., Inc. Sec. Litig., 697 F.3d 869, 877 (9th Cir. 2012). To adequately plead scienter under the PSLRA, "the complaint must 'state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.'" Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc. (Glazer II), 63 F.4th 747, 766 (9th Cir. 2023) (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)(A)). Under the "strong inference" standard, "a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007). The standard is then met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id.

## III. Discussion[4]

### A. SEC Rule 10b-5(b): Untrue Statement or Omission of Material Fact

The use of "manipulative or deceptive" practices "in connection with the purchase or sale of any security" is prohibited by § 10(b) of the Exchange Act. 15 U.S.C. § 78j(b). SEC Rule 10b-5, which implements § 10(b), prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Glazer II, 63 F.4th at 764 (quoting 17 C.F.R. § 240.10b-5(b)). To state a claim under § 10(b) and Rule 10b-5, a complaint must allege: "(1) a material misrepresentation or omission by the defendant ('falsity'); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Id. (cleaned up).

The only issues before the Court with respect to Plaintiffs' Rule 10b-5(b) claim are loss causation and scienter as to the PennyStocks Claim; scienter as to the Disney/Netflix Claim and the Stan Lee Claim; and reliance as to the Rainbow Rangers Claim.

#### 1. PennyStocks Claim

"The thrust of the PennyStocks Claim is that Genius misled investors when it represented in its May 7 SPA that it had not hired anyone to solicit its securities, when, in reality, it had compensated PennyStocks to publish favorable articles about Genius." Genius II, 97 F.4th at 1181. The Court previously dismissed the PennyStocks Claim

---

[4] The Court grants Defendants' unopposed requests for judicial notice of the Seeking Alpha report published on June 15, 2020, Genius's public filings, and historical stock price. See Dkt. 128-2; Dkt. 131-1. The Court also grants Plaintiffs' unopposed request for judicial notice of the Insider Financial report published on June 3, 2020, and the certified transcript from the November 6, 2023 oral argument before the Ninth Circuit. See Dkt. 130-1.

for failure to adequately allege loss causation and scienter. See Genius III, 763 F. Supp. 3d at 1040-45. Defendants argue that Plaintiffs' TAC fails to cure these deficiencies. See Mot. at 12-13, 16-18.

a. Loss Causation

To allege loss causation, a plaintiff must plead "that the defendant's misstatements (or other fraudulent conduct) artificially inflated the price at which the plaintiff purchased her shares" and that, "after purchasing her shares and before selling, the following occurred: (1) 'the truth became known,' and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 789 (9th Cir. 2020). "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." Id. at 790.

Plaintiffs advance a theory of loss causation for the PennyStocks Claim that relies on corrective disclosures, pointing to a report that was published on June 15 by financial analysis group Seeking Alpha. See Opp'n at 23-24.[5] The Seeking Alpha report "posited that Genius likely engaged PennyStocks to pump Genius's stock" and that the Company's "trading volume [would] decline drastically and investors might end up holding a worthless stock" after PennyStocks' campaign ended. TAC ¶ 252. The next day, Genius's stock price declined by 14.8%. Id. ¶ 253.

The Court previously found that Plaintiffs failed to plausibly allege that the Seeking Alpha Report constituted a corrective disclosure because it "was based entirely on publicly available information that was easily accessible and required no special analysis." Genius III, 763 F. Supp. 3d at 1042. Namely, the publicly available information underlying the report "was that PennyStocks published articles about Genius on its website and disclosed on that same website that it only

[5] Plaintiffs previously argued that, in addition to the Seeking Alpha Report, a tweet by activist short seller Citron Research was also a partial corrective disclosure concerning the PennyStocks Claim. See Genius III, 763 F. Supp. 3d at 1040. Plaintiffs no longer advance this argument. See Opp'n at 23-24.

publishes favorable information because it is compensated to only publish favorable information." Id. at 1041 (cleaned up). The Court explained that, although "[a] disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure[,]" such circumstances were not present in this case. See id. at 1041-42. Here, the publicly available information underlying the alleged corrective disclosure was "not at all complex," directly touched on the alleged misstatement, and required minimal effort to locate and analyze because the articles were on the same website as the disclosure that revealed their promotional nature. Id. at 1041.

Plaintiffs argue that the Court's prior determination is now "inapplicable" because the TAC additionally alleges "that PennyStocks was not widely known by investors; that hundreds of websites promote small and microcap issuers; and clarif[ies] that Seeking Alpha is not a short seller." Opp'n at 23-24 (internal citations omitted). The Court finds that these allegations do not alter the analysis in any meaningful way. The fact remains that the pre-existing public information at issue here was "readily available to the public, easily digestible in its native format, and understandable to a lay person," and not "tucked in a deep corner of the internet or buried in some unwieldy spreadsheet." Genius II, 97 F.4th at 1186; c.f. In re Galena Biopharma, Inc. Sec. Litig., 117 F. Supp. 3d 1145, 1190 (D. Or. 2015) (concluding that plaintiff adequately alleged corrective disclosure for analyst report that revealed defendant had paid stock promoter to publish favorable articles where there was "no allegation that the published articles linked to or otherwise referenced" the disclaimer that revealed their promotional nature on a separate and unrelated website).

Plaintiffs also argue that the TAC "clarified that it was the revelation *of the involvement of PennyStocks* that prompted Genius' share price decline following the *Seeking Alpha* report, not other factors." Opp'n at 24 (emphasis in original). The TAC alleges that the information about PennyStocks' promotional campaign was "the only new material piece of news" from the Seeking Alpha Report. TAC ¶ 255. But the only fact alleged in the TAC to support this conclusion is that Genius's 10-K for the year 2019 disclosed its market cap,

revenue, losses, and competition with other children's content creators, including Disney, and also acknowledged that it was "impossible to predict the overall effect of" factors like "the rapid growth of technology, shifting consumer tastes and the popularity and availability of other forms of entertainment . . . on potential revenue from, and profitability of, distributing entertainment programming." Id. ¶ 256. Seeking Alpha revealed far more in its report than the 10-K is alleged to have disclosed. For example, the report analyzed specific and current risks to Genius's business model, "questioning [the] 'hype' surrounding Genius's anticipated launch of [a] streaming platform for children by noting that 'the world is quickly moving away from ad-based services to subscription models' and Genius 'will be competing with the likes of popular brand names'" in streaming, such as Disney+. Genius III, 763 F. Supp. 3d at 1042 (discussing Seeking Alpha Report, of which the Court took judicial notice). The TAC's new allegations on this subject are mainly conclusory and do not meaningfully change the analysis.

The Court finds that Plaintiffs have failed to cure the deficiencies previously identified. The TAC does not plausibly allege loss causation as to the PennyStocks Claim.

b. Scienter

The PSLRA provides that, in a securities fraud action, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The exacting pleading requirements of the "PSLRA require[ ] plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194, and n.12 (1976)). "'Scienter' as used in the federal securities laws means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting In re NVIDIA Corp. Sec. Litig., 768 F.3d 1046, 1053, 1059 (9th Cir. 2014)).

Typically, a plaintiff in a securities fraud action is required to "plead scienter with respect to those individuals who actually made the false statements" at issue. Glazer Cap. Mgmt., LP v. Magistri (Glazer I), 549 F.3d 736, 745 (9th Cir. 2008). Although the Ninth Circuit has "not foreclose[d] the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate[,]" the circuit has framed "the doctrine of collective scienter . . . [as] an exception" to the rule of requiring individualized scienter pleadings. Id. at 744-45.

The Court previously found that Plaintiffs failed to allege facts sufficient to establish the requisite strong inference of scienter as to the PennyStocks Claim. See Genius III, 763 F. Supp. 3d at 1043-45. The Court explained that Plaintiffs had failed to allege that "any particular individual, whether Heyward, Denton, or some other corporate officer, was involved with drafting, reviewing, or approving the May 7 SPA and was also involved with or knowledgeable of the PennyStocks relationship," and that the circumstances here "do not merit an exception to individualized scienter pleading requirements." Id. at 1044-45.

Plaintiffs argue the TAC cures these pleading deficiencies by alleging that Heyward (1) signed the SPA in California and is "charged with knowledge of its contents" under state law; and (2) "signed the form 10-K issued March 30, 2020, which contained information about share grants given to the undisclosed stock promoter." TAC ¶ 232. According to Plaintiffs then, because Heyward signed both documents, he "knew both pieces of information, yet he still made a false statement in the SPA." Opp'n at 24-25. Defendants argue these new allegations are insufficient to plead scienter, noting "this is not a contract action," and the California law presumption that Plaintiffs "tout does not cure [their] failure to allege particularized facts that Mr. Heyward intended to deceive investors on this specific topic." Dkt. 131 at 4.

Plaintiffs' new allegations here have little impact on the Court's prior analysis. Although the TAC now alleges that it was Heyward who approved the May 7 SPA, Plaintiffs' new allegation concerning the 10-K issued on March 30, 2020 is too vague to speak to Heyward's

knowledge of the alleged PennyStocks relationship. That the 10-K disclosed "information about share grants" given by Genius to a stock promoter is unhelpful where the 10-K did not identify the stock promoter and never mentioned PennyStocks. See Dkt. 128-5 (Form 10-K).[6] This is particularly true considering that the TAC alleges Genius was paying Special Equities Group (SEG) to "raise capital" and assist the Company with securities transactions, and that Genius disclosed its relationship with SEG in the May 7 SPA, specifically in connection with the representations at issue here. See TAC ¶¶ 30, 48-49, 53-54.

The Court finds Plaintiffs have failed to cure the deficiencies previously identified. The TAC does not adequately allege scienter as to the PennyStocks claim.

**2. Disney/Netflix Claim**

The statement that forms the basis for the Disney/Netflix Claim is a June 22 post on Genius's official Twitter page retweeting a June 21 Insider Financial article that speculated about a buyout of Genius by Disney or Netflix. TAC ¶¶ 89-93. The article included the following statements: "Consider the shows in development and the depth of characters in the Genius Brands International portfolio. Disney bought Marvel for $4.2 billion. CEO Andy Heyward is following the Marvel playbook. ***We believe it's only a matter of time before either Disney or Netflix buys Genius Brands International***." Id. ¶ 92 (emphasis in original). According to Plaintiffs, the retweet "impliedly represented the accuracy of the Insider Financial analysis—including the conclusion that Genius would be sold to Disney or Netflix—and this was done on the Company's Twitter page[.]" Id. ¶ 89.

---

[6] Although Plaintiffs' use of the phrase "*the* undisclosed stock promoter" in connection with the 10-K could be read to refer to PennyStocks specifically, PennyStocks is not actually mentioned in the 10-K, so it would be more accurate to say the 10-K contained information about "*an* undisclosed stock promoter."

In Genius III, the Court dismissed the Disney/Netflix Claim for failure to adequately allege scienter:

> Considering the facts alleged, the inference that Defendants either intended the June 22 retweet to misrepresent Genius's prospects of being acquired by Disney or Netflix or were deliberately reckless to an obvious danger that investors would be so misled is "less cogent and compelling" than the opposing nonculpable inference, which is that Defendants intended to draw investor attention to the June 21 article because the article provided a counter-narrative to the critical reports Citron and Hindenburg had published about Genius. See Dkt. 115-12 (June 21 Article). The nonculpable inference is stronger because (1) the general tenor of the article is debunking short seller criticism, as reflected in the article's title: "Genius Brands Stock: Why the Shorts are Wrong"; (2) the article devotes only one paragraph to merger speculation; and (3) the paragraph on merger speculation is placed at the end of the article and two sections after the language quoted in the tweet. See id. The Court also agrees that if the intent had been "to create the impression that Genius would be acquired," that would have been better served by retweeting the June 3 Insider Financial article, which focused entirely on merger speculation, rather than "the June 21 article, which devoted almost nothing to that topic." Reply at 7 n.9.

Genius III, 763 F. Supp. 3d at 1049 (footnotes omitted).

Plaintiffs now argue the Court should reconsider this finding, claiming it "was premised, in part, on inaccurate facts." Opp'n at 7. Namely, Plaintiffs argue "Defendants falsely claimed that the June 3 Insider Financial article '*focused entirely* on a potential merger'" and contend this description "was blatantly false" because the article also "discussed several topics unrelated to merger speculation[.]" Id. at 7-8 (emphasis in original). Plaintiffs then claim "[t]he Court accepted,

quoted, and based its decision, in part, on [that] misrepresentation of the content of the June 3 article." Id. at 8.

Plaintiffs are mistaken. As an initial matter, the Court quoted the reply to describe Defendants' argument, not to assume facts outside the allegations of the SAC. Instead, the Court relied on the SAC, which alleged that Insider Financial published an article on June 3 "with the headline '*Will Netflix or Disney Buy Genius Brands International (NASDAQ: GNUS)?*'" and that the June 3 article's buyout speculation caused a surge in Genius's share price. See Dkt. 82 (SAC) ¶¶ 113-15. Based on the headline of the article and the impact plaintiffs alleged the article had on the market, the Court inferred that the article's content was consistent with its headline.

The TAC's new allegation that "the article was ***not*** solely focused entirely on merger speculation," but also addressed other aspects of Genius's business, see TAC ¶¶ 76, 78 (emphasis in original), does not meaningfully change the analysis. That the article discussed various aspects of Genius's business does not suggest that the headline does not speak to the article's broader focus. And, in any event, the Court's conclusion that the context of the tweet and the article it linked seriously undermine any inference of scienter can stand alone without any comparison between the June 3 and June 21 articles.

Plaintiffs also assert the Court "held Plaintiffs to a higher standard than is required," arguing that they adequately allege scienter based on the "plausible inference that Heyward was aware of the article's buyout speculation" because "knowledge of falsity or deliberate recklessness in making a false statement satisfies the scienter requirement." Opp'n at 9-10. Plaintiffs contend the non-culpable inference that "Heyward's specific *purpose*" for sharing the article was "responding to short sellers is irrelevant to his *knowledge* or *deliberate recklessness* regarding his false statement *about the Company being sold to Disney or Netflix*." Id. at 11 (emphasis in original). According to Plaintiffs then, "focusing on unchallenged portions of the June 22 re-tweet," *i.e.* anything other than the merger-related statements,

"misframe[s] the issue and repeat[s] arguments that the Ninth Circuit rejected." Id.

Plaintiffs are again mistaken. In Genius II, the circuit held that Plaintiffs plausibly alleged the June 21 Insider Financial article's assertions are attributable to Genius, Genius II, 97 F.4th at 1188 n.7, and, if Plaintiffs have adequately alleged all other elements of their Disney/Netflix Claim, then they have sufficiently pleaded the element of loss causation, see id. at 1190 (concluding that loss causation was plausibly alleged as to the Disney/Netflix Claim and instructing the Court to determine on remand whether Plaintiffs have alleged facts sufficient to show the remaining elements of that claim). As the Court explained in Genius III, the circuit made "clear that its attribution holding included the [June 21] article's statements regarding a possible buyout by Disney or Netflix" and so precludes any argument that the retweet "had ***nothing*** to do with any merger speculation" and "referred ***only*** to the article's positive statements about Heyward's response" to the short sellers. Genius III, 763 F. Supp. 3d at 1048 (emphasis added). Neither opinion suggests that the Court must now consider the article's statements concerning a possible buyout by Disney or Netflix in isolation. Indeed, adopting such an approach would be inconsistent with the standard for determining whether a statement is false or misleading in violation of Rule 10b-5.

The "central inquiry" in determining whether a statement or omission is misleading "is whether a reasonable investor would have been misled about the nature of his investment." Genius II, 97 F.4th at 1181 (quoting In re VeriFone Sec. Litig., 11 F.3d 865, 869 (9th Cir. 1993)). "This is an objective inquiry that requires [the Court] to assess 'whether an investor who had been reasonably diligent in reviewing' the statement or omission at issue 'would have been misled.'" Id. (quoting Durning v. First Bos. Corp., 815 F.2d 1265, 1268 (9th Cir. 1987)). A reasonably diligent investor would not have determined the meaning of the June 22 tweet by viewing one paragraph of the article to which the tweet linked in isolation from the broader context of the entire article and the tweet itself.

Considering the entirety of the statement at issue (the content of both the tweet and the article), the Court questions whether Plaintiffs have even *plausibly* alleged the requisite misleading statement. But the Court declines to decide that issue because the parties framed their arguments around the issue of scienter, which is determined under a heightened pleading standard.

In a securities fraud action, scienter "means the 'intent to mislead investors' or deliberate recklessness to 'an obvious danger of misleading investors.'" Glazer II, 63 F.4th at 765 (quoting NVIDIA, 768 F.3d at 1053, 1059). Deliberate recklessness "is a higher standard than mere recklessness and requires . . . 'an *extreme* departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" Id. (quoting Schueneman v. Arena Pharms., Inc., 840 F.3d 698, 705 (9th Cir. 2016)) (emphasis and second ellipsis in original). Under the PSLRA, the inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." Tellabs, 551 U.S. at 324. In other words, "an inference of fraudulent intent" that is "plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct" is not enough. Id. at 314.

The Court finds that, even if it was *plausible* that an investor who had been reasonably diligent in reviewing Heyward's tweet and the linked article would have been misled to believe that Genius was actually in the process of negotiating a buyout by Disney or Netflix, the allegations do not allow for a "cogent and compelling" inference that Heyward either intended the retweet to make such a representation or was deliberately reckless as to an obvious danger that the retweet would be understood as making such a representation. Plaintiffs' new or reframed allegations in the TAC are insufficient to overcome this deficiency. Genius's statements concerning Margaret Loesch cannot support scienter for the same reason they could not support a Rule 10b-5 claim—those statements neither "intimate that [*Loesch*] was engaged in or played a role in [Fox News's] sale [to Disney], nor do [they] state

or imply anything regarding a potential merger related to Genius." See In re Genius Brands Int'l, Inc. Sec. Litig., No. CV 20-7457 DSF (RAOX), 2022 WL 22908477, at *6 (C.D. Cal. July 15, 2022), aff'd in part, rev'd in part and remanded, 97 F.4th 1171 (9th Cir. 2024). And statements by Heyward expressing interest in selling Genius in the future at some undefined time and to some undetermined buyer, or optimism about potential value that could result from such a sale, cannot reasonably be understood as "expressly promising that Genius would be sold through a liquidity event . . . ." Compare Opp'n at 14, with TAC¶¶171, 175-79.

The Court finds that Plaintiffs have failed to cure the deficiencies previously identified. The TAC does not adequately allege scienter as to the Disney/Netflix Claim.

### 3. Stan Lee Claim

The basis of the Stan Lee Claim is that Genius misrepresented its rights to the Stan Lee Universe because it overstated the scope of its rights and failed to disclose the risk that those rights may be in dispute. TAC ¶ 165. The alleged misstatements include: (1) a July 6 press release claiming: "Jointly owned and subject to due diligence and documentation, the deal [with POW! Entertainment] will leave Genius Brands as the managing and controlling partner of the Stan Lee Universe joint venture"; (2) a July 6 shareholder letter claiming that the Stan Lee Universe would "assume worldwide rights, in perpetuity, to the name, physical likeness, physical signature, live and animated motion picture, television, online, digital, publishing, theme park, comic book, merchandising and licensing rights to Stan Lee and his IP creations past*, present, and going forward"; and (3) an October 28 SPA representing that it had not received "a clear written notice of a claim to Genius's [intellectual property] (or that of a subsidiary) and/or a claim that Genius is violating the [intellectual property] rights of any person . . . ." Id. ¶¶ 161, 164, 167-68. Plaintiffs allege these statements are false or misleading because Genius received a letter on July 7 from a law firm claiming that the Stan Lee Universe had already been sold to a company called Proxima Studios, which "exposed a material risk that Genius would not be able to monetize the Stan Lee [intellectual

property] consistent with the ways [the Company] represented in the July 6" press release. Id. ¶ 116.

Defendants argue the Stan Lee Claim must be dismissed because (1) the July 6 statements are protected by the PSLRA's safe harbor for forward looking statements; and (2) there are no allegations to suggest why "Genius would have expected the July 7 Letter to have a Material Adverse Effect as defined" in the October 28 SPA, which explicitly excluded from its scope any claims that "could not have or reasonably be expected to not have a Material Adverse Effect." Mot. at 15.

a. PSLRA Safe Harbor for Forward-Looking Statements

Even when all elements of a claim under § 10(b) are adequately pleaded, a "defendant may be protected under the PSLRA's 'safe harbor' provision for forward-looking statements." Glazer II, 63 F.4th at 767. The PSLRA's safe harbor provides as follows:

> [A]n issuer will not be liable with respect to any forward-looking statement if: (A) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; or (B) the plaintiff fails to prove that the statement "was made with actual knowledge . . . that the statement was false or misleading."

Id. (quoting 15 U.S.C. § 78u-5(c)(1)).

First, Plaintiffs argue the July 6 statements are not protected by the PSLRA's safe harbor because they were "mixed statement[s] that included representations about Stan Lee's 'IP creations past, present, and going forward.'" Opp'n at 19. But the phrase "past, present, and going forward" is clearly a description of the intellectual property that Genius planned to acquire through the POW! joint venture, and not a statement that the acquisition had already occurred. See TAC ¶ 164 (shareholder letter announcing joint venture between Genius and

POW! to create the Stan Lee Universe, which "will assume worldwide rights . . . to Stan Lee and his IP creations past*, present, and going forward"). The July 6 statements fall squarely within the PSLRA's definition of forward-looking statements, which "include[s] statements of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." Glazer II, 63 F.4th at 767 (cleaned up).

Plaintiffs also contend the PSLRA safe harbor does not apply here because there was "no adequate cautionary language" and there can be "an inference of actual knowledge" of falsity. Opp'n at 20. But the safe harbor provision does not require cautionary language where the forward-looking statement "is made without actual knowledge that it is false or misleading." Glazer II, 63 F.4th at 767. And Plaintiffs fail to allege the July 6 statements were made with actual knowledge that they were false or misleading because any facts alleged by Plaintiffs to suggest Genius's actual knowledge occurred *after* the statements were made. Plaintiffs do not allege Genius received the demand letter giving notice of Proxima's alleged claim to the Stan Lee intellectual property until July 7, and, although Plaintiffs allege Genius made additional statements concerning the Stan Lee intellectual property on July 15 and November 16, they allege no facts suggesting Genius knew or should have known there was any merit to the allegations in the July 7 letter at the time of those statements. See TAC ¶¶ 213-18.

The Court finds that the Stan Lee statements made on July 6, 2020 are protected from liability by the PSLRA's safe harbor provision for forward-looking statements.

b. October 28 SPA

In addition to their allegations concerning Genius's statements on July 6, Plaintiffs also allege that Genius made a false or misleading statement in the Representations and Warranties section of its October 28 SPA by representing that it had not received "a written notice of a claim or otherwise ha[d] any knowledge that the Intellectual Property Rights violate or infringe upon the rights of any Person, except as could

not have or reasonably be expected to not have a Material Adverse Effect." TAC ¶¶ 167-69. Plaintiffs argue this statement was false or misleading because the July 7 letter "represent[ed] a clear written notice of a claim to Genius's [intellectual property] (or that of a subsidiary) and/or a claim that Genius [was] violating the [intellectual property] rights of any person" and "the Company did have knowledge that the Intellectual Property Rights violate or infringe upon the rights of another person following the July 7 Letter." Id. ¶¶ 168-69.

Defendants argue Plaintiffs fail to adequately allege scienter as to the October 28 statement because there are no allegations to suggest Genius knew, or should have known, that the July 7 letter could have or reasonably could be expected to have a Material Adverse Effect as that term was defined in the SPA. Mot. at 15.

The Court finds three defined terms in the Representations and Warranties of the October 28 SPA to be of particular importance. First, the SPA defines "Subsidiaries": "All of the direct and indirect subsidiaries of the Company are set forth on the SEC Reports, other than newly formed subsidiary Stan Lee Universe, LLC, which has no assets or operations." Dkt. 128-7 at 10 (Oct. 28 SPA § 3.1(a)). Second, the SPA defines "Intellectual Property Rights" as follows:

> The Company and the Subsidiaries have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, trade secrets, inventions, copyrights, licenses and other intellectual property rights and similar rights necessary or required for use in connection with their respective businesses as described in the SEC Reports and which the failure to so have could have a Material Adverse Effect (collectively, the "Intellectual Property Rights").

Id. § 3.1(b). Third, the SPA defines "Material Adverse Effect" to mean any of the three effects described below:

> (i) a material adverse effect on the legality, validity or enforceability of any Transaction Document, (ii) a material

> adverse effect on the results of operations, assets, business or condition (financial or otherwise) of the Company and the Subsidiaries, taken as a whole, or (iii) a material adverse effect on the Company's ability to perform in any material respect on a timely basis its obligations under any Transaction Document.

Id. § 3.1(b).

Plaintiffs fail to allege the October 28 SPA's representations concerning intellectual property rights were false or misleading, let alone made with the requisite scienter. As the Court has explained, the "central inquiry" for determining if a statement or omission is misleading "is whether a reasonable investor would have been misled about the nature of his investment." Genius II, 97 F.4th at 1181 (quoting VeriFone, 11 F.3d at 869). The inquiry is objective, and it requires the Court to evaluate "whether an investor who had been reasonably diligent in reviewing the statement or omission at issue would have been misled." Id. (cleaned up).

The only intellectual property rights that Plaintiffs allege were addressed in the July 7 letter were the rights that Genius announced it would license from POW! Entertainment for its Stan Lee Universe joint venture. TAC ¶ 121. Because the October 28 SPA disclosed that Stan Lee Universe did not yet have any assets or operations, an investor that had been reasonably diligent in reviewing the document would not have been misled to believe that Stan Lee Universe had at the time *any* Intellectual Property Rights, let alone Intellectual Property Rights that could have had a Material Adverse Effect on Genius's business if there had been a dispute over them.

### 4. Rainbow Rangers Claim

Defendants argue that Plaintiffs fail to allege reliance as to the Rainbow Rangers Claim because they "did not trade for more than two months" after those statements were made and then "engaged in intensive, high-frequency trading off and on during certain weeks of the class period, with no trades in between[,]" and more than half of those

transactions occurred after the alleged corrective disclosure. Mot. at 22. According to Defendants then, this transaction history "severs any link between the alleged Rainbow Rangers Statement and Plaintiffs' trading decisions, precluding a finding of reliance." Id. at 21.

Defendants also attempt to shoehorn a standing argument into their reliance arguments, asserting that, absent allegations of reliance, Plaintiffs "cannot establish 'injury in fact' sufficient to confer standing." Id. at 20-21 (quoting Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754-55 (1975) (holding that offerees of a stock offering who had neither purchased nor sold any of the offered shares were "neither 'purchasers' nor 'sellers,' as those terms are defined in the 1934 [Securities Exchange] Act, and therefore" lacked standing to bring a § 10(b) claim)). But reliance and injury are distinct issues. Reliance, an *element* of a Rule 10b-5 claim, "ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), 573 U.S. 258, 267 (2014) (quoting Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 461 (2013)). Defendants' arguments speak to reliance, not standing.

Although "[t]he 'traditional (and most direct) way' for a plaintiff to prove reliance is to show that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation[,]" in Basic, the Supreme Court held that a Rule 10b-5 plaintiff "may also invoke a rebuttable presumption of reliance based on the fraud-on-the-market theory." Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys., 594 U.S. 113, 118 (2021) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 241-47 (1988)). "The 'fundamental premise' of the fraud-on-the-market theory underlying Basic's presumption is 'that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction.'" Id. (quoting Erica P. John Fund, Inc. v. Halliburton Co. (Haliburton I), 563 U.S. 804, 813 (2011)).

A defendant may "rebut the presumption through '[a]ny showing that severs the link between the alleged misrepresentation and either

the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" Id. (quoting Basic, 485 U.S. at 248). "So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply" and the plaintiff would be required to prove reliance directly. Halliburton II, 573 U.S. at 269 (citing Basic, 485 U.S. at 248-49).

Defendants do not appear to dispute that Plaintiffs' allegations are sufficient to invoke the Basic presumption of reliance, instead arguing that the presumption is rebutted by the trading certifications attached to the TAC, which Defendants claim "conflict with any claim of reliance on the Rainbow Rangers Statement or on the market's reflection of that information." Mot. at 22.

But Defendants cannot rebut the Basic presumption merely by offering the interpretation of Plaintiffs' trading certifications that is most favorable to their position. See Goldman Sachs, 594 U.S. at 125-26 (explaining that, to rebut the Basic presumption, a "defendant must 'in fact' 'seve[r] the link' between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat"). Plaintiffs allege facts sufficient to invoke the Basic presumption and have plausibly alleged the element of reliance for purposes of this motion. Whether Defendants can ultimately rebut that presumption is more appropriately determined at a later stage in the litigation.[7]

---

[7] Defendants' arguments concerning the Ninth Circuit's decision in Rambus are misplaced. Rambus considered the issue of reliance only as to the § 18(a) claim and affirmed dismissal of the claim under § 10(b) based on failure to adequately allege scienter. See Kelley v. Rambus, Inc., 384 F. App'x 570, 573 (9th Cir. 2010). Courts "require[ ] a purchaser's actual reliance on the fraudulent statement under § 18(a), as opposed to the constructive reliance, or fraud-on-the-market, theory available under § 10(b)." Howard v. Everex Sys., Inc., 228 F.3d 1057, 1063 (9th Cir.2000). Rambus affirming dismissal of

### B. Remaining Claims

For the same reasons explained in Genius III, the Court finds that Plaintiffs' claims under Rule 10b-5(a) and (c) and under § 20(a) of the Exchange Act are adequately alleged as to the Rainbow Rangers statements. Because Plaintiffs failed to cure the deficiencies identified in Genius III, the Court finds that Plaintiffs fail to state claims under Rule 10b-5(a) and (c) and under § 20(a) of the Exchange Act as to the PennyStocks, Disney/Netflix, and Stan Lee statements.

## IV. Conclusion

Defendants' Motion to Dismiss the TAC is DENIED as to the Rainbow Rangers Rule 10b-5(b), Rule 10b-5(a) and (c), and § 20(a) Claims. The Motion is GRANTED in part as to the PennyStocks, Disney/Netflix, and Stan Lee Rule 10b-5(b), Rule 10b-5(a) and (c), and § 20(a) Claims. The PennyStocks and Disney/Netflix Claims are dismissed with prejudice "for repeated failure to cure deficiencies by previous amendment." Abagninin, 545 F.3d at 742. Because this is the first time the Court has addressed the PSLRA's safe harbor provision and the October 28 representations, the Court GRANTS leave to amend as to Plaintiffs' Stan Lee Claim if, consistent with Rule 11, they can cure the deficiencies identified in this order.

Plaintiffs may file a Fourth Amended Complaint (4AC) no later than September 2, 2025. The 4AC must be complete in itself without reference to the TAC. The 4AC may not add new defendants or claims. If Plaintiffs seek to add new defendants or claims, they must file a noticed motion for leave to amend. Plaintiffs must submit a redlined version of any amended complaint to the chambers email. If Plaintiffs fail to file a timely 4AC, Defendants' response to the TAC will be due September 29, 2025.

---

the § 18(a) claim for "fail[ure] to sufficiently allege *actual* reliance," Rambus, 354 F. App'x at 573, is therefore irrelevant to the issue of reliance under the standard for claims under § 10(b).

IT IS SO ORDERED.

Date: August 5, 2025

Dale S. Fischer
United States District Judge